# 14-1634(L) & 14-1729(XAP)

## United States Court of Appeals

### for the

## Second Circuit

INCORPORATED VILLAGE OF GARDEN CITY AND GARDEN CITY
BOARD OF TRUSTEES,

*Defendants–Appellants*,

v.

MHANY MANAGEMENT, INC.,

*Plaintiff–Appellee–Cross Appellant*,

and

NEW YORK COMMUNITIES FOR CHANGE,

*Intervenor Plaintiff–Appellee–Cross Appellant,*

v.

NASSAU COUNTY,

*Defendant–Cross Appellee*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK (SPATT, D.J.)

**SPECIAL JOINT APPENDIX VOLUME I OF I (SJA 1 – SJA 212)**

*Counsel listed on inside cover*

Ira M. Feinberg
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
(212) 918-3000

*Attorney for Plaintiff-Appellee-Cross Appellant MHANY Management, Inc.*

Joseph D. Rich
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1401 New York Avenue, NW
Suite 400
Washington, DC 20005
(202) 662-8331

*Attorney for Plaintiff-Appellee-Cross Appellant New York Communities for Change*

Frederick K. Brewington
LAW OFFICES OF FREDERICK K.
BREWINGTON
556 Peninsula Boulevard
Hempstead, NY 11550
(516) 489-6959

*Attorney for both Plaintiffs-Appellees-Cross Appellants*

Michael A. Carvin
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
(202) 879-3939

*Attorney for Defendants-Appellants*

Robert F. Vanderwaag
NASSAU COUNTY
ATTORNEY'S OFFICE
1 West Street
Mineola, NY 11501
(516) 571-3954

*Attorney for Defendant-Cross Appellee*

# SPECIAL JOINT APPENDIX

## TABLE OF CONTENTS

| Docket Number | Description of Entry | Date Document Entered | SJA Page |
|---|---|---|---|
| 37 | Memorandum and Order Denying the Defendants' Motions To Dismiss | 07/21/2006 | SJA 1 |
| 315 | Memorandum of Decision and Order Granting Summary Judgment for Nassau County and Denying Summary Judgment for the Village Defendants | 02/15/2012 | SJA 15 |
| 413 | Memorandum of Decision and Order Regarding Liability | 12/06/2013 | SJA 116 |
| 423 | Memorandum of Decision and Order Regarding Remedies | 03/17/2013 | SJA 181 |
| 431 | Final Judgment | 04/22/2014 | SJA 203 |

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

№ 05-CV-2301 (JFB) (WDW)

————————————

ACORN (The New York Association of Community
Organizations for Reform Now),
New York ACORN Housing Company, Inc.,
Daphne Andrews, Vic DeVita,
Vernon Ghullkie, and Natalie Guerrido,

Plaintiffs,

versus

County of Nassau, Incorporated Village of Garden
City, and Garden City Board of Trustees,

Defendants.

————————————

MEMORANDUM AND ORDER
July 21, 2006

————————————

Joseph F. Bianco, District Judge:

Plaintiffs ACORN (The New York Association of Community Organizations for Reform Now), New York ACORN Housing Company, Inc., Daphne Andrews, Vic DeVita, Vernon Ghullkie, and Natalie Guerrido, bring this action against defendants County of Nassau, Incorporated Village of Garden City, and Garden City Board of Trustees, alleging that they have engaged in a long-standing pattern and practice of preventing African-American, and other Black and Hispanic persons from residing in predominantly white communities. Specifically, defendants allegedly engaged in exclusionary zoning that prevented affordable multi-family housing opportunities from being developed on a 25-acre parcel of Nassau County-owned property in Garden City, New York, in violation of the Fair Housing Act, 42 U.S.C. § 3601, *et seq*., the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982, and 1983, the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*, and the Equal Protection Clause of the Fourteenth Amendment. Defendants move pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) to dismiss the amended complaint, arguing that (1) plaintiffs do not have standing and, thus, this Court lacks subject matter jurisdiction, and (2) the amended complaint fails to state a claim upon which relief may be

granted. For the reasons that follow, the motions to dismiss are denied.

## I. THE FACTS

The facts are drawn from the amended complaint and are assumed to be true for purposes of these motions to dismiss.

### A. THE PARTIES

Plaintiff ACORN is a local chapter of a nationwide nonprofit corporate entity organized and existing under the laws of the State of Arkansas. (Am. Compl. ¶ 9.) ACORN is an advocacy group that endeavors to fight discriminatory local and state government decisions, and to promote more affordable housing and racially integrated housing opportunities for Long Island, New York residents. (*Id.* ¶ 10.) Plaintiff New York ACORN Housing Company, Inc. ("NYAHC"), is a not-for-profit community-based developer of affordable housing. NYAHC is incorporated in New York and was formed to develop, own, and manage affordable housing for families with low and moderate income. (*Id.* ¶ 12.)

All but one of the individually named plaintiffs are minority residents of Nassau County who do not live in Garden City, New York ("Garden City"), but have been seeking affordable residences in Nassau County in such areas as Garden City, and desire to live in Garden City. (*Id.* ¶¶ 5, 6, 7, 8.) Defendant Vic DeVita is a white man who resides in Garden City, and desires to live in a more integrated community. (*Id.* ¶ 4.)

Defendants in this case are County of Nassau, ("Nassau" or "Nassau County"), and Incorporated Village of Garden City and Garden City Board of Trustees (the "Garden City Defendants" or "Garden City"). (*Id.* ¶¶ 15, 16, 17.)

### B. ALLEGATIONS OF HISTORICAL PATTERNS AND POLICIES OF HOUSING SEGREGATION BY NASSAU COUNTY

The amended complaint alleges that Nassau County is one of the most racially segregated counties in all of the United States. (*Id.* ¶ 18.) Approximately 80% of Nassau County residents are white, and approximately 17% of Nassau County residents are African-American, other Black, or Hispanic ("minorities"). (*Id.* ¶ 19.) Approximately 84% of white Nassau County residents live in non-integrated, virtually all-white communities, whereas approximately 64% of all minority residents live in minority communities. (*Id.* ¶ 21.)

According to the amended complaint, Nassau County minorities have a disproportionate need for affordable multi-family housing that is not restricted to elderly persons. (*Id.* ¶ 22.) Nassau County is aware of the need for minority residents of affordable multi-family housing. (*Id.*) For many years, however, Nassau County allegedly has an express policy and practice to develop and promote the development of non-age restricted affordable housing only in predominantly minority and low-income areas of Nassau County, and to exclude such affordable housing from predominantly white communities. (*Id.*) This policy and practice was allegedly expressed in a 2000-2004 Nassau County Consolidated Plan, apparently prepared by Nassau County. (*Id.*)

The amended complaint also alleges that Nassau County supports, encourages, facilitates, and acquiesces in the efforts by local zoning authorities to enact exclusionary zoning laws and ordinances. (*Id.* ¶ 23.) This

2

prevents the development of non-age restricted affordable multi-family housing, allegedly done with the "purpose, intent or foreseeable effect of perpetuating racial and ethnic housing segregation throughout Nassau County and creating identifiable enclaves of nearly all-white residential communities, such as Garden City." (*Id.*)

Nassau County has received, and continues to receive federal subsidized housing funds from the Community Development Block Grant program ("CDBG"), and HOME program. (*Id.* ¶ 26.) These programs require, among other things, that Nassau County further fair housing, and use the funds in a manner that promotes racial integration. (*Id.*) Nassau County is required, under these programs, to collect data documenting the impact of its CDBG and HOME expenditures on racial and ethnic housing segregation. (*Id.*) The amended complaint alleges that, in violation of its obligations under CDBG and HOME, Nassau County has directed these funds only to low and moderate income communities with a disproportionate minority population. (*Id.*) This is done, allegedly, with the purpose of perpetuating racial and ethnic housing segregation throughout Nassau County. (*Id.*)

The amended complaint references a January 1974 district court opinion, *Acevedo v. Nassau County*, 369 F. Supp. 1384 (E.D.N.Y. 1974), as support for the proposition that Nassau County has opposed affordable and integrated housing based on race. (*Id.* ¶ 33.) In that opinion, the Court stated:

> By far, however, the most objectionable form of housing has been low-income family housing. It is clear from all the evidence that community opposition to this form of

housing had been racially motivated. In Nassau County low-income family housing is predominantly occupied by Blacks. Proposals for the construction of this form of housing have incurred immediate and vehement opposition. As can be expected such heated opposition has not been ignored by the elected officials of Nassau. There is evidence of more than one housing proposal being dropped because of vehement community opposition.

(*Id.* ¶ 33 (quoting *Acevedo*, 369 F. Supp. at 1389)). The amended complaint alleges that, notwithstanding this judicial finding, Nassau County still acquiesces in and impliedly consents to neighborhood and community opposition to the development of affordable multi-family housing and other housing opportunities disproportionately needed by minorities. (*Id.* ¶ 34.)

## C. ALLEGATIONS OF HISTORICAL PATTERNS AND POLICIES OF HOUSING SEGREGATION BY GARDEN CITY

According to the amended complaint, Garden City is, and has been for decades, a highly segregated, nearly all-white residential community located in Nassau County. (*Id.* ¶ 36.) The population of Garden City is approximately 95% white, with a total of only twenty-three African-American households (constituting approximately 1% of the Garden City population). (*Id.* ¶ 37.) By contrast, the Village of Hempstead, which directly borders Garden City on the South, has a population of which 84% are minority. (*Id.* ¶ 38.) Uniondale, which is located Southeast of Garden City, has a population of which approximately 79% are minority. (*Id.*) The Village of Westbury, which is located northwest of Garden City, has a population of which 43% are minority. (*Id.*)

3

The amended complaint alleges that Garden City has cooperated with, facilitated, and affirmatively acquiesced in Nassau County's segregative policies and practices. (*Id.* ¶ 35.) The amended complaint alleges that Garden City has continuously acted to reject and obstruct the creation of affordable multi-family housing opportunities by engaging in exclusionary zoning practices. (*Id.* ¶ 39.) In support of this allegation, the amended complaint alleges that, in or about April 1989, developers of an eighteen-acre parcel previously owned by Doubleday & Co., Inc., located at 501 Franklin Avenue in Garden City (the "Doubleday Site") proposed a plan to redevelop the Doubleday Site that would have included fifty-one units of affordable housing under then-current zoning. (*Id.* ¶ 40.) Residents of Garden City objected to the proposed Doubleday Site plan, and Garden City rejected the proposed plan, and adopted a plan that eliminated the possibility of an affordable housing development on the Doubleday Site. (*Id.*)

The amended complaint alleges that although Garden City repeatedly rejects multi-family development projects that would attract minority residents, it has not blocked the development of multi-family development projects that, by their design, are likely to attract white residents. (*Id.* ¶ 41.) As an example, the amended complaint points to the Wyndham, completed in 1989, which is a two-building, nine-story complex consisting of 319 luxury condominiums and rental apartments on twelve acres of land. (*Id.*) According to the amended complaint, the size and density of the Wyndham is significantly greater than the multi-family housing proposal that is at issue in this case. (*Id.*) Thus, Garden City has "encouraged and permitted" the building of certain luxury multi-family housing projects such as the Wyndham, that it

knew or should have know would be inhabited only by white residents. (*Id.*)

The amended complaint further alleges that Garden City has engaged in open and notorious conduct to exclude minority persons from Garden City, including (1) denying, in 1970, an application to a church to operate a day care center that would have served low-income families, (2) discriminately excluding minorities from using its public parks, and (3) numerous incidents reported by African-Americans of being harassed by Garden City police while walking, jogging, driving, and shopping in Garden City. (*Id.* ¶ 43.)

### D. THE CONSIDERATION FOR DEVELOPMENT OF THE SOCIAL SERVICES SITE

In or about May 2002, Nassau County began drafting a Real Estate Consolidation Plan (the "Consolidation Plan"). (*Id.* ¶ 44.) The purpose of the Consolidation Plan was to inventory the approximately 2,500 County-owned properties and consolidate, and sell as appropriate, those properties that were no longer necessary for County government operations. (*Id.*) One of the properties identified in the Consolidated Plan was in Garden City, and was known as the "Mineola Complex." (*Id.* ¶ 45.) The Mineola Complex is comprised of a courthouse, certain administration buildings, parking facilities, and twenty-five acres of land located at 101 County Seat Drive, Garden City (the "Social Services Site"). (*Id.*) The Social Services Site is comprised of 21.44 acres located on the Eastern side of County Seat Drive on which a social services building and a parking lot are located. (*Id.*) The additional 3.03 acres are located on the Western side of County Seat Drive on which the Old Laboratory Building and County Garage are situated. (*Id.*)

4

## E. GARDEN CITY CONSIDERS A PLAN FOR THE SOCIAL SERVICES SITE

In response to Nassau County's request, the Garden City Board of Trustees appointed a "P Zone Committee" to address issues relating to the Mineola Complex. (*Id.* ¶ 51.) Specifically, it hired planning consultants, the firm of Buckhurst Fish & Jacquemart, Inc. ("BFJ") to assist the Garden City Defendants in drafting re-zoning proposals in response to Nassau County's plan to sell and redevelop the Social Services Site. (*Id.* ¶ 51.)

During 2003, the P Zone Committee and BFJ held public workshops to discuss the development of the Social Services Site. (*Id.* ¶ 52.) They also met with representatives of Nassau County to discuss issues related to the County's proposed real estate consolidation, including the re-zoning of the Mineola Complex and the Social Services Site. (*Id.* ¶ 53.)

In its final proposal, BFJ recommended that a new zoning designation of "CO-5b" be used for the Social Services Site (the "Proposed Zoning'). (*Id.* ¶ 54.) Under the Proposed Zoning, the CO-5b zone would use existing residential multi-family zoning controls, commonly referred to as "R-M" zoning, and would allow single-family homes, townhouses, and apartments. (*Id.*)

Under the Proposed Zoning, and consistent with R-M zoning, a multi-family dwelling would be subject, *inter alia*, to the following limitations: (1) a maximum building height of thirty-five feet, or two and a half stories; (2) a restriction that the dwelling cover no more than 25% of the plot; (3) a requirement that at least 25% of the plot be open space; and (4) the maximum number of multi-family housing units be equal to one unit per 3000 square feet, or 14.5 units per

acre. (*Id.* ¶ 55.) Hence, the Proposed Zoning allowed for a maximum of 355 affordable multi-family units to be constructed on the twenty-five-acre Social Services Site. (*Id.*) In its proposal, BFJ contemplated the construction of a 311-unit multi-family housing development on the Social Services Site (the "Proposed Plan"). (*Id.* ¶ 56.) Each unit and lot would be sufficiently small in size so as to make it economically feasible for a developer of affordable multi-family housing to develop such housing. (*Id.*) The Proposed Plan stated that the Proposed Zoning permitted the development of housing that fit well with existing uses around the Social Services Site. (*Id.* ¶ 57.)

## F. NEIGHBORHOOD OPPOSITION TO THE PROPOSED ZONING

On January 8 and February 5, 2004, the Garden City Defendants held hearings on the Proposed Zoning of the Mineola Complex and the Social Services Site. (*Id.* ¶ 59.) During these public hearing, Garden City residents objected to the construction of affordable multi-family housing on the Social Services Site, and sought repeated assurances from the Garden City Defendants and Nassau County officials that no such housing would be built on the Social Services Site. (*Id.* ¶ 60.) The amended complaint alleges that this opposition was racially based. (*Id.*)

The amended complaint asserts that Nassau County acquiesced to Garden City and its residents by assuring them that it would not take any action antagonistic to Garden City's wishes and agreed with the Garden City Defendants to reject the Proposed Zoning and to permit only luxury housing to be built on the Social Services Site. (*Id.* ¶ 61.) Nassau County allegedly gave assurances that only luxury housing would be allowed to be developed on the Social Services Site, and

5

gave as a reason that given "the character of Garden City," only such housing "would be appropriate." (*Id.* ¶ 62.)

In June 2004, Garden City rejected the Proposed Zoning and Proposed Plan, and subsequently adopted a new zoning classification for the Social Services Site, designated "R-T," which had not previously existed under Garden City's proposed zoning ordinance ("Special Zoning"). (*Id.* ¶ 64.)

### G. DETAILS OF THE SPECIAL ZONING

According to the amended complaint, the new Special Zoning adopted by Garden City only applied to the Social Services Site. (*Id.* ¶ 64.) The Special Zoning imposed severe restrictions on the construction of multi-family homes. (*Id.*) These restrictions by their effect prohibited the development of affordable multi-family housing on the Social Services Site. (*Id.*) The Special Zoning permits multi-family dwellings only by special permission and only on the 3.03 acre plot on which the Old Laboratory Building and County Garage were located. (*Id.* ¶ 65.) In addition, the Special Zoning permits, at the very most, only thirty-six affordable multi-family housing units. (*Id.*) Even if special permission were obtained, the amended complaint alleges that the Special Zoning only allows one unit per 4000 square feet, as opposed to the one unit per 3000 square feet that was called for under the Proposed Zoning. (*Id.*) The result of the Special Zoning, according to the amended complaint, is that the only economically feasible development on the Social Services Site is for luxury single-family homes and townhouses, which are likely to attract and be inhabited by predominantly white residents. (*Id.*)

In rejecting the Proposed Zoning and adopting the Special Zoning, defendants

reasoned that there was a concern that the Proposed Zoning would cause increased traffic, and an increased burden on the school system from additional children that the Proposed Plan would cause. (*Id.* ¶ 70.) This, according to the amended complaint, was not the real reason the defendants rejected the Proposed Plan because Garden City's own consultants projected that the impact on traffic under the Proposed Plan would be negligible, and that there would only be a projected eighty-nine additional school children as a result of the Proposed Plan. (*Id.* ¶ 72.)

In May 2004, Nassau County objected to certain portions of the Proposed Zoning, but it supported and acquiesced in the Garden City Defendants' plan for the Social Service Site. (*Id.* ¶ 74.)

### H. NASSAU COUNTY ISSUES A REQUEST FOR PROPOSALS

In or about July 2004, after the Special Zoning was adopted, Nassau County issued a Request for Proposals ("RFP") for the Social Services Site that set forth an asking price for the Social Services Site of $30 million. (*Id.* ¶ 76.)

The amended complaint alleges that developers of affordable housing, including plaintiff NYAHC, were unable to respond to the RFP because the Special Zoning made it economically infeasible to develop affordable housing. (*Id.* ¶ 77.)

Immediately after NYAHC received the RFP, plaintiffs NYAHC and ACORN met with Nassau County officials to present an alternative proposal for leasing the Social Services Site that would enable Nassau County to meet its financial objectives while still providing affordable multi-family housing in Garden City. (*Id.*) Nassau

6

County and NYAHC conferred and traded financial information about plaintiffs' proposal. (*Id.*)

NYAHC's proposal called for it to lease the Special Services Site from Nassau County and develop multi-family housing containing both affordable and market-rate units. (*Id.* ¶ 78.) The rents for the affordable units would be below market and be based on the tenant's income and family size as compared to the Nassau County area median income. (*Id.*) NYAHC planned to fund this proposal through tax-exempt bonds, the low income housing tax credit, and other subsidies. (*Id.*) Nassau County never responded to NYAHC's proposal.

After NYAHC submitted its alternative proposal to Nassau County, it drafted an alternative development plan that included multiple scenarios that would comply with the Proposed Zoning. (*Id.* ¶ 80.) Under this alternative proposal, NYAHC would purchase the Social Services Site for the asking price of $30 million. (*Id.*) The alternative proposal provided for multi-family housing containing approximately 300 units, some of which would be affordable units for low income families, and others would be market-rate units. (*Id.*)

Nassau County selected a developer to develop the Social Services Site, and to construct only luxury single family dwellings and townhouses likely to attract only or virtually only white residents. (*Id.* ¶ 82.) This plan, according to the amended complaint, perpetuates and reinforces racial and ethnic housing segregation in Garden City and Nassau County. (*Id.* ¶ 84.)

## II. The Instant Action

Plaintiffs filed a complaint in this case on May 12, 2005, and the case was assigned to the Honorable Leonard D. Wexler. At a pre-motion conference on September 12, 2005, Judge Wexler stayed discovery. Plaintiffs filed an amended complaint on November 30, 2005. The amended complaint alleges that defendants violated (1) the Fair Housing Act (the "FHA"), 42 U.S.C. §§ 3601, 3608 *et seq.*; (2) the Civil Rights Act of 1866 and 1871, 42 U.S.C. §§ 1981, 1982, and 1983; (3) the Equal Protection Clause of the Fourteenth Amendment; and (4) the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* Plaintiffs ask this Court to declare, enjoin, and order that defendants stop discriminating, and develop the Special Services Site consistent with zoning that permits affordable housing, including provisions that will require the development of affordable and integrated housing units at the Social Services Site. On February 9, 2006, this case was reassigned to this Court. On March 10, 2006, defendants moved to dismiss the amended complaint. Oral argument was held on June 26, 2006.

## III. Discussion

### A. Applicable Law - Standing in Allegedly Discriminatory Zoning Cases

Under Article III, standing to bring a lawsuit in federal court is limited to a plaintiff who "show[s] that the conduct of which he complains has caused him to suffer an 'injury in fact' that a favorable judgment will redress." *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 12 (2004); *see also Ziemba v. Rell*, 409 F.3d 553, 555 (2d Cir. 2005). Further, among other standing requirements, "a plaintiff's alleged injury must be an invasion of a concrete and

particularized legally protected interest." *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 227 (2003) (opinion of Rehnquist, C.J., for a majority of the court); *see also Ziemba*, 409 F.3d at 554.

A plaintiff alleging "exclusionary zoning practices must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention."[1] *Warth v. Seldin*, 422 U.S. 490, 508 (1975); *Jaimes v. Toledo Metropolitan Hous. Auth.*, 758 F.2d 1086, 1097 (6th Cir. 1985). The harm does not have to be economic, indeed, "an interest in making suitable low-cost housing available in areas where such housing is scarce" can "support a plaintiff's standing." *Vill. of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 262-63 (1977).

In *Fair Housing in Huntington Comm. Inc. v. Town of Huntington*, the Second Circuit held that "to demonstrate the type of 'particularized injury' necessary for standing [in allegedly discriminatory zoning cases,] plaintiffs 'must allege facts from which it reasonably could be inferred' that, absent

defendants' challenged conduct, there is a 'substantial probability' that housing with greater minority occupancy would have been built in the [town]." 316 F.3d 357, 363 (2d Cir. 2003) (quoting *Warth v. Seldin*, 422 U.S. 490, 504 (1975)). As the Second Circuit explained, "[b]ecause construction of such housing largely depends on the actions of third-party builders and factors such as construction and real estate costs, it is not inherently obvious that plaintiffs' claimed injury is fairly traceable to the challenged conduct." *Fair Hous. in Huntington Comm.*, 316 F.3d at 363; *see also Warth*, 422 U.S. at 508 n.18 (noting that to challenge zoning laws a plaintiff does not have to have a "present contractual interest in a particular project and that "[a] particularized interest may be shown in various ways"). Although the government has no constitutional duty to provide low income housing, *see Acevedo v. Nassau County*, 500 F.2d 1078, 1080-81 (2d Cir. 1974), it may not obstruct "private projects beneficial to minority groups." *Acevedo*, 500 F.2d at 1081.

Plaintiffs' standing, or lack thereof, is proper for a court to consider at every stage of the proceedings. *Jackson*, 21 F.3d at 154; *see also Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 116 n.31 (1979) (noting that "it sometimes remains to be seen whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence adduced at trial").

### C. APPLICATION AS TO PLAINTIFFS' STANDING

Both sides direct this Court to Supreme Court precedent in support of their positions. Plaintiffs argue that *Arlington Heights* controls, and defendants argue that *Warth* is dispositive.

---

[1] The Court uses the same analysis to determine plaintiffs' standing under both the Equal Protection Clause and 42 U.S.C. §§ 1981, 1982, and 1983. *See Huntington Branch, NAACP v. Town of Huntington*, 689 F.2d 391 (2d Cir. 1982); *Jackson v. Okaloosa County*, 21 F.3d 1531, 1539 (11th Cir. 1994). Further, as the parties note in their briefs, standing analysis under the FHA is broader than for the constitutional claims. *See Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972). Hence, the Court does not engage in a separate standing analysis for the FHA claims as to each plaintiff because it finds standing exists under the more stringent constitutional analysis. *See, e.g.*, *Gladstone Relators v. Vill. of Bellwood*, 441 U.S. 91, 111-15 (1979).

8

In *Warth v. Seldin*, the Supreme Court held that the plaintiffs lacked standing because they relied on "little more than the remote possibility, unsubstantiated by allegations of fact, that their situation might have been better had [defendants] acted otherwise, and might improve were the court to afford relief." 422 U.S. at 507. In *Warth*, plaintiffs claimed that a town's exclusionary zoning policies prevented them from obtaining affordable housing. Because none of the plaintiffs in *Warth* had "a present interest" in the property, and because plaintiffs' desire to live in the area at issue depended on the actions of third party developers, the Supreme Court found that plaintiffs' lacked standing. *Id.* at 504-07.

In *Arlington Heights*, the plaintiffs claimed the Village of Arlington Heights engaged in exclusionary zoning when it denied a requested zoning change to a particular parcel of land. 429 U.S. at 258-59. The Supreme Court held that the developer's interest in constructing affordable housing, when coupled with the fact that a "specific project" was at issue, sufficiently gave the developer standing. *Id.* at 262. As to the individual plaintiffs in *Arlington Heights*, they had standing because the "particular project" at issue created an "actionable causal relationship" between the Village's zoning practices and the injury. *Id.* 429 U.S. at 264 (quoting *Warth*, 422 U.S. at 507).

At oral argument, defendants conceded that if this Court were to find that *Arlington Heights* controls, then this case would proceed because plaintiffs would have standing. As set forth below, the Court finds that, although neither of these cases are directly on point, the application of relevant Supreme Court and Second Circuit cases lead the Court to conclude that the facts as alleged by the individual and institutional plaintiffs in the

amended complaint sufficiently give them standing to pursue this case.

The Court first addresses standing for NYAHC, then ACORN, and then the individual plaintiffs.

### 1. NYAHC

NYAHC alleges, *inter alia*, the following facts in support of its standing argument: (1) NYAHC is an experienced developer that seeks to build affordable housing on the Social Services Site; (2) it developed and submitted a Proposed Plan in consultation with architects, and other developers whereby it would lease the Social Services Site from Nassau County, and it discussed this proposal with the County; (3) it has developed specific proposals to build multi-family low income housing that would conform to the Proposed Zoning and be financially viable; (4) it has expended significant money and resources to develop plans for the Social Services Site; and (5) it was prepared to develop the Social Services Site if the defendants did not discriminate against it by rejecting the Proposed Zoning in favor of the Special Zoning. (*See* Am. Compl. ¶¶ 12-14, 77-81.)

Based on the record before the Court, plaintiffs have successfully pled a particularized injury by defendants that, if remedied by the Court, will bring redress to NYAHC. This case is markedly different than *Warth* because here there is a particular site, and NYAHC alleges not only that it submitted a Proposed Plan, but also that it has developed an alternative plan that includes multiple scenarios for developing the Social Services Site. Indeed, the Supreme Court in *Warth* highlighted the fact that plaintiffs were depending "on the efforts and willingness of third parties to build" the housing. *Warth*, 422 U.S. at 505. Here, plaintiffs do not rely on a "third party" developer's efforts; rather,

9

the developer is NYAHC, a plaintiff in this case. *Jackson*, 21 F.3d at 1538 (distinguishing plaintiffs in *Jackson* from those plaintiffs who base claims upon "speculation about the possible actions of third parties not before the court") (quoting *Arlington Heights*, 429 U.S. at 264). The plaintiffs in *Warth*, therefore, are in a different position than NYAHC, who is challenging, in part, defendants' zoning restriction as it applies to the Social Services Site and NYAHC's Proposed Plan. *See id.* at 507.

Defendants argue that NYAHC lacks standing because it fails to allege that it attempted in any way to acquire a permit, submit a bid, or communicate with defendants regarding the RFP for the Social Services Site. (*See* Garden City Mem. at 12-13.) It is true that the developer plaintiff in *Arlington Heights* had entered into a ninety-nine year lease on the property contingent on securing zoning clearance, arguably giving that developer "more" of a property interest in that property than NYAHC has in the Social Services Site, but the difference is not significant. There is no precise formula for standing, indeed, as the Supreme Court has noted, "particularized personal interest may be shown in various ways." *Warth*, 422 U.S. 508 n. 18. Although NYAHC did not formally submit a bid in response to the RFP, it has alleged that immediately after receiving the RFP, it met with Nassau County to discuss an alternative Proposed Plan.

NYAHC also alleges that it developed specific proposals to build multi-family low income housing that complied with the Proposed Zoning, but apparently not the Special Zoning. Defendants' position is that even if NYAHC developed specific proposals, it still lacks standing because it never "put its foot in the water" by submitting it in response to the RFP. Based on the record before the

Court, this argument lacks merit. *See, e.g.*, *Jackson*, 21 F.3d at 1538 (holding that because plaintiffs had a "specific project" they were "easily distinguishable from the line of cases denying standing in housing project cases where no project was at issue"). Plaintiffs allege that submitting its admittedly non-compliant proposal in response to the RFP would have been futile because the discriminatory zoning made it financially impossible to build low income housing on the Social Services Site. Similar to the bidder in *Jackson* who submitted a bid but then did not complete the bidding process because the County policies made it futile, *see Jackson*, 21 F.3d at 1535, NYAHC alleges that it took substantial steps, and expended resources in preparing a plan, but did not formally submit it to defendants because it did not comply with the allegedly discriminatory RFP. NYAHC alleges that it did, however, contact and meet with Nassau County, submit a Proposed Plan, and follow-up with additional information, only to have the County ignore the Plan. Given these alleged facts, NYAHC has alleged a "particularized injury" that can be remedied by this Court. The law of standing is not so rigid so as to deny a developer standing, no matter how significant its "injury in fact," merely because it failed to submit a non-conforming proposal, knowing it will be summarily rejected. Thus, like the non-profit developer in *Arlington Heights*, and the plaintiffs in *Jackson*, NYAHC alleges that it has a proposal, expended money on particular plans for the Social Services Site, and "would benefit in a tangible way from the Court's intervention." *Warth*, 422 U.S. at 508.

Of course, the Court is cognizant of the fact that there is a chance that, even if plaintiffs are granted the relief they seek, NYAHC will still not build at the Social Services Site. Defendants correctly point out

10

that no formal proposal was submitted by NYAHC, and therefore, a complete plan, including financing, has never been reviewed by defendants. Other courts have held, however, that these types of uncertainties always exist in housing development cases, and should not be used as a means to defeat standing. *See, e.g.*, *Arlington Heights*, 429 U.S. at 260 ("[A]ll housing developments are subject to some extent to . . . uncertainties . . . . [A] court is not required to engage in undue speculation as a predicate for finding that the plaintiff has the requisite personal stake in the controversy."); *Huntington Branch, NAACP*, 689 F.2d at 394 (holding that on a motion to dismiss plaintiffs need only show that they would benefit from the court's intervention and that to require more "would be to close our eyes to the uncertainties which shroud human affairs").

Hence, based on the facts and claims as alleged in the amended complaint, the Court concludes NYAHC has standing to pursue its claims.

## 2. ACORN

ACORN does not assert claims on its behalf, but only on behalf of its members. (*See* Am. Compl. ¶¶ 9, 10, 11, 12.) An association such as ACORN may properly bring claims on behalf of its members "so long as 'the interests at stake are germane to [its] purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Fair Hous. in Huntington Comm.*, 316 F.3d at 363 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 181 (2000)); *Warth*, 422 U.S. at 490 ("Even in the absence of injury to itself, an association may have standing solely as the representative of its members.").

Defendants' standing arguments as to ACORN are similar to their arguments as to NYAHC, and are rejected by this Court. As articulated *supra*, the amended complaint sufficiently alleges that plaintiffs, including ACORN's members, have an injury in fact in that defendants have discriminately changed the Proposed Zoning, thereby preventing NYAHC from being able to build multi-family affordable housing on the Social Services Site. At this stage of the proceedings, the Court concludes that ACORN has standing to bring suit on behalf of its members.

## 3. INDIVIDUAL PLAINTIFFS

The individual plaintiffs allege, *inter alia*, the following facts in support of their standing argument: (1) all of the individually named plaintiffs who currently do not live in Garden City, seek to live in Garden City, and would probably move to Garden City if affordable housing were constructed; (2) the individually named plaintiff who does live in Garden City lives less than two miles from the Social Services Site and seeks to live in a more integrated community; and (3) if multi-family, low income housing is built on the Social Services Site, the plaintiffs who do not live in Garden City would probably move to the Social Services Site. (*Id.* ¶¶ 4, 5, 6, 7, 8)

Defendants' arguments as to the individual plaintiffs are similar to their arguments as to the institutional plaintiffs. They lack standing, according to defendants, because as a whole they fail to allege an injury in fact because there is no specific housing project in which they have been denied entry, and that their allegations are too speculative to give them standing to bring suit. (*See, e.g.*, Garden City Mem. at 16-17.)

11

As described *supra*, the individual plaintiffs in this case are in a different position than plaintiffs in cases where there is no developer, or where there is not particular project. *See, e.g.*, *Warth*, 422 U.S. at 508 n. 18 (noting that "the initial focus should be on a particular project"); *Hope, Inc. v. County of DuPage*, 738 F.2d 797, 806 (7th Cir. 1984) (finding lack of standing because plaintiffs failed to show the existence of a particular project); *Jaimes v. Toledo Metro. Hous. Auth.*, 758 F.2d 1086, 1096-97 (6th Cir. 1985) (same). In this case, the individual plaintiffs have asserted an "injury in fact" based on the presence of NYAHC and its commitment to development, as well as the existence of the Special Services Site. In addition, the individual plaintiffs have alleged that they have sufficient financial resources, and a desire to move to, the Social Services Site.[2]

Thus, at least at this stage, there appears to be a "substantial probability" that if this Court grants the relief sought, plaintiffs will be afforded the opportunity to move to the Social Services Site. *See Arlington Heights*, 429 U.S. at 264.

---

[2] Defendants argue that individual plaintiff Vic DeVita lacks standing because his "ostensible injury" is derivative of injuries to others. The Court rejects this position, based on the holdings of *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 210 (1972), and *Jackson*, 21 F.3d at 1539. Indeed, "the loss of important benefits from interracial associations" is an injury in fact to challenge violations of the Fair Housing Act, assuming, *inter alia*, that the "neighborhood in question" is relatively compact. *Jackson*, 21 F.3d at 1539. As DeVita has alleged several claims, including violations of the Fair Housing Act, the Court declines to dismiss his claims based on a lack of standing on defendants' motions to dismiss.

## D. MOTION TO DISMISS

### 1. APPLICABLE LAW

In reviewing a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, the court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). Dismissal is warranted only if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Weixel*, 287 F.3d at 145 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). The appropriate inquiry is "not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 106 (2d Cir. 2005).

### 2. APPLICATION

Defendants' motions to dismiss for a failure to state a claim are based, in part, on the presumption that plaintiffs' claims are similar to those in *Acevedo*, where the Second Circuit held, based on *Palmer v. Thompson*, 403 U.S. 217 (1971), that a town has "no constitutional or statutory duty to provide low income housing." *Acevedo*, 500 F.2d at 1080-81. Defendants contend that plaintiffs fail to state a claim based on their position that plaintiffs have failed to allege that "the plaintiff itself" will build housing. (*See* Nassau County Mem. of Law at 21 (citing *Huntington Branch, NAACP*, 844 F.2d at 936).) The Court rejects this very narrow reading of the amended complaint. Indeed, the amended complaint alleges that NYAHC has a Proposed Plan, and is prepared to build on the Social Services Site, but for defendants' discriminatory interference. *See Arlington Heights*, 429 U.S. 264; *Huntington*

12

*Branch, NAACP*, 844 F.2d at 936. Thus, defendants attempts to align the facts of this case as similar to those where plaintiffs rely on unnamed third parties, where plaintiffs did not have any particular site to build, or where plaintiffs merely speculated about desire to live in a particular area, is unavailing, given the facts as alleged by plaintiffs.[3] For these reasons, defendants' motions to dismiss those claims alleging violations of the FHA, Equal Protection Clause, and the Civil Rights Acts are denied, as plaintiffs have sufficiently stated a cause of action as to each of these claims.

Defendants also argue that plaintiffs have failed to plead intentional discrimination. This argument is rejected. Plaintiffs need only allege that animus against them was a significant factor in the position taken by the defendants in developing the Special Zoning. *See Huntington Branch, NAACP*, 844 F.2d at 936. There can be no dispute that the amended complaint has *alleged* discriminatory animus by defendants. (*See* Am. Compl. ¶¶ 22-24, 27-32). *See U.S. v.*

---

[3] Defendant Nassau County takes two different positions regarding the Proposed Plan submitted by NYAHC to the County. On the one hand, the County argues that because NYAHC failed to formally respond to the RFP, even with a proposal that was not in compliance with the Special Zoning, NYAHC lacks standing. On the other hand, however, when the County argues that plaintiffs have failed to state a claim, defendant submits that NYAHC created its own "obstacle" because it submitted a non-responsive proposal. Rather than consider the merits of the Proposed Plan, or the justifications submitted by NYAHC as to why it failed to submit a formal response to the RFP, the Court, at this juncture, assumes the facts as alleged in the amended complaint and finds that plaintiffs have standing, and have stated a claim upon which relief may be granted. *See Warth*, 422 U.S. 508 n.18 (noting that "particularized personal interest may be shown in various ways").

*Yonkers Bd. of Ed.*, 837 F.2d 1181, 1221 (2d Cir. 1987) (holding that discriminatory animus may be inferred based on the historical background, the sequence of events, statements, and departures from the normal procedures by the government entity). Thus, as *Huntington Branch, NAACP* explains, the burden then shifts to defendants to demonstrate that the zoning decision was taken to further a "legitimate, bona fide governmental interest and that no alternative would serve the interest with less discriminatory intent." *Huntington Branch, NAACP*, 844 F.2d at 936. As the amended complaint has sufficiently alleged discriminatory animus by defendants, and assuming the facts as alleged are true, the burden will shift after discovery, to defendants to show a legitimate government interest. Thus, on a motion to dismiss, the Court finds plaintiffs have sufficiently pled intentional discrimination.

Defendants also argue that plaintiffs have failed to state a claim under 42 U.S.C. § 3608 of the FHA, and failed to state a claim under 42 U.S.C. § 2000d, arguing that plaintiffs must challenge a particular grant under section 3608, and that 42 U.S.C. § 2000d cannot be used to challenge a zoning law. Here, defendants again ask this Court to take a narrow view of the allegations in the amended complaint. As to section 3608, the cases only require that the claims rely on grants that relate to section 3608 "housing or urban development." *See Evans v. Lynn*, 537 F.2d 571, 579 (2d Cir. 1975). Obviously, plaintiffs will not ultimately succeed unless they can show that particular grants were misused by defendants, but *Evans* does not stand for the proposition that a complaint does not state a claim unless a particular grant is identified. *Evans*, 537 F.2d at 578 (holding that the agencies administering grants have "an affirmative duty to encourage fair housing" and that and individual who is

13

injured has standing to challenge "administrative violations of statutory duties"). As to 42 U.S.C. § 2000d, the amended complaint alleges a historical and systematic pattern of racism by defendants, including the zoning decisions as to the Social Services Site. Thus, to the extent discovery shows defendants have violated the federal CDBG and HOME programs by administering them in a discriminatory manner, plaintiffs have successfully stated a claim upon which relief may be granted. *See Evans*, 537 F.2d at 578 ("Allocation of grants without assessing their impact on integration . . . may also increase the disparity between living styles by supporting 'white enclaves' while diverting funds which otherwise would have been used to alleviate ghettoization.")

The amended complaint sufficiently alleges that NYAHC is prepared to build affordable multi-family housing on the Social Services Site, but for the discriminatory policies and practices of Nassau County and Garden City. It further alleges that ACORN's members, and the individually named plaintiffs have the financial means and desire to move to the Social Services Site, should it be built. In addition, the amended complaint alleges that defendants have violated the FHA, and 42 U.S.C. § 2000d by using federal money in a discriminatory manner. Under the standards for a motion to dismiss, and assuming the facts as alleged in the amended complaint are true, plaintiffs have stated claims upon which relief may be granted.

## V. CONCLUSION

For the foregoing reasons, defendants' motions to dismiss the amended complaint are denied. The parties shall proceed with discovery in accordance with the direction of Magistrate Judge Wall.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: July 21, 2006
Central Islip, NY

* * *

Plaintiffs are represented by Frederick K. Brewington, Esq., Law Offices of Frederick K. Brewington, 50 Clinton Street, Ste. 501, Hempstead, New York 11550, and Paul B. Sweeney, Esq., Kim F. Bridges, Esq., Michael Starr, Esq., of Hogan & Hartson LLP, 875 Third Avenue, New York, New York 10022, and Megumi Sakae, Esq., of Proskauer Rose LLP 1585 Broadway, New York, New York Defendant County of Nassau is represented by David B. Goldin, Esq., Nassau County Attorney's Office, One West Street, Mineola, New York 11501. Defendants Incorporated Village of Garden City, and Garden City Board of Trustees are represented by James G. Ryan, Esq., of Cullen & Dykman LLP, 101 Quentin Roosevelt Boulevard, Garden City, New York 11530.

14

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
MHANY Management Inc., Vic DeVita, and
Francine McCray,

|  |  |
|---|---|
| Plaintiffs, | **MEMORANDUM OF** |
|  | **DECISION AND ORDER** |
| -and- | 05-CV-2301 (ADS) (WDW) |

New York Communities for Change, Inc.,

Intervenor - Plaintiff,

-against-

County of Nassau, Incorporated Village of
Garden City, and Garden City Board of Trustees,

Defendants.
-----------------------------------------------------------X
**APPEARANCES:**

**Hogan & Hartson LLP**
*Attorneys for the Plaintiffs Vic DeVita and Francine McCray*
875 Third Avenue
New York, NY 10022
   By: Sabrina Helene Cochet, Esq.,
      Jenny Rubin Robertson, Esq.,
      Joanna F. Wasick, Esq.,
      Stanley Joseph Brown, Esq.,
      Toby William Smith, Esq.,
      Peter Joseph Dennin, Esq., of Counsel

**Law Offices of Frederick K. Brewington**
*Attorneys for the former Plaintiff ACORN and the*
*Intervenor-Plaintiff New York Communities for Change, Inc.*
50 Clinton Street, Suite 501
Hempstead, NY 11550
   By: Frederick K. Brewington, Esq., of Counsel

**Lawyers' Committee for Civil Rights Under Law**
*Attorneys for all Plaintiffs and the Intervenor-Plaintiff*
*New York Communities for Change, Inc.*
1401 New York Avenue, NW
Suite 400
Washington, DC 20005
      By:    Joseph D. Rich, Esq.,
              Linda H. Mullenbach, Esq., of Counsel


**Nassau County Attorney John Ciampoli**
*Attorney for the Defendant County of Nassau*
Office of the Nassau County Attorney
1 West Street
Mineola, NY 11501
      By:    Esther D. Miller, Assistant County Attorney
              Andrew Reginald Scott, Assistant County Attorney
              Ralph J. Reissman, Assistant County Attorney
              Bethany Bresnaider O'Neill, Assistant County Attorney
              David Bruce Goldin, Assistant County Attorney

**Cullen and Dykman, LLP**
*Attorneys for the Defendants Incorporated Village of Garden*
*City and Garden City Board of Trustees*
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
      By:    James G. Ryan, Esq.,
              Jennifer A. McLaughlin, Esq., of Counsel

**SPATT, District Judge.**

      In 2005, several individual plaintiffs and organizations commenced a lawsuit

against the Defendants the County of Nassau (the "County Defendant"), the Incorporated

Village of Garden City, and the Garden City Board of Trustees (collectively, the "Garden

City Defendants").  Briefly, the Plaintiffs allege that the Defendants discriminatorily re-

zoned two parcels of Nassau County-owned land that were located in Garden City to

prevent the building of low- and middle-income housing on that site.  The Plaintiffs further

allege that this decision was part of a long-standing racially discriminatory policy

maintained by the Defendants. Based on these allegations, the Plaintiffs assert claims

pursuant to the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq.; 42 U.S.C. § 1981; 42

U.S.C. § 1982; 42 U.S.C. § 1983; and 42 U.S.C. § 2000d et seq. In response, the

Defendants deny any wrongdoing, and assert that they have no racially discriminatory

policies. Six years have now passed since the suit's initial filing, and there have been

dozens of depositions, the exchange of thousands of documents, expert analyses and

thousands of hours of attorney time.

Now pending before the Court is a series of motions. First, both the County

Defendant and the Garden City Defendants have separately moved, pursuant to Rule 56(c)

of the Federal Rules of Civil Procedure, for summary judgment dismissing the entirety of

both the Plaintiffs' amended complaint and the intervenor complaint. In addition, the

Intervenor-Plaintiff New York Communities for Change, Inc. ("NYCC") has moved to

amend its intervenor complaint to include an additional cause of action that was

inadvertently omitted.

## I. BACKGROUND

The Court has taken the facts described below from the parties' depositions,

affidavits, exhibits, and respective Local Rule 56.1 statement of facts. Upon consideration

of a motion for summary judgment, the Court shall construe the facts in the light most

favorable to the non-moving party. See Capobianco v. New York, 422 F.3d 47, 50 (2d Cir.

2001).

## A.  Factual Background

### 1.  The Parties

Vic DeVita is a white male who resides in Garden City, New York.  (Garden City "GC" 56.1 ¶ 1.)  Francine McCray is an African-American female who seeks affordable housing in a racially integrated and diverse area of Nassau County, including Garden City.  (GC 56.1 ¶ 2.)  The Plaintiff MHANY Management Inc. ("MHANY") is a non-profit community based developer of affordable housing incorporated in New York.  (GC 56.1 ¶ 4.)  MHANY was formerly known as New York ACORN Housing Company Inc. ("NYAHC"), which was previously a plaintiff in this action.  The Intervenor-Plaintiff New York Communities for Change, Inc. ("NYCC") is a non-profit entity organized under the laws of the State of New York and formed in December 2009.  (Nassau County "NC" 56.1 ¶ 4; GC 56.1 ¶ 6.)  NYCC is the practical successor to another former plaintiff in this action, the New York Association of Community Organizations for Reform Now ("ACORN").  (NC 56.1 ¶ 6.)

Nassau County ("the County") is a municipal corporation organized under the laws of the State of New York.  (NC 56.1 ¶ 1.)  The Incorporated Village of Garden City ("Garden City") is a municipal corporation also organized under the laws of the State of New York and located in Nassau County.  (NC 56.1 ¶ 2.)  The Garden City Board of Trustees ("the Board") is an elected governing body in Garden City, from which the Garden City offices responsible for all development in Garden City derive their power.  (NC 56.1 ¶ 3.)

4

### 2. Affordable Housing Options in Nassau County

The Plaintiffs' expert Nancy McArdle, who conducted an analysis of racial change and segregation in Nassau County, reports that as of the year 2000, Nassau County was ranked in the top half of top 1% of all counties in the United States for segregation of African-Americans and in the top 10% of all such counties for segregation of Hispanics. (McArdle Decl. ¶ 6.) Specifically, the population of Nassau County in 2000 was 74% white, 10.3% African-American and 10% Hispanic. (Plaintiffs' Amended Statement of Additional Material Facts ("SAMF") ¶ 12.) Minorities comprised 14.8% of all households in Nassau County, but 31.1% of renter households, 41.4% of very low-income households, and 53.1% of non-elderly, very low-income households. (McArdle Decl. ¶ 49.) In Nassau County, family subsidized housing, which serves a predominantly minority population, tends to be located in high-minority areas, while senior citizen housing, which serves a much lower minority population, tends to be located in much lower minority areas. (McArdle Decl. ¶ 52.) Over half of the County's affordable housing units are located in municipalities with minority shares that are over three times the County average, while two-thirds of subsidized housing for senior citizens are located in municipalities with minority shares below the County average. (McArdle Decl. ¶ 53.)

While the County has a persistent need for affordable housing, the County has noted that "affordable housing sponsors are often confronted with strong neighborhood opposition to proposed low and moderate income developments." (SAMF ¶ 244.) The previous Deputy County Executive for Economic Development, Patrick Duggan, testified that "people who don't want people of different races living in their communities and local

communities elect their elected officials to do the will of the people." (SAMF ¶ 245.) He further stated that "local municipalities have been demonstrated to use zoning to keep out — to use it as a way to keep people out." (Duggan Dep. at 107:12-20.)

### 3. Affordable Housing Options in Garden City

Garden City has a population of approximately 21,750 individuals and has approximately 6,480 residences, of which approximately 1,095 are units contained in multi-family dwellings. (GC 56.1 ¶¶ 104-05.) Garden City's population is over 90% white. (SAMF ¶ 1.) As of the 2000 Census Report, minorities comprised 4.1% of the Garden City population, as opposed to 20.3% of the County's population. (McArdle Decl. at ¶ 17.) Between 1980 and 2000, the minority population of the County increased by 105%, while the minority population of Garden City increased by only 31.4%. (McArdle Decl. at ¶ 17.) It is important to note that according to the Plaintiffs' expert, 61% of the Village's African-American population was living in dormitories in 2000, and thus excluding this population significantly alters these statistics and perhaps paints a more realistic picture of Garden City's demographics. If one looked only at people living in households in 2000, and not in group quarters such as dormitories, the minority share of Garden City's population was just 2.6% of the population (versus the 4.1% above), as compared to 19.7% in the County (versus the 20.3% above).

To the east and south of Garden City are the municipalities of East Garden City, which in 2000 was 67% minority, Hempstead, which in 2000 was 84% minority, and Uniondale, which in 2000 was 79% minority. (SAMF ¶ 5.) In 2000, 2.3% of households in Garden City were headed by an African-American or Hispanic person, compared to

6

15.3% of Nassau County households.  (SAMF ¶ 7.)  If minorities comprised the same share of Garden City households as they did of Nassau County households, Garden City would have 1,333 African-American or Hispanic households, versus the actual total of 167. (SAMF ¶ 9.)  There are "no low- and moderate-income census tracts or block groups in the Village of Garden City."  (SAMF ¶ 3.)  None of the multi-family dwellings that Barbara K. Miller, the former mayor, identified in Garden City offer affordable housing as an option. (SAMF ¶ 168.)  McArdle reported that because of the lower income distributions of minority families, increasing the number of affordable units in a community would increase the number and share of minority households who could afford to live in that community. (McArdle Decl. ¶ 12.)

Former Nassau County Executive Suozzi has stated that "Garden City . . . historically, has been viewed as a community that didn't want to have affordable housing in it."  (SAMF ¶ 98.)  To that end, Garden City residents have expressed their opposition to affordable housing in Garden City in the past.  (SAMF ¶ 174.)  Garden City asserts that in the past twenty-seven years it has not received any applications from any developer of affordable housing and in the history of the village has no record indicating that any such application has ever been filed,.  (GC 56.1 ¶¶ 106-08.)  The Plaintiff disputes this fact based upon: (1) a news article from April 21, 1989, which stated that "a preliminary application [was] submitted . . . by the owners of Doubleday to develop the 18-acres Franklin Avenue property" (Ex. 78 at PM000005); and (2) a news article from May 26, 1989, which contained quotations from Doubleday's owner and developer that he "applied for a building permit under the existing zoning in accordance with which it would build 51

units of affordable housing at the site." (Ex. 38; Ex. 37.) The Garden City Defendants contest the Court's consideration of these articles as hearsay.

In May 2006, the County announced that it intended to sell a parcel of land located in Garden City, the Ring Road site, for the purpose of developing affordable housing in Garden City and Nassau County. (SAMF ¶ 191.) In order for the project to go forward, the Board needed to rezone the site from commercial to multi-family residential. However, Garden City residents expressed opposition to the construction of affordable housing in the town. (SAMF ¶¶ 193-99.) In 2006, Garden City increased the amount of residential space available in its hotel district to allow for the development of more luxury condominiums. (SAMF ¶ 202.) As of May 2011, there were only three areas zoned for multi-family use in Garden City, none of which contain affordable housing. (SAMF ¶ 203.)

### 4. Allegations of Other Discriminatory Acts in Garden City

In early 1969, the Unitarian Universalist Church of Central Nassau proposed to open a subsidized day care center in Garden City, in which the majority of children served would be African-American. (SAMF ¶ 208.) The proposal led to numerous lawsuits and petitions, in which opponents argued that the center would create traffic problems, reduce property values, and change the character of the neighborhood. (SAMF ¶ 209.) The Plaintiffs also allege that between 1987 and 1989, the Board imposed a moratorium on new construction to gain tighter control over housing development in Garden City. (SAMF ¶ 213.)

As another example of alleged discriminatory acts, in 2004, the New York State Attorney General investigated complaints that Garden City enforced a local requirement

limiting the use of its parks to Garden City residents in a racially discriminatory manner. (SAMF ¶ 215.)  In a press release dated May 12, 2005, the New York State Attorney General stated that "Garden City park attendants routinely question black non-residents about their residency and refuse them entry into the parks, while permitting white non-residents to enter and use the parks without questioning their residency."  (Pls.' Ex. 43.)  In the wake of this investigation, Garden City adopted policies and procedures to ensure that local regulations were not enforced in a racially discriminatory manner.  (Pls.' Ex. 43.)

### 5. The County's Real Estate Consolidation Plan

Former County Executive Thomas R. Suozzi began serving his first term in January 2002, at which time the County faced a severe fiscal crisis.  (NC 56.1 ¶¶ 18, 20.) Specifically, the County was struggling to address many County facilities that had fallen into disrepair after years of neglect.  (NC 56.1 ¶¶ 22-24.)  In response to this problem, County Executive Suozzi created a real estate consolidation plan to sell surplus property and maximize the revenue from those sales to invest in refurbishing other County facilities. (NC 56.1 ¶ 25; Cohen Dep. at 16.)  County Executive Suozzi appointed Sheldon Cohen as Director of the Office of Real Estate Planning and Development for the County.  He retained the real estate consulting firm Insignia ESG to advise the County on how to sell surplus and/or underutilized County property and return the profit to the tax rolls.  (NC 56.1 ¶¶ 27-35.)

The consolidation plan included a twenty-five acre parcel of land located within the boundaries of Garden City, which housed the Nassau County Supreme Court, County administration buildings, and parking facilities (hereinafter "the Social Services site").

(GC 56.1 ¶ 8; NC 56.1 ¶ 38.)  At this time, the Social Services site was designated as a "Public P-Zone" under Garden City's zoning code and thus only permitted buildings owned by governmental entities for governmental purposes.  (GC 56.1 ¶ 13; NC 56.1 ¶ 37.) The County represents that in selling the Social Services site, its "only concern" was maximizing revenues from the sale of the property and, therefore, it asked Garden City to re-zone the property in a manner consistent with that goal.  (NC 56.1 ¶¶ 39-43, 57; GC 56.1 ¶¶ 11, 14.)  County Executive Suozzi testified that it was his understanding that zoning which permitted multi-family housing and upscale units would maximize revenue.  (NC 56.1 ¶¶ 44-45.)  Suozzi further stated that he did not want single-family homes on the Social Services site because multi-family housing would fetch a higher purchase price. (NC 56.1 ¶¶ 47-48.)  However, Suozzi did not want to build affordable housing on the Social Services site, but rather housing similar to "The Wyndham," an upscale apartment complex located in Garden City that exceeds six stories, as he felt that this type of housing would garner a higher sale price.  (NC 56.1 ¶¶ 49-53.)

### 6. The Re-Zoning of the Social Services Site

Though the County asked Garden City to re-zone the Social Services site, it maintains that Garden City and its Board possessed the sole authority to make zoning determinations over the construction, location and usage of buildings within Garden City, including real property owned by the County located within Garden City.  (NC 56.1 ¶ 54.) Plaintiffs dispute this assertion, arguing that (1) the County initiated the re-zoning process; (2) the County "touted" the fact that it "partnered" with Garden City in that process; and

(3) the County admits that it failed to engage in serious negotiations with Garden City regarding the process. (Pls.' NC Resp. at 2-3.)

In June 2002, Garden City created a sub-committee (hereinafter "the Committee") which was comprised of three members of the Board — Peter Bee, chair of the Committee, Gerard Lundquist and Peter Negri. The Committee was charged with retaining a planner to review zoning options for the Social Services site, (GC 56.1 ¶ 15; NC 56.1 ¶ 58.) The Committee was also given the task of reviewing the proposed zoning options and making recommendations to the Mayor and the Board. (NC 56.1 ¶ 58.) On recommendation of the Committee, Garden City retained Burkhurst Fish and Jacquemart (hereinafter "BFJ") as its planners. (NC 56.1 ¶ 59; GC 56.1 ¶ 16.)

In September 2002, Garden City Village Administrator Robert Schoelle, Jr. wrote to County Executive Suozzi to advise him that any zoning associated with the proposed development should be in accordance with the goals set forth in the Garden City Zoning Code, i.e. consistent with the surrounding neighborhoods in terms of scale and design. (NC 56.1 ¶ 60.) Schoelle further represented that Garden City would cooperate with the County provided that the County "acknowledge the legitimate interests of the Village to control and guide land uses". (NC 56.1 ¶ 61.) At a September 24, 2002 address to the Garden City Chamber of Commerce, County Executive Suozzi mentioned multi-family housing as a possible use if the County sold the Social Services site. (NC 56.1 ¶ 62.)

By memorandum dated October 8, 2002 and addressed to the four Garden City Property Owners Associations, Schoelle stated that the "County Executive's apparent goal is to sell surplus properties and raise the maximum money for the County . . . . However,

the Village's goals are not necessarily identical to the County's goals . . . . It is apparent that we realize . . . that the County's and Village's interests could conflict and that the Village will work diligently to protect the character and residential quality of our Village." (NC 56.1 ¶ 63.)

By memorandum dated November 15, 2002, titled "Potential Approach to 'P' Zone Changes," and addressed to the Committee, BFJ recommended that Garden City should borrow from its already existing zoning regulations and apply something similar to the "CO-2" zone, allowing for commercial and office use, as well as residential use on the southern part of the property. (NC 56.1 ¶¶ 64-65.) Specifically, BFJ suggested that the regulations for residential use include a maximum density of one unit per 2,300 square feet of lot area, which would permit as many as 770 units on the property. (NC 56.1 ¶¶ 66-68; SAMF ¶ 39.)

Following an April 18, 2003 meeting with the Committee, Schoelle, Special Counsel John Kiernan, and Superintendent of the Garden City Buildings Department Michael Filippon, BFJ issued a memorandum on April 30, 2003 proposing the creation of the "CO-5" zone, which would include a "multifamily residential, group" (hereinafter "R-M") zoning control and ultimately allow for 311 units on the Social Services site. (NC 56.1 ¶¶ 70-73.) Under the proposed zoning, the density would allow garden apartments or townhouses. (NC 56.1 ¶ 73; GC 56.1 ¶ 21.) BFJ memorialized this recommendation in a report entitled "Village of Garden City – A Zoning Study for Public P District" on May 12, 2003. (NC 56.1 ¶ 76; GC 56.1 ¶ 20.) This study stated that the proposed CO-5 zone for the Social Services site "is seen as a transitional area between existing single-family homes

12

neighborhoods and current commercial development. . . . We propose using the existing R-M zoning controls . . . R-M allows 14.5 units per acre. At the Social Services site this would allow a total of 311 units . . . [and] would also allow single-family homes . . . which would allow a total of approximately 75 units." (NC 56.1 ¶ 77.)

On May 2, 2003, Village Administrator Schoelle wrote to Nassau County Real Estate Director Cohen, stating, in part, that "[t]he tentative consolidation proposals are cause to remind you that the Village has building and zoning regulations that should be respected. In particular, we call your attention to . . . the Code of . . . Garden City . . . which requires site plan review and approval . . . It is our belief that the County must comply with the Village's zoning and building regulations and requirements." (NC 56.1 ¶ 75.)

By memorandum dated May 19, 2003 and addressed to Schoelle, BFJ stated that the "contemplated zoning designation would allow office and residential uses . . . . Given the weak office market, the site would most likely be developed for either single-family homes or apartments." (NC 56.1 ¶ 80.) The memorandum further compared the sales value of the property if sold under the single-family home designation, as opposed to the multi-family designation, and concluded that the sales value of the property under the latter designation far exceeded that of the former. (NC 56.1 ¶ 81.) Specifically, the comparison, provided by an appraiser and three local realtors, concluded that the sales value and land value of the property under the multi-family designation would be, respectively, $155.5 million and $31 million dollars, while those figures under the single-family designation would be $86.2 million and $17 million dollars. (NC 56.1 ¶ 81.)

13

On May 29, 2003, BFJ presented its study to Garden City at a public forum. (NC 56.1 ¶¶ 82-83; GC 56.1 ¶ 25.) On July 9, 2003, BFJ issued a revised version of the study, which again included the proposal that Garden City zone the Social Services site under the "CO-5 zone, which would permit residential development of either 311 apartment units or approximately 75 single-family homes." (NC 56.1 ¶¶ 84-85; GC 56.1 ¶ 31.) According to the Plaintiffs, R-M zoning controls would permit the construction of affordable housing developments. (Pls.' GC Resp. at 3.) On August 19, 2003, County Executive Suozzi, Cohen and other County personnel met with the Committee and Frank Fish of BFJ to discuss the County's concerns with the rezoning proposal; specifically, County Executive Suozzi stated that the County wished to maximize the sale of the land and therefore desired a density of at least 400 more apartment units. (NC 56.1 ¶¶ 86-87.)

After meeting with the Committee on September 29, 2003, BFJ reported via memorandum that the Committee favored residential development and, specifically, the R-M designation. (NC 56.1 ¶¶ 87-88.) Several reasons were stated for this preference, including the ability to "Afford both young and older Garden City residents the ability to either establish themselves as homeowners in Garden City or remain in Garden City after their home may be sold; Transition between single-family housing and the County office buildings . . . ; Reduce the traffic generation . . . ; [and] Moderate impacts on the public school system." (NC 56.1 ¶ 89.)

On October 17, 2003, a notice was placed in the Garden City News entitled, "Tell Them What You Think About the County's Plan for Garden City," which stated:

> Where is the Benefit to Garden City? Are We Being Urbanized? . . . The County is asking the Village to change our existing zoning – P (Public use) ZONE – to allow

14

the County to sell the building and land . . . now occupied by the Social Services Building, to private developers.  Among the proposed plans: Low-density (high-rise?) housing – up to 311 apartments . . . These proposals will affect ALL of Garden City.

(NC 56.1 ¶ 92.)  On October 23, 2003, BFJ presented its proposal to Garden City at a second public forum and again stated that single-family homes, townhouses, or apartments would be permitted under the proposed zoning.  (NC 56.1 ¶¶ 90-91; GC 56.1 ¶¶ 33-34.)

In a memorandum setting forth the agenda for a November 6, 2003 meeting between BFJ and the Committee, and in a November 10, 2003 memorandum to the Committee, BFJ again confirmed its proposal for R-M zoning in the Social Services site.  (NC 56.1 ¶¶ 93-94.)  In November 2003, BFJ issued another Zoning Study, its third report, confirming its proposal for the R-M designation that allowed for a possible 311 apartment units on the Social Services site.  (NC 56.1 ¶ 95.)  On November 19, 2003, Committee Chair Peter Bee wrote a letter on the Committee's behalf endorsing the recommendations contained in BFJ's November 2003 Zoning Study, including that which proposed 311 multi-family apartment units on the Social Services site.  (NC 56.1 ¶ 96.)

On January 8, 2004, Garden City held a public hearing to consider a proposed local law that would rezone the P-Zone under the CO-5 zone, which would permit office and courtroom use, as well as both single family and multi-family units.  (GC 56.1 ¶¶ 41-43.)  At the meeting, residents voiced concerns that multi-family housing would generate more traffic, parking problems, and schoolchildren.  (See generally Pls.' Ex. 53.)  Frank Fish of BFJ informed the residents that the County had hired a consulting firm to do a full environmental impact statement, which would include a traffic study, and that residents

15

would be invited to attend a "scoping session" after the completion of the statement, at which time they could provide their input. (Pls.' Ex. 53, at 2344-45.)

On January 20, 2004, the Eastern Property Owners' Association held a Board Meeting, at which time Trustee Bee discussed BFJ's recommendation for the Social Services site. (SAMF ¶ 63.) The summary of the meeting reports that "Trustee Bee answered many questions from the floor" and, in doing so, expressed the opinions that "Garden City demographically has a need for affordable housing" and that "he would keep an open mind but he still felt the recommended zoning change were appropriate." (Pls.' Ex. 66 at 3.) The summary further states that "County Executive Suozzi was reminded that he pledged not to do anything that Garden City residents objected to. Mr. Souzzi's [sic] commitment still stands." (Pls.' Ex. 66 at 3.)

On February 5, 2004, County Executive Suozzi attended a public hearing for the residents of Garden City, at which time he presented the County's real estate consolidation plan. (GC 56.1 ¶¶ 49-50; NC 56.1 ¶ 98.) County Executive Suozzi stated at his deposition that he wanted Garden City to re-zone the Social Services so as to allow multi-family housing. (NC 56.1 ¶ 99.) The County asserts that County Executive Suozzi spoke at the hearing to persuade Garden City to adopt the zoning plan that maximized County revenues. The Plaintiffs maintain that County Executive Suozzi sought to preserve and defend the R-M zoning proposal against changes sought by local residents opposed to the proposed zoning based, in part, on racism. (NC 56.1 ¶ 100; Pls.' NC Resp. at 3; see Pls.' Ex. 21, Deposition of Thomas Suozzi (hereinafter "Suozzi Dep.") at 62-63 ("SUOZZI: I think there

16

are some people that are opposed to affordable housing in Garden City based upon racism.").)

Residents at the public hearing voiced their preference for "upscale" housing at the Social Services site.  (See, e.g., Pls.' Ex. 54 ("Hearing Tr.") at 2391 ("TRUSTEE BEE: [N]either the County nor the Village is looking to create a so-called affordable housing at that spot.  UNIDENTIFIED SPEAKER: Can you guarantee that it won't be in that building? . . . I'm in the Cherry Valley apartments and I'm just concerned about a huge amount of apartments that come on and depress the market for any co-op owner in the Village.  How do you guarantee it's going to be upscale . . . ."); id. at 2386 ("UNIDENTIFIED SPEAKER: You say it's supposed to be upscale.  SUOZZI: It's going to be upscale.  If you sell your $2 million home in Garden City and you don't want to take care of that lawn anymore, you can go into . . . who lives in Wyndham for example?  It's a very upscale place.").)

The residents further voiced their opposition to multi-family housing at the Social Services site.  (See, e.g., Hearing Tr. at 2404 ("BRIAN GEMMEL [to SUOZZI]: "I don't think you are hearing a lot of the people.  We're not against residential, we're against multi-level residential."); id. at 2407 ("SUOZZI: You would probably like to see single family housing I presume.  UNIDENTIFIED SPEAKER: Single family. (Applause)."); id. at 2407-08 ("GAIL MADIGAN: I moved here from Brooklyn so that when I walked out of my house I did not turn to my left and see apartment buildings."); id. at 2408 ("SUOZZI: Mayor out of respect, let me stipulate the facts here.  The public of Garden City especially from the eastern civic association does not want to see multi-family housing here.  They'd

17

rather see single-family housing."); id. at 2409 ("DAVID PICIULO: I don't hear a compelling argument from anyone here tonight as to why we should have multi-dwelling homes. Can we take it out of the proposal?").)

It is undisputed that County Executive Suozzi believed the County could earn the most revenue from a zoning plan that permitted multi-family housing. (NC 56.1 ¶ 102.) County Executive Suozzi clarified at the meeting, however, that "[the County] is absolutely not interested in building affordable housing there and there is a great need for affordable housing, but Garden City is not the location." (NC 56.1 ¶ 105.) He further stated that developers

> would love to build upscale housing in Garden City . . . . We would be willing to put deed restrictions on any property that we sold. The Village would have control of their zoning requirements. We would put on restrictions whatsoever, no ifs ands or buts, that it can't be anything but upscale housing. Put it this way, we generate more revenues for the County by selling it for upscale housing.

(NC 56.1 ¶ 106.) It is further undisputed that Trustee Negri felt that "housing occupied by low income minorities" was not consistent with "the existing character of the neighborhood." (Pls.' Ex. 13, Deposition of Peter Negri (hereinafter "Negri Dep.") at 24-25.)

A flyer distributed in Garden City prior to a March 18, 2004 meeting of the Board asked: "WILL GARDEN CITY PROPERTY VALUES DECREASE IF OVER 300 APARTMENTS ARE BUILT AT THE SITE OF THE SOCIAL SERVICES BUILDING?" It further stated:

> The Garden City Trustees are close to voting on how to zone this property. They might choose to zone it for multi-family housing (If Senator Balboni's current bill passes in June, as many as 30 of those apartments would be considered 'affordable housing.' According to this bill, 'Affordable workforce housing means housing for

18

individuals or families at or below 80% of the median income for Nassau Suffolk primary metropolitan statistical area as defined by the Federal Department of housing and urban development.' . . . NOT JUST GARDEN CITY INCOMES! . . .)

(Pls.' Ex. 32.)

On April 1, 2004, BFJ prepared a document titled "CO-5b Zoning Discussion, Social Services Site," and, under the "Notes for Discussion" section, revised the number of potential multi-family units on the site from 14 units per acre to 10 units per acre, to allow for a maximum of 215 units, versus the prior number of 311. (NC 56.1 ¶¶ 107-08.) On April 22, 2004, BFJ presented this revised proposal to the residents of Garden City. (NC 56.1 ¶ 109; GC 56.1 ¶ 61.)

By memorandum dated May 4, 2004 and addressed to the Board, BFJ proposed eliminating the CO-5b zone altogether, and with it, the potential for multi-family housing on the 21.44 acres of land on the Social Services site located east of County Seat Drive. (NC 56.1 ¶ 110.) Specifically, BFJ stated:

> [W]e reviewed the public comments with Robert Schoelle, Michael Filippon and Gary Fishberg. Based upon these discussions we would recommend for your consideration two basic refinements to the recommendations: (1) Elimination of office use for the 101 County Seat Drive area; (2) Provide for multi-family housing in the 101 County Seat Drive area only by special permit and limited to the West Side of County Seat Drive.

(NC 56.1 ¶ 111.) BFJ suggested renaming the proposed zoning designation as "Residential-Townhouse" (hereinafter "R-T"), which essentially limited the development of multi-family housing to less than 15% of the Social Services site, and only by special permit. (NC 56.1 ¶ 112.) BFJ's proposed description of the R-T zone defined "townhouse" as a "single-family dwelling unit." (NC 56.1 ¶ 114.)

On May 20, 2004, proposed Local Law No. 2-2004, which deleted the P-Zone and replaced it with CO-5 and R-T districts, the latter of which encompassed the Social Services site, was considered at a public hearing.  (GC 56.1 ¶¶ 65-67.)  At the meeting, one attendee asked whether Garden City would be "open to affordable housing" or whether it was "going to take litigation."  (Pls.' GC Resp. at 9.)  An ACORN member noted the need for affordable housing on Long Island and asked that Garden City consider "build[ing] affordable housing in their community."  (Pls.' GC Resp. at 8-9.)

By letter dated May 24, 2004 and addressed to Mayor Miller, Cohen wrote:

[T]he County requests that the Village consider applying zoning regulations that would provide more flexibility for development of property consistent with the zoning framework that controls other areas of the Village.  By limiting the density as proposed, the Village is severely impacting her County's potential revenue from the sale of this property and as such, impacts the overall Real Estate Consolidation Plan.

(NC 56.1 ¶ 119; Resissman Dec. Ex. AQ.)  In a memorandum dated June 2, 2004 and addressed to the Board, BFJ expressly stated: "The maximization of profit on land sales was not a zoning criteria for the Village."  (NC 56.1 ¶ 120.)

County Executive Suozzi testified that he represented to the Board that he would not go against their wishes regarding plans for the Social Services site, and that regardless of whether Garden City's wishes were motivated by racism, he was not concerned with that in his role as County Executive, but rather concerned with maximizing revenues for the sale of the property.  (Suozzi Dep. at 83-84.)

**7. Garden City Adopts the R-T Zone for the Social Services Site**

On June 3, 2004, the Board officially adopted Local Law No. 2-2004, which rezoned the P District containing the Social Services site to R-T zoning.  (NC 56.1 ¶¶ 121-

20

22.)  As enacted, Local Law No. 2-2004 limited construction on the Social Services site to one dwelling unit for each 6,000 square feet of total plot devoted to such use.  (NC 56.1 ¶ 124.)  ACORN representative Ismene Speliotis determined, after reviewing the new zoning, that "it was going to be hard to respond to develop affordable housing given th[e] parameters" in that it "asked for very few housing units . . . [and] a high acquisition price." (Pls.' Ex. 18 (hereinafter "Speliotis Dep.") at 43-44.)  She further noted that "while it is not totally impossible to build affordable housing given that zoning, it certainly does not encourage the building of affordable housing."  (Speliotis Dep. at 183.)

In July 2004, the County issued Requests for Proposals ("RFPs") for the sale of the Social Services site.  (GC 56.1 ¶ 92; NC 56.1 ¶ 128.)  Cohen testified that the RFP was drafted to solicit a purchaser consistent with the new zoning rules that were adopted by Garden City.  (NC 56.1 ¶ 129.)  The RFP stated that the County would not consider bids of less than thirty million dollars.  (GC 56.1 ¶ 93; NC 56.1 ¶ 135.)  Plaintiffs assert that under this RFP, it would have been virtually impossible to build affordable housing and, therefore, it would have been futile for them to submit an affordable housing response to the RFP that complied with the new zoning.  (SAMF ¶¶ 129, 132.)  However, former Plaintiff NYAHC contacted the County to work with them on a proposal that would include multi-family affordable housing, and urged it to withdraw or modify the current RFP to require some part of the property to be affordable housing.  (SAMF ¶¶ 134-35, 143.)  Former Plaintiffs NYAHC and ACORN met with County Executive Suozzi and other County officials to discuss the proposal and the possibility of constructing affordable

21

housing on the Social Services site. (SAMF ¶ 141.) The County did not reissue the RFP. (SAMF ¶ 144.)

Proposals were due by September 10, 2004 at 12:00 noon, with two copies to be mailed to Cohen in Mineola and a third copy to be mailed to Martin Lomazow in Westbury. (GC 56.1 ¶ 94; NC 56.1 ¶ 136.) Applicants were further directed to submit a concept drawing, three bound originals of the proposal, and a good faith deposit of $5,000. (NC 56.1 ¶¶ 137-39.) As of 12:00 noon on September 10, 2004, the County received nineteen bids conforming to the above-mentioned requirements, ranging from $31,070,000 to $56,833,640. (NC 56.1 ¶ 141.)

### 8. NYAHC Submits a Bid

On September 10, 2004, former Plaintiff NYAHC submitted a six page letter proposal that did not conform to the technical requirements laid out in the RFP. (GC 56.1 ¶ 95; NC 56.1 ¶¶ 143-45; Pls.' NC Resp. at 7.) Specifically, NYAHC proposed leasing the subject property (with an up-front lease payment of $5,000,000) for the development of rental apartments for mixed incomes. (NC 56.1 ¶ 148; Pls.' NC Resp. at 11.) Plaintiffs maintain that NYAHC's proposal did not follow the specifications laid out in the RFP because the RFP made the construction of affordable housing on the Social Services site virtually impossible. (Pls.' Resp. at 8-9.) Specifically, NYAHC's proposal stated:

> As the County knows from previous meetings, telephone conversations and correspondence with NYAHC and LI ACORN, NYAHC is unable to respond to the County's Request for Proposals (RFP) of July 2004 related to the 25 County-owned parcel in Garden City (the Parcel) due to the restrictive zoning adopted by the Village of Garden City in connection with the County's sale of the Parcel.

(Pls.' NC Resp. at 8.)  At the time of submission, NYAHC had the capacity to pay the $30 million dollar asking price up front and still build affordable housing on the Social Services site, as well as the capacity to pay the County $150 million dollars over thirty years.  (Pls.' NC Resp. at 11.)

On November 17, 2004, the County selected Fairhaven Properties, Inc. as the highest bidder for the purchase of the Social Service site with the bid of $56,500,000.  (GC 56.1 ¶ 101; NC 56.1 ¶¶ 151-54.)

NYAHC developed four proposals for development at the Social Services site under the R-M zoning designation after the contract was awarded to Fairhaven Properties, Inc., with the percentage of affordable and/or Section 8 housing units out of 311 total rental units ranging from 12.5% to 25%.  (SAMF ¶¶ 149-154.)  Plaintiffs' expert McArdle evaluated each proposal in conjunction with the racial/ethnic distribution of the available pool of renters and determined that had NYAHC been able to building housing under any of the four proposals in accordance with the rejected R-M zoning designation, the pool of renters likely to occupy all units, including market rate, affordable and Section 8 units, would have likely been between 18% and 32% minority with minority-households numbering between 56 and 101.  (McArdle Decl. at ¶¶ 59-61.)  McArdle further analyzed the likely racial composition of the pool of homeowners who could afford to purchase units potentially developed by Fairhaven Properties, Inc., based on their proposal as well as available information regarding Garden City property values, and determined that between 3 and 6 minority-households could afford such a purchase.  (McArdle Decl. at ¶ 67.)

### 9. Current Status of the Social Services Site

On January 1, 2010, Thomas R. Suozzi was succeeded by the present County Executive Edward P. Mangano. (NC 56.1 ¶ 310; GC 56.1 ¶ 111.) The Mangano Administration decided to relocate the County's Family Court building, currently located in Westbury, New York, to the Social Services site. (NC 56.1 ¶ 311; GC 56.1 ¶¶ 112-13.) Thus, although the prior County administration planned to sell the Social Services site to a private developer, the site is currently no longer for sale. (NC 56.1 ¶ 320; GC 56.1 ¶ 114.) The County asserts that a primary factor in the decision to build a new Family and Matrimonial Court Complex at the Social Services site is cost, because although moving the building to a new location and renovation will cost approximately the same $100 million, renovation will not "remedy the many deficiencies in the existing building." (NC 56.1 ¶ 324.) The Plaintiffs dispute this assertion and state that it will cost tens of millions dollars more to relocate the Family Court to the Social Services site rather than renovate the existing Family Court site in Westbury. (Pls.' NC Resp. at 19; Carl Schroeter Dep. at 48:9-49:2, 97:5-11.) According to the Plaintiffs, the estimated cost of relocating the Family Court to the Social Services site is between $110 million and $130 million, while the estimated cost of renovating the current Family Court site is between $85 million and $95 million. (SAMF ¶¶ 161-62.) In addition, by building a new Family Court at the Social Services site, the County will lose the revenue it could gain by selling the site. (SAMF ¶ 163.)

**10. Nassau County's Status as a HUD Grant Recipient**

The United States Department of Housing and Urban Development ("HUD") administers Community Planning and Development Formula Grant Programs ("CPD formula grants"), including the Community Development Block Grant Program ("CDBG") and the HOME Investment Partnerships Program ("HOME"). (NC 56.1 Pt. 2 ¶ 3.) HUD's Office of Community Planning & Development ("CPD") distributes the CPD formula grants to Nassau County as an "Urban County"— one that has a population of 200,000 or more and is certified by HUD as an Urban County Entitlement. (NC 56.1 Pt. 2 ¶ 6.) The Nassau County Office of Community Development ("OCD") is responsible for administering HUD funds to the Nassau Urban County Consortium ("the Consortium"). (NC 56.1 Pt. 2 ¶ 1.)

The Consortium includes participating cities, towns, and villages who agree by a cooperation agreement to apply for HUD funds, including CDBG and HOME funds. (NC 56.1 Pt. 2 ¶ 7.) The Consortium applies for HUD recertification every three years, during which time the County solicits non-participating municipalities to join the Consortium. (NC 56.1 Pt. 2 ¶ 8.) The County also provides the participating communities with the opportunity to "opt out" of the Consortium; those who do not opt out are automatically retained as members. (NC 56.1 Pt. 2 ¶ 9.) Consortium members are considered a "participating jurisdiction" and HUD funds distributed and administered by the County are allocated according to the population and demographics of the participating municipalities. (NC 56.1 Pt. 2 ¶ 11.) Garden City has never participated in, and has never been a member of, the Nassau Urban County Consortium. (NC 56.1 Pt. 2 ¶ 14.)

25

The County's CPD formula grants are distributed in accordance with the Nassau Urban County Five-Year Consolidated Plan and Annual Action Plan ("Con Plan"), which is prepared by the OCD for the Consortium every five years and serves as the comprehensive housing affordability strategy, community development plan, and submission for funding, including CDBG and HOME grants.  (NC 56.1 Pt. 2 ¶¶ 15-16.) The Con Plan governs the County's decision as to which activities and organizations to fund.  (NC 56.1 Pt. 2 ¶ 16.)  HUD mandates that in preparing a Con Plan that is eligible for HUD funding, the authority must certify that they are "affirmatively furthering fair housing within their jurisdictions."  (NC 56.1 Pt. 2 ¶ 29; See 24 C.F.R. § 91.225.)  Part of this effort is the identification and subsequent reduction and/or elimination of "impediments to fair housing", and the Analysis of Impediments is included in the Con Plan.  (NC 56.1 Pt. 2 ¶¶ 29, 33.)  In addition, OCD prepares an annual Consolidated Annual Performance and Evaluation Report ("CAPER"), which requires the County to evaluate its efforts to affirmatively further fair housing on an annual basis. (NC 56.1 Pt. 2 ¶ 33.)

The County points out that it submitted the 2010 Con Plan and Analysis of Impediments to HUD for approval, and has not been notified of any deficiencies or failures to meet federal requirements.  Also, the County has continued to receive HUD funding up through and including the present day. (NC 56.1 Pt. 2 ¶ 43.)  However, the Plaintiffs dispute any suggestion that a lack of notification by HUD of deficiencies indicates compliance with the federal requirements.  (Pls.' NC Pt. 2 Resp. at 17.)

According to the Plaintiffs, the County has a policy and practice of using federal housing funding, including HOME and CDBG funds, to concentrate affordable housing in

high minority areas. (SAMF ¶ 231.) The 2005-2009 draft Con Plan anticipated the

locations of planned affordable housing developments to include five municipalities with

minority shares that are several times the County average. (McArdle Decl. ¶ 55.) Further,

affordable housing projects anticipated to be completed in 2010 with the assistance of HUD

HOME grants were to be constructed in two municipalities that rank in the top three

highest minority municipalities in the County — Roosevelt and New Cassel. (McArdle

Decl. ¶ 55.) The County's 1995, 2000 and 2005 Con Plans stated that "Nassau County

currently targets its comprehensive community development efforts in a number of lower

income and minority areas . . ." (SAMF ¶ 232.)

The County has never evaluated the impact of CDBG or HOME expenditures on

racial or housing segregation, nor has it examined how centering the construction of

affordable housing in minority communities would impede fair housing. (SAMF ¶ 258.)

The County notes, however, that the minority communities targeted for the development of

affordable housing have "active programs." (Pls.' Ex. 14, Deposition Transcript of

Rosemary Anne Olsen (hereinafter "Olsen Dep.") at 218.)

The County Defendant has devoted a large portion of its Rule 56.1 Statement to

describe various aspects of the County's disbursement of federal housing funds, including:

the disbursement of CDBG and HOME funding; analyses of impediments to fair housing;

establishment of fair housing plans; housing training and education programs and

workshops; the County's 10-year plan to end homelessness; the Section 8 Housing Choice

Voucher program; and the emergency shelter grant program. It appears the County did

this, in part, to establish that affordable housing options do exist in Nassau County in a

nondiscriminatory fashion and that it is affirmatively furthering fair housing within its jurisdictions. (See NC 56.1 Pts. 2 and 3; Crean Aff.) For the most part, the Plaintiffs do not dispute any factual allegations in this regard. However, they contest any implication that the preparation and/or existence of these materials and programs indicate that the County's activities comply with its obligations under fair housing law, related civil rights statutes, and federal funding regulations.

## B. Procedural History

On May 12, 2005, the Plaintiffs ACORN, NYAHC, and several individual Plaintiffs filed the instant action, which was initially assigned to United States District Judge Leonard D. Wexler. On February 9, 2006, this case was reassigned to United States District Judge Joseph F. Bianco. On March 10, 2006, the County and the Garden City Defendants moved separately to dismiss the action for lack of standing and failure to state a claim. By Memorandum and Order dated July 21, 2006, Judge Bianco denied both motions in their entirety and directed the parties to conduct discovery in accordance with the Individual Rules of United States Magistrate Judge William D. Wall. See ACORN v. County of Nassau, No. 05 Civ. 2301 (JFB) (WDW), 2006 WL 2053732 (E.D.N.Y. July 21, 2006). In March 2009, both the County Defendant and the Garden City Defendants moved for summary judgment.

On March 2, 2010, Judge Bianco recused himself in this case. Thereafter, the case was reassigned to this Court for all further proceedings. Consequently, all pending motions were denied without prejudice and with leave to refile in accordance with this Court's individual motion practice rules. On April 14, 2010, a motion to intervene as plaintiff

pursuant to Federal Rule of Civil Procedure 24(b) was filed by NYCC, which the Court subsequently granted on June 15, 2010. On June 30, 2010, NYCC filed its intervenor complaint. On June 25, 2010, Magistrate Judge Wall granted the Plaintiff's request to reopen discovery.

On July 29, 2011, motions for summary judgment were again filed by both the Garden City Defendants and the County Defendant. In addition, on August 26, 2011, the Intervenor-Plaintiff NYCC filed a motion to amend its intervenor complaint, pursuant to Rule 15(a)(2), to include an additional cause of action for violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983, and its rights under the Equal Protection Clause of the Fourteenth Amendment. The motions for summary judgment and the motion to amend are currently pending.

## II. MOTIONS FOR SUMMARY JUDGMENT

### A. Legal Standard on a Motion for Summary Judgment

It is well-settled that summary judgment under Fed. R. Civ. P. 56(c) is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" within the meaning of Fed. R. Civ. P. 56 when its resolution "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In determining whether an issue is genuine, "[t]he inferences to be drawn from the

29

underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion."  Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per curiam), and Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989)).

Once the moving party has met its burden, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)).  However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party.  Matsushita, 475 U.S. at 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538.  Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case."  Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223–24 (2d Cir. 1994) (citations omitted).

**B.  Mootness**

The threshold issue that the Court must address prior to addressing the substantive merits of the case is mootness.  See Aladdin Capital Holdings, LLC v. Donoyan, 438 Fed App'x 14, 15 (2d Cir. 2011) ("We must first address whether we have Article III jurisdiction and resolve an issue of mootness."); see also United States v. Miller, 263 F.3d 1, 4 n.2 (2d Cir. 2001) ("[A] federal court may not . . . decide a case on the merits before resolving whether the court has Article III jurisdiction.").

In its motion for summary judgment, the County asserts that the because the Social Services site is no longer being sold due to plans for a new Family and Matrimonial Court Complex to be built at that location, that the relief the Plaintiffs seek, namely, to enjoin the County from selling the site, can no longer be given. Moreover, even though the County acknowledges that the case has been rendered moot only by voluntary cessation of its own challenged conduct, it also claims that it has established that the challenged action will never occur again, through the submission of an affidavit from Chief Deputy County Executive Robert Walker to that effect.

The Garden City Defendants similarly assert that because the Social Services site is no longer being sold, that the case has been rendered moot. According to Garden City, "any such injunctions or orders granted against the Village with the goal of permitting affordable housing on the Site will obviously be ineffective. Even if the Court were to order that the Village approve zoning ordinances allowing for housing at the Site, the Site is no longer for sale by the County and what is done at the Site is not subject to the control of the Village." (GC Mem. at 16.)

On the other hand, the Plaintiffs criticize both of these positions as inaccurate and disingenuous. The Plaintiffs claim that the relief they seek is not limited to the site, so that even if "a meteor fell from the sky and destroyed the Site . . . this case would not be moot." (Pl. Opp. at 15.) For example, the Plaintiffs' prayer for relief seeks to enjoin all the Defendants and their agents, employees, successors and assigns, from engaging in any other discriminatory acts that perpetuate or contribute to segregation in Garden City and Nassau County. The Plaintiffs also seek an order that all the Defendants take and/or fund

31

affirmative steps, supervised by this Court, to overcome the effects of past discriminatory practices, including the funding of remedial activities necessary to overcome the perpetuation of segregation in Nassau County and Garden City.  In addition, the Plaintiffs request a declaratory judgment.  In addition, the Plaintiffs contend that the Court can fashion its own relief to redress the wrongs that the Defendants have allegedly perpetuated against the Plaintiffs.

### 1.  Legal Standard

"Mootness is a doctrinal restriction stemming from the Article III requirement that federal courts decide only live cases or controversies." In re Zarnel, 619 F.3d 156, 162 (2d Cir. 2010).  Under the doctrine of mootness, a court no longer has subject matter jurisdiction when "the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S. Ct. 1379, 1383, 59 L. Ed. 2d 642 (1979) (quoting Powell v. McCormack, 395 U.S. 486, 496, 89 S. Ct. 1944, 1951, 23 L. Ed. 2d 491 (1969) (internal quotation marks omitted)).  Thus, for a federal court to have subject matter jurisdiction over a case, "it is not enough that a dispute was very much alive when suit was filed. . . . The parties must continue to have a personal stake in the outcome of the lawsuit." Knaust v. City of Kingston, 157 F.3d 86, 88 (2d Cir. 1998) (quoting Lewis v. Continental Bank Corp., 494 U.S. 472, 477-78, 110 S. Ct. 1249, 108 L. Ed. 2d 400 (1990)) (internal citation and quotations omitted), cert. denied, 526 U.S. 1131, 119 S. Ct. 1805, 143 L. Ed. 2d 1009 (1999).  "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Friends of the

Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000) (internal quotation marks omitted); see Church of Scientology of Cal. v. United States, 506 U.S. 9, 12, 113 S. Ct. 447, 121 L. Ed. 2d 313 (1992) ("It has long been settled that a federal court has no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." (internal quotation marks omitted)).

**2. As to the Whether the Present Case is Moot**

Before proceeding to analyze the potential mootness of this case, it is essential to first comprehend what relief the Plaintiffs are actually seeking. According to the Prayer for Relief contained in both the Plaintiffs' amended complaint and the intervenor complaint, which are identical, the Plaintiffs seek an injunction that would: (1) enjoin the Nassau County Defendant from proceeding with any sale of the Social Services site, or continuing with any plans for redevelopment of the site, under the discriminatory "Special Zoning" (the R-T zoning); (2) enjoin the Garden City Defendants from enforcing or attempting to enforce in any way the discriminatory or exclusionary provisions of the Special Zoning; (3) order the Garden City Defendants to approve zoning ordinances for the Social Services site that are substantially the same as the "Proposed Zoning" (the R-M zoning) or that otherwise permit affordable housing; (4) order the Nassau County Defendant to issue a Request for Proposals for the sale of the site consistent with the Proposed Zoning or consistent with zoning which otherwise permits affordable housing, including provisions that will require the development of affordable and integrated housing units at the Social Services site; (5) enjoin the Nassau County Defendant from selling the Social Services site

33

to any person or developer that will not agree or commit to building affordable and integrated housing units at the Social Services site to the maximum extent permitted under the Proposed Zoning; (6) order all defendants to take all actions necessary to assure the redevelopment of the Social Services site so as to maximize the availability of affordable and integrated housing at the site, including taking such steps as the Court deems necessary and appropriate to support and/or subsidize such redevelopment; (7) enjoin the Garden City Defendants from granting, and ordering the Garden City Defendants to withdraw, any permits, letters of approval, or other consents allowing steps toward redevelopment of the Social Services site to continue; (8) enjoin all Defendants and their agents, employees, successors and assigns, from engaging in any other discriminatory acts that perpetuate or contribute to segregation in Garden City and Nassau County; and (9) order all Defendants to take and/or fund affirmative steps, supervised by this Court, to overcome the effects of past discriminatory practices, including the funding of remedial activities necessary to overcome the perpetuation of segregation in Nassau County and Garden City. The complaints also seek a declaratory judgment, and any other such relief that the Court deems reasonable, necessary and just, as well as the costs and attorneys' fees incurred by the Plaintiffs.

Thus, there are two specific instances of injunctive relief sought by the Plaintiffs against both sets of Defendants that do not relate specifically to the Special Services site itself. First, the Plaintiffs seek to enjoin all of the Defendants and their agents, employees, successors and assigns, from engaging in any other discriminatory acts that perpetuate or contribute to segregation in Garden City and Nassau County. Second, the Plaintiffs seek an

order that all of the Defendants take and/or fund affirmative steps, supervised by this Court, to overcome the effects of past discriminatory practices, including the funding of remedial activities necessary to overcome the perpetuation of segregation in Nassau County and Garden City.  This is in addition to the declaratory relief and any other relief that the Court deems reasonable, necessary and just.

The preliminary and essential inquiry is whether the relief sought by the Plaintiffs can no longer be given or is no longer needed, so as to make the present case moot.  See Martin-Trigona v. Shiff, 702 F.2d 380, 386 (2d Cir. 1983) ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed."); Cook v. Colgate Univ., 992 F.2d 17, 19 (2d Cir. 1993) ("Accordingly, a case that is 'live' at the outset may become moot 'when it becomes impossible for the courts, through the exercise of their remedial powers, to do anything to redress the injury.'") (quoting Alexander v. Yale, 631 F.2d 178, 183 (2d Cir. 1980).

The focus point of this controversy is undoubtedly Garden City's allegedly discriminatory zoning practices as to the specific Social Services site.  Of course, if the Court were to enjoin the Nassau County Defendant from proceeding with any sale of the Social Services site, or continuing with any plans for redevelopment of the site under the discriminatory Special Zoning; or to order the Garden City Defendants to approve zoning ordinances for the Social Services site that are substantially the same as the Proposed Zoning or that otherwise permit affordable housing, such relief could not actually be given if the County refrains from selling the site.  In fact, this is true for most of the relief that the Plaintiffs seek as to both sets of Defendants, although the Court notes that it may not be

35

impossible for the Court to grant some relief as to the Site.  The County acknowledges in its opposition to NYCC's motion to amend the intervenor complaint that "the County needs finality on the issue of whether plaintiffs' demand for injunctive relief will bar the construction where the decision to build has been made final".  Thus, even the County appears to concede that the Court's injunctive relief as to the Site itself is still a plausible outcome.

Nevertheless, even if relief cannot be granted as to the site itself, it is ultimately irrelevant for purposes of analyzing mootness.  "Where several forms of relief are requested and one of these requests subsequently becomes moot, the Court has still considered the remaining requests."  Powell v. McCormack, 395 U.S. 486, 496, n.8, 89 S. Ct. 1944, 1951, 23 L. Ed. 2d 491 (1969).  The Court finds that the entire controversy is not rendered moot solely because the Social Services site is no longer susceptible to the zoning laws that were alleged to be discriminatory.

Although the relief requested as to the site may have been rendered moot, the broad injunctive relief sought by the Plaintiffs is certainly still a potential outcome of this case. See, e.g., U.S. v. Mass. Maritime Acad., 762 F.2d 142, 157 (1st Cir. 1985) ("Given the evidence of persistent past discrimination, the district court was entitled to enter an injunction permanently enjoining any repeat discriminatory conduct even if the illegal conduct had by then ceased."); South-Suburban Hous. Ctr. V. Greater South Suburban Bd. of Realtors, et al., 935 F.2d 868, 881 (7th Cir. 1991) (finding that an FHA challenge to street plan for damages, declaratory relief, and injunctive relief was not rendered moot

although homes were sold prior to trial, in part because there was still a viable claim for declaratory and injunctive relief).

Moreover, this Court can fashion appropriate relief not specifically requested, such as the building of integrated, affordable housing elsewhere in Garden City, if this Court deems it reasonable, necessary and just. In a civil FHA case brought by a private person, the court's equitable powers include the power to order such affirmative action as may be appropriate. 42 U.S.C. § 3613(c)(1). For example, affirmative injunctive relief may be awarded for past discriminatory practices "where the trial court believes that the vestiges of prior discrimination linger and remain to be eliminated." United States v. DiMucci, 879 F.2d 1488, 1498 (7th Cir.1989) (citations omitted) (internal quotations omitted); see Local 28, Sheet Metal Workers' Int'l Ass'n v. EEOC, 478 U.S. 421, 450, 106 S. Ct. 3019, 92 L. Ed. 2d 344 (1986) ("Affirmative action promptly operates to change the outward and visible signs of yesterday's [discriminatory] distinctions and thus, to provide an impetus to the process of dismantling the barriers, psychological or otherwise, erected by past practices.") (internal quotation omitted); Watkins v. Washington, 472 F.2d 1373, 1376 (D.C. Cir. 1972) ("Where pervasive racial discrimination is demonstrated, the court has not only the power, but also the duty, to render a decree eliminating the effects of past discrimination and ensuring equal opportunity in the future.").

This affirmative action can be appropriate even though the effects of the alleged discrimination cannot be resolved at the particular Social Services site. See Baltimore Neighborhoods, Inc. v. LOB, Inc., 92 F. Supp. 2d 456, 462 (D. Md. 2000) (finding that affirmative action relief was appropriate because although the effects of the discrimination

37

could not be solved at the particular site, it was possible to seek affirmative action "elsewhere in the Odenton area").

At this time, the Court cannot determine whether such broad injunctive relief will be needed or will be proper. Nevertheless, the possibility of this type of relief alone precludes this case from being rendered moot. See Gautreaux v. Romney, 448 F.2d 731, 736 (7th Cir. 1981) ("Plaintiffs have contended that such 'other and further relief' might include a more vigorous utilization of the several different types of housing programs which HUD administers in the form of a decree aimed at 'remedying the continuing effects of the discrimination of the past.' Such a decree . . . might facilitate the overall desired goal of desegregating the public housing sites around Chicago metropolitan area. We express no view on whether such requested relief is either necessary or appropriate. However, as long as a decree utilizing certain HUD programs still remains a possible form of relief not already available through the other case, this Court cannot deem the controversy moot.") (quoting Powell v. McCormack, 395 U.S. 486, 496, n.8, 89 S. Ct. 1944, 1951, 23 L. Ed. 2d 491 (1969)).

Putting aside the non-site related injunctive relief, the Plaintiffs also seek a declaratory judgment, in particular: "Declaring that defendants' acts, practices, and policies complained of herein violated and violate plaintiffs' rights as secured by Fair Housing Act, as amended, 42 U.S.C. § 3601 et seq.; the Civil Rights Act of 1866, 42 U.S.C. § 1981; the Civil Rights Act of 1866, 42 U.S.C. § 1982; the Civil Rights Act of 1871, 42 U.S.C. § 1983; the Equal Protection clause of the Fourteenth Amendment to the U.S. Constitution;

and the 'affirmatively furthering' obligations of the Fair Housing Act, 42 U.S.C. § 3608, and the Civil Rights Act of 1964, 42 U.S.C. §2000d et seq."

Declaratory judgment actions raise particular issues with regard to mootness, and the Supreme Court has explained that "[b]asically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Maryland Cas. Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S. Ct. 510, 512, 85 L. Ed. 826 (1941); see Penguin Books USA Inc. v. Walsh, 929 F.2d 69, 72 (2d Cir. 1991). However, a "litigant may not use the declaratory judgment statute to secure judicial relief of moot questions." Christopher P. by Norma P. v. Marcus, 915 F.2d 794, 802 (2d Cir. 1990). For example, the Second Circuit has noted that claims for declaratory relief under Title IX "appear moot" as the result of the plaintiffs' graduation. Alexander v. Yale Univ., 631 F.2d 178, 184 (2d Cir. 1980).

Within the boundaries of these principles and the mootness doctrine, the Court must determine whether it has the power to address the Plaintiffs' request for a declaratory judgment on the issues in this case. In this regard, the Court finds that a determination of whether or not the County and the Village's past conduct violated the Constitution or applicable federal laws remains very much an open question. A legal dispute still exists as to whether any discriminatory practices took place by the Defendants, and whether an injury is still ongoing for every day there is an alleged lack of affordable housing, and hence a lack of racial integration, in the Village of Garden City and Nassau County as a whole. See Young v. Pierce, 628 F. Supp. 1037, 1059-60 (E.D. Tex. 1985) (finding that

part of the heavy burden of demonstrating that discontinuance of the challenged activity has destroyed any controversy between the parties "includes the necessity of showing that there are no present effects of past conduct that require undoing.") (citing Vitek v. Jones, 445 U.S. 480, 487, 100 S. Ct. 1254, 1260, 63 L. Ed. 2d 552 (1980)).

The Supreme Court has stated that "[a] court may grant a declaratory relief even though it chooses not to issue an injunction or mandamus." Powell v. McCormack, 395 U.S. at 499, 89 S. Ct. at 1952. Thus, the granting of a declaratory judgment is still a potential avenue of relief for the Plaintiffs, especially considering that a declaratory judgment may be the premise for any further relief ordered by this Court, such as the broad injunctive relief specifically requested by the Plaintiffs. See id. ("A declaratory judgment can then be used as a predicate to further relief, including an injunction."); Gantreaux, 448 F.2d at 736 ("A determination of whether or not the Secretary's own past conduct violated the Constitution or applicable federal statute remains very much of an open question. The entry of a declaratory judgment here would have significant consequences in determining the extent of any "further relief" deemed necessary, in the event that practices found to be discriminatory were resumed.").

Therefore, because there still is relief that is obtainable by the Plaintiffs against the Defendants, the Court finds that there remains a live controversy in spite of the fact that the Social Services site will no longer be sold. Thus, the case has not been rendered moot and the Court can proceed to analyze the substantive merits of the action.

**C. FHA Claims Against All Defendants**

Congress enacted the FHA in 1968 to "provide, within constitutional limits, for fair housing throughout the United States." 42 U.S.C. § 3601. The law provides that it shall be unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." Id. § 3604(a). The Second Circuit has determined that "[c]onduct prohibited by this section includes discriminatory zoning practices." Fair Hous. in Huntington Comm. v. Town of Huntington, 316 F.3d 357, 366 (2d Cir. 2003); see Le Blanc-Sternberg v. Fletcher, 67 F.3d 412, 424 (2d Cir. 1995); Huntington Branch, N.A.A.C.P. v. Town of Huntington, 844 F.2d 926, 938 (2d Cir. 1988). A claimant may demonstrate that discriminatory zoning practices were employed by presenting either proof of disparate treatment or disparate impact. See Huntington Branch, N.A.A.C.P., 844 F.2d at 934-35; see also LeBlanc-Sternberg, 67 F.3d at 425. In the instant case, the Plaintiffs, including the Intervenor-Plaintiff NYCC, advance their FHA claim against all Defendants under both theories. As set forth below, the Court finds that the Plaintiffs have raised genuine issues of material fact sufficient to survive summary judgment on this claim as asserted against the Garden City Defendants, but not the County.

   **1. Disparate Treatment**

      **a. Legal Standard**

Under a theory of disparate treatment, "a plaintiff can establish a prima facie case by showing that animus against the protected group 'was a significant factor in the position

taken' by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." LeBlanc-Sternberg, 67 F.3d at 425 (quoting United States v. Yonkers Bd. of Educ., 837 F.2d 1181, 1217, 1223, 1226 (2d Cir. 1987), cert. denied, 486 U.S. 1055 (1988)) (emphasis added); see also Innovative Health Sys. Inc. v. City of White Plains, 117 F.3d 37, 49 (2d Cir. 1997) ("[A] decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decisionmaking process. A . . . discriminatory act [is] no less illegal simply because it enjoys broad public support.").

Discriminatory intent may of course be demonstrated by direct evidence. However, as such evidence is rarely available to plaintiffs, it may also be inferred, as follows:

> "inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." Washington v. Davis, 426 U.S. 229, 242 (1976). Such impact may be an important starting point. Other probative sources may include the "historical background of the decision . . . , particularly if it reveals a series of official actions taken for invidious purposes"; "[t]he specific sequence of events leading up to the challenged decision," such as zoning changes for a given site enacted upon the decisionmaker's learning of plans for the construction there of integrated housing; "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports"; "[d]epartures from the normal procedural sequence"; and "[s]ubstantive departures . . . , particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 267-68 (1977).

Yonkers Bd. of Educ., 837 F.2d at 1221 (full internal citations inserted); see LeBlanc-Sternberg, 67 F.3d at 425 (applying Arlington factors to determine discriminatory intent in FHA claim); see also Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991) (noting that perpetrators of discrimination rarely leave a "smoking gun," and, therefore, "[a] victim of discrimination is . . . seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence."). Accordingly,

"[w]here there are allegations of discrimination supported by such circumstantial evidence, 'a defendant's intent and state of mind are placed in issue, [and] summary judgment is ordinarily inappropriate.'"  The Anderson Group LLC v. City of Saratoga Springs, 557 F. Supp. 2d 332, 340 (N.D.N.Y. 2008) (quoting Rosen, 928 F.2d at 533).

Once plaintiffs have established a prima facie case of housing discrimination, the onus shifts to the defendant to demonstrate "that the same decision would have resulted even had the impermissible purpose not been considered."  Vill. of Arlington Heights, 429 U.S. at 270 n.21.

### b. As to the Plaintiffs' Theory of Disparate Treatment

#### i. The Garden City Defendants

In the instant matter, the Garden City Defendants argue that the Plaintiffs have failed to identify any factual disputes over whether discriminatory animus was a motivating factor in the zoning decision by the Garden City Defendants, or by those to whom they were knowingly responsive.  The Court disagrees.  Construing the totality of the circumstantial evidence presented in favor of the non-movants and drawing all reasonable inferences therefrom, the Court finds that the Plaintiffs have presented sufficient evidence to raise genuine issues of fact as to their disparate treatment claim, thereby precluding summary judgment in favor of the Garden City Defendants.  In particular, evidence of the impact of the R-T zoning designation, its historical background, and the sequence of events leading up to its adoption, as well as contemporary statements by members of the decisionmaking body, have raised genuine issues of material fact regarding whether the Garden City Defendants bowed to race-based opposition to a proposed zoning regulation

43

that allowed the development of affordable housing and hence, made the influx of minority residents, more likely.

> **a. As to Whether the Zoning Bore More Heavily on One Race Than Another**

First, the Plaintiffs have presented evidence that raises a genuine issue of fact as to whether the zoning designation "[bore] more heavily on one race than another." Washington v. Davis, 426 U.S. 229, 242, 96 S. Ct. 2040, 2049, 48 L. Ed. 2d 597 (1976). This evidence typically "involves statistical data supporting either a finding of perpetuation of segregation or of disproportionate impact." Thornton v. City of Allegan, 863 F. Supp. 504, 509 (W.D. Mich. 1993). While this contention will be discussed in greater detail below in the context of whether the Plaintiffs have established a question of fact with regard to their theory of disparate impact, the Court will now briefly outline the proffered evidence.

The Plaintiffs' statistical expert set forth evidence that the original zoning proposal, as proffered by BFJ and endorsed by the Committee, would have created a pool of potential renters with a significantly larger percentage of minority households than the pool of potential renters for the zoning proposal ultimately adopted as law by Garden City. Granted, this statistical analysis presumes the development of affordable, not just multi-family, housing on the Social Services site. However, even assuming arguendo that no affordable housing was constructed, the McArdle Report also notes that minorities comprise a disproportionate share of renter, as opposed to owner, households in the County. Therefore, a zoning proposal that permits only 36 multi-family rental units —

44

and only by special permit — versus the 311 contemplated by the original zoning proposal — as-of-right — would have a greater impact upon potential minority residents.  (See McArdle Report, at ¶ 49 ("Minorities made up just 14.8% percent of all households in Nassau County in 2000, but 31.1% of renter households.").)

Therefore, the Plaintiffs have raised issues of fact over whether the change from the proposed R-M zoning to the adopted R-T zoning affected minority residents to a greater degree.  See, e.g., Jim Sowell Const. Co., Inc. v. City of Coppell, 61 F. Supp. 2d 542, 547 (N.D. Tex. 1999) (finding that evidence from an expert demonstrating a disproportionate amount of African-American potential residents lived in multi-family housing "demonstrate[d] that African-American families are much more likely to reside in apartment complexes than are Caucasian families.  By rezoning certain tracts of land from multifamily to single family use . . . the City decreased the number of apartment units available to new residents.  Because African-Americans are more likely to reside in such housing, this reduction in multifamily units had a statistically greater impact on African-American families than on Caucasian families.").

In the Court's view, the Plaintiffs have thus sufficiently raised disputed issues of fact regarding whether the allegedly discriminatory R-T zoning designation impacted minorities to a greater degree than it affected Caucasians.

### b.  As to the Historical Evidence of Racism in Garden City

The Plaintiffs have also raised disputed issues of fact regarding whether the historical background of the R-T zoning designation, such as past instances of

45

discrimination in the Village, suggest that race-based animus played a role in the zoning's implementation.

First, the Plaintiffs have introduced historical evidence that they contend suggests a pattern and practice of racial segregation in Garden City. By example, the Plaintiffs have introduced evidence that, in 1969, residents opposed the construction of a daycare center that would serve primarily African-American children. In 1989, a building moratorium on new construction was in effect in Garden City to gain tighter control over housing development; an action the Plaintiffs allege was taken to prevent the influx of minority residents. In 2005, the New York State Attorney General determined that Garden City enforced a local requirement limiting the use of its parks to Garden City residents in a racially discriminatory manner. At his deposition, County Executive Suozzi opined that "there are some people that are opposed to affordable housing in Garden City based upon racism."

The Garden City Defendants dispute certain matters of the Plaintiffs' evidence, such as the newspaper article the Plaintiffs rely upon to demonstrate the existence of the above mentioned building moratorium. However, even assuming that this article would not be admissible under the "ancient document" exception to the hearsay rule, there is still some evidence to raise an issue of fact as to whether past instances of discrimination in Garden City suggest that race-based animus played a role in the zoning decision at issue.

The Garden City Defendants also argue that such a patchwork of allegations and inferences is insufficient, especially because claims relating to a day care center and parks have nothing to do with segregated housing practices. The Court disagrees. Previous

46

instances of racial discrimination, even in different settings, may be taken into account on the issue of an alleged pattern and practice of racial segregation in the Village.

In addition, the Plaintiffs have proffered evidence of discrimination in Garden City that has occurred since the filing of this lawsuit. In 2006, the County issued an RFP to solicit proposals for the purchase of the "Ring Road" site in Garden City: a mixed-use development which was characterized as "mixed income" and would have included affordably priced residential units. (Pl. Ex. 61, 62) However, with regard to this proposal, via anonymous emails, the Garden City residents accused Nassau County Executive Suozzi of "catering to ACORN and black people" (SAMF ¶ 199; Pl. Ex. 63), and begged Suozzi not to "turn GC into Hempstead, Roosevelt, etc. . . ." SAMF ¶ 200; Pl. Ex. 65), citing to two towns with a large percentage of minority residents. The Plaintiffs submitted a proposal for this site, but it was not accepted and the site still has not been developed.

Q: Did you award the site to one of the persons that submitted a proposal?

A: No, we did not.

Q: Can you tell me why?

A:  I — I think all along we thought it would — if it was done right, it would achieve settlement of the lawsuit. We're still all sitting here.

(SAMF ¶ 194; Pl. Ex. 100, Schroeter Dep. at 193.)

The Garden City Defendants dispute the relevance of the anonymous emails cited above in opposition to the Ring Road site because they do not demonstrate that "residents" of the Village objected to affordable housing. However, this raises a factual issue as to whether such a sentiment existed because most of the senders state or clearly imply that they are Garden City residents. The Garden City Defendants also contend that the Court

should not consider the emails because they are inadmissible hearsay.  However, these

emails are admissible not for the truth of the matter asserted, but instead to demonstrate

that complaints in opposition to Ring Road were made and received, some of which

indicate racial animus.  See Stephens v. City of Chicago, No. 98 Civ. 809, 2002 WL

31055078, at *1 n.3 (N.D. Ill. Sept. 13, 2002) ("Defendants objected to these statements on

the ground that they were hearsay.  However, they are not being used for the truth of the

matter asserted, only as a representation of . . . alleged racial bias."); Sanders v. Dania Inc.,

No. 01 Civ. 33, 2001 WL 34736295, at *11 (D. Or. Dec. 6, 2001) ("McGrath's statement . .

. still is admissible because it is not offered for the truth of the matter asserted . . . but rather

as evidence of defendant's racial attitude, that is, as direct evidence of discrimination.");

Fincher v. Cnty. Of Westchester, 979 F. Supp. 989, 1005 (S.D.N.Y. 1997) ("To the extent

that these are racial epithets and the like, they are not hearsay because they are not relied on

to prove the truth of the matter asserted, but only to show that the statements were made.").

In any event, even if these emails are inadmissible hearsay, there remains sufficient

evidence for this Court to find a question of fact with regard to Garden City's historical

background as contributing to the Plaintiffs' allegations of disparate treatment.

Finally, the Garden City Defendants dispute that any of the instances described

above are relevant to a disparate treatment analysis, because the relevant inquiry is the

zoning decision's historical background, as opposed to the history of the municipality at

issue.  However, although that is the way the inquiry is framed, the Defendants have not

pointed to any precedent that states that a court's analysis in this regard is limited solely to

events in the jurisdiction immediately preceding the challenged decision.  In fact, the

48

Supreme Court appeared to intend for courts to consider the historical background of the zoning decision in a broader sense, for it purposefully distinguished between the historical background of the challenged decision and the specific antecedent events. Village of Arlington, 429 U.S. at 267. Accordingly, the Court will not disregard allegations of previous acts of discrimination by the Village in other contexts.

Thus, viewing this evidence in its totality and in the light most favorable to the Plaintiffs, a reasonable finder of fact could conclude that the R-T zoning designation decision was another act in a series of efforts to prevent minority citizens from moving to Garden City. See, e.g., Dews v. Town of Sunnyvale, Tex., 109 F. Supp. 2d 526, 571 (N.D. Tex. 2000) (concluding, after a bench trial on the merits, that defendant town's decisions, over the years, to adopt one acre zoning, prohibit multi-family housing, and refuse proposed cooperation agreements with local housing authority demonstrated "history of discouraging African-Americans from moving within its borders.").

### c. As to Sequence of Events Underlying the Zoning

Further, as detailed in the Background section above, the Plaintiffs have set forth evidence that raises genuine issues of disputed fact as to whether the sequence of events leading to the implementation of the R-T zone give rise to an inference of race-based animus by the Garden City Defendants.

Garden City retained BFJ to create a zoning proposal for the Social Services site and BFJ, in turn, proposed the R-M designation, which permitted the development of up to 311 multi-family units. Both the County and the Board supported this proposal and, specifically, the inclusion of multi-family housing. Trustee Bee is a member of the Board

49

**SJA 63**

as well as the Committee.  As reflected in a summary of a meeting with local property owners, Trustee Bee expressed the opinions that "Garden City demographically has a need for affordable housing" and that "he would keep an open mind but he still felt the recommended zoning change were appropriate."  However, when it became clear at the public meetings that residents specifically opposed the development of multi-family housing, BFJ and the Board reversed course.  Not long after representing at a January 20, 2004 meeting that the village had a "need" for affordable housing, Trustee Bee stated at the February 5, 2004 public meeting that "neither the County nor the Village is looking to create a so-called affordable housing."  Soon thereafter, the Board and BFJ endorsed a new proposal which banned the development of multi-family housing on all but a small portion of the Social Services site, and then only by special permit.

The Garden City Defendants argue that the changed proposal simply responded to legitimate concerns, but the Plaintiffs have introduced evidence that those concerns, namely traffic, taxes, and schoolchildren, were no more burdensome under the R-M designation than the R-T zone, and that residents were made aware of that fact.  Moreover, the Plaintiffs have directed the Court's attention to a series of comments made, both at public meetings, as well as in notices posted around town or in the local newspaper, which opposed multi-family housing in terms that the Plaintiffs' expert asserts could be construed as euphemisms for race-based animus.  The Plaintiffs further produced evidence which they argue suggests that the decision-makers understood the race-based component of the opposition.  (See, e.g., ("Where is the Benefit to Garden City?  Are We Being Urbanized? . . . The County is asking the Village to change our existing zoning . . . Among the proposed

plans: Low-density (high-rise?) housing – up to 311 apartments"); <u>see</u> Hearing Tr. at 2404
("BRIAN GEMMEL [to SUOZZI]: "I don't think you are hearing a lot of the people.
We're not against residential, we're against multi-level residential."); <u>see id.</u> at 2409
("DAVID PICIULO: I don't hear a compelling argument from anyone here tonight as to
why we should have multi-dwelling homes.  Can we take it out of the proposal?"); <u>see id.</u>
at 2408 ("SUOZZI: Mayor out of respect, let me stipulate the facts here.  The public of
Garden City especially from the eastern civic association does not want to see multi-family
housing here.  They'd rather see single-family housing."); <u>see</u> Negri Dep. at 24-25
("QUESTION: Is housing occupied by low income minorities consistent with the character
of [Garden City's] neighborhood?  NEGRI: No."); <u>see</u> Pls.' Ex. 32 ("The Garden City
Trustees . . . might choose to zone [the Social Services site] for multi-family housing . . . as
many as 30 of those apartments would be considered 'affordable housing' . . .  '[a]ffordable
workforce housing means housing for individuals or families at or below 80% of the
median income for Nassau Suffolk primary metropolitan statistical area as defined by the
Federal Department of housing and urban development.' . . . NOT JUST GARDEN CITY
INCOMES!").)

In addition, County Executive Suozzi opined that "Garden City . . . historically, has
been viewed as a community that didn't want to have affordable housing in it,"  (SAMF ¶
98), and the Deputy County Executive for Economic Development in the County
specifically testified that "people who don't want people of different races living in their
communities and local communities elect their elected officials to do the will of the
people."  (SAMF ¶ 245.)  Finally, as detailed above, the Plaintiffs have introduced

51

evidence that statements made by the decision-makers, namely, Trustee Negri, County Executive Suozzi, and Patrick Duggan, the Deputy County Executive for Economic Development, could suggest that they understood community opposition to the Economic R-M designation to be motivated by unlawful racial animus.  While the Court finds, as detailed below, that County officials had no legal authority to make a decision regarding the zoning for the Social Services site, their reflections on the process as participants at the community meetings are relevant as to how community opposition could have been construed by the lawmakers.

While the Garden City residents did not explicitly reveal that their opposition was fueled by racist sentiments, the Plaintiffs offer a number of cases as precedent as well as the expert report of Dr. Peter Marcuse to demonstrate that euphemisms for race-based bias in housing situations can demonstrate discriminatory intent.  Indeed, "[i]n a discrimination action, a court cannot be satisfied that the absence of overtly discriminatory remarks proves an absence of discrimination."  Huntington Branch, N.A.A.C.P. v. Town of Huntington, N.Y., 668 F. Supp. 762, 786 (E.D.N.Y. 1987), rev'd on other grounds, 844 F.2d 926 (2d Cir. 1988) (noting that findings of discrimination cannot "be avoided by careful use of code words.").  It is to be noted that courts have accepted expert testimony in discrimination cases to assist the trier of fact in determining whether improper motives played a role in a challenged action.  For instance, in Price Waterhouse v. Hopkins, 490 U.S. 228, 235-236, 109 S. Ct. 1775, 1782-83, 104 L. Ed. 2d 268 (1989), the Supreme Court cited expert testimony proffered by a social psychologist to decipher "gender neutral" remarks made by partners in the hiring process, and opine whether such remarks betrayed discriminatory

52

animus, despite the fact that the expert had not actually "met any of the people involved in the decisionmaking process." Id.

Peter Marcuse is an Emeritus Professor of Urban Planning at Columbia University. He has fifty-five years of experience in research, teaching, practice, and public service in the fields of housing and planning, and holds a J.D. in law and a Ph.D. in planning. (See generally Pls.' Ex. 93 (hereinafter the "Marcuse Report").) Marcuse states in his report that "euphemisms for race are in wide-spread use," and include terms and expressions such as "affordable," "inconsistent with village character," "multi-family," "not upscale," "urban character," "high-density," and "rental," which are "used by opponents of housing expected to be occupied by minority-group members." (Marcuse Report, at 2.) He also states that "[t]he presence of affordable housing is thus, in my opinion, opposed by residents and officials of Garden City and Nassau County with the understood effect of discriminating against minority groups . . ." (Marcuse Report, at 3.) In arriving at the conclusions stated in his report, Marcuse reviewed documents provided by the Plaintiffs' counsel involving the instant litigation, as well as a series of academic treatises and studies related to housing and planning.

The Garden City Defendants do not dispute that Marcuse as an academic expert is qualified to render opinions on the subject at issue. However, they do assert that to the extent the Plaintiffs rely on the expert opinion of Marcuse to supply the requisite discriminatory intent element of their claims, such opinions must be precluded because it represents a legal conclusion and usurps the role of this Court. However, the Marcuse Report only purports to decode potential euphemisms similar to those implicated in the

Price Waterhouse case. Accordingly, the entirety of the report will be considered

admissible at this stage and any determination as to the report's credibility is the province

of the finder of fact. See, e.g., Tuli v. Brigham & Women's Hosp., Inc., 592 F. Supp. 2d

208, 214 (D. Mass. 2009) (finding that professor's proffered expert testimony regarding

"social framework analysis" was admissible, as it did not opine on the ultimate factual

conclusions to be drawn by the jury and was based "not simply on experience, but also

social psychological testing of stereotyping and discrimination over the past thirty or forty

years"); Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC, 470 F. Supp. 2d 345,

355 (S.D.N.Y. 2007) (rejecting movant's argument "that [expert testimony] would not be

helpful to the fact finder in this case because the notion of gender stereotyping is not an

arcane one" as one that goes to weight of expert testimony, not admissibility); Jenson v.

Eveleth Taconite Co., 824 F. Supp. 847, 881 (D. Minn. 1993) (accepting, over defendant's

objection, expert testimony regarding sex stereotyping proffered by social psychologist

who had "performed numerous research studies on the subject of sexual stereotyping and

ha[d] presented his findings in several scholarly articles and at numerous academic

conferences on the issue of gender stereotyping in the workplace"). While the Garden City

Defendants wish to reserve their full arguments as to the admissibility of Marcuse's

opinions, for purposes of this motion, his expert opinion will be taken into consideration by

the Court.

    In addition, the Garden City Defendants raise questions with regard to the

Plaintiff's reliance on the  Marcuse Report in part because Marcuse did not interview

Garden City residents who spoke at a series of public hearings before concluding that their

statements contained euphemisms for racist opinions.  Thus, it appears that the Garden City Defendants contend that the Marcuse Report is not based upon reliable data.  However, any argument that Marcuse's testimony should not be considered because he relied upon newspaper articles and/or transcripts depicting events, without having personal knowledge of the events described, is without merit.  It is beyond dispute that "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 591, 113 S. Ct. 2786, 125 L. Ed. 2d. 469 (1993); see also U.S. v. Mulder, 273 F.3d 91, 102 (2d Cir. 2001) ("Defendants' . . . contention-that the district court impermissibly allowed the experts to rely on multiple hearsay-lacks merit because 'expert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions.'") (quoting United States v. Locascio, 6 F.3d 924, 938 (2d Cir. 1993)); MacQuesten Gen. Contracting, Inc. v. HCE, Inc., No. 99 Civ. 8598, 2002 WL 31388716, at *2 (S.D.N.Y. Oct. 22, 2002) ("[E]xpert analysis is often based on reported information rather than firsthand knowledge, and that is no bar to its admissibility.").

In this field, witnesses offering expert testimony based in social science and/or academia frequently rely upon hearsay or otherwise inadmissible evidence, as Marcuse has in his report.  See United States v. Joseph, 542 F.3d 13, 21 (2d Cir. 2008) ("To the extent that the District Court was concerned that [the expert's] testimony would rely on hearsay, that would not be a valid objection.  Social science experts commonly base their opinions on [hearsay such as] interviews.") (citing Fed. R. Evid. 703).

55

Finally, beyond the issues of the expressions utilized in opposing the zoning and Marcuse's report, the Garden City Defendants argue against the Court's consideration of the comments described above because they are select quotes that in context are "rather sterile" and "not in any way analogous to those made in the cited FHA cases in which actual, strong community opposition was found." (GC Mem. at 26.) The Garden City Defendants rely on several cases outside of this circuit to support this contention. However, all these cases are readily distinguishable from the case at hand.

First, although the Garden City Defendants cite to the case of <u>Hallmark Developers, Inc. v. Fulton County</u>, 466 F.3d 1276 (11th Cir. 2006) in support of their position that ambiguous remarks of alleged racial bias cannot sustain a disparate treatment claim, that case is distinct from the present case. First and foremost, that case affirmed the findings of fact from a bench trial, where credibility assessments of the speakers and their motivations were appropriate. Second, that court specifically noted that the plaintiffs had set forth no evidence that the decision-makers were aware of the attitudes of the community regarding the proposed zoning change or ratified them. This is not the case here, as Board members were present at every public hearing where such opposition was voiced. Moreover, the remarks were the sole evidence of any discriminatory intent before the trier of fact, as the plaintiffs there failed to set forth any evidence regarding a historical background of race-based animus or abnormalities in the sequence of events leading up to the decision. Here, as discussed above, the Plaintiffs have not simply relied upon such remarks in opposition to summary judgment, but rather have provided other evidence (including statistical evidence, historical evidence, and evidence regarding the sequence of events leading to the zoning

56

decision at issue).  In the Court's view, when all of this evidence is construed together in the light most favorable to the Plaintiffs, it is sufficient to raise genuine issues of disputed fact as to whether the Garden City Defendants' decision to reject BFJ's R-M zoning proposal, originally endorsed by both the County as well as the Committee, and adopt the more restrictive zoning designation, was motivated by discriminatory intent.

Second, the Garden City Defendants rely on the case of <u>White Oak Property Development, LLC v. Washington Township, Ohio, et al.</u>, 606 F.3d 842 (6th Cir. 2010), for the proposition that mere inquiries about affordable or Section 8 housing do not amount to evidence of an FHA violation.  Thus, they argue that the record here does not present evidence of any bigoted comments or even an inquiry from a member of the Board as to type of housing that the zoning contemplated.  However, unlike in <u>White Oaks</u>, the public opposition here involved more than isolated inquiries, such as statistical and historical evidence.  Moreover, the plaintiff in <u>White Oaks</u> did not present any evidence that minority populations existed in the township or the surrounding areas.  Here, the record clearly indicates that Nassau County's minority populations disproportionately occupy the County's existing affordable housing, none of which exists in Garden City.

The Court agrees with the Garden City Defendants that some of the comments cited by the Plaintiffs, when viewed in context, may be "innocuous and sterile."  (Def. Mem. at 23.)  However, that does not mean that all that remains are "isolated bigoted comments" that are insufficient to create an issue of fact.  <u>United States v. City of Birmingham</u>, 538 F. Supp. at 828.  Under the totality of the circumstances, there is certainly enough evidence put forth by the Plaintiffs to create a triable issue of material fact that strong community

opposition was present and that the zoning decision may have been an effort to appease that resistance.

### d. As to Whether There Were Departures from Normal Procedural Sequences

Next, the Garden City Defendants argue that there were no departures from normal procedural sequences or substantive criteria, so that these considerations do not weigh in favor of a finding of discriminatory treatment. The one alleged departure from normal procedural sequences is that BFJ recommended R-M zoning on multiple occasions, which was subsequently adopted by the P-Zone Committee and the Board, but consequently was not the zoning scheme that was adopted by the Village. Although the Garden City Defendants attempt to articulate a basis for their contradictory choice, which the Court will address in further detail below, it nevertheless is considered as part of the evidence of the Plaintiffs' prima facie case of housing discrimination under a theory of disparate treatment. See Sunrise Dev., Inc. v. Town of Huntington, N.Y., 62 F. Supp. 2d 762, 775, 776 (E.D.N.Y. 1999) (concluding, after a bench trial on the merits, that "[a]lthough the Town did commission the [Citizens' Advisor Committee] to undertake a study and issue recommendations on senior housing, when the time came to enact the Local Law, the Town disregarded the CAC's recommendations," which suggested that "defendants likely were swayed by the anti-disabled animus present in the community"); Dews, 109 F. Supp. 2d at 571 (N.D. Tex. 2000) ("[Defendant's] history of ignoring the recommendations of its planners and proceeding in the face of sound legal and planning advice" weighed towards finding of discriminatory intent).

58

As Judge Bianco previously stated at an oral argument hearing regarding the previous summary judgment motions: "One of the things that's at the core of their case relates to the fact that the Board's own consultant zoned it for R-M, that the County wanted RM, and that the Board changed it to R-T without any objective basis to support that decision.  And that at least creates an issue of fact where . . . the Court should look at the evidence and the experts on both sides and determine whether or not there was discriminatory intent behind that."  (See Hearing Tr., at 64.)

### e. As to the Defendants' Burden

Weighing the evidence outlined above in its totality, the Court concludes that the Plaintiffs have successfully established a prima facie case of housing discrimination under the theory of disparate treatment.  The burden thus shifts to the Garden City Defendants to demonstrate "that the same decision would have resulted even had the impermissible purpose not been considered."  Vill. of Arlington Heights, 429 U.S. at 270 n.21.

In support of that proposition, the Garden City Defendants offer the expert testimony of Patrick Cleary, who opines that the R-T zoning designation "appropriately fits within the Village's well established zoning and land use framework and is cognizant of the historical significance of that framework."  (Cleary Report, at 2.)  They further argue that the R-T zone was implemented "because of concerns involving traffic generation and to meet the physical character of the neighborhood particularly in this transitional area."  (GC Reply, at 10.)  Finally, the Garden City Defendants refer to statements made at a meeting of the Board of Trustees to demonstrate that they had a legitimate reason to restrict multi-family housing to less than 15% of the subject property and to be obtainable only by

special permit as opposed to as of right.  (See Frank Fish, Board of Trustees Meeting

Minutes, May 20, 2004, GC Ex. P at 35) (responding to an inquiry regarding multi-family

housing with a special permit under R-T zoning, by stating that "[t]he P Zone Committee

had been considering this and the Trustees on the entire site, it wasn't an after thought.

This was, this was a conscious decision . . . there was a concern that if the whole 25 acres

were developed for multi-family it would generate too much traffic . . .").

     Thus, the Garden City Defendants submit that legitimate concerns prompted the

Board to reject the initial proposal offered by their consulting company and endorsed by

their P-Zone Committee, and that the Board's goals were met by the R-T zoning.  While

the Plaintiffs challenge the sufficiency of the Garden City Defendants' factual allegations,

the Court finds that they have satisfied their minimal burden of offering a

nondiscriminatory reason for their zoning decision.  See Reeves v. Sanderson Plumbing

Prods., Inc., 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) ("[The burden of

providing a legitimate, nondiscriminatory reason] is one of production, not persuasion; it

can involve no credibility assessment.") (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S.

502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).

     However, although the Garden City Defendants have offered a nondiscriminatory

reason for their actions, a fact finder could reasonably conclude that the proffered reason is

pretextual and that discrimination was the real reason behind their zoning decision.  "While

the issue of pretext cannot be resolved on summary judgment based on the allegations in

the complaint, [the Court] agree[s] that [the P]laintiffs have come forth with sufficient

60

evidence of pretext to survive summary judgment." Wentworth v. Hedson, 493 F. Supp. 2d 559, 570 (E.D.N.Y. 2007).

First, there are factual disputes regarding whether the Board enacted the R-T designation into law based on the belief that this type of zoning created the least amount of traffic and schoolchildren. (Compare April 22, 2004 Presentation to the Village, GC Ex. I (noting that townhomes produce the least amount of traffic as compared to multi-family and single family homes) with Pl. Ex. 53 at 42-43 ("Michael Filippon: If I could just add on this point of traffic . . . You have to remember that the existing use on that site now generates a certain amount of traffic, a fair amount of traffic. That use is going to be vacated. The two residential uses that are being proposed as one of the alternates, each of which on their face automatically generate far less traffic than the existing use. That is something to consider also.") and Pl. Ex. 54 at 31-32 ("[Resident]: But, we would also have more traffic because of more people owning cars and leaving there in and out. As opposed to . . . [applause] Thomas Suozzi: You may want to clap for that, but that's irrational.").) Although the Plaintiffs do not dispute that the R-T zoning would produce marginally less traffic than the R-M zoning, they allege that both proposals would reduce the amount of traffic currently in the area. (SAMF ¶¶ 75-76.) As to the supposed justification regarding the potential overcrowding of schools in the Village, Garden City even concedes that townhomes would have produced the same number of school children as multi-family homes. (GC Mem. at 36; see also SAMF ¶¶ 71-72.)

Moreover, the Garden City Defendants stress that the R-T designation "furthered the interests of the Village to offer townhouses (an entirely new housing option not

previously constructed in the Village) as an option for the site . . . ."  (GC Mem. at 31.)

However, it is undisputed that although townhouses may have been a "new housing option

not previously constructed in the Village," they were also available under the original R-M

zoning proposal, so their desirability and inclusion into the R-T designation does not

definitively support the proposition that the Board would have decided on that designation

regardless of any alleged discriminatory animus.

Accordingly, there are disputed issues of fact as to whether the preferred

nondiscriminatory reasons of the Garden City Defendants are mere pretext and thus

whether the Board would have arrived at the same decision regarding the zoning

designation even if the impermissible purpose had not allegedly been in play.  This

conclusion is bolstered by the fact that at oral argument before Judge Bianco, the Garden

City Defendants' counsel was directly questioned as to the objective basis for the Board's

decision to change the R-M designation to the R-T designation.  Counsel responded that the

citizens raised concerns, but was unable to direct the Court's attention to any objective

evidence supporting those concerns.

> The Court:  What was the objective basis for switching it from RM to RT?  What was the objective basis?
>
> Mr. Ryan:  . . . after discussion, after public hearings, after input from the community, based on issues of traffic, stated issues of traffic, school crowing [sic], increased taxes, increased drain on services, aesthetics, physical character of the surrounding neighborhood.  It was felt by the Board that we will consistent with the Village make-up . . .
>
> The Court:  What was the expert data that backed up the citizen's complaints?  The expert had told the Village the opposite; right?
>
> Mr. Ryan:  Judge, the Village trustees looked all of these factors and weighed everything and consistent with the Village —

The Court:  But other than the complaints of the citizens . . . my question to you is what else in terms of objective data supported the switch from RM to RT?

Mr. Ryan:  Judge, you listen to as an elected official, you listen to your constituents. You look — You listen to your experts.  You weigh what — and You weigh the — what is presented to you.

(See Aug. 21, 2009 Hearing Tr. at 65-66; see also Trustee Lundquist Dep., Pl. Ex. 9 at 239

(stating "I don't know" when asked to offer an explanation as to why the recommended R-M zoning was not adopted by the Board).)

The Garden City Defendants rely on R.J. Investments v. Board of County Commissioners for Queen Anne's County, Maryland, 414 Fed. App'x 551 (4th Cir. 2011), in which the Fourth Circuit upheld a judgment for the defendants where they demonstrated that their decision to prevent the development of affordable housing was based on "legitimate" concerns regarding sewer capacity, and because the plaintiff's case was merely based on "conjecture and supposition".  The Fourth Circuit found that there was not a "scintilla of evidence that the Board . . . acted with racially discriminatory intent."  Id. at 554.  However, unlike in R.J. where the sewage concerns were unquestionably legitimate, in this case, the Plaintiffs have put forth evidence that raises a genuine issue of fact as to whether the non-discriminatory reasons cited by the Garden City Defendants, such as traffic or the increased burden on the school system, were baseless pretext.  Furthermore, the Court finds that the Plaintiffs case is based on more than "conjecture and supposition" and thus sufficient reasons exist to preclude the case's dismissal on summary judgment.

In sum, the Court concludes that, viewing the evidence in the light most favorable to the Plaintiffs, as required on summary judgment — including the alleged impact of the

zoning change on minorities, the historical background of the zoning decision, the sequence of events leading up to it, and statements made by the decision-makers — that the Plaintiffs have raised genuine issues of material fact as to whether the Garden City decision-makers engaged in discriminatory zoning practices in connection with the Social Services site. Accordingly, the Defendants' motion for summary judgment with regard to the Plaintiffs' disparate treatment claim as to the Garden City Defendants, is denied.

### ii. Nassau County

In the County's separate motion for summary judgment, it argues that the Plaintiffs' disparate treatment claim against it must fail, as a matter of law, because, regardless of whether the Plaintiffs can demonstrate racial animus, they have failed to raise any factual issues as to whether the County bears the legally required causal relationship to the complained-of Village zoning action. The Court agrees.

Although the Plaintiffs' allegations are not entirely consistent in this regard, the allegedly discriminatory act at issue in this case is the rejection of the R-M designation in favor of the R-T designation. However, the County cannot be held liable for that act, as a matter of law, because the County lacked legal power over the chosen zoning designation for the Social Services site. While the County did request that the Garden City Defendants rezone the Site so as to facilitate a higher purchase price for the property, the Garden City Defendants were under no legal obligation to do so. See County Government Law of Nassau County (L 1936, ch 879 § 1606) (stating that "powers with regard to the regulation and restriction of the height, number of stories and size of buildings and other structures, the percentage of the lot that may be occupied, the size of the yards, courts and other open

64

spaces, the density of population, and the location and use of buildings, structures and land for trade, industry, residence or other purposes shall remain in force in such towns, villages and cities"); see also Village Law § 7-700 (L 1972, ch 892, eff. Sept. 1, 1973, Grant of Power) ("the board of trustees of a village is empowered, by local law, to regulate and restrict the height, number of stories and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts and other open spaces, the density of population, and the location and use of buildings, structures and land for trade, industry, residence or other purposes").

The Plaintiffs dispute the County's asserted lack of legal authority because they claim that the County is essentially empowered to ignore or override a municipality's zoning laws when it is in the best interest of the public.  In support of this proposition, the Plaintiffs cite to a small number of New York state cases and one federal case from the Southern District of New York where either a county itself or a private party working in tandem with a county brought suit against a municipality to challenge its zoning laws.  Thus, extrapolating from this precedent, the Plaintiffs claim that the County's deliberate inaction by not bringing such a lawsuit is equivalent to impermissible discrimination.

First, although the Plaintiffs assert that the County could simply ignore a local municipality's zoning ordinance, this is not precisely true.  Rather, if a county's challenge to a zoning law is successful because a court finds that the public interest in a particular land use outweighs the local municipality's interests in preventing that land use, then, and only then, is a county empowered to ignore that zoning.  The Plaintiffs point out that by planning to build a new Family and Matrimonial Court Complex on the Social Services site

65

although the land is no longer zoned as "P" for public governmental use, the County has

acknowledged its authority to ignore the Village's zoning of the Site.  It is not entirely clear

whether Garden City is intending to or would be required to change the site's zoning back

to "P" in order for the County to build the complex.  Carl Schroeter stated in his deposition

that his "opinion—I'm not a lawyer.  My opinion is that the County would have the right to

[renovate or construct a placement for the family court on the Social Services site] without

a rezoning."  (Pl. Ex. 123 at 124.)  The Court finds it strange that the County on one hand

cites to its lack of zoning power to preclude liability in the present case while

simultaneously ignoring this same lack of power if it were to build a government building

on land not zoned for it, arguably in an effort to end the litigation.  However, Schroeter's

statement of belief alone is insufficient to find that the County can ignore Garden City's

zoning to build the Family and Matrimonial Court Complex if Garden City does not change

it on its own initiative, nor does it mean it would have the authority to do so.

Significantly, the Court notes that all of the cases referenced by the Plaintiffs with

regard to the County are distinguishable from the case at hand.  As an initial matter, the

cases cited by the Plaintiffs for the assertion that the County had authority to supersede

Garden City's zoning ordinances are inapplicable, because even if the County were to

achieve such an override, the private developer the site was eventually sold to would still

be subject to Garden City's zoning requirements. Cf. Matter of County of Monroe, 530

N.E.2d 202, 72 N.Y.2d 338, 533 N.Y.S.2d 702 (1988) (addressing the applicability of local

zoning laws where a conflict arises between two governmental entities).  Further, even in

cases where a private developer was not precluded from enjoying such immunity against

66

local zoning, that party was working together with the state or county to complete a certain project.  In other words, the cases cited by the Plaintiff do not involve the situation where a private developer is merely purchasing land from the county to pursue its own endeavor. See Crown Comm'n N.Y., Inc. v. Dep't of Transp. of N.Y., 4 N.Y.3d 159, 824 N.E.2d 934, 791 N.Y.S.2d 494 (2005).

Finally, the one federal case from this circuit cited by the Plaintiffs involved an instance where the State had explicit statutory authority under the New York Education law to initiate quasi-judicial proceedings sua sponte to enforce New York's education policies. See U.S. v. City of Yonkers, 96 F.3d 600, 618 (2d Cir. 1996) ("The State defendants contend, however, that the judgment in their favor should be upheld on the basis that, under New York law, they lacked legal authority or responsibility to intervene in Yonkers to remedy the unlawful segregation.  In light of the express provisions of New York statutory law, this contention need not detain us long.").  No such explicit mandate to commence quasi-judicial or judicial proceedings or any other form of statutory override powers exist here.  Cf. id. ("and it provides that he 'shall also have the power and it shall be his duty' to cause to be instituted such proceedings or processes as may be necessary to properly enforce and give effect to any provision in this chapter").

Even though the cases cited by the Plaintiffs are all distinguishable, the Court recognizes that there is some authority for the proposition that the County hypothetically could initiate a law suit to challenge Garden City's zoning laws.  See Westhab, Inc. v. Village of Elmsford, 151 Misc. 2d 1071, 574 N.Y.S.2d 888 (N.Y. Sup. Ct. 1991) ("Therefore, this court believes that upon a balancing of the public interests test it would be

67

**SJA 81**

determined that the County of Westchester . . . would be exempt from the enforcement by the Village of Elmsford of the local regulations at issue."); see also City of Yonkers, 96 F.3d at 613 ("Liability may be premised not only on action but on a refusal to act."). This ability could potentially extend to a private developer who subsequently purchased the land from the County. See Crown Comm'n N.Y., 4 N.Y.3d at 165 ("it is not the private status of the Wireless Telephone Providers but, rather, the public nature of the activity sought to be regulated by the local zoning authority that is determinative in this case") (internal quotations omitted).

Nevertheless, even if this Court were to assume that in theory the County could have initiated litigation to challenge Garden City's R-T zoning for an exemption in the public interest, the Court is not persuaded that because such litigation was not taken, the County may now be held liable. Cf. Doe v. New York City Dep't of Social Services, 649 F.2d 134, 141 (2d Cir. 1981), cert. denied, 464 U.S. 864, 104 S. Ct. 195, 78 L. Ed. 2d 171 (1983) ("Government officials may be held liable under § 1983 for a failure to do what is required.") (emphasis added).

While the County has certain obligations in accepting HUD funds, including that it will affirmatively further fair housing, the Court will not go so far as to say that this duty encompasses an obligation to sue a municipality every time a county believes it might be violating the FHA. Such a rule would logically mean that a county would need to commence an action against a municipality for any questionable zoning decisions or risk being sued for that municipality's bad acts. The mere ability to bring a lawsuit against a municipality should not impose upon a county a duty to do so in order to avoid being held

68

responsible for a municipality's zoning decisions.  It is unsound for this Court to find that a county needs to proactively and preventively bring suit in order to avoid liability.  The Plaintiffs have not pointed to and the Court has not found a case that states that a county may be held liable under the FHA for not actively pursuing litigation against a municipal zoning authority.  In this case, it is simply too attenuated to say that the County had a discriminatory impact on the Plaintiffs by not itself challenging Garden City's zoning decision presently under attack by the Plaintiffs.

Moreover, the Plaintiffs emphasize that the County did not protest Garden City's actions in a more forceful matter, whether formally or informally.  However, the lack of objection alone does not constitute discriminatory conduct in this case.  The Plaintiffs argue that the County could have formally recommended modification or disapproved of the proposed action pursuant to N.Y. Gen. Mun. Law § 239-m(4)(a), such as recommending that R-M zoning be instituted rather than R-T.  Instead the County merely requested that the density of the R-T zone be less severely limited.  However, although the Plaintiffs may find the lack of outrage by the County to be objectionable, that does not constitute a violation of law.  In addition, the County also cannot be held liable for its mere failure to informally and publicly combat the Garden City Defendants' alleged discrimination, as the Plaintiffs contend.

Therefore, while the Plaintiffs submit that County officials were well aware that racism fueled community opposition to the R-M zoning designation and "acquiesced" to that opposition or acted "in concert" with the Village by selling the property under the R-T designation, the County had no legal authority to alter or ignore the Garden City

69

**SJA 83**

Defendants' zoning decision once enacted. The fact that the County could itself bring suit for an exemption to override the zoning decision does not change this result, in light of the Court's discussion above. The other arguments made by the Plaintiffs to place liability on the County Defendant are also without merit.

Finally, to the extent that the Plaintiffs are alleging that the discriminatory act at issue is not the zoning decision but rather the County's sale of the Social Services site, summary judgment would still be granted as to the County Defendant. The County's stated goal in selling the land was maximizing profits, and it has demonstrated that though it would have preferred the R-M designation, it acted in furtherance of its stated goal when left with the R-T designation. The Plaintiffs have provided no evidence from which a rational finder of fact could determine that the County's ultimate selection of Fairhaven Properties, Inc. as the highest bidder for the Social Services site was motivated by any discriminatory intent.

Accordingly, the County's motion for summary judgment dismissing the Plaintiffs' disparate treatment claim against it is granted.

### 2. **Disparate Impact**

The Court now turns to the Defendants' respective motions for summary judgment dismissing the Plaintiffs' FHA § 3604 claim brought under a theory of disparate impact. For the reasons outlined below, disputed issues of fact preclude summary judgment on this claim as to the Garden City Defendants, but not the County.

70

### a. Legal Standard

In establishing a prima facie case of housing discrimination under a theory of disparate impact, a "plaintiff must show: (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." Tsombanidis v. W. Haven Fire Dep't, 352 F.3d 565, 574-75 (2d Cir. 2003) (internal quotations omitted). A claimant need not provide proof of discriminatory intent, but must demonstrate that "the challenged practice of the defendant 'actually or predictably results in racial discrimination; in other words that it has a discriminatory effect.'" Huntington Branch, N.A.A.C.P., 844 F.2d 926 at 934 (quoting United States v. City of Black Jack, 508 F.2d 1179, 1184-85 (8th Cir. 1974), cert. denied, 422 U.S. 1042 (1975)) (further noting that sometimes "[facially neutral] rules bear no relation to discrimination upon passage, but develop into powerful discriminatory mechanisms when applied"). "The discriminatory effect of a rule arises in two contexts: adverse impact on a particular minority group and harm to the community generally by the perpetuation of segregation." Huntington Branch, N.A.A.C.P., 844 F.2d at 937.

In establishing "discriminatory impact," the plaintiff must demonstrate a "'causal connection between [a] facially neutral policy . . . and the resultant proportion of minority' group members in the population at issue." Hack v. President & Fellows of Yale Coll., 237 F.3d 81, 90-91 (2d Cir. 2000) (quoting Brown v. Coach Stores, Inc., 163 F.3d 706, 712 (2d Cir. 1998)). Once a plaintiff has presented a prima facie case of disparate impact, "the burden shifts to the defendant to 'prove that its actions furthered, in theory and in practice,

71

a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect.'" Tsombanidis, 352 F.3d at 575 (quoting Huntington Branch, N.A.A.C.P., 844 F.2d at 936).  The Second Circuit has set forth two factors that weigh in this analysis; first, although discriminatory intent is not required to establish a prima facie case of disparate impact housing discrimination, "there can be little doubt that if evidence of such intent is presented, that evidence would weigh heavily on the plaintiff's side of the ultimate balance." Huntington Branch, N.A.A.C.P., 844 F.2d at 936. Second, if the plaintiff is suing "only to require a governmental defendant to eliminate some obstacle to housing that the plaintiff itself will build," the government must provide a more substantial justification for its actions than would be the case if a plaintiff was suing to compel the government to construct housing. Id.

### b.  As to the Plaintiffs' Theory of Disparate Impact

#### i.  The Garden City Defendants

In the instant case, as set forth in detail above, the Plaintiffs have raised triable issues of fact with regard to whether an outwardly neutral practice, namely, the adoption of the R-T zoning designation by the Garden City Defendants, had a disproportionate effect on potential minority residents.  First, evidence proffered by the Plaintiffs' expert suggests that the rejection of the R-M zone in favor of the R-T zone significantly decreased the potential pool of minority residents likely to move into housing developed at the Social Services site in proportion to the number of non-minorities affected and, therefore, the enactment of the R-T zone actually resulted in racial discrimination.  See Tsombanidis v. W. Haven Fire Dep't, 352 F.3d 565, 575-76 (2d Cir. 2003) ("The basis for a successful

72

**SJA 86**

disparate impact claim involves a comparison between two groups — those affected and those unaffected by the facially neutral policy. This comparison must reveal that although neutral, the policy in question imposes a significantly adverse or disproportionate impact on a protected group of individuals . . . . Statistical evidence is also normally used in cases involving fair housing disparate impact claims.") (internal quotations omitted).

McCardle's report postulates that in a residential development with a multi-family, affordable housing component that was consistent with the rejected R-M zoning classification, the pool of renters who could have afforded to live at the Social Services site would have ranged from 56 minority households (18% of households) to 101 minority households (32% of households). (SAMF ¶¶ 150-54.) In comparison, under the R-T zoning compliant luxury housing development that was to be built by Fairhaven, the Social Services site would have been occupied almost exclusively by white households, with only 3 to 6 minority households. (SAMF ¶ 69.) See Rivera v. Inc. Vill. Of Farmingdale, 784 F. Supp. 2d 133, 144 (E.D.N.Y. 2011) (finding an issue of fact regarding disparate impact in light of statistical evidence which demonstrated that 21.9% of Hispanic residents would be affected by village project as opposed to only 1.2% of non-Hispanic white residents).

The Garden City Defendants point out that McCardle only compares the number of minorities affected as between the R-M designation and the winning $56 million bid under the R-T zoning, thus excluding a comparison with other potential housing that could have been built at the site under R-T zoning that was not necessarily "high-end". However, even if a different bidder had been awarded the project, the McArdle Report also notes that minorities comprise a disproportionate share of renter (versus owner) households in the

73

**SJA 87**

County and, thus, a zoning proposal that permits only 36 multi-family rental units (and only by special permit) versus the 311 contemplated by the original zoning proposal (as-of-right) would have a greater impact upon potential minority residents. (See McArdle Report, at ¶ 49 ("Minorities made up just 14.8% percent of all households in Nassau County in 2000, but 31.1% of renter households.").) Thus, Garden City's attempt to avoid liability under a disparate impact analysis by pointing the finger at Nassau County's price demand is without merit.

The Plaintiffs also produced evidence that the R-T zone's restriction on the development of multi-family housing perpetuates segregation generally because it decreases the availability of housing to minorities in a municipality where minorities constitute approximately 2.6% of the population versus approximately 19.7% in the County overall. See Davis v. N.Y. City Hous. Auth., 278 F.3d 64, 80-81 (2d Cir. 2002) (stating that district court's determination in disparate impact claim that housing project was segregated where percentage of project's white population was more than four times the system average "was entirely consistent with existing law"); United States v. Inc. Vill. of Island Park, 888 F. Supp. 419, 448 (E.D.N.Y. 1995) (finding that although African-American population in defendant village increased over ten years, it's still relative low share of the overall village population, particularly when considered in contrast with the African-American population of Nassau County Consortium and adjacent town, demonstrated segregation under disparate impact claim).

The Court rejects the Garden City Defendants' argument that the R-T zoning designation does not perpetuate segregation because it creates housing opportunities where

there previously were none under the P zone.  As set forth in the first ACORN decision by Judge Bianco, as well as in the disparate treatment analysis in this Memorandum of Decision and Order, the relevant inquiry here focuses on the housing opportunities available under the rejected R-M designation versus the approved R-T designation.

As the Plaintiffs have established a prima facie case of disparate impact, the burden now shifts to the Defendants to demonstrate that the rejection of the R-M zone for the R-T zone advanced a "legitimate, bona fide governmental interest . . . that no alternative would serve . . . with less discriminatory effect."  Tsombanidis, 352 F.3d 565, 575.  The Garden City Defendants argue that they had such a legitimate, bona fide governmental interest in that the R-T zoning designation "encourages the development of townhomes, a housing option not previously built in the Village."  (GC Mem. at 36.)  However, the Plaintiffs note that the Garden City Defendants fail to identify how those interests were not advanced by the R-M zoning designation, which also allowed for the development of townhouses.  The Garden City Defendants further submit that the R-T zoning designation better balanced the existing residents' concerns about traffic, schools and infrastructure.  However, as the Court has already noted, the Plaintiffs have offered evidence that those concerns were adequately addressed by the R-M framework.  Accordingly, while the Garden City Defendants have identified legitimate governmental interests advanced by the R-T zone, the evidence proffered by the Plaintiffs is sufficient to create genuine issues of disputed fact as to whether those interests truly existed in this case and, if so, whether such interests could be furthered with less discriminatory effect.

75

Finally, even though the Plaintiffs are not required to set forth evidence of discriminatory intent in order to establish a prima facie case of disparate impact, they also have raised triable issues of fact regarding the Garden City Defendants' complicity in acting on the allegedly race-based community opposition to the R-M zone. If a rational finder of fact was to find discriminatory intent, that finding would weigh in the Plaintiffs' favor on a disparate impact claim. As noted above, the Court recognizes that the Garden City Defendants have articulated legitimate, general planning concerns, but there are material issues of fact relating to whether those articulated concerns were a pretext for discriminatory intent. This issue cannot be resolved on summary judgment. Accordingly, the Garden City Defendants' motion for summary judgment on the Plaintiffs' FHA disparate impact claim is denied.

### ii. The County

As with disparate treatment, the Court must initially determine how to frame the alleged discriminatory action in connection with the County. In the context of disparate impact, the Plaintiffs contend that the action they are condemning is the "acquiesce[ence] to the exclusionary R-T zoning" and that anything that "happened during the RFP process is beside the point for the purposes of this Court's disparate impact analysis." (Pl. Opp. at 52-54.) However, as set forth above, under the facts of this case, the County bears no liability for the enactment of the allegedly discriminatory zoning designation, as a matter of law.

In order to advance a claim against this defendant under a theory of disparate impact, the Court finds that the Plaintiffs must set forth evidence from which a rational fact

76

finder could conclude that the County's other possibly discriminatory action — the outwardly neutral decision to sell the Social Services site to Fairhaven Properties, Inc. — had a disproportionate effect on minority residents, as opposed to other potential proposals that conformed to the strictures of the R-T zoning designation.  In other words, because there is no evidence that the County was responsible for that R-T designation, the disparate impact claim against it cannot be based on any disparity between proposals under the R-M designation as opposed to the R-T designation.  Instead, the County can only be held liable with respect to disparate impact among proposals that conform with the R-T zoning requirements.  However, the Plaintiffs have submitted no evidence that the selection of Fairhaven Properties, Inc. bid had a disproportionate effect on minorities when compared to alternate proposals conforming to the strictures of the R-T zone.  Accordingly, the Plaintiffs have failed to establish a prima facie case of disparate impact as it relates to the County and the County is entitled to summary judgment dismissing that claim.

## D.  **FHA Claims Against the County**

The Plaintiffs, including the Intervenor-Plaintiff NYCC, assert a second FHA claim, against only the County, arising under 42 U.S.C. § 3608 (Section 808 of the FHA), on the ground that the County has failed to affirmatively further fair housing while receiving federal grants conditioned on that action.  The County argues first, that this provision of the FHA is only applicable to federal agencies; second, that the provision does not create a private right of action; and third, that federal regulations actually prevent it from disbursing federal housing funds to Garden City and, therefore, it could not have run afoul of the FHA for any alleged complicity in the Garden City Defendants' zoning decisions.  As set forth

below, the Court finds that though this provision is indeed applicable to local agencies as they act on behalf of HUD, it does not provide a private right of action. Thus, the Court need not address the substantive merits of the Plaintiffs' claim in this regard.

### 1. Legal Standard

Section 3608(e)(5) provides that "the Secretary of Housing and Urban Development ["HUD"] shall – administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this title." 42 U.S.C. § 3608(e)(5); FHA § 808(e)(5). To that end, any recipient of affordable housing assistance provided by HUD must "certif[y] to the satisfaction of the Secretary that – the grant will be conducted and administered in conformity with the Civil Rights Act of 1964 and the Fair Housing Act, and the grantee will affirmatively further fair housing." 42 U.S.C. § 5304(b)(2); FHA § 104. Federal regulations specify that consortium fund recipients "affirmatively further fair housing" by "conduct[ing] an analysis to identify impediments to fair housing choice within the area, tak[ing] appropriate actions to overcome the effects of any impediments identified through that analysis, and maintain[ing] records reflecting the analysis and actions in this regard." 24 C.F.R. § 91.425(a)(1)(i). The Second Circuit has determined that the agencies administering grants have "an affirmative duty to encourage fair housing" and that an injured claimant may challenge "administrative violations of statutory duties." See Evans v. Lynn, 537 F.2d 571, 578 (2d Cir. 1975).

2. **As to the Plaintiffs' Section 3608 Claim**

   a.   **Section 3608 Applies to Local Municipalities Administering HUD Funds**

   The County first argues that Section 3608 is only enforceable against federal agencies and not local municipalities and relies upon the Second Circuit's decision in Acevedo v. Nassau County, 500 F.2d 1078 (2d Cir. 1974) in support of that proposition. This argument is without merit, as the Acevedo decision does not preclude Section 3608 claims asserted against local agencies, but rather notes that a viable Section 3608 claim against HUD does not necessarily constitute a valid Section 3604 claim against a municipality administering Section 3608 funds based upon the same factual nexus.  See id. at 1082 ("On the authority of [Section 3608] HUD might be justified in denying appellees funding for other projects if they refuse to approve low income housing . . . .  But HUD's discretionary powers under the [Fair Housing] Act extend beyond the duties imposed by the Act on local housing plans.  HUD's action does not mean that [the County] ha[s] violated section [36]04 of the Act.") (emphasis added).  Moreover, it is clear from case law generated prior to and after the Acevedo decision that non-federal agencies administering grants have "an affirmative duty to encourage fair housing."  See Evans, 537 F.2d at 578. Specifically, the Second Circuit has stated:

   > We agree with the parties and with the district court that the [New York City Housing] Authority is under an obligation to act affirmatively to achieve integration in housing.  The source of that duty is both constitutional and statutory.  Various discriminatory housing practices have been outlawed by judicial decree as violative of the Equal Protection Clause . . .  An additional source of the affirmative duty to integrate is found in the 1968 Fair Housing Act . . . § 3601, and, in § 3608 . . .  We are satisfied that the affirmative duty placed on the Secretary of HUD by § 3608(d)(5) and through him on other agencies administering federally-assisted housing programs also requires that consideration be given to the impact of

79

proposed public housing programs on the racial concentration in the area in which the proposed housing is to be built.

Otero v. New York City Housing Auth., 484 F.2d 1122, 1133-34 (2d Cir. 1973) (emphasis added); see also U.S. ex rel. Anti-Discrimination Ctr. of Metro New York, Inc. v. Westchester County, 495 F. Supp. 2d 375, 386 (S.D.N.Y. 2007) (recipients of HUD funds under Section 3608 such as Westchester County must "affirmatively further fair housing"); Langlois v. Abington Housing Auth., 234 F. Supp. 2d 33, 73 (D. Mass. 2002) ("The remaining question is whether the mandatory obligation imposed by § 3608(e)(5) on the Secretary of HUD can be enforced against the [public housing authorities]. When viewed in the larger context of Title VIII, the legislative history, and the case law, there is no way — at least, none that makes sense — to construe the boundary of the duty to affirmatively further fair housing as ending with the [HUD] Secretary."). Therefore, it is clear that Section 3608 is applicable to the County in the instant matter.

### b. There is No Express or Implied Private Right of Action for Section 3608

The County next argues that, even if applicable, there is no private right of action under § 3608, either express or implied. The Court agrees. Section 3613 of the FHA, entitled "Enforcement by private persons," provides that:

> An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice, or the breach of a conciliation agreement entered into under this subchapter, whichever occurs last, to obtain appropriate relief with respect to such discriminatory housing practice or breach.

42 U.S.C. § 3613(1)(A); FHA § 813(1)(A). Section 3602(f), in turn, defines a "discriminatory housing practice" as "an act that is unlawful under section 3604, 3605,

80

3606, or 3617 of this title."  Section 3608, the provision under which the Plaintiffs assert their claim against the County, is not mentioned.  By its plain language, the FHA does not provide for an express private right of action under Section 3608 against any party implicated by the obligations created by that statute.

The Court must next determine whether Congress created an implied private right of action under Section 3608.  Courts reviewing this statutory provision, as asserted against the <u>federal government</u>, have concluded that no such right exists.  Specifically, they have noted that the proper vehicle for relief under Section 3608 lies not in a private right of action under the FHA, but rather through the Administrative Procedures Act.  <u>See Latinos Unidos De Chelsea En Accion (Lucha) v. Sec'y of Hous. and Urban Dev.</u>, 799 F.2d 774, 791 (1st Cir. 1986) ("[I]t is unlikely that Congress absentmindedly forgot to mention an intended private action against HUD under section 3608(d).") (internal quotations omitted); <u>see also N.A.A.C.P. v. Sec'y of Hous. and Urban Dev.</u>, 817 F.2d 149, 152 (1st Cir. 1987) (no implied private right of action against HUD under Section 3608); <u>Jones v. Office of Comptroller of Currency</u>, 983 F. Supp. 197, 202-03 (D.D.C. 1997) (same); <u>Marinoff v. U.S. Dep't of Hous. and Urban Dev.</u>, 892 F. Supp. 493, 496 (S.D.N.Y. 1995) (same), <u>aff'd</u>, 78 F.3d 64 (2d Cir. 1996); <u>Pleune v. Pierce</u>, 697 F. Supp. 113, 119 (E.D.N.Y. 1988) (same).

However, in the instant case, the Plaintiffs seek relief against the County, a non-federal entity, and thus the Administrative Procedures Act ("APA") provides no recourse for their alleged injury.  The relevant inquiry thus becomes whether "Congress meant to give an injured person a right himself to enforce the federal statute directly against the

81

nonfederal person or whether the injured person can do no more than ask the federal government to enforce the statute." N.A.A.C.P., 817 F.2d at 152. The Court concludes, for two reasons, that this claim falls into the latter category, and no implied private right of action exists. First and foremost, any obligations imposed upon the County under Section 3608 are derived from those imposed upon HUD by the same statutory provision. It follows, then, that if Section 3608 is not enforceable through a private right of action against HUD, it cannot be enforceable through that same vehicle against a non-federal agency implementing the duties imposed upon HUD by the FHA.

Second, the application of the relevant test as described in Cort v. Ash, 422 U.S. 66, 78, 95 S. Ct. 2080, 2088, 45 L. Ed. 2d 26 (1975), weighs against a finding of an implied right of action. In that decision, the Supreme Court directed courts making such an inquiry to ask:

> First, is the plaintiff one of the class for whose especial benefit the statute was enacted," that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

Id. at 78. Here, Section 3608(e) does not identify a class which the provision is meant to benefit, nor does it define a specific right conferred in favor of private plaintiffs. Instead, the section, under the heading "functions of the secretary," lists a variety of affirmative duties placed upon the HUD Secretary, which include, but are not limited to: making studies, publishing reports, cooperating with local agencies seeking to prevent or eliminate discriminatory housing practices, and compiling annual reports for Congress. See 42

82

U.S.C. § 3608(e). As one court noted, "[t]he fact that th[e] duty [plaintiffs seek to enforce] appears in a section devoted solely to HUD's minsterial duties sharply undercuts plaintiffs' claim that Congress intended that duty to confer enforceable rights on them." Thomas v. Butzen, No. 04 Civ. 5555, 2005 U.S. Dist. LEXIS 21525, at *35 (N.D. Ill. Sept. 26, 2005).

In addition, the legislative history contains no suggestion that a private right of action was considered for this section. See Otero, 484 at 1134 n.14 ("[T]here was extended debate in the House, mostly regarding other provisions of the 1968 Civil Rights Act and especially other aspects of Title VIII, 114 Cong. Rec. 9553-9621, but virtually none regarding the affirmative duties placed on the Secretary under § 3608(d)(5)."). Moreover, authorizing a private right of action against a non-federal entity is clearly inconsistent with the legislative scheme of Section 3608, which places affirmative enforcement duties on the Secretary of HUD. Finally, the issue presented is not traditionally addressed by state law so that finding a federal right of action would be inappropriate, but that factor is not dispositive in light of the aforementioned three Cort v. Ash factors which weigh against finding such a right.

Accordingly, it is clear to the Court that Congress did not intend for private citizens to enforce Section 3608 directly against a non-federal entity, but rather those enforcement responsibilities lie with the federal government.

### c. Section 3608 May Not Be Enforced Through Section 1983

Having determined that Section 3608 does not provide for an express or implied private right of action, the Court must finally determine whether, as the Plaintiffs argue, rights granted by that statute may be advanced by a Section 1983 suit. Courts within the

83

Second Circuit have yet to squarely address this issue, and district courts in other

jurisdictions have divided.  Compare S. Middlesex Opportunity Council, Inc. v. Town of

Framingham, No. 07 Civ. 12018, 2008 U.S. Dist. LEXIS 85764, at *51 (D. Mass. Sept. 30,

2008) (dismissing Section 3608 claims asserted through Section 1983 against state actor for

failure to state a claim); Thomas, 2005 U.S. Dist. LEXIS 21525, at *35 (same); with

Wallace v. Chicago Housing Auth., 298 F. Supp. 2d 710, 719 (N.D. Ill. 2003) ("we hold

that Plaintiffs may sue under § 1983 to combat a violation of § 3608(e)(5) of the Fair

Housing Act"); Langlois v. Abington Housing Auth., 234 F. Supp. 2d 33, 72-73 (D. Mass.

2002) (holding that Section 3608 confers rights that can be vindicated through Section

1983 against a state actor).  Having conducted its own analysis, as set forth below, the

Court agrees with the Thomas and Framingham decisions and concludes that Section 3608

does not give rise to rights enforceable against state actors under Section 1983.

It is well-settled that "[s]ection 1983 itself creates no substantive rights; it provides

only a procedure for redress for the deprivation of rights established elsewhere."  Sykes v.

James, 13 F.3d 515, 519 (2d Cir. 1993).  A federal statute creates a cognizable claim

against a state actor under Section 1983 when it meets the following three requirements:

> First, Congress must have intended that the provision in question benefit the
> plaintiff.  Second, the plaintiff must demonstrate that the right assertedly protected
> by the statute is not so vague and amorphous that its enforcement would strain
> judicial competence.  Third, the statute must unambiguously impose a binding
> obligation on the States.  In other words, the provision giving rise to the asserted
> right must be couched in mandatory, rather than precatory, terms.

Blessing v. Freestone, 520 U.S. 329, 340-41 (1997).  The Supreme Court stressed, in

Gonzaga Univ. v. Doe, 536 U.S. 273 (2002), that "it is only violations of rights, not laws,

which give rise to § 1983 actions."  Id. at 283 (emphasis in original).  The Court rejected

84

the notion that any decisions rendered since <u>Blessing</u> "permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." <u>Id.</u> Therefore, "where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit." <u>Id.</u> at 286 (internal quotations omitted). Moreover, "[e]ven after this showing, 'there is only a rebuttable presumption that the right is enforceable under § 1983.' The defendant may defeat this presumption by demonstrating that Congress did not intend that remedy for a newly created right." <u>Racho Palos Verdes v. Abrams</u>, 544 U.S. 113, 120, 125 S. Ct. 1453, 1458, 161 L. Ed. 2d 316 (2005) (quoting <u>Blessing v. Freestone</u>, 520 U.S. 329, 341 (1997) and <u>Smith v. Robinson</u>, 468 U.S. 992, 1012, 104 S. Ct. 3457, 3469, 82 L. Ed. 2d 746 (1984)).

While the Plaintiffs may argue that <u>Gonzaga</u> is limited in its application to laws passed pursuant to Congress' spending power, a notion which underlies the holding in <u>Wallace</u>, this Court is not so persuaded, as <u>Gonzaga</u> expresses no such limitations. Furthermore, the Supreme Court had the opportunity to make such a clarification in the case of <u>Racho Palos Verdes v. Abrams</u>, but simply reiterated "that § 1983 does not provide an avenue for relief every time a state actor violates a federal law. As a threshold matter, the text of § 1983 permits the enforcement of rights, not the broader or vaguer benefits or interests." 544 U.S. 113, 119-20 (2005) (internal quotations omitted). Courts have interpreted this decision as confirmation that <u>Gonzaga</u> is not limited to violations of laws passed pursuant to the spending power. See <u>McCready v. White</u>, 417 F.3d 700, 703 (7th Cir. 2005) ("Any possibility that <u>Gonzaga</u> is limited to statutes that rest on the spending

85

power (as the law in <u>Gonzaga</u> did) has been dispelled by <u>Racho Palos Verdes v. Abrams</u>, which treats <u>Gonzaga</u> as establishing the effect of § 1983 itself."); <u>accord Town of Framingham</u>, 2008 U.S. Dist. LEXIS 85764, at *50-*51.

In the instant case, the text and structure of the FHA demonstrate that Section 3608 does not give rise to an enforceable, individual right. <u>See Town of Framingham</u>, 2008 U.S. Dist. LEXIS 85764, at *49 ("Section 3608 does not establish rights for aggrieved persons in the same clear manner in which §§ 3604 and 3617 do."). As noted in the Court's discussion regarding a private right of action, Congress created an enforcement provision for private citizens to bring suit pursuant to specific sections of the FHA, and Section 3608 was not so included on that list. <u>See id.</u>, 2008 U.S. Dist. LEXIS 85764, at *50-*51 ("After reviewing the structure of the FHA, I conclude that Congress did not intend to confer an individual right pursuant to § 3608. Congress provided an enforcement mechanism in the FHA for private individuals to bring civil actions . . . . Conspicuously missing from the list is § 3608."); <u>Thomas</u>, 2005 U.S. Dist. LEXIS 21525, at *33 ("The text and structure of the FHA clearly evince Congress' intent that section 3608(e)(5) not confer an enforceable, individual right . . . . A housing authority's failure to further fair housing is not a discriminatory housing practice actionable under section 3613, nor is it the subject of a separate cause of action in the statute. The existence of an express cause of action in the FHA that does not encompass section 3608(e)(5) strongly suggests that Congress did not intend section 3608(e)(5) to create enforceable rights."). While the question of whether an implied right of action exists is distinct from the question of whether a statute may be enforced through Section 1983, "the inquiries overlap in one meaningful respect — in

86

either case we must first determine whether Congress <u>intended to create a federal right</u>."

<u>Gonzaga Univ.</u>, 536 U.S. at 283.

In addition, the Court agrees that the broad goal underlying this provision — an intent that HUD do more than simply not discriminate itself but rather use its grant programs to assist in ending discrimination and segregation — "speaks to administrative objectives for the benefits of the parties seeking housing and . . . such benefits do not necessarily translate into enforceable, individual rights." <u>Town of Framingham</u>, 2008 U.S. Dist. LEXIS 85764, at *50; <u>see Thomas</u>, 2005 U.S. Dist. LEXIS 21525, at *34 ("The language of section 3608, itself, bolsters that conclusion. The title of that section is 'Administration' . . . The fact that this duty [to affirmatively further fair housing] appears in a section devoted solely to HUD's ministerial duties sharply undercuts plaintiffs' claim that Congress intended that duty to confer enforceable rights on them."). Finally, the Court concurs with the Northern District of Illinois when it stated that

> the right allegedly conferred by section 3608(e)(5) is [too] vague and amorphous to be enforceable . . . [because it] does not define HUD's duty to further fair housing or place any parameters on it. If violations of that duty could be redressed via section 1983, virtually any act or omission of HUD with respect to housing would be subject to judicial review. Neither the federal nor the state judicial system has the authority, resources or expertise to become HUD's overseer, the position plaintiffs' interpretation of section 3608(e)(5) would impose on them.

<u>Id.</u> at *35.

The Court now holds that a Section 3608 claim may not be advanced through Section 1983, so that the Court need not address if there is a genuine issue of material fact as to whether the County fulfilled its duty to HUD to affirmatively further the purposes of the FHA in its receipt, administration, and disbursement of CDBG and HOME funds.

Having thus failed to satisfy the threshold requirement articulated by the Supreme Court in

Gonzaga, the Plaintiffs may not advance a Section 3608 claim against the County through

Section 1983 and the County's motion for summary judgment dismissing that claim is

granted.

## E.  **Sections 1981, 1982 and 1983**

The Plaintiffs further present claims against all of the Defendants, pursuant to 42

U.S.C. §§ 1981, 1982 and 1983, related to the allegedly discriminatory zoning of the Social

Services site.  The causes of action under Sections 1981 and 1982 are asserted by all

Plaintiffs, including the Intervenor-Plaintiff NYCC.  However, the cause of action under

Section 1983 is not asserted by the Intervenor-Plaintiff NYCC.  As detailed below, the

Court finds that the Plaintiffs have raised genuine issues of material fact on all these claims

as asserted against the Garden City Defendants, but not the County.

### 1.  **Legal Standard**

"To establish a claim under § 1981, a plaintiff must allege facts in support of the

following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to

discriminate on the basis of race by the defendant; and (3) the discrimination concerned

one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue

and be sued, give evidence, [purchase, lease or otherwise hold or convey property,] etc.)."

Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993).

A plaintiff bringing a claim under 42 U.S.C. § 1982, which states that "[a]ll citizens

. . . shall have the same right . . . as is enjoyed by white citizens . . . to inherit, purchase,

lease, sell, hold, and convey real and personal property," must demonstrate that he was

88

intentionally deprived of his property on account of his race, for "[w]hile § 1982 does not use the phrase 'discrimination based on race,' that is its plain meaning." Gomez-Perez v. Potter, 553 U.S. 474, 479, 128 S. Ct. 1931, 1936, 170 L. Ed. 2d 887 (2008); see also Shaare Tefilia v. Cobb, 481 U.S. 615, 616 (1987) ("The section forbids both official and private racially discriminatory interference with property rights.").

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. As stated above, "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993). In the instant case, the Plaintiffs have alleged that defendants deprived them of equal protection under the laws in violation of the Fourteenth Amendment to the Constitution and seek redress for that alleged injury by a Section 1983 cause of action. The Supreme Court has made clear that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact . . . "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65 (1977) (citing Washington v. Davis, 426 U.S. 229, 242 (1976)); see also Orange Lake Assocs., Inc. v. Kirkpatrick, 21 F.3d 1214, 1226 (2d Cir. 1994) ("In short, we will not strike down an even-handedly applied, facially neutral law as violative of the Equal Protection Clause unless the plaintiff can demonstrate discriminatory intent or purpose.").

2. **As to the Plaintiffs' Sections 1981, 1982, and 1983 Claims**

As described above, Sections 1981, 1982 and 1983 all require proof of discriminatory intent. While the constitutional and statutory standards for discrimination in housing differ, the basis for the present summary judgment motions all involve this shared element. Thus, if there is no genuine issue of material fact with regard to the Defendants' discriminatory intent so that summary judgment should be granted in the context of the FHA, it should similarly be granted in the context of Sections 1981, 1982 and 1983. See Wentworth v. Hedson, 493 F. Supp. 2d 559, 571 n.17 (E.D.N.Y. 2007) ("the prima facie elements of [plaintiffs' claims under 42 U.S.C. § 1982 ] do not differ substantially from those applicable to plaintiffs' FHA claims."); Huertas v. East River Hous. Corp., 674 F. Supp. 440, 454 (S.D.N.Y. 1987) (applying the elements of a prima facie FHA claim to claims under § 1981 and § 1982); see also McHaney v. Spears, 526 F. Supp. 566, 574 (W.D. Tenn. 1981) ("The plaintiffs have also alleged that the defendants' actions state a cause of action under 42 U.S.C. § 1982. The Court finds that the requirements necessary to establish a prima facie case, and carry the burden of proof is the same under this provision as it is under 42 U.S.C. § 3601 et seq. Accordingly, the Court finds that the defendants are liable to the plaintiffs for their violation of Section 1982 based on the findings of fact and the conclusions of law discussed in this opinion."). The Defendants argue that the Plaintiffs cannot satisfy this common element and, therefore, these claims must be dismissed.

The Court has determined that there are genuine factual disputes as to whether the Garden City Defendants discarded the R-M zoning designation in favor of the R-T zoning

90

designation to appease race-based community opposition to multi-family housing, thus displaying a discriminatory intent. Accordingly, the Sections 1981, 1982, and 1983 claims survive the Garden City Defendants' motion for summary judgment. On the other hand, because there are no issues of fact related to the County's alleged responsibility for that zoning decision, its motion for summary judgment dismissing the Sections 1981, 1982, and 1983 claims is granted.

In this regard, the Garden City Defendants further assert that the Plaintiffs cannot demonstrate that they were denied the right to "inherit, purchase, lease, sell, hold, and convey real and personal property" secured by Section 1982 because "no housing development exists for them to do so." (GC Mem. at 40.) However, "[a]lthough the full scope of § 1982 has never been made clear, it has long been held to be a viable provision for challenging exclusionary land use restrictions." Jackson v. Okaloosa County, Fla., 21 F.3d 1531, 1539 (11th Cir. 1994) (citing Jones v. Alfred H. Mayer Co., 392 U.S. 409, 417-18 (1968)). Thus, this additional ground to dismiss the Section 1982 claim against the Garden City Defendants is denied.

## F.  Section 2000d

Finally, the Plaintiffs, including the Intervenor-Plaintiff NYCC, claim that the County's alleged "discriminatory practices with regard to the administration of federal programs, including the federal CFBG and HOME programs" was motivated by malice and/or callous disregard for the Plaintiffs and violated Section 601 of Title VI of the Civil Rights Act of 1964, which states that:

91

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participating in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

See 42 U.S.C. § 2000d, et seq. The Supreme Court has clearly stated that "it is . . . beyond dispute that § 601 prohibits only intentional discrimination." Alexander v. Sandoval, 532 U.S. 275 (2001); see Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 178 (2005) ("Sandoval held that private parties may not invoke Title VI regulations to obtain redress for disparate-impact discrimination because Title VI itself prohibits only intentional discrimination."). In this case, the Court has determined that no genuine issues of material fact exist as to whether the County acted with discriminatory intent in selling the Social Services site to the highest bidder. Thus, the County Defendant cannot be held liable under Section 2000d.

While it does not appear that the Plaintiffs are asserting this cause of action against the Garden City Defendants, such a claim would nevertheless be without merit because it is undisputed that Garden City does not receive federal housing funds, as it is not a participant in the Nassau County Urban Consortium. Liability under Title VI is conditioned upon the receipt of such "Federal financial assistance," and the Garden City Defendants cannot be held liable under that statute for any alleged discriminatory zoning practices.

Accordingly, the Plaintiffs' Title VI claims against all the Defendants must fail, as a matter of law, and the County's motion for summary judgment dismissing the claim is granted.

## III. MOTION TO AMEND THE INTERVENOR COMPLAINT

**A.  <u>The Present Motion to Amend</u>**

In addition to the Defendants' motions for summary judgment that were addressed in this opinion, there is a pending motion filed by the Intervenor-Plaintiff NYCC for leave to file an amended complaint.

NYCC filed its original intervenor complaint on June 30, 2010, which NYCC recognizes as being virtually identical to the Plaintiffs' amended complaint filed on November 30, 2005.  The essence of the present motion is that NYCC seeks to assert an additional cause of action that was inadvertently not included in their original intervenor complaint.  In fact, the Court notes that NYCC's original complaint and NYCC's proposed amended complaint are precisely the same, except for the cause of action they now seek to assert, entitled "Violation of the Civil Rights Act of 1871, 42 U.S.C. §1983 and the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States." This claim alleges that the "Defendants' discriminatory customs, patterns, practices, and usage in contravention of the Individual Plaintiffs' and NYCC's constitutional and federal statutory rights motivated by malice and/or callous disregard for their rights, deprive the Individual Plaintiffs of their right of equal access to housing and deprive NYCC of its right to make housing available under color of law in violation of the Federal Civil Rights Act of 1871, 42 U.S.C. § 1983, and its rights under the Equal Protection Clause of the United States Constitution with regard to housing."  This cause of action would be asserted against both the County Defendant and the Garden City Defendants.

## B.  Whether NYCC May Amend Under Fed. R. Civ. P. 15(a)

### 1.  The Legal Standard

Rule 15(a) of the Federal Rules of Civil Procedure requires that courts freely grant leave to amend "when justice so requires." Fed. R. Civ. P. 15(a).  Rule 15(a)(2) states in pertinent part:  "Amendments Before Trial. . . . a party may amend its pleading only with the opposing party's written consent or the court's leave."  Id.  A court should deny leave to amend only upon "undue delay, bad faith or dilatory motive on the part of the [moving party], repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the [non-moving party,] . . . [or] futility." Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962); see also Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 603–04 (2d Cir. 2005) ("a Rule 15(a) motion should be denied only for such reasons as undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party.") (internal quotations and citation omitted).  Amendments are generally favored because "they tend to facilitate a proper decision on the merits." Blaskiewicz v. County of Suffolk, 29 F. Supp. 2d 134, 137 (E.D.N.Y. 1998).  However it is ultimately "within the sound discretion of the court whether to grant leave to amend."  John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp., 22 F.3d 458, 462 (2d Cir. 1994) (citing Foman, 371 U.S. at 182, 83 S. Ct. 227).

### 2.  Whether NYCC's Proposed Amendment is Futile

The Court first considers whether permitting NYCC's motion to amend their complaint would be futile.  In this Court's discretion, it may deny a proposed amendment which would be futile, or which does not establish a sufficient or cognizable claim, or

which has no merit.  Health-Chem Corp. v. Baker, 915 F.2d 805, 810 (2d Cir. 1990)

("[W]here ... there is no merit in the proposed amendments, leave to amend should be

denied.")  Accordingly, an amendment is futile where it is legally insufficient on its face so

that it could be defeated by a motion to dismiss.  Lucente v. IBM Corp., 310 F.3d 243, 258

(2d Cir. 2002).  However, when a motion to amend is made in response to a summary

judgment motion, a court can determine if the amendment is futile based upon whether the

evidence in support of the plaintiff's proposed new claim creates a triable issue of fact,

even if the amended complaint would state a valid claim on its face.  See Milanese v.

RustOleum Corp., 244 F.3d 104, 110 (2d Cir. 2001).

     In the present case, NYCC seeks to add an identical cause of action based upon the

same allegations that were already made by the other Plaintiffs.  Thus, the Court's analysis

above with regard to the Section 1983 and Equal Protection claims is determinative of

whether NYCC's proposed amendment would be futile.  Accordingly, the Court now finds

that the amendment would be futile as to the County but would not be futile as to the

Garden City Defendants.

### 3.  Whether NYCC Exhibited Undue Delay in Bringing the Motion to Amend

     Even though NYCC has stated a new and valid cause of action in its proposed

amended complaint as against the Garden City Defendants, the Court must still consider

the timeliness of the motion to amend.  "One of the most important considerations in

determining whether amendment would be prejudicial is the degree to which it would delay

the final disposition of the action."  H.L. Hayden Co. v. Siemens Med. Sys., 112 F.R.D.

417, 419 (S.D.N.Y. 1986) (collecting cases).  Length of time, in of and itself, does not

provide a basis to deny a motion to amend.  See Daniels v. Loizzo, 174 F.R.D. 295

(S.D.N.Y. 1997) (finding that the plaintiff's nine-year delay in submitting proposed

amendments to the complaint did not necessitate the denial of the motion to amend absent

evidence of prejudice to the defendants and in light of plaintiff's pro se status and former

inadequate representation); Rachman Bag Co., 46 F.3d at 234–35 (noting that a lengthy

delay alone, in the absence of prejudice or bad faith, is not a sufficient basis to deny a

motion to amend).

     NYCC initially filed its intervenor complaint on June 30, 2010.  NYCC claims that

the alleged clerical oversight first came to the attention of NYCC's attorneys on May 23,

2011, when the Garden City Defendants filed a letter requesting a pre-summary judgment

motion conference.  Three months later, on August 24, 2011, NYCC contacted the

Defendants to seek their consent to the now requested amendment, which consent was

declined.  Two days later, NYCC filed the present motion to add the additional cause of

action.  Therefore, there was at least an eleven month delay before NYCC even recognized

this alleged clerical error, and then another three month delay before filing the present

motion to amend.

     NYCC asserts that the delay is not excessive because it was only "a short period of

time" between when it first discovered the error on May 23, 2011 and it filed the instant

motion on August 26, 2011.  (NYCC Mem. at 4.)  The Garden City Defendants contend the

error should have been caught as early as March 11, 2011, when the Village served its

Local Rule 56.1 statement and pointed out the omission.  Nevertheless, even a five month

delay, without evidence of bad faith or prejudice, is not a sufficient basis to deny a motion

to amend.  See Rachman Bag Co. v. Liberty Mut. Ins. Co., 46 F.3d 230, 234-35 (2d Cir. 1995); Zoll v. Jordache Enters. Inc., No. 01 Civ. 1339, 2002 WL 485733, at *2 (S.D.N.Y. March 29, 2002) ("The time between September, when defendant maintains that it discerned the basis for the defense, and the end of January, when it filed the motion to amend, constitutes a delay of not quite five months. This delay is hardly egregious . . ."). "Narrow pleading rules should not be applied to foil an honest plaintiff's efforts to gain redress."  Middle Atl. Utils., Co. v. S.M.W. Dev. Corp., 392 F.2d 380, 384 (2d Cir. 1968). In light of the Court's finding below that undue prejudice will not result, and because there is no evidence of bad faith, the Court finds that this delay does not warrant denial of the leave to amend.

### 4. Whether the Defendants will be Prejudiced if NYCC is Permitted to Amend the Intervenor Complaint

In determining whether leave to amend should be granted, among the "most important" issues to consider is prejudice to the opposing party.  AEP Energy Servs. Gas Holding Co. v. Bank of America, N.A., 626 F.3d 699, 725 (2d Cir. 2010) (internal quotations omitted).  In analyzing "prejudice," courts consider whether the amendment would: (1) require the opponent to "expend significant additional resources to conduct discovery and prepare for trial," (2) significantly prolong the resolution of the action, or (3) "prevent the plaintiff from bringing a timely action in another jurisdiction."  Monahan v. N.Y. City Dept. of Corr., 214 F.3d 275, 284 (2d Cir. 2000).  The main concern is undue or substantial prejudice — when the nonmoving party shows that it would be unfairly disadvantaged or deprived of the opportunity to present facts or evidence that it would have offered.

97

Cognizant of the aforementioned considerations, the Court finds that there is no undue prejudice that would result from this amendment. The new cause of action that NYCC now seeks to assert has been already pleaded by the other three Plaintiffs— MHANY (previously NYAHC), Devita, and McCray — throughout the entire course of this litigation. Further, NYCC does not seek to make any factual allegations with regard to this cause of action that differ in any way from the allegations contained in the 2005 amended complaint. The Garden City Defendants have been vigorously defending against this claim throughout the past six years of this litigation, and hence have had the ability to prepare a full defense. The Garden City Defendants do not explain why their defense of this claim thus far, including relevant discovery, differs in any way by virtue of the fact that it is asserted by the Intervenor-Plaintiff as opposed to the other Plaintiffs.

Moreover, when the amended complaint was filed in 2005, one of the plaintiffs that asserted the Section 1983 cause of action was ACORN. NYCC only intervened after ACORN disbanded and was terminated as a plaintiff, because NYCC was an organization with goals similar to those of ACORN. This further supports the notion that the Defendants were on notice of this claim since the inception of this litigation. Finally, the Garden City Defendants have now had the opportunity to twice brief and argue in support of summary judgment against the Plaintiffs to dismiss this cause of action, and both times the Garden City Defendants did not distinguish between any of the four plaintiffs. This plainly demonstrates that the Defendants have had the ability to defend against this claim. Accordingly, the Court does not find that the proposed amendment would require the Defendants to expend significant additional resources to conduct discovery and prepare for

98

**SJA 112**

trial.  The Court agrees with NYCC that "permitting what is essentially an administrative amendment to correct a clerical mistake will not delay these proceedings or prejudice [the Garden City Defendants] in any way."  (NYCC Mem. at 6.)

The Garden City Defendants also argue that if the Court permits the present motion to amend, then the current summary judgment motions would have to be withdrawn and a third summary judgment motion would necessarily need to be filed in order to address this new claim.  However, because the Court finds that this claim has already previously been asserted by the other Plaintiffs and fully defended by all of the Defendants, there is no need for the current summary judgment motions to be withdrawn and refiled in light of this new but duplicative claim by the Intervenor-Plaintiff.  To do so would be a waste of time and resources for this Court as well as for all of the parties involved, as the Court has already made a determination as to this claim.  Furthermore, there does not appear to be a need for the Garden City Defendants to refile their present summary judgment motion merely to defend against this claim by NYCC, because they do not state a basis for making new or additional arguments as to this claim in connection with this particular plaintiff.  This is demonstrated by the fact that the Garden City Defendants do not even address futility in their opposition to the motion to amend, likely because to do so would be to simply rehash the arguments in their summary judgment motion.  In addition, there is no need for the Garden City Defendants to file a new answer, as NYCC stipulates that the Defendants deny the claim, as they consistently have from the initial filing of this case as to every other Plaintiff's claim in this regard.  Thus, no new answer will be required.

Therefore, the Court grants NYCC's motion to amend the complaint only as against the Garden City Defendants in conformance with the rulings set forth in this Memorandum of Decision and Order to include an additional cause of action for violations of the Civil Rights Act of 1871, 42 U.S.C. §1983 and the Equal Protection Clause of the Fourteenth Amendment. NYCC is directed to file an amended complaint within 20 days of the date of this Order.

## IV. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the Defendant County's motion for summary judgment dismissing all claims against it is GRANTED; **and it is further**

**ORDERED** that the Garden City Defendants' motion for summary judgment dismissing all claims against it is DENIED in all respects; **and it is further**

**ORDERED** that the Inventor-Plaintiff NYCC's motion to amend the intervenor complaint to include a cause of action for violations of the Civil Rights Act of 1871, 42 U.S.C. §1983 and the Equal Protection Clause of the Fourteenth Amendment is GRANTED. NYCC is directed to file an amended complaint only as against the Garden City Defendants in conformance with the rulings set forth in this Memorandum of Decision and Order within 20 days of the date of this Order; **and it is further**

**ORDERED** that the Plaintiffs and the Garden City Defendants are directed to appear on Thursday, February 23, 2012 at 9:00am for a conference to set a trial date.

**SO ORDERED.**

Dated: Central Islip, New York
February 15, 2012

_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge

101

**FILED**
**CLERK**

12/6/2013 10:51 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
MHANY MANAGEMENT INC.,

                              Plaintiff,

    -and-                                              **MEMORANDUM OF**
                                                       **DECISION AND ORDER**
NEW YORK COMMUNITIES FOR CHANGE,                       05-CV-2301 (ADS)(WDW)
INC.,

                              Intervenor-Plaintiff,

                -against-

INCORPORATED VILLAGE OF GARDEN
CITY AND GARDEN CITY BOARD OF
TRUSTEES,

                              Defendants.
--------------------------------------------------------X

**<u>APPEARANCES:</u>**

**Law Offices of Frederick K. Brewington**
*Attorneys for the Plaintiffs*
556 Peninsula Blvd.
Hempstead, New York 11550
        By:    Frederick K. Brewington, Esq., of Counsel

**Lawyers' Committee for Civil Rights Under Law**
*Attorneys for the Plaintiffs*
1401 New York Avenue, NW
Suite 400
Washington, DC 20005
        By:    Joseph D. Rich, Esq.
               Linda H. Mullenbach, Esq.
               Abigail E. Shafroth, Esq., of Counsel

**Hogan Lovells US LLP**
*Attorneys for the Plaintiff Mhany Management Inc.*
875 Third Avenue
New York, New York 10022
        By:    Stanley J. Brown, Esq.
               Peter J. Dennin, Esq.
               Chava Brandriss, Esq.
               Andrew J. Sein, Esq.he h
               Sarah J. Gregory, Esq.

Benjamin A. Fleming, Esq., Of Counsel

**Cullen and Dykman, LLP**
*Attorneys for the Defendants Incorporated Village of Garden City and Garden City Board of Trustees*
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
      By:    James G. Ryan, Esq.
               Ariel E. Ronneburger, Esq.
               Thomas B. Wassel, Esq.
               Cynthia Ann Augello, Esq.
               Douglas J. Bohn, Esq.
               Jennifer A. McLaughlin, Esq., of Counsel

**SPATT, District Judge**.

In 2005, several individual plaintiffs and organizations commenced a lawsuit against the County of Nassau, the Incorporated Village of Garden City (the "Village" or "Garden City"), and the Garden City Board of Trustees. Briefly, the Plaintiffs allege that the Defendants discriminatorily re-zoned two parcels of Nassau County-owned land that were located in Garden City to prevent the building of low-and middle-income housing on that site. The Plaintiffs further allege that this decision was part of a long-standing racially discriminatory policy maintained by the Defendants. Based on these allegations, the Plaintiffs assert claims pursuant to the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq.; 42 U.S.C. § 1981; 42 U.S.C. § 1982; 42 U.S.C. § 1983; and 42 U.S.C. § 2000d et seq. The Plaintiffs seek injunctive and declaratory relief, costs, and attorneys' fees. In response, the Defendants deny any wrongdoing and assert that they have no racially discriminatory policies.

Currently, only the corporate Plaintiffs, MHANY Management, Inc. ("MHANY"), formerly known as New York ACORN Housing Company, Inc. ("NYAHC") and the Intervenor-Plaintiff New York Communities for Change, Inc. ("NYCC"), the practical successor to former Plaintiff, the New York Association of Community Organizations for Reform Now ("New York

ACORN"), remain as plaintiffs. Also, the case against the County of Nassau was dismissed by a summary judgment decision and thus only the Incorporated Village of Garden City and the Garden City Board of Trustees (the "Garden City Defendants") remain as defendants.

The Court has jurisdiction over this case pursuant to 42 U.S.C. § 3613 and 28 U.S.C. §§ 1343 and 2201. The Court conducted an 11-day bench trial commencing on June 17, 2013. Having considered the evidence and the arguments submitted at the trial and the written submissions of the parties, the Court concludes that the Plaintiffs have established the liability of the Garden City Defendants under (1) the FHA based on a theory of disparate treatment and disparate impact; (2) 42 U.S.C. § 1981; (3) 42 U.S. C. § 1983; and (4) the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

This opinion will first state the Court's findings of fact which will essentially be a history of the events leading to the subject zoning decision of the Village of Garden City. Next, the Court will briefly review the complicated procedural history of this case. Finally, the opinion will close with this Court's conclusions of law and choice of remedies.

## I. FINDINGS OF FACT

A. <u>The Parties</u>

MHANY is a not-for-profit community-based developer of affordable housing incorporated in New York and, at all times relevant to the allegations in the amended complaint was known as NYHAC. The former Plaintiff New York ACORN is a former local chapter of a nationwide nonprofit corporate entity that was called the Association of Community Organizations for Reform Now organized and existed under the State of Arkansas which disbanded in or about December 2009. NYCC is a non-profit entity formed in December 2009, and which intervened in this action on June 30, 2010.

The Village of Garden City is a municipal corporation organized under the laws of the State of New York.  It is located in New York State in the County of Nassau.  The Garden City Board of Trustees is an elected governing body in Garden City.

B.  The Racial Makeup of Nassau County and Garden City

The Plaintiffs' expert Nancy McArdle, who conducted an analysis of racial change and segregation in Nassau County, testified that, as of the year 2000, the minority population share of the total population in Nassau County was 20.3%.  McArdle defined minority as all persons identifying their ethnicity as Hispanic or African-American.  The minority population in Garden City increased from 2.9% in 1980 to 4.1% in the year 2000.

C.  The Affordable Housing in Nassau County

Former Nassau County Executive Thomas Suozzi testified that a lack of affordable housing has been a problem in Nassau County. (Tr. at 977-78.).  The parties defined affordable housing as that which is financially attainable – namely, no more than 30% of a household's income is spent on housing – for households earning 80% or less of the Area Median Income for the Nassau-Suffolk Metropolitan Statistical Area. (Tr. at 493-94.)

In the year 2000, although only 14.8% of all households in Nassau County were African-American or Hispanic, 41.4% of "very low" income elderly renter households in the County were African-American and Hispanic, as were 53.1% of "very low" income non-elderly renter households.  (Tr. at 148.)  In 2000, African-American people comprised 88% of the waiting list in Nassau County for Section 8 housing. (Tr. at 164-65.)  "Section 8" housing refers to federally subsidized rental assistance paid to private landlords pursuant to Section 8 Housing Act of 1937, 42 U.S.C. § 1437f on behalf of low income renters.

D. <u>The Racial Makeup of Garden City</u>

As of the year 2000, Garden City had a population of 21,672 people. Garden City is 5.3 square miles in size. In 2011-2012, Garden City contained the following types and numbers of residential dwelling places: Single-Family homes, 6,845, Condominiums, 410, Apartments or Co-ops, 691. (Tr. at 67.)

McArdle testified that, as of the year 2000, the percentage of minority population in Garden City was 4.1%, up from 2.9% in 1980. McArdle further noted that 61% of the Village's African-American population was living in dormitories in 2000, and thus, excluding this population would significantly alter these statistics. If one examined only people living in households and not in dormitories in 2000, the minority population in Garden City was just 2.6% of the population, as opposed to the 4.1% stated above, and as compared to 15.3% of the County. (Tr. at 139.)

In 2000, 2.3% of the households in Garden City were headed by an African-American or Hispanic person, compared to 15.3% of the Nassau County households. (Tr. at 144-45.) If minorities comprised the same share of Garden City households as they did of Nassau County households, Garden City would have 1,333 African-American or Hispanic households, as opposed to the actual total of 167.

E. <u>The Affordable Housing Options in Garden City</u>

Village Administrator Robert Schoelle testified that, to his knowledge, Garden City, unlike other parts of Nassau County, contained no affordable housing, nor does it to this day. (Tr. at 494.) Garden City has declined to join the Nassau County Urban Consortium, a group of

municipalities in Nassau County that are eligible to receive federal funding to support affordable housing development. (Tr. at 494.)

In May 2006, the County announced that it intended to sell a parcel of land, the Ring Road Site, located in Garden City for the purpose of developing affordable housing in Garden City and Nassau County. The County issued a Request for Proposals ("RFP") for the purchase of the "Ring Road" site in Garden City. This was a mixed-use development which was characterized as "mixed income" and would have included affordably priced residential units. (Tr. at 1013.) However, Garden City residents expressed opposition to the construction of affordable housing in the community. To date, nothing has been built on the property. (Tr. at 658.)

## F.   Evidence of Discriminatory Acts in Garden City

The Village Administrator Schoelle testified that, in 1989, a developer proposed constructing fifty one units of affordable housing at the former Doubleday & Co. site on Franklin Avenue in Garden City. The Garden City Defendants deny having any record indicating that any such application has ever been filed. In any event, the Plaintiffs contend that a building moratorium in Garden City in the late 1980s prevented such construction. Recently, a luxury development was approved for the Doubleday site. (Tr. at 645.)

In February 2004, ACORN released a study entitled "Whites Only" – which involved "actual testing" by sending "Caucasian testers and sending African[-]American or Latino testers into real estate companies and documenting the results of how they were treated, what they were given, what they were told." (Tr. at 1268-72.)

In 2005, the New York State Attorney General determined that Garden City enforced a local requirement limiting the use of its parks to Garden City residents in a racially

discriminatory manner.  In the wake of this investigation, Garden City adopted policies and procedures to ensure that local regulations were not enforced in a racially discriminatory manner.

G.   The County's Real Estate Consolidation Plan

In May 2002, the County, under the leadership of then County Executive Suozzi, began drafting a Real Estate Consolidation Plan (the "Plan").  The purpose of the Plan was to identify what property the County needed to operate its government.  The balance of the other properties that the County owned would be sold in order to maximize revenue to fund renovations for the County's existing operations.

One of the properties considered under the Plan was a parcel of land located within the boundaries of the Village of Garden City in its Public or "P" Zone.  This property encompasses numerous County buildings, including the Nassau County Police Headquarters and the County Executive Building.  It also included the Nassau County Supreme Court building, the Social Services Building, and parking lot areas for the Court and the Social Services Building.  The P-Zone did not permit residential housing.  The entire parcel encompasses 84.76 acres.  The portion of the "P" Zone site at issue in this case is an approximately 25 acre site which, currently and at all times relevant to the allegations in the amended complaint, houses the parking lots for the Supreme Court of Nassau County, the former Social Services building, a garage, an ancillary building, and additional parking facilities (the "Social Services Site").  The Social Services Site is property owned by the County.  However, Garden City retained the right to zone the property.

The Social Services Site consists of 21.44 acres located on the eastern side of County Seat Drive, on which the Social Services building and a parking lot are situated, and an additional 3.03 acres located on the western side of County Seat Drive, on which are located a County owned building and parking garage.  The County intended to sell the Social Services Site

to a private developer and aimed to maximize the sale value of the Social Services Site. In this regard, the County hoped to receive at least $30 million for the property.

H. The Re-Zoning of the Social Services Site

In June 2002, at the County's request, the Village created a sub-committee charged with retaining a planner and reviewing zoning options for the entire 84.76 acre P-Zone, including the Social Services Site (the "P-Zone Committee"). The P-Zone Committee consisted of Village Trustees Peter Bee, Peter Negri, and Gerard Lundquist. Trustee Bee was the chairman of the P-Zone Committee.

The Village also retained the firm of Buckhurst Fish and Jacquemart ("BFJ") to provide a recommendation with regard to the rezoning of the Social Services site. Over the course of Garden City's decades-long relationship with BFJ, the Village had come to respect BFJ's work and generally adopted its recommendations. (Tr. at 230-31.) The Village also hired attorney John Kiernan to advise it on the rezoning process. (Tr. at 498.)

During the re-zoning process, Schoelle served as a liaison between the P-Zone Committee and the Board of Trustees. (Tr. at 1096.) The P-Zone Committee also kept Garden City's four Property Owners Associations ("POAs") apprised of the rezoning process. (Tr. at 490, 838-39.) The POAs, in turn, acted as liaisons between Garden City and the citizens who lived within their respective "jurisdictions." (Tr. at 488-90.) The Social Services Site is located within the "jurisdiction" of the Eastern Property Owners' Association. (Tr. at 490-91.)

On September 13, 2002, BFJ sent a facsimile to Garden City outlining the general planning principles for redevelopment of County properties in Garden City. These principles included that "[a]ny rezoning associated with the proposed development should be in accordance with the goals and parameters set forth in the zoning code [in Garden City]." (Tr. at 239.) In

particular, these principles provided that any development should "be consistent with the existing character and surrounding neighborhoods of Garden City"; "not overburden roads, utilities, and schools"; "be consistent with the surrounding neighborhood in terms of scale and design and with the densities permitted in the Zoning Code"; "not tend to depreciate the value of property in the village"; "be in accordance with the goals and parameters set forth in the Zoning Code"; and "protect[] . . . the environment [in terms of traffic, visual effects, or burdens on public facilities] . . . through compliance with the State Environmental Quality Review (SEQR)." (Tr. at 239-41.)

By memorandum dated November 15, 2002, entitled "Potential Approach to 'P' Zone Changes," and addressed to the P-Zone committee, BFJ recommended that Garden City borrow from its already existing zoning regulations and apply something similar to the "CO-2" zone, allowing for commercial and office use, as well as residential use on the southern part of the property. (Plf's Exh 386.) Specifically, BFJ suggested that the residential use include a maximum density of one unit per 2,300 square feet of area, which would permit as many as 440 units on the property.

By memorandum dated April 29, 2003, BFJ proposed to the P-Zone Committee the creation of a "CO-5(b)" zone for the Social Services Site and Co-5(a) zone for the remaining 63.32 acres of the P-Zone. BFJ also proposed applying "multi-family residential group" ("R-M") zoning controls to the residential component of the proposed CO-5(b) zone. This would have allowed for up to 311 residential units to be built at the Social Services Site. The proposed R-M zoning controls also permitted the construction of multi-family housing.

In May 2003, BFJ again proposed R-M zoning to the P-Zone Committee, which contemplated single-family homes and apartments for the residential component of the Social

Services Site.  The May 2003 report states that BFJ's zoning proposal would "be likely to generate a net tax benefit to the Village."

On May 29, 2003, BFJ made a PowerPoint presentation of the May 2003 Report to the Village at a public forum.  Under the proposed zoning, single family homes and apartments would be permitted at the Social Services Site.  At the forum, several residents expressed concern about the impact of 311 residential units on traffic and the schools.

In July 2003, BFJ issued a revised version of its study, which again included the proposal that Garden City zone the Social Services site under the "CO–5 zone, which would permit residential development of either 311 apartment units or approximately 75 single-family homes." Responding to some of the residents' concerns, the July 2003 report states that "[t]here would be a smaller number of school children generated by the new development than with the development of single-family homes."  At this time, the P-Zone Committee "adopted [BFJ's] final report for recommendation to the Village Trustees" containing the proposed R-M zoning. (Tr. at 281.)

In September 2003, BFJ issued a draft Environmental Assessment Form ("EAF").  The EAF proposed that R-M zoning controls be used for the residential component of the Social Services Site.  The EAF concluded that the proposed zoning "will not result in any large and important impact(s) and, therefore, is one which will not have a significant impact on the environment, therefore a negative declaration will be prepared." (Tr. at 288-290.)  Specifically, according to the EAF, multi-family housing at the Site would: (1) not "result in the generation of traffic significantly above present levels" (Tr. at 290.); (2) have a minimal impact on schools. (Tr. at 299-300.);  (3) create a transition zone between the surrounding single-family and office uses; (4) maximize existing zoning tools; (5) respect the character of surrounding neighborhoods;

and (6) have positive aesthetic impacts. (Tr. at 301.)  The impacts of the proposed zoning were

so minimal that a full Environmental Impact Statement was not required. (Tr. at 289.)  Frank

Fish of BFJ and Superintendent of the Garden City Buildings Department Michael Filippon

agreed with the conclusions reached in the EAF. (Tr. at 1720-1721.)

On October 17, 2003, a notice was placed in the Garden City News entitled, "Tell Them

What You Think About the County's Plan for Garden City," which stated:

> Where is the Benefit to Garden City? Are We Being Urbanized? . . . The County
> is asking the Village to change our existing zoning – P (Public use) ZONE –
> to allow the County to sell the building and land . . . now occupied by the Social
> Services Building, to private developers.  Among the proposed [sic] plans: Low-
> density (high-rise?) housing – up to 311 apartments . . . These proposals will
> affect ALL of Garden City.

(Plf's Exh. 45.)

On October 23, 2003, at a second public forum, BFJ made another PowerPoint

presentation to the Village summarizing the Co-5b zoning, including the R-M zone for the

residential component.

In November 2003, BFJ presented its third report to the P-Zone Committee, again

confirming its proposal for the R-M designation that allowed for a possible 311 apartment units

on the Social Services site.  The November 2003 report set forth a draft zoning text for the CO-

5B district and R-M controls for the residential component of the Social Services Site.

On November 20, 2003, the Board accepted the P-Zone Committee's recommendations.

(Tr. at 514-15.)  On December 4, 2003, the Board made a finding pursuant to New York's State

Environmental Quality Review Act that the zoning incorporated in the proposed Local Law 1-

2004 would have "no impact on the environment" and moved the law to a public hearing.  Local

Law 1-2004 would create a new CO-5b zone which would include the Social Services Site,

allowing residential use as well as office and courtroom use. The residential use in the new CO-5b zone would allow both single family as well as multi-family units at the Social Services Site.

On January 8, 2004, Garden City held a public hearing for the purpose of considering Local Law 1-2004. At the hearing, residents voiced concerns that multi-family housing would generate traffic, parking problems, and school children. In response, Filippon stated "If I could just add on this point of traffic . . . You have to remember that the existing use on that site now generates a certain amount of traffic, a fair amount of traffic. That use is going to be vacated. The two residential uses that are being proposed as one of the alternates, each of which on their face automatically generate far less traffic than the existing use. That is something to consider also." (Joint Exh. 24, at 875.)

On January 20, 2004, the Eastern Property Owners Association held a meeting at which Trustee Bee discussed BFJ's recommendation for the Social Services Site. A summary of the meeting reports that "Trustee Bee answered many questions from the floor" and, in doing so, expressed the opinions that "Garden City demographically has a need for affordable housing" and that "he would keep an open mind but he still felt the recommended zoning change were appropriate." (Pls.' Ex. 147.) Although Suozzi did not attend the January 20, 2004 meeting, he met with the Trustees earlier that evening to discuss the most recent plans for the Social Services Site. The summary states that "Suozzi was reminded that he pledged not to do anything that Garden City residents objected to. Mr. Souzzi's [sic] commitment still stands." (Id.)

On February 5, 2004, Suozzi attended a public hearing for the residents of Garden City at which time he presented the Plan. At the hearing, one resident asked whether Trustee Bee's statement "last time" about affordable housing was true. (Joint Exh. 12, at 905.) Trustee Bee responded that "neither the County nor the Village is looking to create a so-called affordable

housing at that spot." An unidentified speaker then asked whether Trustee Bee could "guarantee" that the housing on the Social Services Site would be "upscale" rather than affordable and expressed concerns about multi-family housing "depress[ing] the market." (Id. at 906)

The residents further voiced their opposition to multi-family housing at the Social Services site. Id. at 918 ("Brian Gemmel" [to Suozzi]: "I don't think you are hearing a lot of the people. We're not against residential, we're against multi-level residential."); id. at 921 ("Suozzi: You would probably like to see single family housing I presume. Unidentified Speaker: Single family. (Applause)."); id. at 921-922 ("Gail Madigan: I moved here from Brooklyn so that when I walked out of my house I did not turn to my left and see apartment buildings."); id. at 922 ("Suozzi: Mayor out of respect, let me stipulate the facts here. The public of Garden City especially from the eastern civic association does not want to see multi-family housing here. They'd rather see single-family housing."); id. at 923 ("David Piciulo: I don't hear a compelling argument from anyone here tonight as to why we should have multi-dwelling homes. Can we take it out of the proposal?")

Similarly, one resident urged officials to adopt zoning "in the flavor and character of what Garden City is now." (Id. at 912.) Residents further objected to "full families living in one bedroom townhouses, two bedroom co-ops," resulting in "overburdened and overcrowded" schools and "overrun" sanitation, a "multi-housing community . . . [with] four people or ten people in an apartment," and "that whole section of people" who use the bus to access the Department of Social Security. (Id. at 912, 929, 944.)

However, Suozzi clarified that the County is "absolutely not interested in building affordable housing there and there is a great need for affordable housing, but Garden City is not the location." (Id. at 905.)  He further stated that developers

> would love to build upscale housing in Garden City. . . . We would be willing to put deed restrictions on any property that we sold. The Village would have control of their zoning requirements.  We would put on restrictions whatsoever, no ifs ands or buts, that it can't be anything but upscale housing.  Put it this way, we generate more revenues for the County by selling it for upscale housing.

(Id. at 906.)  Also, at one point, Suozzi stated bluntly that a resident's concern about traffic was "irrational." (Id. at 908.)  Fish testified that residents who claimed to prefer single-family homes because of school impacts were "simply wrong." (Tr. at 316.)

Thereafter, a flyer distributed in Garden City asked: "WILL GARDEN CITY PROPERTY VALUES DECREASE IF OVER 300 APARTMENTS ARE BUILT AT THE SITE OF THE SOCIAL SERVICES BUILDING?"  It further stated:

> The Garden City Trustees are close to voting on how to zone this property.  They might choose to zone it for multi-family housing (If Senator Balboni's current bill passes in June, as many as 30 of those apartments would be considered 'affordable housing.'  According to this bill, 'Affordable workforce housing means housing for individuals or families at or below 80% of the median income for Nassau Suffolk primary metropolitan statistical area as defined by the Federal Department of housing and urban development.' . . . NOT JUST GARDEN CITY INCOMES! . . .)

(Pls.' Ex. 17.)  The flyer reached Schoelle, who faxed it to Fish and at least one member of the Board of Trustees. (Tr. 662-63.)  The record reflects that the flyer was brought to Trustee Lundquist's attention as well. (Tr. at 767-68.)  On the other hand, Trustee Negri claimed that he had never seen nor had any conversations about this flyer. (Tr. at 1080-81.)

At a Board meeting on March 18, 2004, residents raised concern about the Balboni Bill. Schoelle's notes from that meeting indicate that residents expressed concern that

the Balboni Bill might apply "retroactive[ly]." (Tr. 551-553.)  One resident urged decision-makers to "play it safe" with respect to the Balboni Bill and "vote for single family homes." (Tr. at 550.)  The following month, Trustee Negri told residents at a Central Property Owners Association meeting that he and other Village officials met with state representatives to discuss the Balboni Bill, noting that a family of four making $67,000 per year would qualify for housing under the proposed legislation.  (Plfs' Exh. 379, at 522.)

Fish testified that, by the spring of 2004, the public was beginning to have an influence on the decision-making process.  (Tr. at 331, 333-34.)  On April 1, 2004, BFJ modified its zoning proposal to reduce office density, minimize traffic impacts, and to lower the number of multifamily units to reduce population numbers. (Tr. at 1670-1673.)

On April 22, 2004, BFJ made a PowerPoint presentation to the Village residents.  Under the proposed zoning contemplated by this presentation, single-family homes and apartments would be permitted at the Social Services Site.  However, this time, only 215 apartments would be permitted.

By memorandum dated May 4, 2004 and addressed to the Board, BFJ proposed eliminating the CO-5b zone altogether, and with it, the potential for multi-family housing on the 21.44 acres of land of the Social Services located east of County Seat Drive.  Specifically, BFJ stated:

> [W]e reviewed the public comments with Robert Schoelle, Michael Filippon and [Garden City counsel] Gary Fishberg.  Based upon these discussions we would recommend for your consideration two basic refinements to the recommendations: (1) Elimination of office use for the 101 County Seat Drive area; (2) Provide for multi-family housing in the 101 County Seat Drive area only by special permit and limited to the West Side of County Seat Drive.

(Joint Exh. 19.)  BFJ suggested renaming the proposed zoning designation as "Residential–Townhouse" ("R–T"), which essentially limited the development of multi-

family housing to less than 15% of the Social Services site, and only by special permit. BFJ's proposed description of the R-T zone defined "townhouse" as a "single-family dwelling unit."

In May 2004, BFJ issued its final EAF, which proposed a R-T district to replace the previously proposed CO-5b District. No draft EAF was ever issued for the R-T Zone, even though Fish affirmed that the R-T zoning proposal was a significant change to the Co-5b zoning proposal with R-M controls. (Tr. at 341.)

On May 20, 2004, proposed Local Law No. 2–2004, which deleted the P–Zone and replaced it with CO–5 and R–T districts, the latter of which encompassed the Social Services site, was considered at a public hearing. There, a member of the New York ACORN expressed concern about the need for affordable housing on Long Island and asked that Garden City consider building affordable housing in their community. Indeed, responding to an inquiry regarding multi-family housing with a special permit under R–T zoning, Fish stated that "[t]he P Zone Committee had been considering this and the Trustees on the entire site, it wasn't an after thought. This was, this was a conscious decision . . . there was a concern that if the whole 25 acres were developed for multi-family it would generate too much traffic  . . ." (Joint Exh. 25, at 35.)

At the hearing, Fishberg explained that the required referral to the Nassau County Planning Commission (the "NCPC") had already been made, and that the NCPC would be addressing the new law the following week.  (Joint Exh. 25, at 25.)  ACORN members subsequently attended the NCPC meeting and again expressed opposition to the R-T zoning. (Tr. at 1288-89.)  At the same time, NYAHC sent a letter to the NCPC strongly

opposing R-T zoning and warning that the new zone would "ensure that developers cannot create affordable multi-family housing." (Plf's Exh. 156, at 467.)

I.   Garden City adopts the R-T Zone for the Social Services Site

On June 3, 2004, Garden City adopted the new R-T zoning and the Social Services Site was rezoned R-T.  As enacted, Local Law No. 2–2004 limited construction on the Social Services site to one dwelling unit for each 6,000 square feet of total plot devoted to such use.

In July 2004, the County issued a Request for Proposals (the "County's RFP") concerning the Social Services Site under the R-T zoning designation.  The RFP stated that the County would not consider bids of less than thirty million dollars.  The County's RFP required that all proposals be received on September 10, 2004 before 12:00 noon.

The Plaintiffs assert that under this RFP, it would have been virtually impossible to build affordable housing and, therefore, it would have been futile for them to submit an affordable housing response to the RFP that complied with the new zoning.  Indeed, Ismene Speliotis, Executive Director of NYAHC/MHANY, analyzed the R-T zoning at that time and concluded that it was not financially feasible to build affordable housing under those zoning restrictions at any acquisition price. (Tr. 1470-75.)  Suozzi concurred with that assessment. (Tr. at 1036.)

Thus, NYAHC contacted the County to work on a proposal that would include multi-family affordable housing, and urged the County to withdraw or modify the RFP to require some part of the property to be affordable housing.  NYAHC and New York ACORN met with Suozzi and other County officials to discuss the proposal and the possibility of constructing affordable housing on the Social Services site.  However, the County did not reissue the RFP.

J.   NYAHC submits a Bid

On September 10, 2004, NYAHC submitted a "protest" proposal to the County for

development of the Social Services Site that did not conform to the technical requirements set forth in the RFP. Specifically, the NYAHC proposal contemplated NYAHC leasing the Social Services Site from the County, with an upfront payment of $5 million. However, the NYAHC proposal did not utilize R-T zoning. Rather, the proposal contemplated a development of 2,000 apartment units, of which about two-thirds would be at below market rents for families making between 40% and 120% of the Nassau County median income, and 35% would be at market rents (Joint Exh. 29). The Plaintiffs maintain that NYAHC's proposal did not follow the specifications laid out in the RFP because the RFP made the construction of affordable housing on the Social Services site virtually impossible. Specifically, NYAHC's proposal stated:

> As the County knows from previous meetings, telephone conversations and correspondence with NYAHC and LI ACORN, NYAHC is unable to respond to the County's Request for Proposals (RFP) of July 2004 related to the 25 County-owned parcel in Garden City (the Parcel) due to the restrictive zoning adopted by the Village of Garden City in connection with the County's sale of the Parcel.

(Id.) The County ultimately awarded the contract to develop the Social Services Site to Fairhaven Properties, Inc. ("Fairhaven") for $56.5 million, the highest bid.

After the contract was awarded to Fairhaven, NYAHC prepared four proposals for development at the Social Services site under the R–M zoning designation, with the percentage of affordable and/or Section 8 housing units of the 311 total rental units ranging from 12.5% to 25%. McArdle evaluated each proposal in conjunction with the racial/ethnic distribution of the available pool of renters and determined that, had NYAHC been able to building housing under any of the four proposals in accordance with the rejected R–M zoning designation, the pool of renters likely to occupy all units, including market rate, affordable and Section 8 units, would have likely been between

18% and 32% minority with minority-households numbering between 56 and 101. (Tr. at 157.)

McArdle further analyzed the likely racial composition of the pool of homeowners who could afford to purchase units potentially developed by Fairhaven based on their proposal as well as available information regarding Garden City property values. She determined that between 3 and 6 minority-households could afford such a purchase. (Tr. at 169.) In this regard, McArdle testified that whereas the NYAHC proposals would likely increase racial diversity in Garden City, the Fairhaven proposal would likely leave the racial composition of Garden City "unchanged" (Tr. at 182.)

However, McArdle admitted that she was not attempting to predict who would actually live in any development at the Site. (Tr. at 203-04.) Nor did McArdle conduct any analysis under the R-T zoning actually enacted, concerning the development of potential affordable housing, or market-priced housing using 150 townhomes and 36 multifamily units. (Tr. at 189.)

K. Current Status of the Social Services Site

On January 1, 2010, Suozzi was succeeded by the present County Executive Edward P. Mangano. The Mangano Administration decided to relocate the County's Family Court building, currently located in Westbury, New York, to the Social Services site. The transaction with Fairhaven never closed. Thus, although the prior County administration planned to sell the Social Services site to a private developer, the site is currently no longer for sale. The Plaintiffs contend, and Garden City does not dispute, that the County has since taken no action at the Site.

## II. PROCEDURAL HISTORY

On May 12, 2005, ACORN, NYAHC, and several individual Plaintiffs filed the instant action, which was initially assigned to United States District Judge Leonard D. Wexler. The

Plaintiffs asserted claims pursuant to the "FHA", 42 U.S.C. § 3601 et seq.; 42 U.S.C. § 1981; 42

U.S.C. § 1982; 42 U.S.C. § 1983; and 42 U.S.C. § 2000d et seq.  On February 9, 2006, this case

was reassigned to United States District Judge Joseph F. Bianco.  On March 10, 2006, the

County, and the Garden City Defendants moved separately to dismiss the action for lack of

standing and failure to state a claim.

By Memorandum and Order dated July 21, 2006, Judge Bianco denied both motions in

their entirety and directed the parties to conduct discovery in accordance with the Individual

Rules of United States Magistrate Judge William D. Wall.  See ACORN v. County of Nassau,

No. 05 Civ. 2301(JFB)(WDW), 2006 WL 2053732 (E.D.N.Y. July 21, 2006).  In March 2009,

both the County Defendant and the Garden City Defendants moved for summary judgment.

On March 2, 2010, Judge Bianco recused himself in this case.  Thereafter, the case was

reassigned to this Court for all further proceedings.  Consequently, all pending motions were

denied without prejudice and with leave to refile in accordance with this Court's individual

motion practice rules.

On April 14, 2010, NYCC filed a motion to intervene as a plaintiff pursuant to Federal

Rule of Civil Procedure 24(b), which the Court subsequently granted on June 15, 2010, 270

F.R.D. 123 (E.D.N.Y. 2010).  On June 30, 2010, NYCC filed its intervenor complaint.  On June

25, 2010, Magistrate Judge Wall granted the Plaintiffs' request to reopen discovery.

On July 29, 2011, motions for summary judgment were again filed by both the Garden

City Defendants and the County.  In addition, on August 26, 2011, NYCC filed a motion to

amend its intervenor complaint pursuant to Rule 15(a)(2) to include an additional cause of action

for violation of the Civil Rights Act of 1871, 42 U.S.C. § 1983, and its rights under the Equal

Protection Clause of the Fourteenth Amendment.

By Memorandum and Order dated February 15, 2012, the Court (1) granted the County's motion for summary judgment dismissing all the claims against it; (2) denied Garden City's motion for summary judgment dismissing all claims against it; and (3) granted NYCC's motion to amend the intervenor complaint. <u>MHANY Mgmt. Inc. v. Cnty. of Nassau</u>, 843 F. Supp. 2d 287 (E.D.N.Y. 2012).

Prior to the trial, the claims of the Individual Plaintiffs Vic DeVita and Francine McCray were dismissed with prejudice. (Docket Entry No. 378, Tr. at 5.) Thus, at the trial, the only remaining Plaintiffs were MHANY and NYCC, and the only remaining Defendants were the Garden City Defendants, namely the Incorporated Village of Garden City and the Garden City Board of Trustees. The only remaining causes of action were the claims under (1) the FHA; (2) 42 U.S.C. §§ 1981, 1982, and 1983, and (3) the Equal Protection Clause of the Fourteenth Amendment. The claim under 42 U.S.C. §2000d had been asserted only against the County. On June 17, 2013, the Court commenced a bench trial that spanned 11 days.

### III. CONCLUSIONS OF LAW

A. <u>Is the Garden City Board of Trustees Subject to this Lawsuit?</u>

The Garden City Defendants argue for the first time that the Board of Trustees is not a suable legal entity separate from the Village. In support of this assertion, the Garden City Defendants rely on <u>Glacken v. Inc. Vill. of Freeport</u>, CV 09-4832 (DRH)(AKT), 2011 WL 7546425 (E.D.N.Y. June 27, 2011), <u>report and recommendation adopted</u>, 09 CV 4832 (DRH)(AKT), 2012 WL 895392 (E.D.N.Y. Mar. 15, 2012). There, United States Magistrate Judge A. Kathleen Tomlinson found that "[a]lthough no cases conclusively hold that a board of directors of a village is not a suable entity or is redundant when the village is also a named defendant, the Court finds that the relevant case law supports such a conclusion." 2011 WL

7546425, at *2. Judge Tomlinson determined that cases that have barred suits against a city or village police department as opposed to the municipality itself apply with full force to suits against the Board, here, an administrative arm or governing body of the Village.

Although the Court finds <u>Glacken</u> persuasive as a logical conclusion, the Court declines to dismiss the Board of Trustees where, as here, the Garden City Defendants failed to previously raise this issue. Indeed, the <u>Glacken</u> court dismissed the Board of Directors at the motion to dismiss stage. <u>Id.</u> at *1 ("no <u>evidence</u> has been offered to support the propositions that the Board is a suable entity or that the naming of the Board as a party is not duplicative of the Village being named as a party.")(emphasis added).

Here, by contrast, the Court heard no proof regarding whether the Board is a separate legal entity from the Village. Although, in all likelihood, any recovery against the Board would be the obligation of the Village, the Court declines to dismiss the Board without any evidence or further notice to NHYAC and NYCC. Also, absent relevant case law, the Court declines to find non-waivable the defense that a Board of Trustees of a Village is not a suable entity separate from the Village so that the Court is obligated to consider this newly-raised argument.

B. <u>As to the Article III Standing of the Plaintiffs</u>

Under Article III of the United States Constitution, standing to bring a lawsuit in federal court is limited to a plaintiff who "show[s] that the conduct of which he complains has caused him to suffer an 'injury in fact' that a favorable judgment will redress." <u>Elk Grove Unified School Dist. v. Newdow</u>, 542 U.S. 1, 12, 124 S. Ct. 2301, 159 L. Ed. 2d 98 (2004); <u>see also</u> <u>Ziemba v. Rell</u>, 409 F.3d 553, 555 (2d Cir. 2005). Further, among other standing requirements, "a plaintiff's alleged injury must be an invasion of a concrete and particularized legally protected interest." <u>McConnell v. Fed. Election Comm'n</u>, 540 U.S. 93, 227, 124 S. Ct. 619, 157 L. Ed. 2d

491 (2003) (opinion of Rehnquist, C.J., for a majority of the court); see also Ziemba, 409 F.3d at 554.

A plaintiff alleging "exclusionary zoning practices must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention." Warth v. Seldin, 422 U.S. 490, 508, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975); Jaimes v. Toledo Metropolitan Hous. Auth., 758 F.2d 1086, 1097 (6th Cir. 1985). The harm does not have to be economic, indeed, of relevance here, "an interest in making suitable low-cost housing available in areas where such housing is scarce" can "support a plaintiff's standing." Vill. of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 262-63, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977).

In Fair Housing in Huntington Comm. Inc. v. Town of Huntington, 316 F.3d 357 (2d Cir. 2003), the Second Circuit held that "to demonstrate the type of 'particularized injury' necessary for standing [in alleged discriminatory zoning cases,] plaintiffs 'must allege facts from which it reasonably could be inferred' that, absent defendants' challenged conduct, there is a 'substantial probability' that housing with greater minority occupancy would have been built in the [town]." Id. at 363 (quoting Warth, 422 U.S. at 504, 95 S. Ct. 2197, 45 L. Ed. 2d 343). Although the government has no constitutional duty to provide low income housing, it may not obstruct "private projects beneficial to minority groups." Acevedo v. Nassau County, 500 F.2d 1078, 1080-81 (2d Cir. 1974),

At the motion to dismiss stage, the Court found that the Plaintiffs properly plead standing. However, "it sometimes remains to be seen whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence adduced at trial." Gladstone, Realtors v. Vill. of Bellwood, 441 U.S. 91, 115 n. 31, 99 S. Ct. 160160 L. Ed. 2d 66

(1979); see also Alexander v. Yale Univ., 631 F.2d 178, 183 (2d Cir. 1980)("It is also mandatory that [these elements] must be satisfied throughout the course of adjudication by the courts.") Accordingly, the Court now addresses the Garden City Defendants' arguments challenging the Plaintiffs' Article III standing.

1. NYAHC/MHANY

At the motion to dismiss stage, the Garden City Defendants contended that NYAHC lacked standing because it failed to allege that it attempted in any way to acquire a permit, submit a bid, or communicate with the Defendants regarding the RFP for the Social Services Site. Judge Bianco rejected this argument, noting that NYAHC alleged that immediately after receiving the RFP, NYAHC met with County officials and submitted a Proposed Plan, only to have the County ignore the Plan. Judge Bianco observed that while no formal proposal or financing had been reviewed by the Garden City Defendants, "these types of uncertainties always exist in housing development cases, and should not be used as a means to defeat standing." 2006 WL 2053732, at * 10. Judge Bianco further noted that "[t]he law of standing is not so rigid so as to deny a developer standing, no matter how significant the 'injury in fact,' merely because it failed to submit a non-conforming proposal, knowing it will be summarily rejected." Id. at *9.

The Garden City Defendants now contend that NYAHC failed to prove at the trial the necessary elements of standing, asserting that the Plaintiffs have offered no evidence that NYAHC would have submitted a qualifying bid for the Social Services Site but for the Village's zoning decision. The Garden City Defendants also note that the "protest" proposal NYAHC submitted to the County was admittedly not "serious" and it did not comply with the terms of the RFP or CO5b zoning.

In response, NYAHC cites to testimony by Ismene Speliotis that NYAHC would have bid on the property had it been available in 2004 under the R-M designation. NYAHC also cites the four alternative development scenarios created by Speliotis to assess the feasibility of affordable housing at three different land-acquisition costs for which NYAHC could have obtained funding.

In the Court's view, NYAHC proved injury in fact at the trial notwithstanding that it did not submit a proposed bid during the RFP process. In this regard, NYAHC proved "that submitting its admittedly non-compliant proposal in response to the RFP would have been futile because the [shift to R-T zoning] made it financially impossible to build low income housing on the Social Services Site." ACORN v. Cnty. of Nassau, 2006 WL 2053732, at *9; LeBlanc–Sternberg v. Fletcher, 67 F.3d 412, 424-25 (2d Cir. 1995) (holding that the plaintiff had standing to bring an FHA claim challenging an ordinance, even before the government entity had applied the ordinance against the plaintiff). To be sure, whether the shift to R-T zoning was discriminatory in nature under federal law presents a question, distinct from the issue of standing, which issue will be addressed later.

The Garden City Defendants further contend, without authority, that the Plaintiffs must establish that a bid for affordable housing at the site under CO5b zoning would have been successful. However, first, "a court is not required to engage in undue speculation as a predicate for finding that the plaintiff has the requisite personal stake in the controversy." Vill. of Arlington Heights, 429 U.S. at 261-62, 97 S. Ct. 555, 561, 50 L. Ed. 2d 450. Second, one of alternatives Speliotis projected contemplated a $56.1 million purchase price, which would have been directly competitive with the winning bid. (Joint Exh. 28 at 696, Plfs Exh. 179.)

Finally, the Garden City Defendants assert that because the Plaintiffs' inability to benefit from affordable housing on the Site was not caused by the Village, the Plaintiffs cannot show that any remedy against the Village would redress that injury. However, the Court finds this argument unavailing because the shift to R-T zoning by the Village, whether discriminatory or not, caused injury to NYHAC because, as explained later, the high cost to develop single-family housing under R-T zoning made it financially impossible to build low income housing on the Site.

2.   NYCC

At the motion to dismiss stage, Judge Bianco determined that the Plaintiffs sufficiently alleged that members of ACORN, which asserted claims only on behalf of its members rather than itself, had an injury in fact and that the Defendants discriminatorily changed the proposed zoning, thereby preventing NYAHC from being able to build multifamily affordable housing on the Social Services site. Subsequent to Judge Bianco's order denying the motion to dismiss and, after ACORN disbanded, NYCC intervened in this action, as a practical but not legal successor, to ACORN.

The Garden City Defendants now challenge NYCC's standing. To have standing to bring suit to redress its members' injuries, an association must establish that (1) its members would otherwise have standing to sue in their own right, (2) the interests it seeks to protect are germane to the organization's purpose, and (3) neither the claim nor the relief requested requires the participation of individual members in the lawsuit. See United Food & Commercial Workers Union Local 751 v. Brown Group, 517 U.S. 544, 552–53, 116 S. Ct. 1529, 134 L. Ed. 2d 758 (1996).

The Court finds that the Plaintiffs proved that NYCC's members would have been eligible for and would have an interest in obtaining affordable housing in Garden City. (Tr. at 1228, 1432.)  Indeed, Ann Sullivan, one of NYCC's deputy directors, testified that ACORN members, many of whom subsequently became NYCC members, desired to live in affordable housing in Garden City and provided the names of three such members. (Tr. at 1372-73.) Further, the fact that NYCC intervened after the County decided not to sell the Social Services Site is immaterial to NYCC's associational standing because the injury NYCC's members suffered allegedly occurred previously when the Board shifted from R-M zoning to R-T zoning.

C.  <u>As to the Statutory Standing of the Plaintiffs</u>

In addition to challenging the constitutional standing of the Plaintiffs, the Garden City Defendants argue, apparently for the first time, that the Plaintiffs, as corporate entities, lack statutory standing to bring an action under 42 U.S.C. § 1982.

Section 1982 provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."  Unlike §§ 1981 and 1983 which apply to "persons," § 1982 protects the property rights of "citizens of the United States."

Here, the Garden City Defendants argue that Section 1982 permits actions by "citizens" and that corporations are not "citizens."  In support of that assertion, the Garden City Defendants cite <u>Comtel Technologies, Inc. v. Paul H. Schwendener, Inc.</u>, 04 C 3879, 2005 WL 433327 (N.D. Ill. Feb. 22, 2005).  Prior to that case, some courts presumed that corporations could bring § 1982 claims, <u>see e.g.</u>, <u>Park View Heights Corp. v. City of Black Jack</u>, 467 F.2d 1208, 1214 (8th Cir. 1972)(allowing corporate plaintiffs standing to bring claims under both § 1981 and § 1982). However, some courts presumed that they could not bring such a claim, <u>see e.g.</u>, <u>American Civil</u>

Rights Investigations, Inc. v. O'Connor & Tushla, 1989 U.S. Dist. LEXIS 17771, at *4 (W.D. Mich. 1989)(dismissing plaintiff corporation's § 1982 claim because only citizens have claims under the statute).  Also, as to this subject, the Comtel court observed that "no court ha[d] provided much analysis of the issue." Comtel, 2005 WL 433327 at *5.  In Comtel, the court "note[d] the difference [between "persons" and "citizens"] and [found that it was] compelled to enforce § 1982 as written-limiting its protection to "citizens," a category that does not include the private corporations." Id. at *6.

While the Garden City Defendants contested the standing of NYHAC and ACORN at the motion to dismiss stage, they couched their arguments in constitutional rather than statutory terms.  Statutory standing arguments, unlike constitutional standing arguments, can be waived. See Gribben v. United States (In re Gribben), 158 B.R. 920, 921–22 (S.D.N.Y. 1993) (the Government's failure to raise issue of standing in proceedings before bankruptcy court waived any argument on appeal that debtor lacked statutory standing to seek turnover of tax refunds.) Accordingly, the Court deems the Garden City Defendant's statutory standing arguments under Section 1982 to be waived.

D.  As to Mootness

The Garden City Defendants also assert that, even if the Plaintiffs had standing to initiate the suit, the Plaintiffs lost that standing after the County decided not to sell the site.  Indeed, the Garden City Defendants note that NYCC did not intervene until after the County decided not to sell the Site.  This argument is identical to the mootness claim previously rejected by the Court at the summary judgment stage. Alexander, 631 F.2d at 183 ("Th[e] 'time element of standing' comes under the rubric of mootness doctrine.")  The Garden City Defendants did not seek reconsideration of that decision and such a motion would now be untimely.

However, even were the Court to consider this issue, the Court would adhere to its prior determination that "[a]lthough the relief requested as to the site may have been rendered moot, the broad injunctive relief sought by the Plaintiffs is certainly still a potential outcome of this case." 843 F. Supp. 2d at 30. Indeed, the Plaintiffs request non-site related injunctive relief and a declaratory judgment. In fact, the Court previously noted that it may be possible for the Court to grant some relief as to the Social Services Site. The County acknowledged in its opposition to NYCC's motion to amend the intervenor complaint that "the County needs finality on the issue of whether plaintiffs' demand for injunctive relief will bar the construction where the decision to build has been made final." Thus, even the County appeared to concede that the Court's injunctive relief as to the Site itself is still a plausible outcome. As the Plaintiffs observe, the County has yet to take action at the Site, and thus this decision may furnish determinative issues in the future.

Relatedly, the Garden City Defendants contend that if the County had decided not to sell the Social Services Site prior to commencement of this suit, the complaint would have been dismissed for lack of a justiciable controversy. The Court disagrees. Again, the injury resulting from the change in the proposed zoning preceded the County's decision not to sell the site. The "no sale" decision had no effect on the Plaintiffs' injuries; rather, the County's decision simply may have mooted certain types of relief that could be awarded based on those injuries.

The Garden City Defendants also contend that the Plaintiffs failed to prove that Garden City's zoning decision somehow caused the County's "no sale" decision. In this regard, the Garden City Defendants observe that after Garden City adopted R-T zoning in June 2004, the County proceeded with its RFP process and did not change course until the election of a new County Executive in 2010, 6 years after the zoning change. However, even if the Garden City's

zoning change had nothing to do with the County's "no sale" decision, the Plaintiffs are not foreclosed from recovery. As previously stated, the Plaintiffs' injuries occurred at the time of the zoning change, prior to the County's "no sale" decision.

As to the mootness issue, notwithstanding the fact that the Social Services Site is no longer being used, there are issues in the case that are not moot. As stated by the Court in its summary judgment decision, 843 F. Supp. 2d 287, in the prayer for relief seeking an injunction are the following: "(8) enjoin all Defendants and their agents, employees, successors and assigns, from engaging in any other discriminatory acts that perpetuate or contribute to segregation in Garden City and Nassau County; and (9) order all Defendants to take and/or fund affirmative steps, supervised by this Court, to overcome the effects of past discriminatory practices, including the funding of remedial activities necessary to overcome the perpetuation of segregation in Nassau County and Garden City." The complaint also seeks a declaratory judgment and such other relief that the Court deems reasonable and necessary with regard to the request set forth above.

Therefore, there are two specific instances of injunctive relief sought by the Plaintiffs against the Defendants that do not relate specifically to the Special Services site itself. First, the Plaintiffs seek to enjoin the Defendants from engaging in any other discriminatory acts that perpetuate or contribute to segregation in Garden City. Second, the Plaintiffs seek an order that the Defendants take and/or fund affirmative steps, supervised by this Court, to overcome the effects of past discriminatory practices, including the funding of remedial activities necessary to overcome the perpetuation of segregation in Garden City. This is in addition to the declaratory relief and any other relief that the Court deems reasonable, necessary and just.

In this regard, the Court found that this controversy is not rendered moot solely because the Social Services Site is no longer susceptible to the zoning laws that were alleged to be discriminatory. See, e.g., U.S. v. Mass. Maritime Acad., 762 F.2d 142, 157 (1st Cir. 1985) ("Given the evidence of persistent past discrimination, the district court was entitled to enter an injunction permanently enjoining any repeat discriminatory conduct even if the illegal conduct had by then ceased."); South-Suburban Hous. Ctr. V. Greater South Suburban Bd. of Realtors, et al., 935 F.2d 868, 881 (7th Cir. 1991) (finding that an FHA challenge to street plan for damages, declaratory relief, and injunctive relief was not rendered moot although homes were sold prior to trial, in part because there was still a viable claim for declaratory and injunctive relief).

This affirmative action can be appropriate even though the effects of the alleged discrimination cannot be resolved at the particular Social Services site. See Baltimore Neighborhoods, Inc. v. LOB, Inc., 92 F. Supp. 2d 456, 462 (D. Md. 2000) (finding that affirmative action relief was appropriate because although the effects of the discrimination could not be solved at the particular site, it was possible to seek affirmative action "elsewhere in the Odenton area").

Also, as stated by the Court in its summary judgment decision:

> In this regard, the Court finds that a determination of whether or not the County and the Village's past conduct violated the Constitution or applicable federal laws remains very much an open question. A legal dispute still exists as to whether any discriminatory practices took place by the Defendants, and whether an injury is still ongoing for every day there is an alleged lack of affordable housing, and hence a lack of racial integration, in the Village of Garden City . . .". See Young v. Pierce, 628 F. Supp. 1037, 1059-60 (E.D. Tex. 1985) (finding that part of the heavy burden of demonstrating that discontinuance of the challenged activity has destroyed any controversy between the parties "includes the necessity of showing that there are no present effects of past conduct that require undoing.") (citing Vitek v. Jones, 445 U.S. 480, 487, 100 S. Ct. 1254, 1260, 63 L. Ed. 2d 552 (1980)).

. . .

Therefore, because there still is relief that is obtainable by the Plaintiffs against the Defendants, the Court finds that there remains a live controversy in spite of the fact that the Social Services site will no longer be sold. Thus, the case has not been rendered moot and the Court can proceed to analyze the substantive merits of the action.

E. <u>As to Liability</u>

1. <u>FHA Claims Against the Garden City Defendants</u>

Congress enacted the FHA, or Title VIII of the Civil Rights Act of 1968, to "provide, within constitutional limits, for fair housing throughout the United States." 42 U.S.C. § 3601. The law provides that it shall be unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." <u>Id.</u> § 3604 (a). The Second Circuit has determined that "[c]onduct prohibited by this section includes discriminatory zoning practices." <u>Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y.</u>, 316 F.3d 357, 366 (2d Cir. 2003); <u>see</u> <u>Le Blanc–Sternberg v. Fletcher</u>, 67 F.3d 412, 424 (2d Cir. 1995); <u>Huntington Branch, N.A.A.C.P. v. Town of Huntington</u>, 844 F.2d 926, 938 (2d Cir. 1988) <u>aff'd in part sub nom. Town of Huntington, N.Y. v. Huntington Branch, N.A.A.C.P.</u>, 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988). A claimant may demonstrate that discriminatory zoning practices were employed by presenting either proof of disparate treatment or disparate impact. <u>See</u> <u>Huntington Branch. N.A.A.C.P.</u>, 844 F.2d at 934–35; <u>see also</u> <u>LeBlanc–Sternberg</u>, 67 F.3d at 425. In the instant case, the Plaintiffs advance their FHA claim against the Garden City Defendants under both theories of liability, which the Court will address in turn.

i. <u>Disparate Treatment Legal Standard</u>

"The framework of burdens fashioned in Title VII cases is fully applicable to [FHA] housing discrimination cases." <u>Cabrera v. Jakabovitz</u>, 24 F.3d 372, 383 (2d Cir. 1994); <u>see also</u> <u>id.</u> at 381-82 (describing "the three-step formulation of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and <u>Texas Dep't of Community Affairs v.</u> <u>Burdine</u>, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)" in the context of fashioning jury instructions).

Under the theory of disparate treatment, "a plaintiff can establish a prima facie case by showing that animus against the protected group 'was a *significant* factor in the position taken' by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." <u>LeBlanc–Sternberg</u>, 67 F.3d at 425 (quoting <u>United States v. Yonkers</u> <u>Bd. of Educ.</u>, 837 F.2d 1181, 1217, 1223, 1226 (2d Cir.1987), <u>cert. denied</u>, 486 U.S. 1055, 108 S. Ct. 2821, 100 L. Ed. 2d 922 (1988)) (emphasis added); <u>see also</u> <u>Innovative Health Sys. Inc. v.</u> <u>City of White Plains</u>, 117 F.3d 37, 49 (2d Cir. 1997) ("[A] decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decisionmaking process.  A . . . discriminatory act [is] no less illegal simply because it enjoys broad public support.").

Discriminatory intent may of course be demonstrated by direct evidence.  However, as such evidence is rarely available to plaintiffs, it may also be inferred through factors such as: "[t]he impact of the official action whether it 'bears more heavily on one race than another,' " "[t]he historical background of the decision," "[t]he specific sequence of events leading up to the challenged decision," "[d]epartures from the normal procedural sequence," "[s]ubstantive departures . . ., particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached," and "contemporary statements by

members of the decisionmaking body, or reports." <u>Vill. of Arlington Heights</u>, 429 U.S. at 267–68, 97 S. Ct. 555, 50 L. Ed. 2d 450; <u>see</u> <u>also Rosen v. Thornburgh</u>, 928 F.2d 528, 533 (2d Cir. 1991) (noting that perpetrators of discrimination rarely leave a "smoking gun," and, therefore, "[a] victim of discrimination is . . . seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence.").

Once a plaintiff presents a *prima facie* case of discrimination based on the <u>Vill. of Arlington Heights</u> factors, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for its actions. <u>Reg'l Econ. Cmty. Action Program v. City of Middletown</u>, 294 F.3d 35 at 49 (2d Cir. 2002).

At the third stage of the <u>McDonnell Douglas test</u>, "the sole remaining issue [is] 'discrimination *vel non*.'" <u>Byrnie v. Town of Cromwell</u>, 243 F.3d 93, 101-02 (2d Cir. 2001) (citations omitted), and "the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." <u>James v. New York Racing Ass'n</u>, 233 F.3d 149, 156 (2d Cir. 2000); <u>see</u> <u>also</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

    ii.  <u>As to the Plaintiffs' Theory of Disparate Treatment</u>

        a.  <u>As to Whether the Zoning Bore More Heavily on One Race Than Another</u>

The Plaintiffs have presented evidence that indicates that the subject zoning designation "[bore] more heavily on one race than another." <u>Washington v. Davis</u>, 426 U.S. 229, 242, 96 S. Ct. 2040, 2049, 48 L. Ed. 2d 597 (1976). This evidence typically "involves statistical data supporting either a finding of perpetuation of segregation or of disproportionate impact." <u>Thornton v. City of Allegan</u>, 863 F. Supp. 504, 509 (W.D. Mich. 1993). Not surprisingly, the parties' analysis of this issue dovetails with their respective analyses of the theory of disparate

impact. For that reason, the Court will discuss this issue in greater detail in the disparate impact section.

For now, it is sufficient to note that McArdle, the Plaintiffs' statistical expert, set forth evidence that the original R-M zoning proposal, as proffered by BFJ and endorsed by the P-Zone Committee, would have created a pool of potential renters with a significantly larger percentage of minority households than the pool of potential renters for the zoning proposal ultimately adopted as law by Garden City. In this regard, the Plaintiffs established that the change from the proposed R-M zoning to the adopted R-T zoning affected minority residents to a greater degree. See e.g., Jim Sowell Const. Co., Inc. v. City of Coppell, 61 F. Supp. 2d 542, 547 (N.D. Tex. 1999) (finding that evidence from an expert demonstrating a disproportionate amount of African–American potential residents lived in multi-family housing "demonstrate[d] that African–American families are much more likely to reside in apartment complexes than are Caucasian families. By rezoning certain tracts of land from multifamily to single family use . . . the City decreased the number of apartment units available to new residents. Because African–Americans are more likely to reside in such housing, this reduction in multifamily units had a statistically greater impact on African–American families than on Caucasian families.").

b. As to the Historical Evidence of Racism in the Village of Garden City

Under Vill. of Arlington Heights, "[t]he historical background of the decision [at issue] is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes." 429 U.S. at 267, 97 S. Ct. 555. As this Court previously pointed out in its summary judgment order, in Vill. of Arlington Heights, the Supreme Court explicitly distinguished between the "historical background" of a decision and the "specific antecedent events" leading up to it, indicating that courts should consider the historical background of a zoning decision in a

"broad[] sense." 843 F. Supp. 2d at 317; see Dews v. Town of Sunnyvale, Tex., 109 F. Supp. 2d

526, 571 (N.D. Tex. 2000) (concluding, after a bench trial on the merits, that defendant town's

decisions, over the years, to adopt one acre zoning, prohibit multi-family housing, and refuse

proposed cooperation agreements with local housing authority demonstrated "history of

discouraging African–Americans from moving within its borders.").

     Here, the totality of evidence concerning the historical background of discrimination is as

follows: (1) the unsuccessful application for affordable housing at the Doubleday site; (2) the

adoption of an anti-discrimination policy after an Attorney General investigation into

discrimination at Garden City parks; and (3) the failed attempt to institute affordable housing at

the Ring Road Site.

     Although each of these events could tend to suggest that racial discrimination has

historically been a problem in Garden City, the Court declines to place significant weight on

them for various reasons.  First, the Doubleday application was apparently filed in 1989,

approximately 15 years prior to the underlying events here.  After Vill. of Arlington Heights, the

Supreme Court has cautioned that historical evidence not "reasonably contemporaneous" with

the challenged decision has "little probative value." McCleskey v. Kemp, 481 U.S. 279, 298, 107

S. Ct. 1756, 1770, 95 L. Ed. 2d 262 (1987); cf. Hunter v. Underwood, 471 U.S. 222, 228-233,

105 S. Ct. 1916, 1920-1922, 85 L. Ed. 2d 222 (1985) (relying on legislative history to

demonstrate discriminatory motivation behind a state statute).

     Second, the Court declines to place much weight on the adoption of the anti-

discrimination policy at the Garden City parks because, as the Plaintiffs note, to do so would

have a chilling effect on any entity's willingness to enact similar guidelines. In fact, in

McLaughlin v. Diamond State Port Corp., C.A.03-617 (GMS), 2004 WL 3059543 (D. Del. Dec.

30, 2004), the court excluded such evidence as analogous to subsequent remedial measures under Federal Rule of Evidence 407. In this case, while the Court did not exclude such evidence, the Court finds the reasoning in <u>McLaughlin</u> persuasive and therefore accords little weight to the adoption of the anti-discrimination park policy.

To be sure, the Court considers the underlying complaints at the parks, which, of course, involve behavior not to be encouraged. In any event, the underlying complaints at the parks, while relevant, appear too attenuated from the subject zoning decision to carry much weight.

Third, the Court declines to consider the opposition to the Ring Road site because this event occurred in 2006, two years after the zoning change in this action, and therefore would have little relevance to whether the Garden City Defendants evinced discriminatory intent in 2004.

        c.  <u>As to the Sequence of Events</u>

The Court finds that the sequence of events leading up to the implementation of the R-T Zone give rise to an inference of race-based animus by the Garden City Defendants. Garden City retained BFJ to create a zoning proposal for the Social Services Site. BFJ, in turn, proposed the R–M designation, which permitted the development of up to 311 multi-family units. Both the County and the Board supported this proposal and, specifically, the inclusion of multi-family housing. Trustee Bee is a member of the Board as well as the Committee. As reflected in a summary of a meeting with local property owners, Trustee Bee expressed the opinions that "Garden City demographically has a need for affordable housing" and that "he would keep an open mind but he still felt the recommended zoning change was [sic] appropriate."

However, when it became clear at the public meetings that residents pointedly opposed the development of multi-family housing, BFJ and the Board reversed course. Not long after

representing at a January 20, 2004 meeting that the village had a "need" for affordable housing, Trustee Bee stated at the February 5, 2004 public meeting that "neither the County nor the Village is looking to create a so-called affordable housing." Soon thereafter, the Board and BFJ endorsed a new proposal which banned the development of multi-family housing on all but a small portion of the Social Services Site, and then only by special permit.

The Garden City Defendants repeatedly insist that nothing in the R-T zoning designation specifically prohibited the building of affordable housing. However, this is just another way of saying that the R-T zoning was facially neutral. As mentioned above, the absence of overt discrimination does not defeat a claim of disparate treatment. Furthermore, as explained later, many times a facially neutral law lies at the heart of a claim of disparate impact.

In addition, the Garden City Defendants characterize the recommendation by BFJ for R-M zoning as BFJ's "initial thoughts"; describe the zoning process here as "evolutionary" and "ongoing;" and contend that there was no abrupt shift from R-M zoning to R-T zoning. Indeed, the Garden City Defendants contend that the R-M zoning proposal was "continuously modified throughout 2003." However, in the Court's view, the Garden City Defendants are seeking to rewrite history. The Garden City Defendants only cite two changes to BFJ's proposal: a decrease in floor-to-area ratio and a change from R-6 to R-8 controls for single-family homes. Neither adjustment altered BFJ's multi-family recommendation. Moreover, the Garden City Defendants ignore the P-Zone Committee's consistent recommendation and public comment over eighteen months studying the Social Services Site. A review of the record reveals that the Board and the BFJ's consideration of R-T zoning spanned a matter of weeks, and was not nearly as

deliberative as that for R-M zoning. <u>Sunrise Dev., Inc. v. Town of Huntington, New York</u>, 62 F. Supp. 2d 762, 774 (E.D.N.Y. 1999) (Spatt, J.)(" The Town simply asserts its desire to comply with the Comprehensive Plan as the reason for the Local Law's enactment without pointing to a single reason to support the expedited passage of the Local Law some five years after the plan's effective date.").

After a final public presentation on the proposed R-M zoning in April 2004, Schoelle, Filippon, and Fishberg met with BFJ to review the public comments. For an unexplained reason, members of the P-Zone Committee did not participate in this meeting, and neither did zoning counsel Kiernan.

In addition, the Garden City Defendants' description of citizen reactions to the R-M proposal mischaracterizes the record. The Garden City Defendants assert that the January 2004 public hearing constituted the first time the public enjoyed an opportunity to comment on the proposed zoning. However, in actuality, two public sessions were held with regard to R-M zoning in May and October of 2003.

The Garden City Defendants insist that, in any event, they simply responded to legitimate concerns about the effect of R-M zoning, including traffic, taxes, and school children. The Garden City Defendants note that, whereas the word "affordable" was used only once by a single resident at the February 5, 2004 meeting, the word "traffic" was used 68 times and the word "school" was mentioned 44 times. However, the Garden City Defendants are silent regarding the expression, albeit in a single instance, of concerns about changing the Village's "character" and "flavor."

Further, as the Court has previously held, "[i]n a discrimination action, a court cannot be satisfied that the absence of overtly discriminatory remarks proves an absence

of discrimination." <u>Huntington Branch, N.A.A.C.P. v. Town of Huntington, N.Y.</u>, 668 F.

Supp. 762, 786 (E.D.N.Y. 1987), <u>rev'd on other grounds</u>, 844 F.2d 926 (2d Cir. 1988)

(noting that findings of discrimination cannot "be avoided by careful use of code

words."); <u>Sunrise Dev., Inc.</u>, 62 F. Supp. 2d at 775 (finding substantial likelihood of

discriminatory intent under FHA and Americans with Disabilities Act when residents of

community voiced opposition to construction of assisted living facility, including by

criticizing the "appearance and activity" of such facilities and asserting that such facilities

would "alter the residential character."); <u>Atkins v. Robinson</u>, 545 F. Supp. 852, 871-72

(E.D. Va. 1982) (finding statement that she "feared the projects 'would degenerate to

slum-like conditions, with an abundance of crime' " to be a veiled reference to race); <u>but

see</u> <u>Generally Boyd v. Lefrak Org.</u>, 509 F. 2d 1110, 1112 (2d Cir. 1975)("The premise of

plaintiffs' argument is that '(w)elfare recipiency . . . must be seen as the 'functional

equivalent' of race.'  Such an equivalency between race and income has been rejected by

the Supreme Court.")(citing <u>James v. Valtierra</u>, 402 U.S. 137, 91 S. Ct. 1331, 28 L. Ed.

2d 678 (1971) (internal quotation marks and citations omitted); <u>Forty-Second Street Co.

v. Koch</u>, 613 F. Supp. 1416, 1423 (S.D.N.Y. 1985) (class-biased plan seeking to attract

affluent customers does not prove that plan sought to remove African-Americans or

hispanics which comprise a disproportionate segment of the low-income population).

 The inference of discrimination is not defeated by the fact that the Plaintiffs

declined to rely on the expert testimony of Dr. Peter Marcuse, a professor of urban

planning, who both the Plaintiffs and the Court cited to heavily at the summary judgment

stage.  Marcuse found in his expert report, not in evidence at the trial, that euphemisms

for race-based bias in housing situations can demonstrate discriminatory intent.

However, the Court need not rely on Marcuses's expertise to characterize aspects of the opposition to affordable housing at the Social Services Site. The Court acknowledges that the Plaintiffs overstate their case in describing the opposition to affordable housing in terms of a "surge" and "outcry." Nevertheless, the Court evaluates this real opposition in light of (1) the racial makeup of Garden City; (2) the lack of affordable housing in Garden City; and (3) the likely number of minorities that would have lived in affordable housing at the Social Services Site. Set against this background, the Court concludes that at least some of the expressions by Garden City residents of disapproval for affordable housing reflected race-based animus or at least could have been construed as such by the Board.

### d. As to Whether There Were Departures from Normal Procedural Sequences

The Court next considers whether there were departures from normal procedural sequences in Garden City's zoning decision. See Sunrise Dev., Inc., 62 F. Supp. 2d at 775-76 (concluding that "[a]lthough the Town did commission the [Citizens' Advisor Committee] to undertake a study and issue recommendations on senior housing, when the time came to enact the Local Law, the Town disregarded the CAC's recommendations," which suggested that "defendants likely were swayed by the anti-disabled animus present in the community"); Dews, 109 F. Supp. 2d at 571 ("[The Defendant]'s history of ignoring the recommendations of its planners and proceeding in the face of sound legal and planning advice" weighed towards finding of discriminatory intent).

Here, as previously mentioned, the Court finds that the consideration of R-M zoning proposal involved much greater deliberation than that for the R-T zoning. It is also true that Local Law 2-2004 was moved to a public hearing even though no zoning

text had been drafted and no environmental analysis of the law's impact had been conducted. However, the record is bereft of any evidence regarding the <u>customary</u> zoning procedures, and therefore Court cannot determine whether there was a departure from such procedures.

iii. <u>As to the Defendants' Burden against the Disparate Treatment Claim</u>

Once a plaintiff presents a *prima facie* case of discrimination based on the <u>Vill. of Arlington Heights</u> factors, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for its actions. <u>Reg'l Econ. Cmty. Action Program</u>, 294 F.3d at 49.

Here, the Garden City Defendants submit that legitimate concerns prompted the Board to reject the initial proposal offered by BFJ and endorsed by the P-Zone Committee. Indeed, the Garden City Defendants contend that R-T zoning met the planning principles set forth by BJF better than did the proposed R-M zoning.

In this regard, the Garden City Defendants point to the testimony of their zoning expert Patrick Cleary that R-M zoning "permitted a range of uses that . . . had the potential to create significant, potentially significant adverse impacts" whereas R-T zoning "eliminated the potential for those adverse impacts," namely that R-T zoning eliminated office use and reduced the number of multifamily units, the two biggest generators of traffic. (Tr. at 1855.) The Garden City Defendants also point to the April 22, 2004 presentation to the Village Residents, in which BFJ demonstrated that 215 apartments at the Site would generate 1,423 vehicular trips per day, while 90 single family homes would generate 940 trips and 150 townhomes would generate 920 trips per day. (Joint Exh 13.) Based on these statistics, for 311 multifamily units, the number of

daily traffic trips, over 2,000, is more than double the amount of traffic generated by the proposed number of single family homes or townhomes. (Tr. at 399-401.)

Cleary also stated that R-T zoning "provided for an expansion of the housing opportunities available in the Village of Garden City by facilitating the development of townhomes." (Tr. 1856.)  Indeed, Filippon testified that, while the BFJ reports suggested that townhomes were allowed under the CO-5b zoning, R-M zoning did "[n]ot directly" provide for townhomes "in the usual sense of the word." (Tr. at 1662-63.)  Rather, Filippon noted that the R-T zoning proposal, for the first time, defined "townhomes" in the Village Code. (Tr. at 1772.)

As to additional school children, Fish estimated that, under R-M zoning controls, single family homes would, on average, produce one additional school child, whereas "[w]ith a community aimed at young couples and empty nesters there could be as few as 0.2 to 0.3 public school children per unit [of a multi-family home.]" (Joint Exh. 22, at 691.)  Thus, under Fish's estimates, 90 single family homes would have generated roughly 90 additional school children, while 311 would have generated roughly between 62 and 93 school children.  In opposition, the Garden City Defendants correctly emphasize that even a slight change in the resident mix would have significantly altered these numbers.

Taken together, the Court finds that the Garden City Defendants have satisfied their minimal burden of offering a nondiscriminatory reason for their zoning decision. See Reeves, 530 U.S. at 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105("[The burden of providing a legitimate, nondiscriminatory reason] is one of production, not persuasion; it

can involve no credibility assessment.")(quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)).

 iv. <u>The Plaintiffs' Burden</u>

 Having satisfied their burden of production, the presumption of discrimination no longer applies against the Garden City Defendants, so that the sole remaining issue for the Court is "discrimination *vel non*." <u>Reeves</u>, 530 U.S. at 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (citation omitted), and "the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." <u>James v. New York Racing Ass'n</u>, 233 F.3d 149, 156 (2d Cir. 2000).

 Here, the parties present conflicting evidence regarding whether the R-M or R-T controls would have resulted in greater traffic flow.  The Plaintiffs dispute that traffic concerns motivated the opposition to multi-family housing at the Social Service Site.  Indeed, the Plaintiffs cite the September 2003 EAF, which concluded that the proposal would not generate traffic significantly above present levels.  Further, Fish testified that, even using a conservative approach, the elimination of multi-family housing only reduced peak-traffic by about 3%. (Tr. at 449, 453.)  At the February 5, 2004 meeting, Suozzi described a resident's concern about traffic as "irrational." (Joint Exh. 12, at 908.).

 The Plaintiffs also dispute that townhomes could not be built under the proposed R-M zoning controls.  Fish, and Flippon, a witness for the Garden City Defendants, testified that townhomes would be allowed under the proposed R-M zoning controls. (Tr. at 274, 405-06, 1732.)

Other justifications for R-T zoning are not just disputed, but unsupported by the record. Indeed, the Garden City Defendants assert that the R-M proposal would "not provide an aesthetically pleasing transition" from commercial to single-family homes. (Garden City Defs' Post-Trial Mem, at 8, 16.) Yet, Cleary conceded that R-M would also have provided a form of transition. (Tr. at 1882.) Indeed, the May 2003 study stated that the R-M zone "is seen as a transitional area between existing single-family homes neighborhoods and current commercial development."

Finally, the Garden City Defendants note that, although the Board ostensibly sought to "maximize the use of existing zoning tools," BFJ always recommended an entirely new zone, named initially the "CO5b" zone. (Tr. at 1703.) However, the Court notes that, unlike the R-T zone, the Co-5 B zone contained existing components of the Garden City zoning code, including R-M. Further, the EAF found that R-M zoning maximized existing zoning tools.

That said, the Court is "mindful of the general proscription that 'federal courts should not become zoning boards of appeal to review nonconstitutional land[-]use determinations by the [C]ircuit's many local legislative and administrative agencies.'" Zahra v. Town of Southold, 48 F.3d 674, 679-80 (2d Cir. 1995) (quoting Sullivan v. Town of Salem, 805 F.2d 81, 82 (2d Cir. 1986) (alterations in Zahra)). Accordingly, the Court is reluctant to second-guess citizens and decision-makers' legitimate concerns about traffic and the promotion of townhomes, even if those concerns may have been ill-founded.

However, finding that the Board acted based on legitimate concerns about traffic and the promotion of townhomes does not foreclose a finding that impermissible

discriminatory intent <u>also</u> played a role in the Board's decision-making process.  In fact,

it is clear from the record that there were many different factors – some of which

reflected race-based opposition -- surrounding the enactment of the R-T zoning.  <u>Cabrera</u>,

24 F.3d at 382-82 (under the FHA, plaintiff need prove only that an impermissible

consideration was a motivating factor, not the only motivating factor).

　　　　Given (1) the sequence of events involved in the Board's decision to adopt R-T

zoning instead of R-M zoning after it received public opposition to the prospect of

affordable housing in Garden City and (2) the considerable impact that this zoning

decision had on minorities in that community, the Court finds that the Garden City

Defendants acted with discriminatory intent.  <u>See</u> <u>Valley Hous. LP v. City of Derby</u>, 802

F. Supp. 2d 359, 386-87 (D. Conn. 2011) (stating that a defendant's "drafting of the

decision to deny plaintiffs' appeal before the meeting without discussion with the other

ZBA members and without showing them a draft prior to reading it into the record . . .

support a conclusion of discriminatory decision-making" and indicating that a Zoning

Board's reliance upon an interpretation of the zoning regulations without having probed

the research supported a finding of discrimination).  Further, "[t]he events leading up to

the enactment of the Local Law lead the court to conclude that the defendants likely were

swayed by the anti-[minority] animus present in the community." <u>Sunrise Dev</u>, 62 F.

Supp. 2d at 775; <u>Wentworth v. Hedson</u>, 493 F. Supp. 2d 559, 567 (E.D.N.Y. 2007)("In

cases involving 'vague remarks,' context and timing are everything").

　　　　The question then becomes which party prevails in this type of "mixed motive"

case under the FHA.  "Mixed motive" discrimination deals with situations, as in this case,

in which the evidence shows that the defendant used both legitimate and illegitimate

considerations in making a decision.  The Supreme Court has yet to address "mixed motive" discrimination in a disparate treatment case under Title VIII.  Rather, the Vill. of Arlington Heights involved mixed motive discrimination in housing based on the Equal Protection Clause of the Fourteenth Amendment.

Therefore, before considering "mixed motive" cases under the FHA, the Court will examine the evolution of "mixed motive" cases under Title VII.  Indeed, the Supreme Court and several lower courts have relied on Title VII precedents to interpret Title VIII. See Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 93 S. Ct. 36434 L. Ed. 2d 415 (1972); DiCenso v. H.U.D., 96 F.2d 1004, 1008-09 (7th Cir. 1996); Huntington Branch, N.A.A.C.P., 844 F.2d at 935; Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights, 558 F.2d 1283, 1288-89 (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978); see generally Robert Schwemm, Housing Discrimination Law and Litigation § 7:4 (2001).

In 1989, the Supreme Court decided Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S. Ct. 1775, a Title VII employment discrimination case.  There, the Supreme Court held that, in a "mixed motive" analysis, the plaintiff's burden of proof is satisfied if (1) the evidence shows that the employer relied on any unlawful considerations in making its decision and (2) improper consideration of the employee's gender or other protected status played a motivating part in the employment decision.  The burden of persuasion then shifts to the defendant to show that the employer would have made the same decision if it had not taken the illegitimate factor into account.  The employer would not be held liable if it satisfied its burden of persuasion on the "same decision" issue, which the plurality characterized as an affirmative defense.

Congress responded to Price Waterhouse and a handful of other Supreme Court employment discrimination decisions with what eventually became the Civil Rights Act of 1991, which "expressly overruled the basic premise that an employer could avoid all liability under Title VII by establishing the absence of 'but for' causation." Costa v. Desert Palace, Inc., 299 F.3d 838, 850 (9th Cir. 2002) aff'd, 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003).  Now, under Title VII, the use of a prohibited characteristic such as race, color, religion, sex, or national origin as simply "a motivating factor" in an employment action is unlawful. 42 U.S.C. § 2000e-2(a)(1).  However, Congress added one safety valve: an employer can escape damages and orders of reinstatement, hiring, promotion and the like – but not attorney's fees or declaratory or injunctive relief – by proving the absence of "but for" causation as an affirmative defense. Id. § 2000e-2(m).

Prior to Price Waterhouse, lower courts agreed that the FHA is violated even if only one of the factors that motivated the defendant was unlawful. Schwemm, supra note 3, at 10-22; Hanson v. Veterans Admin., 800 F.2d 1381, 1386 (5th Cir. 1986) (Title VIII is violated if race "was a consideration and played some role in the real estate transaction"); Jordan v. Dellway Villa, Ltd., 661 F.2d 588, 594 (6th Cir. 1981) (a plaintiff should recover if race "played a part" in his rejection of housing); Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1042-43 (2d Cir. 1979) (Title VIII is violated if race "is even one of the motivating factors," and considerations of race must not "play any role in the decision to deny [the plaintiff's] application"); United States v. Pelzer Realty Co., Inc., 484 F.2d 438, 443 (5th Cir. 1973) (race need only be "one significant factor" that the defendant considered in order to find liability).

After Price Waterhouse, "defendants in housing discrimination cases [could] avoid liability where they could show that the illegitimate factor was only a partial reason for the denial of housing, so long as they could show that they would have made the same decision absent the illegitimate factor." Note, Cassandra A. Giles, Shaking Price Waterhouse: Suggestions for A More Workable Approach to Title VIII Mixed Motive Disparate Treatment Discrimination Claims, , 828 (2004)(citing Cato v. Jilek, 779 F. Supp. 937, 944 (N.D. Ill. 1991)) .

The Civil Rights Act of 1991 amended only Title VII, not Title VIII. Therefore, those courts that have addressed the issue have held that the "undiluted Price Waterhouse standard continues to control in Title VIII 'mixed-motive' cases." Cato, 779 F. Supp. at 943 n. 19; see also H.U.D. v. Denton I, 1991 WL 442794 at *8 (H.U.D. A.L.J.)(a defendant "may avoid a finding of liability only by proving that it would have made the same decision even if it had not allowed [the forbidden factor] to play such a role.")(citing Price Waterhouse); H.U.D. v. Denton II, 1992 WL 406537, at *8 (H.U.D. A.L.J)(rejecting the argument that the Civil Rights Act of 1991 overruled Price Waterhouse as applicable to mixed motive Title VIII cases).

In Denton II, the Administrative Law Judge (ALJ) stated that, although Congress overruled the result of Price Waterhouse through the Civil Rights Act of 1991, that piece of legislation "did not address the Price Waterhouse Court's analysis for determining liability in a mixed motive case where the language of a statute proscribes conduct 'because of' certain unlawful factors." Denton II, at *8. For that reason, the ALJ "conclude[d] that the causation analysis formulated in Price Waterhouse remains apt for Fair Housing Act cases" despite the Civil Rights Act of 1991. Id. Thus, "although

Congress sought to remedy the perceived evils of <u>Price Waterhouse</u>, courts in applying Title VIII are still using this case to determine liability in mixed motive housing discrimination cases." Giles, 37 Ind. L. Rev. at 829.

     Consistent with these post-Civil Rights Act of 1991 decisions, the Second Circuit has reaffirmed the rule that, in a FHA case, although the plaintiff need only prove that an impermissible factor played a role in the defendant's housing decision, the "defendant can prevail if it sustains its burden of proving its affirmative defense that it would have taken the adverse action on the basis of the permissible reason alone." <u>Cabrera</u>, 24 F.3d at 383 (2d Cir. 1994)(citing <u>Price Waterhouse</u>). The Second Circuit, by citing <u>Price Waterhouse</u> and not mentioning the Civil Rights Act of 1991, implied that the former survived the latter for purposes of FHA cases.

     Therefore, in this Circuit, although a defendant in an FHA case can escape liability entirely if it proves it would have rendered the same decision had it not considered impermissible reasons, a defendant in a Title VII case can only reduce monetary damages and avoid certain injunctive relief based on liability if it makes the same showing. To be sure, this more defendant-friendly standard under the FHA cuts against the broad remedial interpretation typically accorded to the FHA, <u>Trafficante</u> 409 U.S. at 211, 93 S. Ct. 364, 34 L. Ed. 2d 415 (describe the language of the FHA as "broad and inclusive" and stating that the FHA effectuates a "policy that Congress considered to be of the highest priority") and the general rule that Title VII and the FHA be construed in a similar manner.

     However, absent contrary authority from the Supreme Court or the Second Circuit, the Court is bound by <u>Cabrera</u>, and therefore the Garden City Defendants can

escape liability _if_ they proved that they would have shifted from R-M to R-T zoning even if they had not considered impermissible reasons.

Turning to that precise issue, the Plaintiffs contend that "[t]he _only thing_ R-T zoning accomplished . . . was to effectively eliminate the possibility of affordable housing." (Plf's Post-Trial Memo, at 32.)  The Garden City Defendants counter that the R-T zone met each of the goals of the Village better than did the R-M proposal.

As supported by the record, the Court previously recognized some of the justifications – namely, concerns about traffic and townhomes – for shifting from R-M to R-T zoning.  In that regard, the case at bar is not a "pretext" case, where it is assumed that a single reason motivated the adverse action and the issue is whether the unlawful consideration or legitimate consideration was actually the basis for the action.  Rather, as borne out by the record and despite language regarding "pretext" in this Court's summary judgment decision, the Court is presented with a "mixed motive" case.

Nevertheless, the Court considers the jurisprudence in "pretext" cases relevant to "mixed motive" cases inasmuch as the former sheds light on how much weight to place on legitimate justifications for adverse actions, even if those justifications are not entirely invalid.  Critically, those cases are relevant for the concept that "[t]iming alone may be sufficient to establish pretext." Wentworth, 493 F. Supp. 2d at 570; see also O'Neal v. State University of New York, No. 01 Civ. 7802 (DGT), 2006 WL 3246935, at *15 (E.D.N.Y. Nov.8, 2006) ("Temporal proximity between adverse actions and a plaintiff's complaint of discrimination can be sufficient to show pretext.") (citing Quinn v. Green Tree Credit Corp., 159 F.3d 759, 770 (2d Cir. 1998)); Bouley v. Young-Sabourin, 394 F. Supp. 2d 675, 678 (D. Vt. 2005) (the timing of the eviction and statements in the eviction

letter could lead a reasonable jury to conclude that the lease violation was a pretext and unlawful discrimination was the real reason for the eviction).

In this case, the Court notes that, while residents raised traffic concerns prior to increase in public opposition to affordable housing, the figures concerning traffic relied upon by the Garden City Defendants derive from the April 2004 presentation, given <u>after</u> the increase in public opposition against affordable housing and immediately before the change to R-T zoning. Also, it is not clear that traffic under R-M zoning would be significantly worse than under R-Z zoning, if worse at all.

The Court also notes that there is no indication in the record that, prior to the increase in public opposition, Garden City desired to make townhouses available in their community. The Court also observes that Garden City could have provided for townhouses more specifically in the R-M zoning.

Thus, although the Court finds that these otherwise legitimate concerns played a role in the Board's shift to from R-M zoning to R-T zoning, the Court finds that the Plaintiffs have established that discrimination played a determinative role. In other words, the Court declines to hold that, based on these concerns, the Board would have shifted from R-M zoning to R-T zoning even if discrimination played no role.

Accordingly, because the Court finds that (1) the Plaintiffs have proved that discrimination played a significant factor in the Board's decision to enact R-T zoning instead of R-M zoning and (2) the Garden City Defendants failed to prove that they would have made the same decision absent discriminatory considerations, the Court finds that the Plaintiffs have established liability under § 3604(a) of the FHA based on a theory of disparate treatment.

v. <u>Disparate Impact</u>

The Court now turns to the Plaintiffs' FHA § 3604(a) claim brought under a theory of disparate impact. The Supreme Court has not previously answered and has recently granted a writ of certiorari on the question: "Are disparate impact claims cognizable under the Fair Housing Act?" <u>Mt. Holly Gardens Citizens in Action, Inc. v. Township of Mount Holly</u>, 658 F.3d 375 (3d Cir. 2011), <u>cert. granted</u>, __ U.S. __, 133 S. Ct. 2824, __ L. Ed. 2d __ (2013). However, that case was ultimately settled before oral argument.

<u>http://www.nytimes.com/2013/11/14/us/fair-housing-case-is-settled-before-it-reaches-supreme-court.html?_r=0</u> (last visited November 18, 2013)

All of the circuits, including the Second Circuit, have held that the statute affords the Plaintiffs the ability to prove FHA violations on the theory of disparate impact. <u>See</u> e.g. <u>Tsombanidis v. W. Haven Fire Dep't</u>, 352 F.3d 565, 574–75 (2d Cir. 2003) (internal quotations omitted). Moreover, on February 15, 2013, the United States Department of Housing and Urban Development issued a final rule establishing that disparate impact claims are cognizable under the FHA. 78 Fed. Reg. 11460 (Feb. 15, 2013) (codified at 24 C.F.R. § 100.500 (2013)).

In establishing a *prima facie* case for such a claim, a "plaintiff must show: (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." <u>Tsombanidis</u>, 352 F.3d at 574–75 (internal quotations omitted). A claimant need not provide proof of discriminatory intent, but must demonstrate that "the challenged practice of the defendant 'actually or predictably results in racial discrimination; in other words that it has a discriminatory effect." <u>Huntington Branch, N.A.A.C.P.</u>, 844 F.2d at 934 (quoting <u>U.S. v. City of Black Jack, Missouri</u>, 508 F.2d 1179, 1184–85 (8th Cir. 1974), <u>cert.</u>

denied, 422 U.S. 1042, 95 S. Ct. 2656, 45 L. Ed. 2d 694 (1975)) (further noting that sometimes "[facially neutral] rules bear no relation to discrimination upon passage, but develop into powerful discriminatory mechanisms when applied"). "The discriminatory effect of a rule arises in two contexts: adverse impact on a particular minority group and harm to the community generally by the perpetuation of segregation." Huntington Branch, N.A.A.C.P., 844 F.2d at 937.

In establishing "discriminatory impact," the plaintiff must demonstrate a "'causal connection between [a] facially neutral policy . . . and the resultant proportion of minority' group members in the population at issue." Hack v. President & Fellows of Yale Coll., 237 F.3d 81, 90–91 (2d Cir. 2000) (quoting Brown v. Coach Stores, Inc., 163 F.3d 706, 712 (2d Cir. 1998)).

The Second Circuit has set forth two factors that weigh in this analysis; first, although discriminatory intent is not required to establish a *prima facie* case of disparate impact housing discrimination, "there can be little doubt that if[, as here,] evidence of such intent is presented, that evidence would weigh heavily on the plaintiff's side of the ultimate balance." Huntington Branch, N.A.A.C.P., 844 F.2d at 936. Second, if the plaintiff is suing "only to require a governmental defendant to eliminate some obstacle to housing that the plaintiff itself will build," the government must provide a more substantial justification for its actions than would be the case if a plaintiff was suing to compel the government to construct housing. Id.

Once a plaintiff has presented a *prima facie* case of disparate impact, "the burden shifts to the defendant to 'prove that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect.'" Tsombanidis, 352 F.3d at 575 (quoting Huntington Branch, N.A.A.C.P., 844 F.2d at 936).

vi. <u>As to the Plaintiffs' Theory of Disparate Impact</u>

As noted above, McCardle testified that minority households comprised 41.4% of very-low income renters in need of affordable housing, even though they comprised only 14.8% of all households in Nassau County. (Tr. at 146-48.)  Since the R-T zone largely eliminated the potential for the type of housing that minorities were disproportionally likely to need – namely, affordable rental units (Tr. at 149), the Court finds that minorities bore the brunt of the negative impacts of the R-T zone. <u>See</u> <u>Tsombanidis</u>, 352 F.3d at 575–76 (2d Cir. 2003) ("The basis for a successful disparate impact claim involves a comparison between two groups – those affected and those unaffected by the facially neutral policy.  This comparison must reveal that although neutral, the policy in question imposes a significantly adverse or disproportionate impact on a protected group of individuals. . . . Statistical evidence is also normally used in cases involving fair housing disparate impact claims.") (internal quotations omitted).

 In particular, McArdle testified that, under the initial Fairhaven bid for 156 townhomes, between 1.9% and 3.8% of minority homebuyers in Nassau County could have afforded to purchase a home at the Site.  Expressed in absolute terms, minority households could afford only 3 to 6 of the 156 proposed townhouse units at the Fairhaven development.

Similarly, Speliotis calculated that any development on the Social Services Site would cost at least $500,000 per single-family unit to develop under R-T zoning (whether single-family townhome or single family detached home), without including any acquisition cost for the land. (Tr. at 1472-74.)  Accordingly, she concluded that "one could not build any measurable number of affordable housing units under that [R-T] Zoning." (Tr. at 1474-75; Joint Exh. 29, at 451.) Indeed, Speliotis wrote in 2004 and testified at the trial that the types of dwelling places "encouraged by the [R-T] zoning" were "luxury townhouses." (Tr. at 1479).

Conversely, Speliotis determined that it was possible to develop affordable housing under the rejected R-M controls. (Tr. at 1466-67, 1490-91.) In particular, Speliotis concluded that it would have been financially feasible to build 45 to 78 affordable housing units on the Social Services Site under the R-M controls – including up to approximately 78 Section 8 subsidized rental housing units – at the Site at a cost ranging from $30 million (the County's minimum bid price) to $56 million (the approximate final accepted bid amount.) (Tr. at 1496-97, 1505-06, 1512.) Under these circumstances, Speliotis' estimated that under R-M development proposals for the Site, between 56 (18% of the households) and 101 (32% of the households) minority households would have been able to afford such housing.

Moreover, by blocking Section 8 Housing from being built on the Social Services Site, the Court finds that R-T zoning prevented the overwhelmingly African-American and Hispanic households on the Nassau County Section 8 waiting list from being able to live in Garden City. (Tr. at 157, 165-66, 182-83.). Again, African-American and Hispanic households comprised 88% of the Section 8 rental housing waiting list in Nassau County, even though they comprised only 14.8% of the households in Nassau County. Under MHANY's alternative proposals developed under the R-M zoning controls, up to 78 section 8 units could have been built (Plf's Exhs. 179, 406, 407.), and up to 69 minority families could have afforded to live there.

The Plaintiffs also established that the R-T zone's restriction on the development of multi-family housing perpetuates segregation generally because it decreases the availability of housing to minorities in a municipality where minorities constitute approximately only 4.1% of the overall population, according to the Census taken closest in time to the events in question, and only 2.6% of the population living in households. Huntington Branch, N.A.A.C.P., 844 F.2d 926, 928 (2d Cir. 1988)(the "overwhelmingly white suburb's zoning regulation" which resulted

in a disproportionate harm to African-Americans and segregative impact on the rest of the municipality violated the Fair Housing Act); Vill of Arlington Heights, 558 F.2d 1283, 1286-87 (7th Cir. 1977) (failure to rezone perpetuates racial segregation); City of Black Jack, Missouri, 508 F.2d at 1186 (exclusion of multi-family housing perpetuates segregation).

McArdle's expert testimony also showed that, had the originally proposed R-M zoning been adopted at the Site, the segregation in Garden City could have been alleviated. The four mixed-income housing proposals designed by MHANY for the Site would have likely been occupied by 18% to 32% minority households. (Tr. at 156-57.) Two of the four proposals contained a significant number of Section 8 units. (Tr. 154-56.) Finally, McArdle's testimony showed that, under R-T zoning, the share of minority households who could have afforded to buy homes in the proposed Fairhaven development was so low that the underlying racial composition of the Village would not have changed. (Tr. at 169, 182.) Notably, the Garden City Defendants make no argument or comment in their post-trial memorandum as to whether the shift from R-M to R-T perpetuates segregation in Garden City.

This set of facts is comparable to Huntington Branch, N.A.A.C.P., where the Second Circuit found that a proposed but unrealized development "with [a] goal of 25% minorities" would have desegregated a neighborhood that was 98% white. 844 F. 2d at 937. There, the Second Circuit held that the trial court erred by "fail[ing] to take the next logical step and find that" the zoning ordinance in question perpetuated segregation. Id.

The Garden City Defendants contend that the Plaintiffs' disparate impact claims fails because they have not challenged any facially neutral "policy" or "general practice." However, contrary to the Garden City Defendants' contention, the zoning law at issue here is not one specific act similar to the denial of a variance of a particular parcel of property. In that regard,

the Garden City Defendants' reliance on Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 281 F.3d 333, 351 (2d Cir. 2002), opinion corrected and superseded, 294 F.3d 35 (2d Cir. 2002) is misplaced. There, the Second Circuit held that a disparate impact claim fails if "[n]o comparison of the act's disparate impact on different groups of people is possible." Id. However, the Second Circuit specifically distinguished the facts in that case – namely, the denial of a single-use permit – from a situation, such as here, involving the enactment of a generally applicable zoning law.

The Garden City Defendants further assert that the decision to change from the P-Zone which provided no housing opportunities to the R-T zone at the Social Site, in fact, increased the housing for minorities in Garden City. However, as set forth in the motion to dismiss order and the summary judgment order, "the relevant inquiry here focuses on the housing opportunities available under the rejected R–M designation versus the approved R–T designation," not P-Zone versus R-T zone. 843 F. Supp. 2d at 330. Framed in this manner, a finding of disparate impact here would not, as the Garden City Defendants insist, impose a requirement in the FHA to maximize minority density for every zoning decision.

The Garden City Defendants also fault the Plaintiffs for failing to conduct a proper analysis of potential affordable housing under the R-T designation. However, Speliotis credibly testified that such an analysis would have been futile because it was not possible to build any measurable number of affordable housing units under R-T zoning. (Tr. at 1474-76.) While Speliotis did not produce any documentary evidence of her initial analysis of R-T zoning, she persuasively testified about the cost of a single-family townhome or a single family detached home under R-T zoning. Although not its burden to do so, Garden City could have called an

affordable housing expert to analyze the Social Services Site, its zoning, and the economics of building affordable housing there.

Taken together, the Court concludes that the Plaintiffs have established, by a preponderance of the evidence, that the rejection of the R–M zone in favor of the R–T zone significantly decreased the potential pool of minority residents likely to move into housing developed at the Social Services Site in proportion to the number of non-minorities affected and, therefore, the enactment of the R–T zone actually resulted in racial discrimination.

vii. The Garden City Defendants' Burden

As the Court finds that the Plaintiffs have established a *prima facie* case of disparate impact, the burden shifts to the Garden City Defendants to demonstrate that the rejection of the R–M zone for the R–T zone advanced a "legitimate, bona fide governmental interest . . . that no alternative would serve . . . with less discriminatory effect." Tsombanidis, 352 F.3d at 575.  In this regard, the Plaintiffs are not required to prove that Garden City's stated justifications were pretextual. See Rivera v. Inc. Vill. of Farmingdale, 784 F. Supp. 2d 133, 145 (E.D.N.Y. 2011).  In addition, "[a]lthough the plaintiff is not required to prove discriminatory intent in order to show discriminatory effect, in balancing disparate impact against a governmental interest, evidence of such intent[, as in this case,] weighs heavily in the plaintiff's favor." Oxford House, Inc. v. Town of Babylon, 819 F. Supp. 1179, 1184 (E.D.N.Y. 1993)(citing Huntington Branch N.A.A.C.P., 844 F.2d at 936).

For the reasons explained previously, the Court finds that the enactment of R-T zoning advanced certain legitimate, bona fide government interests – namely, reducing traffic and providing for the construction of townhomes.  However, the Court finds that the Garden City Defendants did not establish the absence of a less discriminatory alternative. Batiste v. City of

New Haven, 239 F. Supp. 2d 213, 224 (D. Conn. 2002)("The defendants offered little evidence to prove that there are no less discriminatory alternatives than building the Prince-Welch School at the Kossuth Street Site."); Sunrise Dev., Inc., 62 F. Supp. 2d at 776 ("the Town has not offered evidence to support a finding that no less discriminatory alternative to the Local Law would serve the Town's interest in complying with the Comprehensive Plan."). Indeed, R-M zoning would have reduced traffic significantly as compared to the P-zone. Further, the Court finds that R-M zoning could have provided for the construction of townhomes in addition to the substantial increase in minorities able to live in the R-M housing.

In sum, the Court concludes that Plaintiffs have established, by a preponderance of the evidence, the liability of the Garden City Defendants under § 3604(a) of the FHA by proving that the Village's acts had both an adverse impact on minorities and tended to perpetuate segregation, and that even though some of Garden City's offered justifications are bona fide and legitimate, less discriminatory alternatives to the current zoning ordinance existed.

    2.   Other Federal Civil Rights Causes of Action

The Court also concludes that the Plaintiffs have established liability under 42 U.S.C. §§ 1981, 1983, and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by proving that Garden City acted with discriminatory intent. The Plaintiffs have also established the other statutory requirements; for example, there is no dispute that Garden City is a municipality covered by Section 1983.

With respect to the § 1983 cause of action, the Garden City Defendants suggest that the adoption of R-T zoning – that is, the enactment of a zoning ordinance – does not qualify as a "policy or custom" supporting a violation of that provision. The Court disagrees. It is well-settled that "municipalities may be sued directly under § 1983 for constitutional deprivations

inflicted upon private individuals pursuant to a governmental custom, policy, *ordinance*, regulation, or decision." Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983)(citing Monell v. Dep't of Soc. Servs., 436 U .S. 658, 690–91, 98 S. Ct. 2018 (1978))(emphasis added).

However, with respect to 42 U.S.C. § 1982, to state such a claim, a plaintiff must allege intentional deprivation of a property right because of race. Perez v. de la Cruz, 09 CIV. 264 (JPO), 2013 WL 2641432, at *12 (S.D.N.Y. June 12, 2013). Here, the Court finds that, as a matter of law, the Plaintiffs fail to identify a cognizable property interest in as yet-built or planned affordable housing. Accordingly, the Court dismisses the Plaintiffs § 1982 cause of action.

## IV.  REMEDIES

Having found that the Garden City Defendants are liable under the FHA, 42 U.S.C. §§ 1981 and 1983, and the Equal Protection Clause of the Fourteenth Amendment, the Court is now required to determine a remedy for those violations through the imposition of appropriate injunctive relief.

The FHA expressly authorizes courts to award injunctive relief:

> if the court finds that a discriminatory housing practice has occurred . . . the court may . . . grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

42 U.S.C. § 3613(c)(1).  "The Court must craft injunctive relief with a view toward the statute's goals of preventing future violations and removing lingering effects of past discrimination.  The scope of the injunction is to be determined by the nature and extent of the legal violation." United States v. Space Hunters, Inc., 2004 WL 2674608, at * 8 (S.D.N.Y. Nov. 23, 2004) (citing Rogers v. 66–36 Yellowstone Blvd. Coop. Owners, Inc., 599 F. Supp. 79, 83 (E.D.N.Y. 1984)).

"[T]he two most common forms of injunctive relief requested under the FHA seek either to prohibit the offending party from engaging in future acts of housing discrimination or to impose upon that party certain affirmative duties to atone for past discrimination and prevent recurrence of such acts." Ueno v. Napolitano, 2007 WL 1395517, at * 6 (E.D.N.Y. May 11, 2007). In determining whether or not to grant a request for injunctive relief, "[t]he critical question . . . is whether a sufficiently flagrant violation of the plaintiffs' civil rights – the guidepost for granting FHA injunctive relief – has occurred." Id. at * 4.

In the Court's view, at a minimum, prohibitive injunctive relief enjoining future FHA violations is appropriate. Rogers, 599 F. Supp. at 85-86 (approving prohibitive relief, i.e. ., forbidding a defendant from disobeying the law, and requiring "defendants to take definite steps via education and advertising towards sustained lawful conduct"). Indeed, the Court anticipates that the Garden City Defendants may be willing to consent to this relief. See United States v. Hylton, 3:11-CV-1543 (JCH), 2013 WL 3927858, at *6 (D. Conn. July 26, 2013)(noting the federal government's acceptance of a general injunction prohibiting it from violating the FHA in the future).

However, because such an injunction merely prohibits what is already prohibited, further relief, perhaps in the form of affirmative relief, appears appropriate. Analogizing to affirmative equitable relief ordered for Title VII violations, courts have looked to traditional principles of equity for guidance. See Park View Heights Corp., 605 F.2d 1033 (directing the district court to take affirmative steps in its efforts to bring low-income housing to the City of Black Jack, but also suggesting that the court meet with the parties to ensure that the relief not be more intrusive on governmental functions than is necessary to achieve the goals of the FHA); see also United States v. City of Parma, Ohio, 661 F.2d 562, 577 (6th Cir. 1981)("The requirements that the City

take whatever action may be necessary to permit construction of public housing, adopt a plan to utilize an existing section 8 program and take required steps for submitting an acceptable application for CDBG funds are reasonable."); Metropolitan Housing Development Corp. v. Village of Arlington Heights, 616 F.2d 1006, 1015 (7th Cir. 1980) (affirming the district court's approval of a consent decree ordering site-specific relief).

In Huntington Branch, N.A.A.C.P., 844 F.2d at 942, the Second Circuit directed the district court to order the Town (1) to rezone the Plaintiff's parcel of land and (2) to strike the challenged portion of its zoning ordinance. In determining the appropriate relief, the Second Circuit pointed to the protracted nature of the litigation and the Town's proven track record of stalling efforts to build low-income housing. Certainly, the present case reflects another example of protracted litigation and, if not a history of opposition to affordable housing in Garden City, certainly a lack of affordable housing in Garden City. For that reason, a directive requiring Garden City to join the Nassau Urban Consortium appears eminently reasonable as a starting point. See Smith v. Town of Clarkton, 682 F.2d 1055, 1065 (4th Cir. 1982)(ordering the Defendant found liable under the FHA to rejoin a regional housing cooperative).

That said, the Court is cognizant of the general reluctance of the judiciary to impose affirmative relief. "If the court orders a FHA defendant to provide affirmative relief, such as to pass policies or rules, build housing or take other affirmative steps toward non-discriminatory housing, then such mandates require serious justification," Robinson v. Parkshore Co-op., 01 C 2103, 2002 WL 1400322, at *4 (N.D. Ill. June 27, 2002), because it is a "massive judicial intrusion on private autonomy." Vill. of Arlington Heights, 558 F.2d at 1293. Indeed, there is no constitutional or statutory right for individual citizens to have housing comply with a particular standard, nor is there a concomitant duty on the part of political entities to provide housing.

Lindsey v. Normet, 405 U.S. 56, 92 S. Ct. 862, 31 L. Ed. 2d 36 (1972).  However, "[a]t the same time, municipalities cannot frustrate the underlying policy of providing fair housing within their communities." Macone v. Town of Wakefield, 277 F.3d 1, 8 (1st Cir. 2002)

In light of these principles, the Court requires further input from the parties on the appropriate remedies in this case.  Thus, within thirty days of the date of this order, the Court directs the Plaintiffs to submit a proposed remedial plan to be incorporated in the final judgment in this case.  The Garden City Defendants shall then have thirty days to respond with objections, including an alternative remedial plan.  In this regard, "[t]he [C]ourt encourages the parties to work cooperatively[, where possible] in formulating a remedial plan so that as many potential objections as possible can be resolved before the plan is submitted to the [C]ourt for consideration and approval." Inclusive Communities Project, Inc. v. Texas Dep't of Hous. & Cmty. Affairs, 860 F. Supp. 2d 312, 332 (N.D. Tex. 2012).

## V.  CONCLUSION

For the foregoing reasons, the Court find that the Plaintiffs have not established liability on the part of the Garden City Defendants under 42 U.S.C. § 1982 and the amended complaint is dismissed as to that cause of action.

However, the Court finds that the Plaintiffs have established by, a preponderance of the evidence, the liability on the part of the Garden City Defendants under (1) the FHA, 42 U.S.C. § 3601 *et seq.*, based on a theory of disparate treatment and disparate impact; (2) 42 U.S.C. § 1981; (3) 42 U.S.C. § 1983; and (4) the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

As noted above, the Court finds that the Garden City Defendants acted with discriminatory intent when they eliminated R-M zoning and endorsed R-T zoning after they

received public opposition to the prospect of affordable housing in Garden City.  The Court notes that R-T zoning banned the development of multi-family housing on all but a small portion of the Social Services site --  the 3.03 acres located on the western side of County Seat Drive – and then only by special permit.  The Court also notes the negative remarks by Garden City residents at public hearings and the flyer against multi-family housing on the Social Services Site.  Set against the underlying sequence of events and the considerable impact that this zoning decision would have had on minorities in that community, the Court concludes that some of the expressions by Garden City residents of disapproval for affordable housing reflected race-based animus or at least could have been construed as such by the Board.

Furthermore, the Court finds that the adoption of R-T zoning instead of R-M zoning had a disparate impact on minorities in Garden City and tended to perpetuate segregation in that community.

Accordingly, the Court directs the Plaintiffs to submit a proposed remedial plan to be incorporated in the final judgment in this case – within thirty days of the date of this order.  The Garden City Defendants shall then have thirty days to respond with objections.  The Plaintiffs shall then have 15 days to reply to the Garden City Defendants' objections.

**SO ORDERED.**
Dated: Central Islip, New York
December 6, 2013


    _Arthur D Spatt_
     ARTHUR D. SPATT
    United States District Judge

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
MHANY MANAGEMENT INC.,

                    Plaintiff,

    -and-                                    **MEMORANDUM OF**
                                            **DECISION AND ORDER**
NEW YORK COMMUNITIES FOR CHANGE,    05-CV-2301 (ADS)(WDW)
INC.,

                    Intervenor-Plaintiff,

            -against-

INCORPORATED VILLAGE OF GARDEN
CITY AND GARDEN CITY BOARD OF
TRUSTEES,

                    Defendants.
-------------------------------------------------------X

<u>**APPEARANCES:**</u>

**Law Offices of Frederick K. Brewington**
*Attorneys for the Plaintiffs*
556 Peninsula Blvd.
Hempstead, New York 11550
        By:    Frederick K. Brewington, Esq., of Counsel

**Lawyers' Committee for Civil Rights Under Law**
*Attorneys for the Plaintiffs*
1401 New York Avenue, NW
Suite 400
Washington, DC 20005
        By:    Joseph D. Rich, Esq.
               Linda H. Mullenbach, Esq.
               Abigail E. Shafroth, Esq., of Counsel

**Hogan Lovells US LLP**
*Attorneys for the Plaintiff Mhany Management Inc.*
875 Third Avenue
New York, New York 10022
        By:    Stanley J. Brown, Esq.
               Peter J. Dennin, Esq.
               Chava Brandriss, Esq.
               Andrew J. Sein, Esq.he h
               Sarah J. Gregory, Esq.

Benjamin A. Fleming, Esq.
Carol H. Cheng, Esq. Of Counsel

**Cullen and Dykman, LLP**
*Attorneys for the Defendants Incorporated Village of Garden City and Garden City Board of Trustees*
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
      By:    James G. Ryan, Esq.
               Ariel E. Ronneburger, Esq.
               Thomas B. Wassel, Esq.
               Cynthia Ann Augello, Esq.
               Douglas J. Bohn, Esq.
               Jennifer A. McLaughlin, Esq., of Counsel

**Jones Day**
*Attorneys for the Defendants Incorporated Village of Garden City and Garden City Board of Trustees*
51 Louisiana Ave N.W.
Washington, D.C. 20001
      By:    Michael A. Carvin

**SPATT, District Judge**.

      Familiarity with the facts of this case is presumed.

      Of relevance here, on December 6, 2013, after an 11-day bench trial commencing on

June 17, 2013, this Court concluded that the Plaintiffs established the liability of the Incorporated

Village of Garden City (the "Village" or "Garden City") and the Garden City Board of Trustees

(collectively the "Garden City Defendants") under (1) the Fair Housing Act ("FHA"), 42 U.S.C.

§ 361 *et seq.* based on a theory of disparate treatment and disparate impact; (2) 42 U.S.C. § 1981;

(3) 42 U.S. C. § 1983; and (4) the Equal Protection Clause of the Fourteenth Amendment to the

United States Constitution. <u>MHANY Mgmt. Inc. v. Inc. Vill. of Garden City</u>, 05-CV-2301

(ADS)(WDW), 2013 WL 6334107 (E.D.N.Y. Dec. 6, 2013)(Spatt, J.).  In particular, the Court

found that:

Garden City Defendants acted with discriminatory intent when they eliminated R–M [Multi-Family Residential Group] zoning and endorsed R–T [Residential Townhouse]zoning after they received public opposition to the prospect of affordable housing in Garden City. The Court notes that R–T zoning banned the development of multi-family housing on all but a small portion of the Social Services site—the 3.03 acres located on the western side of County Seat Drive—and then only by special permit. The Court also notes the negative remarks by Garden City residents at public hearings and the flyer against multi-family housing on the Social Services Site. Set against the underlying sequence of events and the considerable impact that this zoning decision would have had on minorities in that community, the Court concludes that some of the expressions by Garden City residents of disapproval for affordable housing reflected race-based animus or at least could have been construed as such by the Board.

Furthermore, the Court finds that the adoption of R–T zoning instead of R–M zoning had a disparate impact on minorities in Garden City and tended to perpetuate segregation in that community.

Id. at *37.

With respect to remedies, the Court recognized that the FHA authorizes injunctive relief. The Court noted that "at a minimum, prohibitive injunctive relief enjoining future FHA violations is appropriate." Id. at *36. "However," the Court reasoned, "because such an injunction merely prohibits what is already prohibited, further relief, perhaps in the form of affirmative relief, appears appropriate." Id. In that regard, the Court noted that "a directive requiring Garden City to join the Nassau Urban Consortium appears eminently reasonable as a starting point." Id. The Consortium is a group of municipalities in Nassau County that are eligible to receive federal funding to support affordable housing development.

At the same time, the Court made clear that "there is no constitutional or statutory right for individual citizens to have housing comply with a particular standard, nor is there a concomitant duty on the part of political entities to provide housing." Id. Ultimately, the Court reserved decision on the issue of remedies and directed the parties to propose remedial plans to be incorporated into the final judgment in this case.

As modified in its reply brief and described in more detail throughout this opinion, the Plaintiffs' proposed remedies for inclusion in the final judgment are as follows: (1) a general injunction prohibiting any discrimination in housing policy in Garden City on the basis of race, color, or national origin; (2) a directive to Garden City to adopt a Fair Housing Resolution to assure equal housing opportunities and nondiscrimination in its zoning and other land use processes; (3) the appointment of a third-party contractor as a Fair Housing Administrator to ensure compliance with the final judgment; (4) rezoning the Social Services Site from R-T zoning to R-M zoning; (5) participation by Garden City in the Nassau County Urban Consortium; (6) promotion of the development of no less than 78 affordable housing units in Garden City; (7) Fair Housing training for Garden City employees whose duties relate to housing or zoning; (8) funding of an Affordable Housing Trust Fund; (9) certain record-keeping requirements; (10) a deadline to file a motion for attorney's fees and costs; and (11) retention of jurisdiction by this Court over this action until Garden City has fulfilled its obligations under the judgment.

In opposition, without conceding liability, the Garden City Defendants contend that at most the Plaintiffs are entitled to have the Social Services Site rezoned R-M. Alternatively, the Plaintiffs suggests (1) a prohibitory non-discrimination injunction; (2) a requirement that any developer of multi-family property consisting of 5 or more units in the Village offer at least 10% of the units to be reserved for families whose income is 40% to 100% of the Nassau-Suffolk County Area Median Income; (3) Fair Housing training for Village officials whose duties relate to housing or zoning; (4) appointment of a Garden City employee or Trustee as a Fair Housing Compliance Officer to ensure compliance with the final judgment; (5) a deadline for compliance;

(6) a deadline to file a motion for attorney's fees and costs; and (7) retention of jurisdiction over this matter by this Court until Garden City has fulfilled its obligations under the judgment.

In this decision, the Court adopts various aspects of the parties' respective proposed judgments, and includes its own changes as well. Within ten days of the date of this order, the Plaintiffs are directed to submit a final judgment in accordance with the terms of this decision. The Defendants shall then have ten days to file objections or an alternative proposed judgment. The Court will subsequently enter a final judgment.

## I. DISCUSSION

The FHA expressly authorizes courts to award injunctive relief:

> if the court finds that a discriminatory housing practice has occurred . . . the court may . . . grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

42 U.S.C. § 3613(c)(1). "The Court must craft injunctive relief with a view toward the statute's goals of preventing future violations and removing lingering effects of past discrimination. The scope of the injunction is to be determined by the nature and extent of the legal violation." United States v. Space Hunters, Inc., 2004 WL 2674608, at *8 (S.D.N.Y. Nov. 23, 2004) (citing Rogers v. 66–36 Yellowstone Blvd. Coop. Owners, Inc., 599 F. Supp. 79, 83 (E.D.N.Y. 1984)). "[T]he two most common forms of injunctive relief requested under the FHA seek either to prohibit the offending party from engaging in future acts of housing discrimination or to impose upon that party certain affirmative duties to atone for past discrimination and prevent recurrence of such acts." Ueno v. Napolitano, 2007 WL 1395517, at *6 (E.D.N.Y. May 11, 2007). In determining whether or not to grant a request for injunctive relief, "[t]he critical question . . . is

whether a sufficiently flagrant violation of the plaintiffs' civil rights – the guidepost for granting FHA injunctive relief – has occurred." Id. at *4.

In this regard, "[t]he Supreme Court has not required that the 'least restrictive means of implementation' be adopted but has 'recognized that the choice of remedies to redress racial discrimination is 'a balancing process left, within appropriate constitutional or statutory limits, to the sound discretion of the trial court.'" United States v. Yonkers Bd. of Educ., 837 F.2d 1181, 1236 (2d Cir. 1987)(citations omitted).

Here, "[t]o the extent the defendants are concerned that the imposition of *any* injunctive relief is unwarranted, intrusive or burdensome, the court finds such concerns misplaced." Ueno, 2007 WL 1395517, at *7. The Garden City Defendants did not move for reconsideration of the December 6, 2013 order, and in the absence of such a motion, the Court declines to relitigate liability. In other words, "the law has been broken and the defendants cannot now complain of the ensuing consequences." Id.

Further, contrary to the contention of the Garden City Defendants, the Plaintiffs have proved that they are likely to suffer future harm from the "continuing, present adverse effects" of the Defendants' illegal conduct, thereby justifying injunctive relief. City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983). In particular, the Court finds that the Plaintiffs proved that the enactment of R-T zoning continues to limit available housing options in Garden City. See Sierra v. City of New York, 535 F. Supp. 2d 448, 450 (S.D.N.Y. 2008)(On motion to dismiss for lack of standing, "[[a]s to injunctive relief, Sierra has made a sufficient (if thin) showing that section 27-2076(b) continues to limit her available housing options."). Although Nassau County has since declined to sell the Social Services Site, the Court notes that R-T zoning, which the Court found was enacted with a discriminatory intent and

purpose, remains in effect as a barrier to the construction of affordable housing in the Village.  In other words, even if the County changed course and decided to sell the property for residential development, Garden City would still need to repeal the R-T controls to make construction of any measurable number of affordable housing units feasible. <u>South–Suburban Hous. Ctr. v. Greater South Suburban Bd. of Realtors, et al.</u>, 935 F.2d 868, 881 (7th Cir. 1991) (finding that an FHA challenge to a street plan for damages, declaratory relief, and injunctive relief was not rendered moot although homes were sold prior to the trial, in part because there was still a viable claim for declaratory and injunctive relief).

The Garden City Defendants contend that, absent a systemic violation throughout the Village, the Court cannot order Village-wide relief and at most the Plaintiffs are entitled to have the Social Services Site rezoned R-M.  The Court disagrees.

As the <u>Ueno</u> court found:

> The FHA sweeps broader than providing assurance that individual litigants are protected from housing discrimination.  Rather, to achieve Congress' goal of eliminating discrimination wholesale, individual litigants like the plaintiffs here should be considered proxies for the public at large, with the latter group being the real focus in crafting "particularly tailored" injunctive relief under the FHA.

<u>Id.</u> at *5.

The Supreme Court decisions in <u>Horne v. Flores</u>, 557 U.S. 433, 129 S. Ct. 2579, 174 L. Ed. 2d 406 (2009) and <u>Missouri v. Jenkins</u>, 515 U.S. 70, 115 S. Ct. 2038, 132 L. Ed. 2d 63 (1995) do not dictate otherwise.

In <u>Horne</u>, the Supreme Court vacated a statewide injunction to the extent it extended beyond the district proven to have violated the Equal Educational Opportunities Act on the ground that "a statewide injunction . . . intruded deeply into the State's budgetary processes" and

"obscured accountability for the drastic remedy," as the state legislature or state courts had the authority to decide that issue and not the lower court. 557 U.S. at 471, 129 S. Ct. at 2607.

Similarly, in <u>Jenkins</u>, a case involving unconstitutional racial segregation, the Supreme Court held that "[a] district court seeking to remedy an intradistrict violation that has 'directly caused' significant interdistrict effects exceeds its remedial authority if it orders a remedy with an interdistrict purpose." <u>Jenkins</u>, 515 U.S. at 97, 115 S. Ct. at 2054.

Put in simpler terms, <u>Horne</u> and <u>Jenkins</u> stand for the proposition that a remedy for a constitutional violation should only bind the party found to be liable. In contrast to the Plaintiffs in those cases, here, the Plaintiff seeks relief only as to the entities held liable, the Garden City Defendants.

Finally, the Garden City Defendants argue that prospective injunctive relief is inappropriate where, as here, the Village did not engage in a policy or practice of discrimination. As the Second Circuit has summarized, "a plaintiff seeking injunctive relief [against a municipality] must demonstrate *both* a likelihood of future harm *and* the existence of an official policy or its equivalent." <u>Shain v. Ellison</u>, 356 F.3d 211, 216 (2d Cir. 2004)(emphasis added). This is not to say that such injunctive relief demands a history of repeat violations. Rather, the Court finds that the enactment of a zoning ordinance, such as R-T zoning, qualifies as "an official policy or its equivalent" adopted by the Village. <u>Compare</u> <u>Batista v. Rodriguez</u>, 702 F.2d 393, 397 (2d Cir. 1983) ("[M]unicipalities may be sued directly under § 1983 for constitutional deprivations inflicted upon private individuals pursuant to a governmental custom, policy, *ordinance*, regulation, or decision.")(emphasis added).

Having addressed the Defendants' arguments disputing the legal basis for injunctive relief, the Court now addresses the specific relief to be incorporated into the final judgment in this case.

A.  Prohibitive Injunctive Relief

As the Court previously stated in this case, "prohibitive injunctive relief enjoining future FHA violations is appropriate." 2013 WL 6334107, at *36, citing Rogers, 599 F. Supp. at 85-86 (approving prohibitive relief, i.e., forbidding a defendant from disobeying the law, and requiring the "defendants to take definite steps via education and advertising towards sustained lawful conduct").

In this regard, the Plaintiffs propose that the following prohibitory injunction be entered against the Garden City Defendants:

In accordance with the laws of the United States, Garden City, along with their officers, agents, employees, successors, and all persons in active concern or participation with any of them, are permanently enjoined from:

(1). Denying or otherwise making unavailable a dwelling because of race, color or national origin;

(2). Discriminating in the terms, conditions or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color or national origin;

(3). Coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right protected by the FHA;

(4). Interfering with the funding, development or construction of any housing because of race, color or national origin; and

(5). Discriminating on the basis of race, color or national origin in any aspect of the administration of its zoning processes relating to residential property.

(Plfs' Amended Proposed Judgment, at § V.)

The Garden City Defendants contend that the proposed prohibitive injunction is violative of Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 65(d), which requires that injunctions be "specific in terms." The Second Circuit has cautioned that "an injunction must be more specific than a simple command that the defendant obey the law." Peregrine Myanmar Ltd. v. Segal, 89 F.3d 41, 51 (2d Cir. 1996). Thus, without conceding liability, the Garden City Defendants propose the following alternative language:

> In accordance with the laws of the United States, the Village shall not take any action:
>
> (1). Interfering in any way with any person in the exercise of his or her right under the law to secure equal housing opportunity for himself, herself, or others, or any other right enjoyed under the FHA.
>
> (2). Interfering with the development or acquisition of any affordable housing units because of race, color, or national origin.
>
> (3). Discriminating because of race, color, or national origin in any aspect of the enactment or administration of zoning, land use, special permit, or building ordinance laws, polices, practices, requirements, or processes relating to residential property.

(Defs' Alternative Proposed Judgment, at § V.) .

In the Court's view, the language proposed by the Garden City Defendants is more appropriate under the circumstances of this case and complies with Fed. R. Civ. P. 65(d).

Accordingly, the Court directs that the Plaintiffs include in the final judgment the language regarding the prohibitory injunction proposed by the Garden City Defendants Judgment, with no time limitation.

B. Affirmative Injunctive Relief

The FHA "gives the district court the power it needs to fashion affirmative equitable relief calculated to eliminate as far as possible the discriminatory effects of violation of the Fair

Housing Act." Park View Heights Corp. v. City of Black Jack, 605 F.2d 1033, 1036 (8th Cir.

1979).

That said, the Court is cognizant of the general reluctance of the judiciary to impose

affirmative relief.  "If the court orders a FHA defendant to provide affirmative relief, such as to

pass policies or rules, build housing or take other affirmative steps toward non-discriminatory

housing, then such mandates require serious justification," Robinson v. Parkshore Co-op., 01 C

2103, 2002 WL 1400322, at *4 (N.D. Ill. June 27, 2002), because it is a "massive judicial

intrusion on private autonomy." Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights, 558 F.2d

1283, 1293 (7th Cir. 1977) .  "Indeed, there is no constitutional or statutory right for individual

citizens to have housing comply with a particular standard, nor is there a concomitant duty on the

part of political entities to provide housing." 2013 WL 6334107, at *36.  The Court now

addresses the following items of affirmative relief to be included in the final judgment.

1. Fair Housing Training

With regard to Fair Housing training, the Plaintiffs propose that the following language

be included in the final judgment:

A.  Garden City shall implement a yearly fair housing training program for all
elected Garden City officials, and for all officials and Garden City employees
who have duties related to the planning, zoning, permitting, construction, or
occupancy of residential housing. The primary purpose of this training program is
to educate those persons with respect to the requirements of this Order, the FHA,
and state and local fair housing laws.

B.  Garden City shall select a qualified third party entity that has experience
providing fair housing training to conduct the training, and shall select from the
following entities: Plaintiff NYCC, Long Island Housing Services, Inc., the Fair
Housing Justice Center or ERASE Racism.

C.  Each year, at least one time per calendar year, Garden City shall provide in
person training of the requirements of this Order, the FHA, and state and local fair
housing laws. All elected officials, and all officials and employees who have
duties related to the planning, zoning, permitting, construction, or occupancy of

residential housing shall be required to attend the in-person training within the first year after this Order.  All newly elected officials, and all newly appointed officials and hired employees who have duties related to the planning, zoning, permitting, construction, or occupancy of residential housing shall be required to attend the in person training within one year of their election, appointment or hiring.

D.  Each person who attends an in-person training session shall sign a form attesting to the fact that he or she completed the training and the date on which it was completed. All training certification forms shall be maintained by Garden City for five years from the date of signature, and made publicly available upon request to the Village Clerk.

(Plfs' Amended Proposed Judgment, at § XII.)

The Court finds that required Fair Housing Training is consistent with established FHA remedies. See United States v. Hous. Auth. of City of Chickasaw, 504 F. Supp. 716, 734 (S.D. Ala. 1980) (requiring the municipality found liable for a FHA violation to institute educational program for employees "to inform them of the provisions of this [Remedial] Order and their duties under the Fair Housing Act"); City of Parma, 661 F.2d at 577 ("We can see no objection to requiring an educational program to acquaint those officials and employees of the City who are responsible for carrying out the terms of the remedial order of their obligations thereunder.").

Accordingly, the Court directs that the Plaintiffs include in the final judgment the language regarding Fair Housing Training in their Amended Proposed Judgment, with the caveat that the trainers be qualified organizations or individuals mutually agreed upon by the parties. In this regard, the Court notes that, despite NYCC's familiarity with the facts of this case, the Court finds that, given its role in this litigation, permitting NYCC to implement aspects of the remedial order could present partiality problems.  The Court further notes that this case does not involve complex legal issues that would make it difficult for a third party to conduct the mandated Fair Housing Training.

### 2. Fair Housing Resolution

The Plaintiffs also propose that Garden City enact a resolution "to assure equal housing opportunities and nondiscrimination in its zoning and other land use processes." (Plfs' Amended Proposed Judgment, at § VI.). The Court finds that a directive to enact such a measure is reasonable and consistent with the purpose of the FHA. Yonkers Bd. of Educ., 635 F. Supp. at 1577-80 (requiring the defendant to enact legislation setting forth a fair housing policy). Accordingly, the Court directs that the Plaintiffs include in the final judgment the language in their Amended Proposed Judgment regarding a Fair Housing Resolution.

### 3. Re-Zoning the Social Services Site to R-M

While, as noted above, the Court is not limited to site-specific affirmative relief under the FHA, the Court prefers such relief in this case, primarily because such a remedy "fit[s] the nature and extent of the violation [here]." United States v. Yonkers Bd. of Educ., 837 F.2d 1181, 1235 (2d Cir. 1987). The violation of the FHA, and other civil rights provisions, was the specific action by the Garden City Defendants to eliminate R-M zoning and endorse R-T zoning after they received public opposition to the prospect of affordable housing in Garden City. The violation was not, as the Plaintiffs assert, the history of segregation and the absence of affordable housing in Garden City. Rather, the Court considered such factors as relevant to its determination as to whether the Garden City Defendants acted with discriminatory intent and purpose in the re-zoning of the Social Service Site.

Further, while a Town's track record of stalling efforts to build low-income housing is relevant to the imposition of affirmative relief, Huntington Branch, N.A.A.C.P. v. Town of Huntington, 844 F.2d 926, 942 (2d Cir. 1988), aff'd in part sub nom. Town of Huntington, N.Y. v. Huntington Branch, N.A.A.C.P., 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988), the

Court notes that, in this case, for various reasons, it expressly declined to place significant weight on any history of discrimination in Garden City.

It is true that the district court has "the power it needs to fashion affirmative equitable relief calculated to eliminate as far as possible the discriminatory effects of violation of the Fair Housing Act." Park View Heights Corp., 605 F.2d at 1036, and one of the effects of the discriminatory action in the re-zoning of the Social Services Site was the perpetuation of existing segregation in Garden City. However, the Court must be careful not to impose overbroad or "unnecessarily restrictive" relief. Uneo, 2007 WL 1395517, at *5.

The Court also notes that "[t]he animating purpose of [discrimination] remedies must always be to put the victims of constitutional injury where they would have been but for the injury." United States v. City of Yonkers, 197 F.3d 41, 56 (2d Cir. 1999), citing Milliken v. Bradley, 433 U.S. 267, 280, 97 S. Ct. 2749, 2757, 53 L. Ed. 2d 745 (1977). In other words, a discrimination remedy "must be designed as nearly as possible 'to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct.'" Milliken, 433 U.S. at 280, 97 S. Ct. at 2757 (citation omitted).

While the Court retains the authority to direct a municipality to rezone a parcel of land that was previously zoned in violation of the FHA, Huntington Branch, N.A.A.C.P., 844 F.2d at 942, the Court notes that, in this case, the Social Services Site is no longer for sale. Indeed, at some point, the current Nassau County Executive Edward P. Mangano announced plans to relocate the County's Family Court building, currently located in Westbury, New York, to the Social Services Site. The County has since apparently taken no action at the site. Thus, the Court could direct a rezoning only if Nassau County changed course and allows residential

development on the site.  Also, the Court notes that it cannot issue a directive binding Nassau County, which is no longer a party to this case.

Stated otherwise, a directive to the Garden City Defendants to rezone the Social Services Site to zone R-M would not, without further action by third-parties, remedy the FHA and constitutional violations in this case.  However, the Court does not foreclose such a directive because, in the Court's view, unlike other potential remedies, the opportunity to place a competitive bid for affordable housing on the Social Services Site would place the Plaintiffs – in particular, the developer, Mhany – in substantially the same position they were in before the unlawful discriminatory zoning action by the Garden City Defendants.

Accordingly, the Court directs that the Plaintiffs include in the final judgment the following language, or its equivalent:

> In the event Nassau County announces that the Social Services Site will be sold for residential development within one year of the date of this judgment, Garden City shall, within thirty days of that announcement, begin the process of rezoning the Social Services Site with the R-M zoning designation so as to allow for residential multifamily development on the Social Services Site as of right, with no additional permitting or variance process required.

To be clear, the Court is not directing Nassau County, nor could it direct Nassau County to sell the Social Services Site for residential development.  That ultimate action is left to the discretion of the County.

The Court will next address the two conditional measures of affirmative injunctive relief with which Garden City must comply *in the event* the Nassau County does not announce for sale the Social Services Site for residential development within one year of the date of the judgment.

### i.    Participation in the Nassau County Urban Consortium

The Plaintiffs propose that Garden City join and participate in the Nassau County Urban Consortium as follows:

Within sixty days of this Order, Garden City shall apply to become a member of the Nassau County Urban Consortium ("Consortium").

A. Participation: Once accepted as a member of the Consortium, Garden City shall participate in Consortium activities in good faith.

(Plfs' Amended Proposed Judgment, at § IX).

As noted above, this Court previously concluded that "a directive requiring Garden City to join the Nassau Urban Consortium appears eminently reasonable as a starting point." 2013 WL 6334107, at *36, citing Smith v. Town of Clarkton, 682 F.2d 1055, 1065 (4th Cir. 1982)(ordering the Defendant found liable under the FHA to rejoin a regional housing cooperative).

The Garden City Defendants contend that Smith is distinguishable because, unlike the Town in that case, Garden City has not previously been a member of such a coalition. However, the Court finds that ordering a municipal entity to join a housing coalition is not significantly more intrusive than requiring a municipal entity to rejoin a housing coalition.

Beyond Garden City joining the Nassau County Consortium, the Plaintiff requests that, as a member of that coalition, Garden City be enjoined from:

1. Refusing funds from [the Department of Housing and Urban Development], such as Community Development Block Grants ("CDBG") and HOME Investment Partnerships Program ("HOME") funds, intended for provision of affordable housing (as defined by the relevant HUD program), in Garden City;

2. Failing to use funds obtained from HUD for affordable housing (as defined by the relevant HUD program); and

3. Applying residency preferences, such as a preference for current or past residents of Garden City, to housing programs Garden City participates in as a member of the Consortium.

(Plfs' Amended Proposed Judgment, at § IX.)

However, the Court finds that these additional obligations of participation in the Nassau County Consortium go far beyond the rulings in this case and are unnecessary to achieve the objectives set forth. Accordingly, the Court directs that the Plaintiffs include in the final judgment the language regarding the Nassau County Urban Consortium that they include in their Amended Proposed Judgment, without the above-mentioned additional obligations.

ii.     <u>Construction of Affordable Housing</u>

At the trial, Ismene Speliotis, Executive Director of NYAHC/MHANY, concluded that it would have been financially feasible to build 45 to 78 affordable housing units on the Social Services Site under the R-M zone. Using the latter figure, the Plaintiffs Amended Proposed Judgment requires Garden City to "take all the necessary steps to ensure" the development of 78 affordable housing units in Garden City within five years, but specifies that Garden City need not do the building itself. The Plaintiffs also propose that the housing units "be located within Garden City Public School District attendance boundaries" and provides that at least 75% of the units must be two-bedroom units or larger. The Plaintiffs would further obligate the Garden City Defendants to, among other things, conduct an annual survey of Garden City to identify publicly and privately owned sites that are viable for residential development, including new construction or rehabilitation projects. The Plaintiffs would also require Garden City to give Mhany the right of first consideration if Garden City chooses to sell Garden City-owned land for the development of the 78 affordable housing units. Finally, the Plaintiffs propose that Garden City could fulfill its requirements under the judgment if it donated suitable land for the development of the 78 affordable housing units.

The Garden City Defendants counter-propose a requirement that any developer of multi-family property consisting of 5 or more units in the Village offer at least 10% of the units at affordable rates. The Garden City Defendants define "affordable housing" as that for which a family whose income is 40% to 100% of the Nassau-Suffolk Statistical Area Median Income pays no more than 30% of its income. The Garden City Defendants note that while this requirement would be similar to the provisions of the Long Island Workforce Housing Act, New York General Municipal Law § 699, *et seq.* ("LIWHA"), it would differ in two respects. First, under the Garden City proposal, a developer would be required to provide housing for those with lower incomes than does the LIWHA. Indeed, while the LIWHA requires a developer of five or more units of multi-family housing to make available 10% of those units to families with, at a maximum, 130% of the Nassau-Suffolk Area Median Income, the Garden City proposal would limit such units to families, with a maximum, of 100% of the Nassau-Suffolk Area Median Income. Second, under the Garden City proposal, a developer could not "buy-out" of this requirement, as is permitted by the LIWHA.

In the Court's view, the Plaintiffs' proposed steps that Garden City must take to promote the building of the 78 housing units go too far. As this Court previously found, "'federal courts should not become zoning boards of appeal to review nonconstitutional land[-]use determinations by the [C]ircuit's many local legislative and administrative agencies.'" 2013 WL 6334107, at *26, quoting Zahra v. Town of Southold, 48 F.3d 674, 679-80 (2d Cir. 1995) (quoting Sullivan v. Town of Salem, 805 F.2d 81, 82 (2d Cir. 1986) (alterations in Zahra)).

With this principle in mind, the Court finds that the Garden City Defendants' counter-proposal to require new residential developers to set aside at least 10% of their units at affordable rates is reasonable, with one caveat.  The Court directs that the final judgment adopt the Plaintiffs' definition of "affordable housing" "as housing for which a family whose income is 80% or less of the Nassau-Suffolk Metropolitan Statistical Area Median Income . . . pays no more than 30% of its income." (Plfs' Amended Proposed Judgment, at § IV(A).)   Thus, the Court directs that the Plaintiffs include in the final judgment the language regarding the construction of "affordable housing" used by the Garden City Defendants in the Alternative Proposed judgment, but with the Plaintiffs' definition of "affordable housing."

### 4. Appointment of a Fair Housing Compliance Officer

Given that the language regarding Garden City's duty to promote affordable housing adopted by this Court is not as far reaching as the Plaintiffs propose, the Court finds that the appointment of a Fair Housing "Administrator" with the duties described in the Amended Proposed Judgment is not necessary.  Rather, the Court finds that appointment of a Fair Housing Compliance Officer, as described by the Garden City Defendants in their Alternative Proposed Judgment, is appropriate.  Indeed, while oversight is appropriate, Baltimore Neighborhoods, Inc. v. LOB, Inc., 92 F. Supp. 2d 456, 473 (D. Md. 2000)("The use of special masters to administer relief in fair housing cases is an accepted practice"), the powers that the Plaintiffs would bestow on the proposed Fair Housing Administrator are overly broad and unnecessary in light of the more limited housing relief fashioned by the Court.

Thus, the Court directs that the Plaintiffs include in the final judgment the language regarding appointment of a Fair Housing Compliance Officer used by the Garden City Defendants in their Alternative Proposed Judgment, including the reporting requirements and enforcement guidelines.  Also to be included is the caveat that the officer be a third-party independent contractor retained by Garden City, rather than a current employee of the Village.

   5.  <u>Funding</u>

In the Plaintiff's original proposed judgment, they requested that the Court direct the Garden City Defendants to contribute a total of $1,500,000 to an "Affordable Housing Trust Fund" to finance the relief ultimately required in the final judgment.  In their Amended Proposed Judgment, the Plaintiffs request an "Affordable Housing Trust Fund," but remove that figure without replacing it.

At this time, it is not yet clear what forms of relief will ultimately apply to the Garden City Defendants, as some of the relief is conditional on Nassau County's independent choice as to whether to sell the Social Services Site for residential development.  The only mandatory affirmative injunctive relief is the passage of a Fair Housing Resolution; implementation of Fair Housing Training; and employment of a Fair Housing Compliance Officer.  The other forms of relief – rezoning the Social Services Site, joining the Nassau County Urban Consortium, and the enforcement of affordable housing requirements for new developers in Garden City – are only triggered if the County does not announce plans to sell the Social Services Site for residential development within a year of the date of the judgment.

The Court directs that the Plaintiffs' include in the final judgment a directive to Garden City to take reasonable measures to fund the relief required by that judgment.

C. Miscellaneous Directives in the Final Judgment

Pursuant to Fed. R. of Civ. P. 54(d)(2)(B), the Plaintiffs will have fourteen

days from the date the judgment is entered to file a petition for attorney's fees and costs. See 42

U.S.C. § 3613(c) and 42 U.S.C. § 1988(b). The Court directs the Plaintiffs to include in the final

judgment such a directive. The Court also directs the Plaintiffs to include in the final judgment

the language in Section XVII of their Amended Proposed Judgment as it relates to the retention

of jurisdiction over the judgment by this Court.

## II.      CONCLUSION

For the foregoing reasons, within ten days of the date of this order, the Plaintiffs are

directed to submit a proposed final judgment in accordance with the terms set forth in this

decision and order. The Defendants shall then have ten days to file objections or an alternative

proposed judgment. The Court will subsequently enter a final judgment.

Absent further negotiation by the parties as to the terms of the judgment, the

judgment must include, as described herein, (1) a prohibitory non-discrimination

injunction; (2) Fair Housing Training; (3) a directive to Garden City to pass a Fair

Housing Resolution; (4) appointment of a third-party Fair Housing Compliance Officer by

the Village; and (5) expenditure of reasonable sums to fund the relief required by the

judgment. The duties imposed by this mandatory relief shall expire within four years of

the date from the judgment, except for the prohibitory injunction which has no time

limitation.

The judgment must also include a directive that, if Nassau County announces the sale of

the Social Services Site within one year of the date of the judgment, then Garden City shall begin

the process of rezoning the Social Service Site from R-T to R-M controls. If Nassau County

does not make such an announcement, Garden City shall also be required, as described herein, to (1) join the Nassau County Urban Consortium and (2) enforce certain affordable housing requirements for new developers in Garden City. The duties and obligations imposed by this conditional relief shall expire within five years from the date of the judgment.

Finally, as previously stated, the judgment shall also include, a date for the Plaintiffs to move for attorneys' fees and the retention of jurisdiction by this Court.

**SO ORDERED.**
Dated: Central Islip, New York
March 17, 2014

_Arthur D. Spatt_

ARTHUR D. SPATT
United States District Judge

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
MHANY MANAGEMENT INC.,

                       Plaintiff,

   -and-                                 **FINAL JUDGMENT**
                                       05-CV-2301 (ADS)(WDW)

NEW YORK COMMUNITIES FOR CHANGE,
INC.,

                     Intervenor-Plaintiff,

          -against-

INCORPORATED VILLAGE OF GARDEN
CITY AND GARDEN CITY BOARD OF
TRUSTEES,

                     Defendants.
--------------------------------------------------------X

<u>**APPEARANCES:**</u>

**Law Offices of Frederick K. Brewington**
*Attorneys for the Plaintiffs*
556 Peninsula Blvd.
Hempstead, New York 11550
        By:    Frederick K. Brewington, Esq., of Counsel

**Lawyers' Committee for Civil Rights Under Law**
*Attorneys for the Plaintiffs*
1401 New York Avenue, NW
Suite 400
Washington, DC 20005
        By:    Joseph D. Rich, Esq.
                     Linda H. Mullenbach, Esq.
                     Abigail E. Shafroth, Esq., of Counsel

**Hogan Lovells US LLP**
*Attorneys for the Plaintiff Mhany Management Inc.*
875 Third Avenue
New York, New York 10022
        By:    Stanley J. Brown, Esq.
                     Peter J. Dennin, Esq.
                     Chava Brandriss, Esq.
                     Andrew J. Sein, Esq.he h
                     Sarah J. Gregory, Esq.

Benjamin A. Fleming, Esq.
Carol H. Cheng, Esq. Of Counsel

**Cullen and Dykman, LLP**
*Attorneys for the Defendants Incorporated Village of Garden City and Garden City Board of Trustees*
100 Quentin Roosevelt Boulevard
Garden City, NY 11530
  By: James G. Ryan, Esq.
     Ariel E. Ronneburger, Esq.
     Thomas B. Wassel, Esq.
     Cynthia Ann Augello, Esq.
     Douglas J. Bohn, Esq.
     Jennifer A. McLaughlin, Esq., of Counsel

**Jones Day**
*Attorneys for the Defendants Incorporated Village of Garden City and Garden City Board of Trustees*
51 Louisiana Ave N.W.
Washington, D.C. 20001
  By: Michael A. Carvin

**SPATT, District Judge**.


**I. INTRODUCTION**

  A. Plaintiff MHANY Management, Inc. ("MHANY") (formerly known as New York

ACORN Housing Company, Inc.), Intervenor-Plaintiff New York Communities for Change, Inc.

("NYCC") (practical successor to former Plaintiff New York Association of Community

Organizations for Reform Now) (collectively, "Plaintiffs") and several individual former

plaintiffs commenced this lawsuit against Defendants Incorporated Village of Garden City, the

Garden City Board of Trustees (collectively, "Garden City"), and Defendant County of Nassau

(the "County") on May 12, 2005 by filing a Complaint asserting claims pursuant to the Fair

Housing Act, 42 U.S.C. § 3601 et seq. (the "FHA"); 42 U.S.C. § 1981; 42 U.S.C. § 1982; 42

U.S.C. § 1983; 42 U.S.C. § 2000d et seq.; and the Equal Protection Clause of the Fourteenth

Amendment to the United States Constitution. On February 12, 2012, the Court granted summary judgment to the County, and dismissed the case against the County.

B. The Complaint alleged that Garden City discriminatorily re-zoned approximately twenty-five acres of County-owned land located in Garden City (the "Social Services Site") to prevent affordable housing from being built, which would likely be occupied by minorities.

C. The Court conducted an 11-day bench trial commencing on June 17, 2013. After considering the evidence and the arguments submitted at the trial and the written submissions of the parties, the Court issued a Memorandum of Decision and Order dated December 6, 2013. In that Decision and Order, the Court found that Garden City acted with discriminatory intent in re-zoning the Social Services Site. The Court further found Garden City liable under (1) the FHA, based on theories of both disparate treatment and disparate impact; (2) 42 U.S.C. § 1981; (3) 42 U.S.C. § 1983; and (4) the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

Accordingly, it is hereby ORDERED, ADJUDGED and DECREED as follows:

**II. JURISDICTION**

The Court has jurisdiction over this case pursuant to 42 U.S.C. § 3613 and 28 U.S.C. §§ 1343 and 2201.

**III. DISMISSAL OF NASSAU COUNTY**

Pursuant to this Court's February 15, 2012 order granting summary judgment to the County, the Clerk of Court is directed to enter a final judgment of dismissal as to the County.

**IV. GENERAL NON-DISCRIMINATION**

In accordance with the laws of the United States, Garden City shall not take any action:

A. Interfering in any way with any person in the exercise of his or her right under the law to secure equal housing opportunities for himself, herself, or others, or any other right enjoyed under the FHA;

B. Interfering with the development or acquisition of any affordable housing units because of race, color, or national origin; and

C. Discriminating because of race, color, or national origin in any aspect of the enactment or administration of zoning, land use, special permit, or building ordinance laws, policies, practices, requirements, or processes relating to residential property.

## V. FAIR HOUSING RESOLUTION

Within sixty days of the date of this Judgment, Garden City shall adopt a Fair Housing Resolution setting forth the fair housing policy of Garden City as it relates to zoning and land use: to assure equal housing opportunities and nondiscrimination in its zoning and other land use processes.

## VI. REZONING THE SOCIAL SERVICES SITE

In the event the County announces, within one year of the date of this Judgment, that it intends to sell the Social Services Site for residential development, Garden City shall, within thirty days of being notified of that announcement, begin the process of rezoning the Social Services Site with the R-M zoning designation so as to allow for residential multifamily development on the Social Services Site as of right, with no additional permitting or variance processes required. The Social Services Site shall be rezoned R-M no later than ninety days from the date Garden City is notified of the County's intent under this section, provided all the requirements of the State Environmental Quality Review Act are met.

## VII. PARTICIPATION IN THE NASSAU COUNTY URBAN CONSORTIUM

In the event the County does not announce, within one year of the date of this judgment, that it intends to sell the Social Services Site for residential development, or, if the County so announces, but does not actually sell the Social Services Site for residential development within two years of the date of this Judgment, Garden City shall immediately – at the expiration of either the one year or two year period, as appropriate – apply to become a member of the Nassau County Urban Consortium (the "Consortium").

Once accepted as a member of the Consortium, Garden City shall participate in Consortium activities in good faith.

## VIII. AFFORDABLE HOUSING REQUIREMENT

A. "Affordable Housing" as used in this section refers to housing for which a family whose income is 80% or less of the Nassau-Suffolk Metropolitan Statistical Area Median Income (to include families defined by the Department of Housing and Urban Development ("HUD") as "low income," "very low income," or "extremely low income"), pays no more than 30% of its income.

B. In the event the County does not announce, within one year of the date of this Judgment, that it intends to sell the Social Services Site for residential development, or the County so announces, but does not actually sell the Social Services Site for residential development within two years of the date of this Judgment, Garden City shall immediately – at the expiration of either the one year or two year period, as appropriate – require that ten percent of newly constructed residential developments of five units or more be reserved for Affordable Housing, as follows:

1. Garden City will require that, when Garden City approves a subdivision

plat or site plan for five or more residential units or approves a mixed-use development that incorporates five or more residential units, the applicant shall receive a density bonus or other incentive pursuant to a written agreement between the applicant and Garden City, and Garden City shall require of the applicant: (a) to set aside at least ten percent of such units for Affordable Housing on the site; or (b) the provision of other land and the construction of the required Affordable Housing units that are not part of the applicant's current subdivision plat or site plan but are to be provided on another site within Garden City.

2. "Density bonus" means a density increase of at least ten percent over the otherwise maximum allowable residential density or floor area ratio if part of a mixed use development under the Village of Garden City Zoning Code (the "Code") and Comprehensive Plan (the "Plan") as of the date of the application by the applicant to Garden City. All density calculations resulting in fractional units shall be rounded to the nearest whole number.

3. Applicants for residential unit development in Garden City may not avoid this Affordable Housing set-aside by opting to build at less than maximum density under the Code and Plan.

4. Applicants for residential unit development in Garden City may not "buy out" of this Affordable Housing set-aside requirement.

5. Garden City will ensure that all Affordable Housing units remain Affordable Housing through the use of deed restrictions.

## IX. FAIR HOUSING TRAINING

A. Garden City shall implement an annual fair housing training program for all elected Garden City officials, and for all officials and Garden City employees who have duties related to the planning, zoning, permitting, construction, or occupancy of residential housing.

The primary purpose of this training program is to educate those persons with respect to the requirements of this Judgment, the FHA, and state and local fair housing laws.

B. The fair housing training shall be conducted by a qualified third party entity or individual, mutually agreed upon by the parties, that has experience providing fair housing training.

C. Each year, at least one time per calendar year, Garden City shall provide in person training of the requirements of this Judgment, the FHA, and state and local fair housing laws. All elected officials, and all officials and employees who have duties related to the planning, zoning, permitting, construction, or occupancy of residential housing shall be required to attend the in-person training within the first year after this Judgment. All newly elected officials, and all newly appointed officials and hired employees who have duties related to the planning, zoning, permitting, construction, or occupancy of residential housing shall be required to attend the in-person training within one year of their election, appointment or hiring.

D. Each person who attends an in-person training session shall sign a form attesting to the fact that he or she completed the training and the date on which it was completed. All training certification forms shall be maintained by Garden City for five years from the date of signature, and made publicly available upon request to the Garden City Village Clerk.

## X. FUNDING OF RELIEF

Garden City shall take reasonable measures to fund the relief required by this Judgment.

## XI. IMPLEMENTATION AND ENFORCEMENT OF THIS JUDGMENT

A. Fair Housing Compliance Officer: Within ninety days of the date of this Judgment, Garden City shall appoint a person who shall serve as Garden City's Fair Housing Compliance Officer ("FHCO"). The FHCO may not be a current or past employee or elected

official of Garden City, but rather, shall be a third-party independent contractor mutually agreed upon by the parties. Garden City shall at all times during the term of this Judgment maintain a FHCO. The FHCO shall:

      1. oversee Garden City's compliance with this Judgment and maintain copies of this Judgment; and

      2. receive and review complaints of alleged housing discrimination against Garden City.

    B. Record-Keeping Requirements: Garden City shall retain and preserve all records, forms, logs, reports, and other written documents, including electronic records and files, that are relevant to compliance with this Judgment. Garden City shall be responsible for maintaining and preserving, or supervising the maintenance and preservation of, these records. These records shall be maintained for so long as the Court retains jurisdiction over this action, as set out below in Section XIV.

    C. Compliance Reports: Garden City shall provide annual reports ("Compliance Reports"), beginning six months after the date of this Judgment, identifying all actions taken by Garden City to comply with the terms of this Judgment so long as the Court retains jurisdiction over this action, as set out below in Section XIV. The Compliance Reports shall be made publicly available and shall be able to be obtained by submission of a written request to the Garden City Village Clerk. Garden City shall also provide the Compliance Reports to the Court. The following information shall be included in the Compliance Reports:

      1. A description of all actions taken by Garden City to comply with the terms of this Judgment;

      2. A description of the Fair Housing Training required by this Judgment;

        3. Any requests for zone changes received by Garden City to accommodate residential housing development for five or more units;

        4. Any proposals for residential development of five (5) or more units that have been submitted by the Village.

        5. Any written complaint received by Garden City alleging discrimination by Garden City related to zoning or fair housing, with a report of the action taken by Garden City in response to such complaint, including court filings, etc.; and

        D. Notice: All notices or writings required to be provided under this Judgment shall be addressed to counsel for the parties.

## XII. TIME FOR COMPLIANCE AND PROCEDURE FOR NON-COMPLIANCE

        A. Garden City's duties and obligations regarding enacting a Fair Housing Resolution as set out above in Section V, conducting Fair Housing Training as set out above in Section IX, and appointment and maintenance of a FHCO as set out above in Section XI.A shall expire four years after the date of this Judgment.

        B. The requirement of a non-discrimination injunction as set out above in Section IV has no time limitation.

        C. Garden City's duties and obligations regarding rezoning the Social Services Site for residential multifamily housing development (R-M) as set out above in Section VI, joining the Consortium as set out above in Section VII, requiring Affordable Housing as set out above in Section VIII, and expending sums to fund the relief required by this Judgment as set out above in Section X shall expire five years after the date of this Judgment.

## XIII. ATTORNEYS' FEES AND COSTS

        Pursuant to Federal Rule of Civil Procedure 54(d)(2)(B), the Plaintiffs shall have fourteen

days from the date this Judgment is entered to file a petition for attorneys' fees and costs. <u>See</u> 42

U.S.C. § 3613(c) and 42 U.S.C. § 1988(b).

## XIV. RETENTION OF JURISDICTION

A. This Court retains jurisdiction over the action until Garden City has fulfilled all of

its obligations under this Judgment, as determined by the Court, for the purpose of enforcing any

of its provisions and terms.

B. The parties shall work cooperatively with one another and in good faith and should

use their best efforts to effectuate the purposes of this Judgment and to resolve informally any

differences regarding interpretation of and compliance with this Judgment prior to bringing such

matters to the Court for resolution.

C. The parties shall have the right to seek from the Court relevant modifications of

this Judgment to ensure that its purposes are fully satisfied, provided that any request for a

modification has been preceded by good faith negotiations between the parties. The parties may

agree in writing to modify the deadlines established in this Judgment without Court approval, but

such a writing must be filed with the Court.

D. The Clerk of the Court is directed to close this case.

**SO ORDERED.**
Dated: Central Islip, New York
April 22, 2014

_____ _Arthur D. Spatt_____ _

ARTHUR D. SPATT
United States District Judge