# 14-1634(L)

## & 14-1729(XAP)

### United States Court of Appeals for the Second Circuit

MHANY MANAGEMENT, INC., AKA NEW YORK ACORN HOUSING COMPANY,

*Plaintiff – Appellee – Cross-Appellant*,

NEW YORK COMMUNITIES FOR CHANGE, INC.,

*Intervenor – Plaintiff – Appellee – Cross-Appellant*,

ACORN, THE NEW YORK ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW, DAPHNE ANDREWS, VIC DEVITA, VERNON GHULLKIE, NATALIE GUERRIDO, NEW YORK ACORN HOUSING COMPANY, INC., LISBETT HUNTER, FRANCINE MCCRAY,

*Plaintiffs*

v.

COUNTY OF NASSAU, COUNTY OF NASSAU PLANNING COMMISSION, COUNTY OF NASSAU OFFICE OF REAL ESTATE & DEVELOPMENT

*Defendants – Cross-Appellees*,

INCORPORATED VILLAGE OF GARDEN CITY, GARDEN CITY BOARD OF TRUSTEES,

*Defendants – Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK (SPATT, D.J.)

**JOINT APPENDIX VOLUME XV OF XV (JA 2985 – JA 3055)**

**Summary Judgment Exhibits**

*Counsel Listed on Inside Cover*

Ira M. Feinberg
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
(212) 918-3000

*Attorney for Plaintiff-Appellee-Cross Appellant MHANY Management, Inc.*

Joseph D. Rich
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1401 New York Avenue, NW
Suite 400
Washington, DC 20005
(202) 662-8331

*Attorney for Plaintiff-Appellee-Cross Appellant New York Communities for Change*

Frederick K. Brewington
LAW OFFICES OF FREDERICK K. BREWINGTON
556 Peninsula Boulevard
Hempstead, NY 11550
(516) 489-6959

*Attorney for both Plaintiffs-Appellees-Cross Appellants*

Michael A. Carvin
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
(202) 879-3939

*Attorney for Defendants-Appellants*

Robert F. Vanderwaag
NASSAU COUNTY ATTORNEY'S OFFICE
1 West Street
Mineola, NY 11501
(516) 571-3954

*Attorney for Defendant-Cross Appellee*

# JOINT APPENDIX
# TABLE OF CONTENTS

## Joint Appendix – Volume I of XV

| Docket Number | Description of Entry | Date Document Entered | JA Page |
|---|---|---|---|
| | Docket Sheet for E.D.N.Y. Case No. 05-02301 | | JA 1 |
| 24 | Amended Complaint | 11/30/2005 | JA 59 |
| 211 | Judge Bianco's Order of Recusal | 03/02/2010 | JA 91 |
| 246 | Order Granting New York Communities for Change's Motion To Intervene | 06/15/2010 | JA 92 |
| 276 | Order Denying Plaintiffs' Motion To Re-Open Discovery | 07/26/11 | JA 101 |
| 283 | Declaration of R. Reissman | 07/29/2011 | JA 105 |
| 283-1 | Affidavit of Robert Walker | 07/29/2011 | JA 113 |
| 298 | Declaration of S. Brown | 08/31/2011 | JA 121 |
| 318 | Amended Complaint in Intervention by New York Communities for Change | 02/29/2012 | JA 133 |
| | Trial Transcript from June 17, 2013 | N/A | JA 162 |

## Joint Appendix – Volume II of XV

| Docket Number | Description of Entry | Date Document Entered | JA Page |
|---|---|---|---|
| | Trial Transcript from June 18, 2013 | N/A | JA 246 |
| | Trial Transcript from June 19, 2013 | N/A | JA 320 |
| | Trial Transcript from June 20, 2013 | N/A | JA 400 |
| | Trial Transcript from June 24, 2013 | N/A | JA 478 |

## Joint Appendix – Volume III of XV

| Docket Number | Description of Entry | Date Document Entered | JA Page |
|---|---|---|---|
| | Trial Transcript from June 25, 2013 | N/A | JA 528 |
| | Trial Transcript from June 26, 2013 | N/A | JA 612 |
| | Trial Transcript from June 27, 2013 | N/A | JA 702 |

## Joint Appendix – Volume IV of XV

| Docket Number | Description of Entry | Date Document Entered | JA Page |
|---|---|---|---|
| | Trial Transcript from July 1, 2013 | N/A | JA 786 |
| | Trial Transcript from July 2, 2013 | N/A | JA 870 |
| | Trial Transcript from July 3, 2013 | N/A | JA 939 |
| 403 | Plaintiffs' Post-Trial Memorandum | 08/05/2013 | JA 984 |
| 436 | The Village Defendants' Notice of Appeal | 05/05/2014 | JA 1042 |
| 446 | Plaintiffs' Notice of Appeal with Respect to Nassau County | 05/16/2014 | JA 1043 |

## Joint Appendix – Volume V of XV

## Trial Exhibits

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| JTX1 | Fax from F. Fish & T. Yardley to R. Schoelle, M. Fillipon & B. Ridgeway | 09/13/2002 | JA 1056 |
| JTX2 | Memo from BFJ to P Zone Committee, J. Kiernan, R. Schoelle & M. Filippon Regarding Potential Approach to P Zone changes | 11/15/2002 | JA 1057 |

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| JTX3 | May 2003 Draft of BFJ's "Zoning Study for the Public P District Containing the County Properties" | 05/13/2002 | JA 1064 |
| JTX4 | Letter from R. Schoelle to B. Miller Enclosing Slides Presented by F. Fish at Public Forum on May 29, 2003. | 05/29/2003 and 05/30/2003 | JA 1085 |
| JTX5 | Memo from BFJ to R. Schoelle, G. Fishberg & J. Kiernan re: Potential Land Value for the Social Services Site | 05/19/2003 | JA 1103 |
| JTX6 | BFJ/GC Board of Trustees Meeting Minutes with Attendance sheet and meeting record re: GC P Zone | 06/24/2003 | JA 1105 |
| JTX7 | July 2003 Draft of BFJ's "Zoning Study for the Public P District Containing the County Properties" | 07/09/2003 | JA 1111 |
| JTX8 | BFJ Meeting Record re: GC P-Zone | 08/19/2003 | JA 1132 |
| JTX9 | Nassau County Environmental Assessment Form | 09/08/2003 | JA 1134 |
| JTX10 | Slides Presented by F. Fish to P-Zone Committee and General Public on October 23, 2003 | 10/23/2003 | JA 1163 |
| JTX11 | November 2003 Draft of BFJ's "Zoning Study for the Public P District Containing the County Properties" | 11/2003 | JA 1184 |
| JTX12 | Transcript of Public Hearing | 02/05/2004 | JA 1208 |
| JTX13 | BFJ Presentation: A Zoning Study for the Public P District | 04/22/2004 | JA 1279 |

iii

## Joint Appendix – Volume VI of XV

### Trial Exhibits

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| JTX14 | Environmental Assessment Form | 05/2004 | JA 1299 |
| JTX15 | Notice of Adoption of Local Law No. 2- 2004 | 06/03/2004 | JA 1343 |
| JTX16 | BFJ Memorandum from F. Fish to R. Schoelle re: Presentation for October 13, 2003 | 09/30/2003 | JA 1351 |
| JTX17 | BFJ Memorandum from F. Fish to Public "P" Zone Committee re: Revisions to the Proposed Zoning Draft for County Property | 11/10/2003 | JA 1355 |
| JTX18 | BFJ Notes for Discussion re: Village of Garden City Zoning Discussion Social Services Site | 04/01/2004 | JA 1358 |
| JTX19 | BFJ Memorandum from F. Fish and T. Yardley to Garden City Village Trustees re: Revisions to the Proposed zoning of the Public "P" Zone | 05/04/2004 | JA 1360 |
| JTX20 | Memo from P Zone Committee to Mayor Lewis and Board of Trustees re: "Progress to Date" | 08/14/2002 | JA 1365 |
| JTX21 | Memo from BFJ to J. Kiernan, R. Schoelle and M. Filippon re: draft P Zone zoning text | 04/17/2003 | JA 1369 |
| JTX22 | BFJ memorandum to J. Kiernan, R. Schoelle, and M. Fillpon with coversheet | 04/29/2003 | JA 1380 |
| JTX23 | Memo to B. Miller and Board of Trustees re: Re-zoning - Public "P" Zone | 11/19/2003 | JA 1393 |

iv

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| JTX24 | Transcript of Public Hearing | 01/08/2004 | JA 1394 |
| JTX25 | Certified Transcript of Garden City Board of Trustees May 20,2004 Meeting | 05/20/2004 | JA 1437 |
| JTX26 | Letter from R. Schoelle to T. Suozzi re: update from P-Zone committee | 09/18/2002 | JA 1503 |
| JTX27 | Resolution No. 8825-04 | 05/28/2004 | JA 1505 |
| JTX28 | Letter from M. Nelkin to S. Cohen re: Final Offer 25 Acre Development Parcel Garden City | 10/28/2004 | JA 1508 |
| JTX29 | Fax from ACORN re response to Nassau County's Request for Proposal | 09/10/2004 | JA 1510 |

**Joint Appendix – Volume VII of XV**

**Trial Exhibits**

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| JTX30 | Spreadsheets re: financing of housing project in Garden City | N/A | JA 1531 |
| PTX4 | Letter From the "P-Zone" Committee to Mayor R. Lewis re: Progress to Date | 11/07/2002 | JA 1630 |
| PTX17 | Flyer re: March 18,2004 Meeting | N/A | JA 1632 |
| PTX32 | Letter from Mayor G. Lundquist to Hon. T. Suozzi re: Housing Development | 06/09/2006 | JA 1635 |

## Joint Appendix – Volume VIII of XV

### Trial Exhibits

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| PTX45 | Fax from R. Schoelle to F. Fish re: P-Zone | 10/21/2003 | JA 1636 |
| PTX45.1 | Newspaper Notice of October 23, 2003 P-Zone Meeting | N/A | JA 1640 |
| PTX89 | Email from B. Miller to J. Cunningham & R. Schoelle re: ACORN Questions | 08/13/2004 | JA 1641 |
| PTX90 | One Liners for August 18 Meeting | N/A | JA 1645 |
| PTX133 | Letter from T. Suozzi to J. Claffey re: Garden City | 08/23/2004 | JA 1646 |
| PTX139 | Board of Trustees Meeting Minutes | 05/05/2005 | JA 1647 |
| PTX142 | Chapter 34: Adoption of Ordinances from the Village of Garden City General Code | 04/29/2008 | JA 1657 |
| PTX143 | Handwritten notes | 03/18/2004 | JA 1660 |
| PTX147 | EPOA Meeting Minutes | 01/20/2004 | JA 1663 |
| PTX148 | ACORN Bid Documents | N/A | JA 1668 |

## Joint Appendix – Volume IX of XV

### Trial Exhibits

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| PTX149 | Garden City Request for Proposal | 07/2004 | JA 1807 |
| PTX155 | Letter from I. Speliotis to A. Sullivan re: Garden City 25 acre development site | 07/22/2004 | JA 1868 |

vi

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| PTX156 | Fax from I. Speliotis to Nassau County Planning Commission | 05/26/2004 | JA 1870 |
| PTX179 | Garden City Original Zoning Recommendations | 12/09/08 | JA 1873 |
| PTX315 | EPOA Board of Directors Meeting Minutes | 03/09/2004 | JA 1874 |
| PTX317 | EPOA Board of Directors Meeting Minutes | 11/11/2003 | JA 1880 |
| PTX348 | Board of Trustees Meeting Minutes | 03/18/2004 | JA 1885 |
| PTX349 | Board of Trustees Meeting Minutes | 03/04/2004 | JA 1896 |
| PTX350 | Board of Trustees Meeting Minutes | 04/22/2004 | JA 1901 |
| PTX351 | Board of Trustees Meeting Minutes | 06/03/2004 | JA 1905 |
| PTX354 | Article, "Public Hearing to be Held on Signage Code Revisions," The Garden City News, Vol. 80, No. 30 | 05/14/2004 | JA 1911 |
| PTX358 | Board of Trustees Meeting Minutes | 06/17/2004 | JA 1915 |

**Joint Appendix – Volume X of XV**

**Trial Exhibits**

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| PTX359 | "Affordable Housing Plan in Garden City Part of Doubleday Site Commercial Proposal" Markup | N/A | JA 1920 |
| PTX359.1 | E. Nagourney, "Affordable Housing Plan in Garden City Part of Doubleday Site Commercial Proposal," Newsday | 04/14/1989 | JA 1921 |
| PTX360 | Letter from T. Suozzi to Mayor G. Lundquist re: Garden City | 05/08/2006 | JA 1924 |

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| PTX362 | Nassau County Request for Proposal | 03/2007 | JA 1926 |
| PTX363 | Board of Trustees Meeting Minutes | 11/20/2003 | JA 1973 |
| PTX364 | EPOA Board of Directors Meeting Minutes | 02/10/2004 | JA 1981 |
| PTX365 | EPOA Meeting Minutes | 01/16/2007 | JA 1987 |
| PTX367 | Board of Trustees Meeting Minutes | 12/04/2003 | JA 1993 |
| PTX368 | Extract of Board of Trustees Meeting Minutes | 12/04/2003 | JA 1999 |
| PTX372 | EPOA Board of Directors Meeting Minutes | 12/12/2006 | JA 2002 |
| PTX378 | EPOA Meeting Minutes | 10/12/2004 | JA 2008 |
| PTX379 | Meeting Agenda | 04/13/2004 | JA 2014 |
| PTX383 | Affidavit of R. Schoelle | 01/24/2007 | JA 2021 |
| PTX384 | Chapter 200: Zoning of the Village of Garden City Rules | 06/02/2013 | JA 2024 |
| PTX385 | Board of Trustees Special Meeting Minutes | 04/01/2004 | JA 2089 |
| PTX386 | Memorandum from F. Fish to J. Kiernan | 11/25/2002 | JA 2090 |
| PTX387 | BFJ Recommends Multi-Family for Social Services Site | 04/2003 | JA 2096 |
| PTX388 | Aerial Image of Social Services Site | N/A | JA 2097 |
| PTX389 | Cherry Valley Apartments | N/A | JA 2098 |
| PTX390 | Aerial Image of Social Services Site with Zoning Overlay | N/A | JA 2099 |
| PTX394 | Potential Number of School Children Chart | N/A | JA 2100 |

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| PTX395 | BFJ's Recommendations R-M for 1.5 Years then Reverses Position in Response to Public Opposition Chart | N/A | JA 2101 |
| PTX396 | Traffic Generation Comparison (Sept. 2003 vs. May 2004) | N/A | JA 2102 |
| PTX398 | Transcript of Public Hearing | 02/05/2004 | JA 2108 |
| PTX401 | Handwritten Notes | unknown | JA 2180 |
| PTX406 | Number of Affordable Units in NYAHC's Scenarios under Proposed R-M Zoning | N/A | JA 2185 |
| PTX407 | Financial Feasibility of NYAHC's Scenarios under Proposed R-M Zoning | N/A | JA 2186 |
| PTX409 | Nassau County Map | N/A | JA 2187 |
| PTX413 | Zoning Timeline | N/A | JA 2188 |
| PTX416 | Minority Percent of Population: 1980 and 2000 | N/A | JA 2189 |
| VGC Ex. CI | Development of R-T Zoning | N/A | JA 2190 |
| VGC Ex. CN | District Map of Garden City | 08/30/2004 | JA 2191 |
| VGC Ex. CO | Zoning Chapter 200 of General Code | 06/2001 | JA 2192 |

## Joint Appendix – Volume XI of XV

## Summary Judgment Exhibits

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| | Declaration of Ralph J. Reissman in Support of Defendant Nassau County's Motion for Summary Judgment | 07/29/2011 | JA 2197 |
| Reissman Decl. Ex. H | Deposition Transcript of Thomas R. Suozzi | 04/24/2008 | JA 2205 |
| Reissman Decl. Ex. X | Letter from R. Schoelle to S. Cohen, enclosing Article XIIA of the Garden City Code | 05/02/2003 | JA 2315 |
| Reissman Decl. Ex. AF (Plaintiffs' Trial Exhibit 45, VGC537-540) | Facsimiles from R. Schoelle, attaching notice posted in Garden City News dated October 10, 2003 | 10/21/2003 | See PTX 45 JA 1636 |
| Reissman Decl. Ex. AK | Letter from R. Schoelle to S. Cohen enclosing BFJ Report "A Zoning Study for the Public P District Containing the County Properties," report not attached | 12/05/2003 | JA 2329 |
| Reissman Decl. Ex. AQ | Letter from S. Cohen to B. Miller re: Nassau County Comments – Village of Garden City's Proposed Zoning Amendments | 05/24/2004 | JA 2330 |
| Reissman Decl. Ex. AT | Legal Notice of Request for Proposal for Sale of 25+/- Acre Redevelopment Site | 08/10/2004 | JA 2340 |
| Reissman Decl. Ex. AU | Letter from CBRE to S. Cohen, with Proposal Summary, September, 2004 | N/A | JA 2341 |

x

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| Reissman Decl. Ex. AX | 101 County Seat Drive RFP Evaluation Process timeline beginning with week of 9/27/04 | N/A | JA 2427 |
| Reissman Decl. Ex. AY | Best And Final Offer (BAFO) Bid Matrix for 25-Acre Development Site in Garden City | 10/28/2004 | JA 2429 |
| Reissman Decl. Ex. AZ | CBRE letter to Fairhaven Properties, Inc. | 11/17/2004 | JA 2430 |
| Reissman Decl. Ex. BC | Excerpt from Nassau County Capital Improvement Plan for Years 2011-2013 | N/A | JA 2431 |
| Reissman Decl. Ex. BD | Contract Details, Nassau County and LiRo Program and Construction Management, P.C. | 01/21/2011 | JA 2432 |
|  | Declaration of Stanley J. Brown in Opposition to Defendants Incorporated Village of Garden City's, Garden City Board of Trustees' and Nassau County's Motions for Summary Judgment | 08/31/2011 | JA 2434 |
| Brown Decl. Ex. 3 | Excerpts of Sheldon Cohen Deposition Transcript | 04/22/2008 | JA 2446 |

**Joint Appendix – Volume XII of XV**

**Summary Judgment Exhibits**

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| Brown Decl. Ex. 5 | Excerpts of Patrick Duggan Deposition Transcript | 04/10/2008 | JA 2460 |
| Brown Decl. Ex. 14 | Excerpts of Rosemary Anne Olsen Deposition Transcript | 02/13/2008 | JA 2486 |
| Brown Decl. Ex. 17 | Excerpts of Carl Schroeter Deposition Transcript | 03/24/2008 | JA 2503 |
| Brown Decl. Ex. 18 | Excerpts of Ismene Speliotis Deposition Transcript | 11/29/2007 | JA 2516 |

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| Brown Decl. Ex. 19 | Excerpts of Ann Sullivan Deposition Transcript | 11/28/2007 | JA 2540 |
| Brown Decl. Ex. 20 | Excerpts of Ann Sullivan Deposition Transcript | 02/15/2008 | JA 2563 |
| Brown Decl. Ex. 45 | Nassau County Consolidated Strategy and Plan for 1995-1999 (excerpts) | 07/1995 | JA 2569 |
| Brown Decl. Ex. 46 | Draft of document entitled "Housing for Nassau's Next Generation: New Initiatives for New Suburbia" | N/A | JA 2581 |
| Brown Decl. Ex. 47 | Nassau County Consolidated Strategy and Plan for period Covering Federal Fiscal Years 2000-2004 (excerpts) | 07/2000 | JA 2602 |
| Brown Decl. Ex. 48 | Nassau Urban County Consortium Five Year (2005-2009) Consolidated Plan & Annual Action Plan (excerpts) | N/A | JA 2634 |
| Brown Decl. Ex. 49 | Memorandum from S. Cohen regarding Garden City Zoning Recommendations, with handwritten notes | 06/04/2003 | JA 2663 |
| Brown Decl. Ex. 50 | E-mail from C. Schroeter to S. Cohen, C. Senior, re: Draft OCA Letter, R-M zoning | N/A | JA 2665 |
| Brown Decl. Ex. 51 | E-mail from C. Friedman re: "Garden City zoning letter," attaching draft letter | 12/23/2003 | JA 2666 |
| Brown Decl. Ex. 52 | E-mail from S. Cohen to W. Tripp Jr. et al. regarding "Thanks for all your help," attaching Real Estate Consolidation outline and chart | 07/22/2004 | JA 2670 |
| Brown Decl. Ex. 54 (Joint Trial Exhibit 12) | Transcript of Incorporated Village of Garden City Public Hearing | 02/05/2004 | See JTX 12 JA 1208 |

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| Brown Decl. Ex. 58 (Joint Trial Exhibit 28) | Letter from Fairview Properties, Inc. to S. Cohen re: Final Offer, 25 +/- Acre Development Parcel Garden City | 10/28/2004 | See JTX 28 JA 1508 |
| Brown Decl. Ex. 59 | Newspaper article entitled "Long Island has Failed to Stem Segregation, a Group Charges," *The New York Times* | 04/19/2005 | JA 2673 |
| Brown Decl. Ex. 60 | Letter from T. Suozzi to J. Claffey re: lack of support in Garden City for affordable housing development at 101 County Seat Drive property | 8/23/2004 | JA 2676 |
| Brown Decl. Ex. 61 (Plaintiffs' Trial Exhibit 133) | Email from J. Calderone regarding Nassau County Press Release "Suozzi Calls for 'Next Generation' Housing in Garden City" | 05/08/2006 | See PTX 133 JA 1646 |
| Brown Decl. Ex. 62 | Newspaper article, "'Next Generation' Housing Proposed Near Roosevelt Field Mall," *Garden City Life* | 05/19/2006 | JA 2677 |
| Brown Decl. Ex. 63 | Web messages and inter-departmental memoranda memorializing calls to the Office of the County Executive regarding community opposition to affordable housing | 01/18/2006 | JA 2680 |
| Brown Decl. Ex. 67 (Plaintiffs' Trial Exhibit 149) | Nassau County Request for Proposal (RFP) for 25 +/- Acre Development Cite, Garden City, Long Island, New York | 07/2004 | See PTX 149 JA 1807 |
| Brown Decl. Ex. 68 (Joint Trial Exhibit 29) | Letter from NYAHC to T. Suozzi with fax coversheets, re: response to Nassau County's Request for Proposal | 09/10/2004 | See JTX 29 JA 1510 |

xiii

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| Brown Decl. Ex. 69 (Joint Trial Exhibit 30) | NYAHC spreadsheets re: financing for alternative development plan in Garden City | N/A | See JTX 30 JA 1531 |
| Brown Decl. Ex. 70 (Plaintiffs' Trial Exhibit 155) | Letter from I. Speliotis to A. Sullivan re: Garden City development pro forma | 07/22/2004 | See PTX 155 JA 1868 |
| Brown Decl. Ex. 71 (Plaintiffs' Trial Exhibit 156) | Letter, via facsimile, from NYAHC to Nassau County Planning Commission | 05/26/2004 | See PTX 156 JA 1870 |
| Brown Decl. Ex. 84 | Newspaper article, "Taking Another Look at Garden City's Public Use Zone," *The Garden City News* | 11/07/2003 | JA 2703 |

## Joint Appendix – Volume XIII of XV

## Summary Judgment Exhibits

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| Brown Decl. Ex. 85 | Nassau County Economic Development Plan (excerpts) | 11/15/2002 | JA 2707 |
| Brown Decl. Ex. 86 | Draft Analysis of Impediments to Fair Housing Choice (excerpts) | 08/2004 | JA 2729 |
| Brown Decl. Ex. 88 | Spreadsheet entitled "Office of Housing & Homeless Services Tracking" | N/A | JA 2735 |
| Brown Decl. Ex. 89 | DRAFT Existing Public/Assisted/Affordable Housing Resources | 06/2008 | JA 2736 |

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| Brown Decl. Ex. 91 | Newspaper article, "The Forbidden Garden," *The New York Times* | 05/14/2006 | JA 2745 |

## Joint Appendix – Volume XIV of XV

## Summary Judgment Exhibits

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| Brown Decl. Ex. 94 | Declaration of Nancy McArdle | 09/12/2008 | JA 2747 |
| Brown Decl. Ex. 99 | Excerpts of Diane Goins Deposition Transcript | 02/01/2011 | JA 2778 |
| Brown Decl. Ex. 100 | Excerpts of Carl Schroeter Deposition Transcript (incorrectly dated September 28, 200**9**) | 09/28/2010 | JA 2781 |
| Brown Decl. Ex. 101 | Nassau County's Analysis of Impediments and Fair Housing Plan (excerpts) | 07/21/2010 | JA 2796 |
| Brown Decl. Ex. 104 | Nassau Urban County Consortium Five Year (2010-2014) Consolidated Plan & Annual Action Plan (excerpts) | N/A | JA 2847 |
| Brown Decl. Ex. 106 | Study entitled "Whites Only: Racial Discrimination in the Nassau County Real Estate Market and in the Public School System," published by New York ACORN Long Island | 02/2004 | JA 2861 |
| Brown Decl. Ex. 107 | Nassau Urban County Consortium, End of the Year Reporting Narratives for IDIS for Fiscal Year 2009 (excerpts) | 2009-2010 | JA 2891 |
| Brown Decl. Ex. 109 | The Racial Equity Report Card: Fair Housing on Long Island: A Report from ERASE Racism | 03/2009 | JA 2915 |

## Joint Appendix – Volume XV of XV

## Summary Judgment Exhibits

| Exhibit No. | Description of Entry | Document Date | JA Page |
|---|---|---|---|
| Brown Decl. Ex. 110 | Nassau County Interim Finance Authority Resolution No. 11 | 01/26/2011 | JA 2985 |
| Brown Decl. Ex. 111 | *County of Nassau v. Nassau County Interim Finance Authority*, No. 001455-11, 2001 WL 1044556 (Sup. Ct. Nassau Cnty. March 11, 2011) | 03/11/2011 | JA 3022 |
| Brown Decl. Ex. 123 | Excerpts of C. Schroeter Deposition Transcript (incorrectly dated September 28, 200**9**) | 09/28/2010 | JA 3040 |
| Brown Decl. Ex. 124 | Excerpts of D. Goins Deposition Transcript | 02/01/2011 | JA 3048 |
| Brown Decl. Ex. 126 | Letters from S. Brown to R. Reissman dated August 18, 2011 and August 29, 2011 (excerpts of full Ex. 126) | N/A | JA 3052 |

# NASSAU COUNTY INTERIM FINANCE AUTHORITY

## RESOLUTION NO. 11

## DECLARATION OF A CONTROL PERIOD UPON FINDING LIKELIHOOD AND IMMINENCE OF A DEFICIT OF MORE THAN ONE PERCENT IN THE COUNTY'S FISCAL YEAR 2011 BUDGET

WHEREAS, on September 15, 2010, the County Executive submitted for NIFA's review his Proposed Multi-Year Financial Plan, Fiscal 2011-2014, the first year of which was its Proposed Budget for FY 2011; and

WHEREAS, on September 28, 2010, NIFA concluded in a preliminary review that the County's Proposed Plan, and the FY 2011 Proposed Budget in particular, did not meet the standards necessary to project budget balance because of the degree of risk in various projected revenue sources and cost savings; and

WHEREAS, NIFA further observed, preliminarily, that the County planned to forego the use of operating revenues to fund its certiorari obligations and instead proposed bonding of an additional $364 million over the next two years, including $100 million in Fiscal Year 2011, which borrowing would require approval by a supermajority of the County Legislature; and

WHEREAS, on September 28, 2010, at a public meeting at which the County Executive delivered a presentation on his budget and plan, NIFA Directors stated publicly that the County's proposed budget was not balanced, identified specific projected revenues and cost savings as unduly risky and warned that the County was on the edge of a fiscal abyss; and

WHEREAS, on October 30, 2010, after a one-day recess of its October 29, 2010 meeting, the County Legislature completed enactment of a Multi-Year Financial Plan, including a Budget for FY 2011 (the "Budget"), containing many of the revenue sources and cost savings previously identified as risky by NIFA; and

WHEREAS, the Budget enacted by the County Legislature added new "contingencies" purporting to offset the aforementioned Budget risks; and

1

WHEREAS, in meetings with County leaders, and by letter of December 13, 2010, Chairman Stack requested from the County documentation supporting various revenue and cost-saving components of the Budget, including contingencies; and

WHEREAS, on December 21, 2010, NIFA convened a public meeting and conducted a lengthy executive session to consult with its outside counsel and its outside accounting advisors; and

WHEREAS, on December 29, 2010, the County Executive delivered a letter to NIFA with, among other things, a list of $157.9 million in new contingencies allegedly available in 2011, but unmentioned by the County in its enacted budget or in earlier meetings with NIFA and NIFA's staff; and

WHEREAS, at a public meeting on December 30, 2010, following a presentation by the County Executive, NIFA conducted another lengthy executive session with its counsel and accounting advisors, and then NIFA publicly announced that, in an abundance of caution, it was providing the County with a final opportunity to provide information by January 20, 2011 to alleviate the strong sense of the Directors that a statutory operating deficit was substantially likely and imminent; and

WHEREAS, NIFA, with the assistance of its counsel and its outside accounting advisors, has conducted a careful analysis of the information provided by the County; and

WHEREAS, by law NIFA shall impose a control period upon its determination that there is a substantial likelihood and imminence of the County incurring a major operating funds deficit of one percent or more in the aggregate results of operations during its fiscal year assuming all revenues and expenditures are reported in accordance with generally accepted accounting principles,

NOW, THEREFORE, BE IT RESOLVED, that with the hope and prospect that representatives of County government will work collaboratively and in good faith with NIFA to achieve a resolution of the County's financial difficulties, and that such resolution will allow the County to meet its financial obligations while providing effective services for County residents, NIFA hereby imposes a control period, effective immediately; and be it further

RESOLVED, that for the reasons in the Determination annexed hereto and made a part of this Resolution, NIFA hereby determines that there exists a substantial

2

likelihood and imminence of the County incurring a major operating funds deficit of one percent or more in the aggregate results of operations during its Fiscal Year 2011 assuming all revenues and expenditures are reported in accordance with generally accepted accounting principles; and be it further

RESOLVED, that NIFA hereby directs the County, by February 15, 2011, to submit for NIFA's consideration a financial plan for FY 2011 eliminating such revenue, cost-saving and contingency items deemed by NIFA to carry unacceptable risk; and be it further

RESOLVED, that in preparing such financial plan the County shall consult with NIFA and adhere to NIFA's requirements, to be communicated to the County in such consultations, for the form of the financial plan and the supporting information required; and it being further

RESOLVED, that in preparing the financial plan, the County shall be mindful of NIFA's statutory authority to modify the County's financial plan during the control period; and be it further

RESOLVED, that by February 15, 2011, the County Executive shall present to NIFA proposed guidelines respecting the categories and types of contracts and other obligations required to be reviewed by NIFA in carrying out its authority to disapprove contracts.

_____
Ronald Stack
Chairperson

January 26, 2011

3

**Determination of the Nassau County Interim Finance Authority**

Pursuant to Section 3669(1) of the N.Y. Public Authority Law, Chapter 43-A (the "NIFA Act"), the Nassau County Interim Finance Authority ("NIFA") determines that there exists a substantial likelihood and imminence that Nassau County (the "County") will incur a major operating funds deficit of more than one percent in the aggregate results of operations during its Fiscal Year 2011 assuming all revenues and expenditures are reported in accordance with generally accepted accounting principles ("GAAP"). As a result, NIFA hereby declares a control period as defined by the Act.

## I. Background

Understanding this determination requires important background concerning NIFA, its enabling legislation and its historical experience in overseeing the County's finances for more than a decade.

### A.    *Creation of NIFA*

In early 2000, the County was in dire financial straits. Its credit rating had deteriorated to one level above junk status, resulting in huge borrowing costs. Through its uniquely problematic property assessment system, the County had incurred hundreds of millions of dollars in liability for tax certiorari refunds ("Tax

1

Certs"). Unable to pay its Tax Certs liability with recurring revenues (a fiscally prudent practice known as "PAYGO"), the County embarked on the alternative of excluding Tax Certs from its budget – instead, borrowing in the bond market each year to fund this significant operating expense. Amid ballooning costs of providing services, in particular labor and pension costs, the County's elected officials refused either to raise recurring taxes or to cut recurring expenditures, instead relying on a series of temporary, or "one-shot," fixes, such as sales of County property, tapping financial reserves and more borrowing. With a structural imbalance between recurring revenues and expenditures, coinciding with enormous debt service on some $2.7 billion in borrowing (debt service accounted for nearly one-fourth of budgeted spending) and dwindling cash reserves, the County could no longer maintain fiscal stability. An independent report commissioned by the Governor concluded in May 2000 that the County's budget deficit in FY 2000 alone could not be reduced below $117 million.

The NIFA Act, in June 2000, resulted from a bipartisan effort of the Governor and State Legislature to assist the County in returning to fiscal stability while ensuring reform of its financial practices. The legislative findings recognized not only the needs of the County and its taxpayers, but also the State's important interest in resolving the crisis, as follows: "The impairment of the credit of the county of Nassau may affect the ability of other municipalities in the state to

2

issue their obligations at normal interest rates. Such effect is a matter of state concern." The then-County Executive proposed, and the County Legislature voted unanimously to approve, a home rule message requesting passage of the NIFA Act as "necessary and in the public interest."[1] In that context the NIFA Act was adopted by the New York State Legislature and signed by the Governor.

NIFA is governed by six independent Directors (a seventh seat is currently vacant). All Directors are appointed by the Governor, including one each upon the recommendation of the Majority Leader of the State Senate, the Speaker of the State Assembly and the State Comptroller. NIFA Directors serve their terms without compensation and are assisted by a small full-time professional staff.[2]

The NIFA Act provided a number of essential financial benefits to the County and its residents. Under the Act, the State directly subsidized the County by paying it $100 million ($25 million per year) in State funds through 2004. NIFA was authorized to borrow funds for the County, which it was able to do at more favorable rates, reducing the County's debt service by millions of

---

[1]  The current County Executive and the current Majority Leader of the County Legislature were among the legislators voting for this home rule message.

[2]  More information about NIFA and its Directors can be found on its website at www.nifa.state.ny.us.

3

dollars. To date the State has provided the County, through NIFA, with more than $500 million in budgetary relief.

The Act contemplated that, over time, the County would be weaned from this State financial assistance. In particular, recognizing that reform of the Tax Certs problem would require a period of years, the Act set a timetable for transitioning from the use of borrowed funds to PAYGO. The statutory mechanism was a provision in § 3667(1) of the Act which allowed the County to accord special treatment of its Tax Certs borrowing as "operating revenues" – but only through the end of 2007, and at decreasing levels for 2006 and 2007. Beginning in 2008, therefore, the County would need real operating revenues (sources other than borrowing) to offset its annual Tax Certs liability, which in the absence of such offsets would contribute to an operating deficit monitored by NIFA (as described below). The idea was to achieve structural balance between the County's recurring revenues and expenditures (including Tax Certs expenditures), without imprudent borrowing or non-recurring "one-shot" fixes.

## B. NIFA Oversight and Controls

In return for the substantial financial relief afforded by the NIFA Act, the County became subject to statutory oversight of its finances, with NIFA monitoring – and, if necessary, *imposing* – fiscal balance.

4

For Fiscal Years 2001 through 2008, the Act directed NIFA to approve or disapprove the County's budgets and out-year financial plans based on whether or not they met the fiscal balance requirements of the Act, with NIFA responsible for certifying the revenue estimates in the County's financial plans. Although this mechanism to impose fiscal balance expired in 2008, NIFA maintained statutory authority to review and comment on budgets and financial plans in Fiscal Year 2009 and beyond. NIFA has done so.

The second mechanism in the Act for imposing balance has no expiration date during the existence of NIFA and is at issue here. It is the so-called "control period," a statutorily defined interval when NIFA's mandate is to stabilize the County's finances by exercising a degree of control over financial planning, spending and borrowing.

As relevant here, the Act provides that NIFA "shall" impose a control period "upon its determination at any time . . . that there exists a substantial likelihood and imminence of . . . a major operating funds deficit of one percent or more in the aggregate results of operations of such funds during its fiscal year assuming all revenues and expenditures are reported in accordance with generally accepted accounting principles, subject to the provisions of this title." Public Authorities Law § 3669(1).

5

Thus, the Act provides that NIFA Directors must make a predictive judgment as to whether or not the County's projections of revenues and expenditures for a fiscal year are realistic and likely achievable. NIFA by necessity must make its statutorily required determination regarding a likelihood of a deficit by exercising judgment and discretion as to whether predictions in the budget are in fact likely to occur. It would make little sense for the County's own budgeting predictions simply to stand as the final word when the very purpose of NIFA, as directed by the New York State Legislature, is to provide meaningful oversight of the County's finances.

The Act relies upon NIFA's competency and expertise to evaluate the County's financial projections.[3] As noted above, NIFA approved the County's revenue projections in prior years. The Act additionally requires that NIFA make certain notifications "if, in the judgment of" NIFA, the County's financial "plan fails to contain projections of revenues and expenditures that are based on reasonable and appropriate assumptions and methods of estimation." Public

---

[3] The experience of NIFA Directors reflects such expertise. Chairman Ronald Stack has been a public finance investment banker for 26 years. George Marlin is a municipal finance expert and author of *The Guidebook to Municipal Bonds*. Leonard Steinman is an experienced litigator and the immediate past Chairman of the Nassau County Industrial Development Agency. Thomas Stokes holds an MBA in corporate finance and earlier in his career served in Nassau County as Deputy County Executive for Operations and Finance. Robert Wild founded and is Chairman of a major Long Island law firm with extensive experience representing hospitals and health care providers. Christopher Wright was a partner at two global accounting firms and is managing director at a New York consulting firm.

6

Authorities Law § 3667(e)(ii). In the event of a control period, the Act provides, NIFA will "certify to the county the revenue estimates approved" in any approved financial plan, and NIFA may "exercise the rights of approval, disapproval and modification with respect to the financial plan, *including but not limited to the revenue estimates contained therein*." Public Authorities Law § 3669(2)(a)(iii) (emphasis added).

In addition to the predictive judgment of likelihood and imminence described above, the statute also directs NIFA to "assume[e] revenues and expenditures are reported in accordance with" GAAP. Public Authorities Law § 3669(1). GAAP rules are generally applied to events that already have occurred in order to prepare historical financial statements. Where NIFA is evaluating *budgeted* revenues and expenditures, GAAP is applied to test whether anticipated sources and uses of funds in the budget qualify as revenues and expenditures as defined by GAAP. Giving effect to the words of the statute – as NIFA must – if a particular budgeted revenue source does not in fact qualify as revenue under GAAP, NIFA cannot include such revenue when determining whether a deficit is substantially likely.

By law, once it determines that the statutory criteria exist, NIFA cannot allow the County to incur a deficit pursuant to an unachievable financial plan. By directing NIFA to act upon likelihood and imminence (as opposed to

7

actual historical results), the Act contemplates imposition of controls *before* the opportunity for corrective measures has passed. Likewise, the Act provides that NIFA "shall terminate any such control period when it determines that none of the conditions which would permit [NIFA] to impose a control period exist." Public Authorities Law § 3669(1). The Act uses mandatory language requiring NIFA to terminate upon its finding of the absence of a supporting condition for the control period.

In a control period, the County's elected officials continue to make policy decisions and maintain direct responsibility for County operations and the delivery of services within the limits imposed by a NIFA-approved financial plan. NIFA's limited function is to exercise a degree of financial control in order to restore fiscal balance. The primary powers that become available to NIFA during a control period are (i) to direct the County to prepare a revised financial plan in a form acceptable to NIFA, (ii) to modify the revised financial plan if NIFA chooses (and to issue orders compelling County officials to comply with the NIFA-approved plan), (iii) to approve contracts, (iv) to approve borrowing, and (v) if necessary, to impose a wage freeze upon declaration of a fiscal crisis.

## C. *NIFA's Experience with the County Through 2010*

For more than a decade, NIFA's monitoring and assessment of the County's financial challenges has been detailed and well documented. Before

8

turning to an analysis of Fiscal Year 2011, it is instructive briefly to note four pertinent elements of NIFA's experience with the County in those prior years.

**First**, NIFA has actively warned the County on several occasions of deficiencies that might trigger the imposition of controls, and the County historically has taken corrective action to obtain NIFA's approval of its budget and avert a control period. For example:

- NIFA rejected the County's initial budget proposal for FY 2001 because it contained an unacceptable level of risk totaling $81.7 million, but the County reduced the risk to $6.3 million and won NIFA approval.

- Again for FY 2002, NIFA deemed the County's initial budget proposal "unacceptable" because of $55 million in risk, prompting the County to reduce the risks and win NIFA approval.

- For FY 2009, NIFA found an unacceptable level of $125 million in risk, but the County Legislature reduced the risk to $53 million, which NIFA found manageable given contingencies identified and available for immediate use as required.

In this way, NIFA and the County have worked cooperatively to avoid the imposition of controls, with NIFA signaling undue risk and the County acting to address the problem.

9

**Second**, in October 2000 NIFA made clear that the characterization of surplus Fund Balance as an operating revenue violates the NIFA Act.[4]

**Third**, from 2000 through 2004, the County successfully executed a plan to build reserves of approximately $285 million, an essential cushion if financial projections proved inaccurate.[5] However, pursuant to the County's financial plan, the trend reversed and reserves were reduced to approximately $65 million by the close of 2010. NIFA's October 2, 2009 report charted this decline:

STATUS OF GENERAL RESERVES



---

[4] Fund Balance does note equate to cash, but is an accounting determination of the extent to which assets exceed liabilities. NIFA concluded that the use of surplus Fund Balance to prepay a *future* year debt service obligation was an acceptable method under the NIFA Act to achieve budget relief in the *future* year. The County has made such use of Fund Balance.

[5] The NIFA Act required the County's financial plans to include adequate reserves "to maintain essential programs in the event revenues have been overestimated or expenditures underestimated for any period." Public Authorities Law § 3667(4)(c).

10

NIFA noted that the County's proposed Fund Balance and Reserve Policy called for replenishment of its unreserved Fund Balance by direct appropriation if it fell, for two successive years, below 4% of its General Fund and the County-wide Special Revenue Funds. Yet no such appropriations were made, and the County's financial cushion stands at a fraction of what is required by the policy. An additional result of the diminished reserves is the County's growing need to borrow annually against anticipated revenues to meet its cash flow needs, creating still another debt service obligation.[6]

**Fourth**, NIFA has monitored the County's various efforts to solve the Tax Certs problem. Tax Certs are the Gordian Knot of the County's finances and the leading cause of the fiscal emergency which precipitated NIFA's creation.[7] As authorized by the Act, NIFA issued $800 million in bonds on the County's behalf for the payment of Tax Certs settlements and judgments, and granted $5 million in State aid to assist the County in streamlining its claims process. Yet following

---

[6]    NIFA analyzed this phenomenon in its October 2, 2009 report as follows: "The County is continuing a high level of cash flow borrowing, which it recommenced in FY 2005. The borrowings have increased steadily such that they are budgeted for approximately $280 million for FY 2010. These cash flow borrowings are estimated to cost the County $4.0 million in FY 2010 and $7.7 million in FY 2011, an increased expense of almost $12 million compared to FY 2005. In prior years, these borrowings were not necessary because the County had sufficient cash reserves."

[7]    As NIFA warned in its June 18, 2008 report: "The County has returned to its former practice of bonding tax certiorari refunds, a fiscally imprudent practice, which led to the creation of NIFA."

several County reform efforts, the County still struggles to pay its Tax Certs liability out of current operating expenditures and the backlog of unpaid Tax Certs remains and, as recently as 2009, grew.

The Act initially contemplated the elimination of borrowing to fund Tax Certs liability, and full transition to PAYGO, beginning in 2005. The mechanism in the Act was a provision stating that "[f]or purposes of determining operating revenues" through Fiscal Year 2004, the County's financial plan "may assume" that certain levels of borrowing to pay Tax Certs judgments and settlements "may be counted as operating revenues." Public Authorities Law § 3667(1). This provided the County for a limited duration with an exception to the GAAP rule that such borrowing did not constitute operating revenue. In the absence of this exception, the County would have been unable to achieve balance under the Act because it would have insufficient operating revenues to offset its annual Tax Certs liability. At the County's request, the Act was amended by the State Legislature on three occasions to extend the duration of the exception (in decreasing amounts) through Fiscal Year 2007. Thus, by 2008 the exception had expired, and borrowed funds used to pay Tax Certs settlements and judgments could no longer be treated as operating revenues. Going forward, such use of borrowed funds would contribute, dollar-for-dollar, to the major operating funds deficit that would, at one percent or more, trigger a control period.

12

Beginning in 2006, the County's plan to address the problem was a commitment to pay at least $50 million of its Tax Certs liability each year through operating expenditures, while using borrowed funds for excess payments and working to reduce the backlog of unpaid claims. The County also renewed this commitment in 2008, and in its October 21, 2008 report, NIFA concluded the County's strategy "appears to be a feasible plan." The County's commitment to $50 million of PAYGO was important to NIFA and was referred to by NIFA as a "promise" and an "obligation" of the County. The budget for Fiscal Year 2010 included an expenditure of $50 million in PAYGO, and estimated that its backlog of Tax Certs claims was $139 million.[8] (October 2, 2009 Report at 28.)

## II. Fiscal Year 2011 Budget

As regression to the pre-NIFA landscape neared fruition, the County in Fall 2010 faced the challenge of developing a balanced budget for Fiscal Year 2011 (and accompanying financial plan for 2011 – 2014).[9] At least four realities of 2011 brought this challenge to the breaking point:

---

[8] The cost of carrying existing Tax Certs debt was enormous, with $150.6 million budgeted for such debt service costs in Fiscal Year 2009, nearly 6 percent of the budget for major operating funds. (May 28, 2009 Report at 27.)

[9] On May 20, 2010, NIFA concluded in a review of the County's Multi-Year Financial Plan Update Fiscal 2010-2013 that the County did not have a well-defined roadmap to solve its budgetary problems or to achieve projected savings, even after factoring in the County's large borrowing program.

- First, federal stimulus funding, which had provided essential budgetary relief of approximately $40 million in each of Fiscal Years 2009 and 2010, was reduced to approximately $20 million in FY 2011.

- Second, viable one-shot revenue sources of significant size were not readily available.

- Third, elected officials of both parties were unwilling to propose (much less enact) a property tax or other tax increase, or program cuts; to the contrary, the energy tax projected to yield more than $40 million annually was repealed in 2010.[10]

- Fourth, existing collective bargaining agreements (approved by the County Executive and the County Legislature) were in place through 2015, and labor agreements with many County employees prohibited layoffs through the end of 2011.

---

[10] On January 5, 2010, NIFA wrote to the County Executive, copying County Legislative leaders, regarding challenges posed by (i) the County's bipartisan repeal of the energy tax, which, by NIFA's estimate, will reduce the County's revenues by more than $40 million annually in Fiscal Year 2011 and subsequent years, and (ii) unlikely State authorization for a budgeted cigarette tax projected to raise $16 million annually.

14

## A. Budget Proposal and NIFA Review

On September 15, 2010, the County submitted its proposed budget for Fiscal Year 2011. On September 28, 2010, NIFA concluded in a preliminary review that the County's proposed 2011 budget did not meet the standards necessary to project budget balance because of the degree of risk in various projected revenue sources and cost saving, including:

- labor savings not secured ($61 million),

- red light camera expansion ($17.3 million),

- Long Island Expressway patrol surcharge ($5 million), and

- housing Suffolk County inmates ($3.4 million).

NIFA further observed, preliminarily, that the County planned to forego the use of operating revenues to fund its Tax Certs obligations and instead proposed bonding of an additional $364 million over the next two years (a proposal requiring approval of a supermajority of the County Legislature), including all Tax Certs expenditures in 2011. In other words, the County, as it had prior to enactment of the NIFA Act, removed its substantial Tax Certs liability from its budget altogether, the very practice that precipitated the 2000 crisis NIFA was created to address. In a real sense, the County turned the NIFA Act on its head: Whereas a fundamental tenet of the statute is to eliminate borrowing in favor of PAYGO, the 2011 budget eliminated PAYGO in favor of borrowing. The County

15

thus abandoned the commitment it had made to NIFA to budget $50 million in PAYGO each year under a plan – which NIFA found "feasible" in 2008 – to reduce imprudent borrowing and slowly reduce the Tax Certs backlog.

The total budgetary risk identified in NIFA's report was $244.4 million, a figure more than *twice* the level of risk NIFA had found unacceptable in 2009 (the 2009 budget proposal was released amid the financial crisis), prompting substantial corrective action by the County Legislature. NIFA was not alone. The County Comptroller subsequently issued his own report quantifying the risk items at a comparable level, $258.1 million. The independent Office of Legislative Budget and Review followed suit, identifying budget risks totaling $245.7 million. An itemized chart of these three analyses is annexed as Exhibit 1.

At a public meeting on September 28, 2010, NIFA granted the County Executive's request to appear in person and make a presentation on his budget proposal. He began by presenting a slide stating: "Despite being one of the wealthiest counties in the nation, Nassau's fiscal problems are bankrupting us." He explained that the County had more than $1.5 billion in existing debt relating to Tax Certs and a backlog of $164 million in claims.[11] He emphasized that because his plan to reform Tax Certs would not have an effect until 2013, "the public

---

[11]   After failed attempts to correct the Tax Certs system, the County passed legislation to eliminate the County Guarantee. This change would reduce the County's responsibility for payment of Tax Certs refunds by shifting a large portion to local taxing jurisdictions.

16

should know" that Tax Certs would create liability of an additional $100 million per year in 2011 and 2012 "that we can't do anything about."[12]  His plan proposed new borrowing $364 million in 2011-12 to pay the $164 million Tax Certs backlog and the $200 million in new liabilities incurred in 2011-12.  He presented as his top money-saving action in the budget proposal his ordering (in the absence of voluntary labor concessions) $61 million in labor cost savings pursuant to his newly proposed legislation empowering him to make unilateral cuts in labor payments under existing labor agreements.  He indicated that his proposal "obviously" did not use Fund Balance, and that his Administration intended to find ways to re-establish the reserve funds that had been depleted between 2005 - 2010.

In response, NIFA Directors stated publicly that the County's budget as proposed was not balanced, identified specific projected revenues and cost savings as unduly risky and warned that the County was on the edge of a fiscal abyss.  The Directors conducted an executive session to discuss legal matters and then, in public session, passed a resolution authorizing retention of outside counsel, former Chief Judge Judith S. Kaye of Skadden, Arps, Slate, Meagher & Flom LLP.

---

[12]  A slide critiquing the County Guarantee read as follows: "FACT:  Creates $100 million per year in new liability in 2011 & 2012."

## B. *Adopted Budget and Downgrade*

On October 30, 2010, after a one-day recess of its October 29, 2010 meeting, the County Legislature completed enactment of a Multi-Year Financial Plan, including the 2011 budget, containing many of the revenue sources and cost savings previously identified as risky by NIFA, the County Comptroller and the Nassau County Office of Legislative Budget Review, including those listed above. The Budget enacted by the County Legislature added "contingencies" purporting to offset the aforementioned Budget risks (in particular the $61 million in proposed labor savings), including:

- securitization of Mitchel Field leases ($30 million),
- County land sales ($25 million), and
- various expense reductions ($5.3 million).

On November 4, 2010, for the first time in more than a decade, one of the three major ratings agencies, Moody's, downgraded the County's credit ratings, both short-term and long-term. Addressing only a portion of the risks analyzed by NIFA and others, Moody's found that "approximately $158 million (8.4% of the County's budget) of both revenues and expenditures to be risky." The two other major ratings agencies, Standards & Poor's and Fitch, maintained the County's credit rating.

18

In meetings with County leaders, and by letter of December 13, 2010, the NIFA Chairman requested from the County documentation supporting various revenue and cost-saving components of the budget, including the contingencies added by the Legislature. In response, the County provided a two-page memorandum with minimal information. At a public meeting on December 21, 2010, NIFA passed a resolution to engage an outside accounting firm, Grant Thornton LLP. The NIFA Directors then conducted a lengthy executive session with their lawyers and accountants and scheduled NIFA's next public meeting for the morning of December 30, 2010.

### C. Newly Proposed Contingencies

On December 29, 2010, the afternoon before NIFA's scheduled public meeting, the County Executive delivered a three-page letter (dated December 28) to NIFA asserting that the budget adopted by the County Legislature "is balanced!" (Emphasis in original.) The letter asserted that the County Executive had reached an agreement with the County Legislature on the Tax Certs problem such that "tax certiorari expenditures for 2011 should no longer be considered a risk by NIFA." Following up on a press release and press conference earlier in the week, the letter asserted that the County Executive had ordered $23 million in additional 2011 budget cuts, including a hiring freeze, to mitigate concern that budgeted revenue sources (such as the red light cameras and Long Island Expressway surcharge)

19

required State authorization not yet obtained. Finally, the letter identified a list of $157.9 million in *new* contingencies allegedly available in 2011. These contingencies were unmentioned by the County in its enacted budget or in earlier meetings with NIFA and NIFA's staff.

The County Executive asked to address NIFA publicly at the December 30 meeting, and NIFA again granted his request. In his remarks, the County Executive introduced his December 28 letter as an exhibit, provided no details concerning the newly proposed items to ensure balance in 2011 and asked NIFA to dispel rumors of a control period. He stated that there might come a time when he might ask NIFA "to enact [its] powers with respect to assisting the County," but that the time had not yet arrived.

Following another lengthy executive session among Directors and NIFA's counsel and accountants, NIFA announced publicly that, in an abundance of caution, it was providing the County with a final opportunity to provide information by January 20, 2011 that would alleviate the Directors' strong sense that a statutory operating deficit was substantially likely and imminent. In a letter to the County the following day, the NIFA Chairman spelled out specific information required on budgeted and unbudgeted elements of the County Executive's plan to achieve balance. At NIFA's request, the County delivered six narrative descriptions of its position on key issues, together with supporting data.

20

At NIFA's direction, Grant Thornton engaged in discussion with County staff regarding the County's explanations and support. Grant Thornton requested additional information and data, some of which was provided and some not.

On January 21, 2011, the County Executive initiated a conference call with the Minority Leader of the County Legislature and the NIFA Chairman in an effort to assure NIFA that a real agreement was in place among the County's elected officials to allow sufficient borrowing to cover the County's 2011 Tax Certs liability. Finally, yesterday afternoon, January 25, 2011, the County Executive emailed a four-page letter to the NIFA Directors; NIFA has considered this letter as well in its determination.

## III. Substantially Likely and Imminent Deficit

In the context of approximately $2.7 billion budgeted for the County's major operating accounts in 2011, a deficit of one percent, or approximately $27 million, constitutes the statutory trigger amount for imposition of controls. Having reviewed the County's submissions and supporting data in detail, and having consulted extensively with its accountants and counsel, NIFA now concludes that a 2011 deficit of far more than one percent, as defined by the Act, is both substantially likely and imminent. As such, a control period is essential to the preparation of a new fiscal plan directed at restoring balance, as required by law.

21

## A. *Identification of Risk Items*

NIFA has identified a schedule of primary risk items that are the focus of its analysis. These items are listed in the column labeled "Current Risk" in the schedule annexed hereto as Exhibit 1. As the chart demonstrates, NIFA did not simply rely on risk items identified in its review of the County Executive's initial budget proposal. Rather, NIFA selected the items of most significant risk identified in the three major budget reviews represented in the remaining three columns of the schedule: NIFA's initial review, the Comptroller's review, and the review of the Office of Legislative Budget Review. NIFA eliminated items where risks exist but actions already have been taken to ameliorate their effect. Thus, the remaining items are those which are – at the very least – substantially likely to reduce the County's budgeted revenues or fail to offset certain expenses.

NIFA totaled these risks both with and without the impact of bonding items, which standing alone carry significant implications under GAAP. The Act provides that NIFA "shall" conduct its determination "assuming all revenues and expenses are reported in accordance with" GAAP. Nevertheless, the Directors wished also to examine the impact of the cumulative risks in the absence of GAAP-related bonding items in order to assess the cash impact of identified risks. NIFA found a total of approximately $119.5 million in risk before bonding items, and assigned a range of risk of between $110 to $125 million. With the additional

22

$100 million in bonding necessary to cover the County's expected 2011 Tax Certs liability, the total assessed risk is $219.5 million, to which NIFA assigned a range of risk between $210 to $225 million.

## B. Deficit Offset Items

### 1. Cash Items

Having calculated a potential deficit associated with the risk items, NIFA evaluated the alleged deficit offset items proposed by the County and, for each, made a determination as to whether the offset item would likely be successful or not in contributing offset. A chart summarizing this analysis is annexed hereto as Exhibit 2. Those offsets which NIFA found to have a high probability of success are in one column, and include the two major contingency items added to the budget by the County Legislature (the Mitchel Field Lease Securitization and the proposed Land Sales). Those offsets which NIFA found to have a low probability of success are in a separate column, and include many (but not all) of the contingencies proposed by the County Executive for the first time in his letter of December 28, 2010.

Subtracting the successful cash offsets from the total assessed risk before bonding items, NIFA calculated its anticipated cash deficit for 2011 of $49 million. This magnitude of cash deficit expected by NIFA approaches *twice* the $27 million figure triggering NIFA's statutory obligation to impose controls. The

23

fact that this calculation depicts a cash impact shows a real-world reduction in available funds to the County to meet its financial obligations and commitments. In other words, these are not technical accounting entries but dollars that the County likely will be short by the end of 2011 when bills come due.

### 2. GAAP Items

The additional statutory mandate that NIFA apply GAAP significantly magnifies the deficit further still – in fact, more than *tripling* the statutory deficit to $176 million. Two offset items are at issue. First, harkening back to the pre-2000 era, the County has taken its Tax Certs liability off budget in 2011. The underlying theory is that the County can meet this obligation through borrowing of $100 million. However, GAAP prohibits the County from recognizing borrowed funds as operating revenues for this operating expense, and the statutory exception in the Act (allowing special treatment of Tax Certs bonding proceeds as operating revenues) expired in 2007.

The net effect is to increase the statutory deficit by the full amount of the Tax Certs borrowing, *i.e.*, the full $100 million. This dramatic impact is in no sense artificial, even in the event the County proves able to tap the bond markets and obtain the funds.[13] The drafters of the NIFA Act had especially good reason to

---

[13] As discussed below, the County Executive's assertion that he had reached an agreement with the Minority Leader of the County Legislature for approval of the bonding turned out to be incorrect.

24

require NIFA to apply GAAP in this circumstance. A basic tenet of the Act was to wean the County from Tax Certs borrowing in favor of PAYGO. Here, GAAP prevents the County from recognizing borrowed funds as operating revenues to offset this operating expense – foreclosing an imprudent practice that defers current expenses to future periods while incurring growing debt service obligations.[14] There can be no doubt that the drafters of the Act knew and intended this GAAP impact because they carefully crafted a temporary exception to allow some Tax Certs borrowing to count as operating revenues through 2007.

Second, the County's largest offset item is the Mitchel Field securitization plan, whereby the rights to future income from a series of leases would be sold for a lump sum of cash. Even though this item could result in a $30 million cash payment to the County in 2011, GAAP does not allow the whole of the purported $30 million to be treated as operating revenues in the year the cash is received. Rather, as confirmed by Grant Thornton, GAAP requires the County to amortize the lump sum payment over the term of the lease, with an amount of approximately $3 million of the cash payment qualifying as operating revenue for

---

[14] As the NIFA Chairman explained in his public comments at NIFA's meeting on September 28, 2010, the County's practice of borrowing to pay its Tax Certs obligation is the functional equivalent of imposing a tax increase on our children, plus interest. When a Director asked the County Executive whether he agreed with the Chairman's analogy, the County Executive responded by asserting that his plan will allow the County to end Tax Certs borrowing – *in 2013*.

2011. Again, GAAP's function in the context of the NIFA Act is not artificial but rather gets to the heart of the economics of the transaction. The Act seeks to impose on the County the fiscal discipline of balancing recurring revenues against recurring expenses. The Mitchel Field transaction, by contrast, is a classic one-shot, structured deliberately to sacrifice a natural income stream in order to achieve an accelerated, one-time cash jolt. The fact that GAAP calls for a limited operating funds credit to the County for such a transaction cannot be overlooked in applying the words and intent of the NIFA Act.

## C. Achievability

NIFA carefully evaluated each risk and each of the County's proposed deficit offset items, studying the County's narrative explanations and supporting data with assistance from Grant Thornton, whose staff engaged in dialogue with the County's Deputy Executive for Finance and other County personnel responsible for the projects. Assessments of these items are necessarily fact specific, and in some cases the assessments turn on professional judgments and experience with municipal finances. Descriptions of NIFA's assessments of two key example items follows.

### 1. Labor Savings

The County's labor unions enjoy collective bargaining agreements running through 2015, and agreements covering many County employees prohibit

26

layoffs.[15] Nevertheless, the County Executive proposed $61 million in labor

concessions as his signature expenditure savings measure for the 2011 budget.

There is no discernible evidence that one dollar of savings will be achieved.

Indeed, the union leaders have publicly stated, in no uncertain terms, that no

concessions will be given in 2011 – against which the County Executive's repeated

assertion of success in "bringing the unions to the table" rings hollow. In response

to NIFA's request for some objective evidence of progress, the County's letter of

January 7, 2011 could not identify even a single data point to buttress its

conclusion that "[t]he County Executive is optimistic that an agreement can be

reached." In this letter, the County specifically declined to provide, as requested

by NIFA, a schedule of target goals for each union or a timetable for their

achievement.

       The notion of enacting new County legislation authorizing unilateral

cuts by the County Executive (notwithstanding negotiated collective bargaining

agreements) remains just that – a notion. The proposed legislation has not been

adopted, and its legal validity is questionable. On January 13, 2011, the County

Executive and the Majority Leader held a joint press conference to announce that

---

[15] The ability to order layoffs is an important tool for exacting labor concessions. As NIFA described in its April 17, 2002 Report (at p. 20): "To the extent that the County cannot achieve $65 million in savings through collective bargaining, layoffs will be implemented to achieve a commensurate fiscal impact."

27

hearings on the legislation would be scheduled by the County Legislature. Yet no dates for hearings were set, and no vote on the proposed law was scheduled.

## 2.    Tax Certs Borrowing

The lack of budgetary relief from applying GAAP to Tax Certs borrowing is described above. In addition, NIFA cannot credit the County Executive's assertion that he has the necessary agreement with County Legislators to achieve such borrowing. Issuing the bonds requires the vote of a supermajority of the County Legislature, and this cannot be achieved without the support of the Democratic minority led by Legislator Diane Yatauro. In his December 28, 2010 letter to NIFA, the County Executive asserted that the necessary agreement was in hand. But when he convened a conference call with the Minority Leader and the NIFA Chairman on January 21, 2011 in order to underscore the existence of this agreement, the Minority Leader made plain that no agreement for new Tax Certs borrowing currently exists.

Indeed, when the County Executive pressed her to tell the NIFA Chairman that her caucus would support Tax Certs borrowing if necessary to avert a one percent deficit and a control period, the Minority Leader pointedly refused. She stated that she understood what the County Executive wanted her to say, but she would not say it and would not issue a blank check to the County Executive. She followed up her remarks on the call with a confirmatory letter to the NIFA

28

**JA 3015**

Chairman.  In assessing the anticipated cash deficit described above, NIFA wished

to be conservative and therefore credited the County on a cash basis with the

ability to bond its entire Tax Certs liability in 2011, notwithstanding the lack of

any agreement for that course of action by the necessary elected officials.[16]  Even

so, NIFA's overall assessment of the probability of the County achieving its budget

plan must take into account instances where a key assumption of the County

Executive proved unfounded.

Exhibit 2 identifies the offsets as to which NIFA, in the exercise of its

best judgment, after consultation with its accountants, finds a low probability of

success.  For example, the County could not provide a detailed plan or supporting

data for its departmental consolidation/elimination initiative.  Given the substantial

headcount reductions in 2009 and 2010, it would be difficult to rely upon

consolidations, in the absence of program cuts, to reduce headcount further.

Likewise, given OTPS restrictions in 2009, it is unlikely that the County will be

able to effect substantial expense reductions in the absence of program cuts.  Other

examples with a low probability of success include expansion of the red light

camera initiative (which, among other challenges, requires State legislation that

has not been passed), the Long Island Expressway patrol charge (which also

---

[16]  As noted above, by law NIFA must exclude the bond proceeds from its calculation of a
statutory deficit pursuant to applicable GAAP rules.

requires State legislation not yet passed) and police overtime reductions (which are suspect amid police headcount reductions).

## III. Conclusion

The steps statutorily required during a control period do not revise the County's financial plan overnight. Nor does NIFA assume control of the day-to-day operations of the County government. Rather, NIFA must exercise defined statutory powers to impose a degree of control with the goal of restoring balance. Because exercise of those statutory procedures involves preparation of a revised financial plan by the County, as well as review and, if necessary, modification by NIFA, the process of finalizing a plan will take a period of a month or more, to be followed by weeks if not months of implementation to execute the plan. One month of 2011 is already gone, so time is of the essence. NIFA acts today with the hope and prospect that representatives of County government will work collaboratively and in good faith with NIFA to achieve a resolution the County's financial difficulties, and that such resolution will allow the County to meet its financial obligations while providing effective services for County residents.

Dated: January 26, 2011

By the Directors

30

JA 3017

# EXHIBIT 1

**Nassau County Interim Finance Authority**
**Risk Assessment of Nassau County 2011 Budget**
**as of January 25, 2011**

| ($ in millions) | Nassau County Comptroller[1] | Nassau County Interim Finance Authority [2] | Office of Legislative Budget Review [3] | Current Risk [4] |
|---|---|---|---|---|
| **Revenues** | | | | |
| Red Light Camera Program/Expansion | $37.3 | $17.3 | $29.6 | $17.0 |
| L.I.E. Ticket Surcharge | 5.0 | 5.0 | 5.0 | 5.0 |
| Ambulance Fees | 9.9 | - | - | 4.0 |
| County Clerk Fees | 7.9 | 8.3 | - | 4.0 |
| Parks Revenue | 4.3 | 2.3 | 1.0 | 1.0 |
| Housing Suffolk County Inmates | 3.6 | 3.4 | 3.4 | 1.5 |
| New Fees Requiring Legislative Approval | - | - | 18.3 | - |
| Traffic Parking Violations Agency Fines | 9.0 | 7.3 | 11.0 | - |
| Other Fines & Forfeitures | 0.6 | - | - | - |
| Long Island Bus Subsidy | - | 26.0 | - | - |
| Other Departmental Revenue | 0.3 | - | - | - |
| FIT Tuition Reimbursement | 6.8 | - | - | 6.0 |
| Investment Income | 4.7 | - | - | 4.0 |
| Sales Tax | 2.3 | - | - | - |
| Boot and Tow Initiative | - | 1.0 | - | - |
| OTB Profits | 1.5 | - | 1.5 | 1.5 |
| **Total Revenue Risk** | 93.2 | 70.6 | 69.8 | 44.0 |
| | | | | |
| **Expenses** | | | | |
| Salary Adjustment/Labor Concessions | 61.2 | 61.0 | 61.1 | 61.0 |
| Outsourcing Medical Care for Inmates | 5.0 | 4.8 | 4.8 | 4.5 |
| NIFA Restructuring Savings | - | 8.0 | 8.0 | 8.0 |
| Police Overtime | - | - | 2.0 | 2.0 |
| Other | (1.3) | - | - | - |
| **Total Expense Risk** | 64.9 | 73.8 | 75.9 | 75.5 |
| | | | | |
| **Assessed Risk before Bonding Items** | 158.1 | 144.4 | 145.7 | 119.5 |
| *Assumed Range* | | | | 110.0 to 125.0 |
| **Bonding Items**[2] | | | | |
| Bonding of Property Tax Refunds | 100.0 | 100.0 | 100.0 | 100.0 |
| | | | | |
| **Total Assessed at Risk** | **$258.1** | **$244.4** | **$245.7** | **$219.5** |
| *Assumed Range* | | | | $210.0 to $225.0 |

Notes:

[1] Based on Budget Review Report dated as of October 6, 2010.

[2] Based on Budget Review Report dated as of September 28, 2010.

[3] Based on Budget Review Report dated as of October 14, 2010.

[4] Current Risk assessment includes only items deemed "at risk" as of the dates of the Budget Review Reports and does not attempt to identify new risks which may have materialized during the period October 2010 to date.

[5] Excludes recent MTA $20 judgment, which the County has indicated they plan to appeal, and all other pending judgments.

# EXHIBIT 2

**Nassau County Interim Finance Authority**
**Alleged Deficit Offset Items per Nassau County Executive**
**as of January 25, 2011**

| ($ in millions) | Alleged Deficit Offset Items | Revenue/Expense complies w/GAAP | | Success Factor | |
|---|---|---|---|---|---|
| | | No | Yes | High Probability | Low Probability |
| **Expenses** | | | | | |
| Approved 2011 Budget Contingencies | | | | | |
| Mitchel Field Lease Securitization | $30.0 | $27.0 | $3.0 | $30.0 | |
| Land Sales[1] | 25.0 | | 25.0 | 25.0 | |
| Department Reductions | 5.3 | | 5.3 | 0.5 | 4.8 |
| December 2010 County Executive Actions[2] | 23.0 | | 23.0 | 15.0 | 8.0 |
| Additional Hiring Freeze | 10.0 | | 10.0 | | 10.0 |
| MTA Subsidy Elimination | 9.6 | | 9.6 | | 9.6 |
| Departmental Consolidation/Elimination | 15.0 | | 15.0 | | 15.0 |
| Additional Real Estate Sales[3] | - | | - | | - |
| Police Overtime Reduction | 10.0 | | 10.0 | | 10.0 |
| Reduce OTPS | 10.0 | | 10.0 | | 10.0 |
| Sales Tax to Villages Elimination | 1.3 | | 1.3 | | 1.3 |
| | 139.2 | 27.0 | 112.2 | 70.5 | 68.7 |
| Use of Cumulative Fund Balance | 65.0 | 65.0 | | | 65.0 |
| Tax Certiorari Loans | 100.0 | 100.0 | | | 100.0 |
| | $304.2 | $192.0 | $112.2 | $70.5 | $233.7 |

*(Left margin row-group labels: "To Offset Labor Concessions", "Executive", "Per Nassau County")*

**Budget Risk and Deficit Offsets**

| | Alleged Deficit Offset Items |
|---|---|
| Assessed Risk before Bonding Items | ($119.5) |
| "High Probability" Offsets (all cash) | 70.5 |
| Cash Deficit | ($49.0) |
| | |
| Assessed Risk before Bonding Items | ($119.5) |
| "High Probability" Offsets (GAAP only) | 43.5 [4,5] |
| | (76.0) |
| Bonding of Property Tax Refunds | (100.0) |
| STATUTORY DEFICIT[6] | ($176.0) |

Notes:
[1] Land Sales are considered a GAAP revenue item only to the extent sales price exceeds historical cost.
[2] An additional $23 million in budget cuts were ordered in December 2010. The $23 million is comprised of $15 million in savings from implementing non-essential employee hiring freeze and $8 million in savings from OTPS. Detailed support for the OTPS cost reductions lacks specificty and appears insufficient as of January 20, 2011.
[3] The $10 million Additional Real Estate Sales contingency relates to 6 of the 8 parcels previously included in the $25 million Land Sales contingency.
[4] "GAAP" means "Generally Accepted Accounting Principles".
[5] Total comprised of $25 million Land Sales, $15 million December 2010 County Executive Actions, $0.5 Department Reductions and $3 million Mitchel Field Lease Securitization.
[6] Does not include $10 million of "contingency" from original budget.

--- N.Y.S.2d ----, 2011 WL 1044556 (N.Y.Sup.), 2011 N.Y. Slip Op. 21103
**(Cite as: 2011 WL 1044556 (N.Y.Sup.))**

Supreme Court, Nassau County, New York.
In the Matter of The COUNTY OF NASSAU and Edward P. Mangano, County Executive, Petitioners,
v.
The NASSAU COUNTY INTERIM FINANCE AUTHORITY, Respondent.

No. 001455-11.
March 11, 2011.

Rivkin Radler, Uniondale, William M. Savino Esq., Nassau County Attorney, John Ciampoli Esq., Mineola, for petitioners.

Skadden, Arps, Slate, Meagher & Flom LLP, New York, Christopher J. Gunther, Esq., Jeremy Wise, Esq., Nassau County Interim Finance Authority, Mineola, for Respondent NIFA.

ARTHUR M. DIAMOND, J.
**\*1** The following papers having been read on this motion:

| | |
|---|---|
| Order to Show Cause | 1 |
| Affidavit in Support | 2 |
| **Petitioners Memorandum of Law** | **3** |
| **Notice of Cross-Motion** | **4** |
| **Respondent's Memorandum of Law** | **5** |
| **Petitioners Opposition** | **6** |
| **Affidavit in Opposition** | **7** |
| **Transcript of Hearing February 18, 2011** | **8** |

The petitioners, County of Nassau and Edward P. Mangano as County Executive ("County") commenced this action pursuant to Article 78 of the CPLR for a judgement annulling and vacating the respondent Nassau Interim Finance Agency's ("NIFA") Resolution No. 11 and Supporting Determination dated January 26, 2011 which imposed a control period on the County pursuant to Public Authorities Law § 3669(1).

The County also moved for an order granting a preliminary injunction pursuant to CPLR § 6301, § 6311 and § 7805 thereby restraining and enjoining NIFA from continuing to impose the control period upon it and from exercising any of its powers set forth at Public Authorities Law § 3669.

Respondent NIFA cross moved for an order pursuant to CPLR § 7804(f), § 3211(a)(1), (7) denying the petition and dismissing this proceeding.

The hearing on the preliminary injunction was held on February 18, 2011. At the conclusion of the proceeding, NIFA was stayed by the court from taking any action pending the determination of the County's motion for a preliminary injunction.

**PROCEDURAL HISTORY**
The NIFA Act was enacted on June 23, 2000 pursuant to a Home Rule Message which had been proposed by the County Executive and approved by a vote of the County Legislature. The Legislative history indicates that in enacting the Act, the Legislature found that "a condition of financial difficulties ... existed and ha[d] existed in the County of Nassau" which resulted in the repeated reduction of the County's bond ratings and as a consequence, increased interests costs being borne by the County. The Legislature found and declared:

"that the continued existence of such condition of fiscal difficulties is contrary to the public interest of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- N.Y.S.2d ----, 2011 WL 1044556 (N.Y.Sup.), 2011 N.Y. Slip Op. 21103
**(Cite as: 2011 WL 1044556 (N.Y.Sup.))**

the county and the state and seriously threatens to cause a decline in the general prosperity and economic welfare of the inhabitants of the county and the people of this state [and that] [t]he impairment of the credit of the county of Nassau may affect the ability of other municipalities in the state to issue their obligations at normal interest rates. Such effect is a matter of state concern. Public Authorities Law, ch. 43-A, art. 10-D, titl, refs & annots. (McKinneys 2002).

The Legislative history also indicates that the County had

"request[ed] the enactment of all of the provisions of [the] act as necessary and in the public interest to accomplish the objective of improving market reception for the necessary sale of bonds and other obligations of the county by discouraging certain practices which have occurred in the past and providing direction and assistance in budgetary and financial matters to restore the county to fiscal health, while retaining the county's right to operate independently as a municipal corporation of the state of New York.

**\*2** Indeed, the statute itself provides:

It is hereby determined that the creation of NIFA and the carrying out of its corporate purposes are in all respects for the benefit of the people of the state of New York and are public purposes. Accordingly, NIFA shall be regarded as performing an essential governmental function in the exercise of the powers conferred upon it by this title. Public Authorities Law § 3661(1).

The Act authorized NIFA to issue bonds and notes for various County purposes and to closely oversee the County's budget and finances. Pursuant to the Act, the County was provided with a $100 million state subsidy ($25 million per year through 2004) as well as a State grant of $5 million to assist the County in streamlining the tax certiorari process. NIFA has issued in excess of $1.6 billion in bonds for the County's benefit and assisted the County by restructuring maturing debt, refinancing existing debt and borrowing money.

The Act provided for an "interim finance period"

during which time the County was required to demonstrate: (1) based upon annual audit reports for three consecutive fiscal years, that it had adopted and adhered to budgets covering all expenditures which did not show a major operating deficit when calculated pursuant to Generally Acceptable Accounting Principles (hereinafter refer to as) GAAP and that there was a substantial likelihood that the County's operations for the current fiscal year would not show a deficit in the major operating funds in accordance with GAAP, either; and (2) that the securities sold in the general public market by or for the County's benefit during the fiscal year immediately preceding as well as the current fiscal year satisfied the financing requirements of the County and that there was a substantial likelihood that such securities could be sold in the general public market from that date through the end of the next fiscal year in amounts sufficient to satisfy substantially all of the County's capital and seasonal financing requirements in accordance with the County's fiscal plan. (Public Authorities Law § 3651(14)).

During the interim finance period, NIFA was required to approve or disapprove the County's budget and current year financial plans based on whether or not they met the fiscal balance requirements set forth in the Act.

The interim finance period established via the Act's enactment was scheduled to end in 2004. (Public Authorities Law § 3651(14)). In 2003, the interim finance period was extended by the legislature to 2007 over the County Executive's objection. County Executive Suozzi maintained that an extension was "unnecessary and redundant" because there was already "a mechanism for continuing oversight: a control period". (Letter from Thomas R. Suozzi, July 21, 2003, in N.Y. Bill Jacket, 2003 S.B. 5543, ch. 314). In 2007, the Legislature again extended the interim finance period through 2008 finding that its "insight, expertise and guidance [was] needed and necessary for the foreseeable future." (N.Y. Bill Jacket 2007, S.B. 6014, ch. 364). The interim finance period expired in 2008.

**\*3** Thereafter, pursuant to the Act, NIFA continued to review and issue detailed reports on the County's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- N.Y.S.2d ----, 2011 WL 1044556 (N.Y.Sup.), 2011 N.Y. Slip Op. 21103
**(Cite as: 2011 WL 1044556 (N.Y.Sup.))**

budget and financial plans. In fact, in its December 3, 2008 report NIFA noted

> Last Year after NIFA approved the county's fiscal year 2008 through 2011multi-year plan the county borrowed for cert judgements and settlements over the unanimous objection of the NIFA directors. NIFA considers this borrowing practice to be one of if not the preeminent reason for the original fiscal crisis of the county, which led to the creation of NIFA by the state. (Order to show cause, affidavit of Tomas Sullivan, Exhibitt, H p 1).

It cautioned that because the tax certiorari borrowing would probably exceed one percent of the County's budget, it would be required to make a determination "unless the County can convince NIFA that the borrowed funds should count as revenue" A letter authored by the County's bond counsel which concluded that bond revenues could be budgeted as operating revenues without limit after the interim financing period did just that.

In its May 28, 2009 report, NIFA commented "the county's actions are troubling because the use of bond proceeds and off-budget reserves to pay operating expenses masks an imbalance that many would characterize as a deficit and also exacerbates the budgetary gaps that must be resolved in future years, both by deferring the necessary steps to correct the imbalance and layering on debt reserves for current year borrowings. The county has continued to rely on its practice of bonding items that should be funded with operating income, for example, tax certiorari refunds." Indeed, in its May, 2009 report, NIFA acknowledged that $58.8 million in bond proceeds had been used in 2008 to pay tax certiorari claims. While it does not expressly state that that would not be permitted in the future, it declared that it "masks an imbalance that many would characterize as a deficit." Similarly, while NIFA again acknowledged in its October 2009 report that the County would likely use $27.7 million in borrowed funds to pay tax certiorari claims in order to achieve a balanced budget and that only $50 million of the $90 million needed in financial year 2010 for tax certiorari claims would come from operating funds with the remainder presumably coming

from borrowed funds, it noted (r)egrettably, the County already bonds for certiorari judgements, both of which should also come out of the operating budget (emphasis added)." In 2009 and 2010, based on the County's bond counsel's opinion that bond funds used to pay tax certiorari obligation could be budgeted as operating revenue, coupled with efforts by the County to pay a portion of those claims from actual operating revenues, NIFA permitted deficits that might otherwise have triggered a control period.

Similarly, NIFA allowed the County to use $13.4 million in General Reserve Fund balance in 2006, $38.1 million in 2007, $17.9 million in 2008 and $10 million in 2009 to balance the budget. In 2011, it has disallowed its use of the $65 million Reserve Fund balance.

**\*4** When the County issued bond offerings in December 2009, November 2010 and as recently as December 16, 2010, the bond offerings noted not only the history of the Act including the interim finance period which it noted had expired in 2008, but NIFA's continuing "ongoing monitoring and review of the County's financial operations ..." as well as NIFA's power "to impose a control period" under certain conditions set forth in the statute, including a determination that "there exist[ed] a substantial likelihood and imminence of the County incurring a major operating funds deficit of one percent or more in the aggregate results of operations during its fiscal year 2011 assuming all revenues and expenditures are reported in accordance with GAAP." The bond offering also noted that:

> "[d]uring a control period NIFA would be required to withhold transitional State aid and is empowered, among other things, to approve or disapprove proposed contracts and borrowings by the County and Covered Organizations; approve, disapprove or modify the County's Multi-Year Financial Plan; issue binding orders to the appropriate local officials; impose a wage freeze; and terminate the control period upon finding that no condition exists which would permit imposition of a control period."

These statements were certified by the County Treasurer who is the County's "chief financial officer"

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- N.Y.S.2d ----, 2011 WL 1044556 (N.Y.Sup.), 2011 N.Y. Slip Op. 21103
**(Cite as: 2011 WL 1044556 (N.Y.Sup.))**

under the County Charter and the Act. (Public Authorities Law § 3651(3)).

On September 15, 2010, the County submitted its fiscal plan for 2011-2014 which included its proposed budget for 2011. In its Preliminary Review dated September 28, 2010, NIFA found that the proposed 2011 budget was not adequately balanced. Anticipated revenues totaling $244.4 million were deemed "risky," which included $100 million bonding/borrowing to pay tax certiorari awards; $61 million in labor savings; $26 million in a Long Island Bus subsidy; $17.3 million in Red Light Camera Expansion; $8.3 million in County Clerk's fees; $8 million in NIFA Restructuring Savings; $7.3 million in Traffic and Parking Violation Agency ("TPVA") fines; $5.0 million in Long Island Expressway Patrol Surcharge; $4.8 million in Inmate Healthcare Initiative; $3.4 million in Housing Suffolk Inmates; $2.3 million in Parks Fees; and, $1.0 million in Boot and Tow Initiative.

NIFA noted that in this budget no County revenues were being used to pay tax certiorari claims and that the $100 million in bonding revenues being used instead created a long term expense, required the County Legislature's approval and was contrary to NIFA's long standing history of opposing the County's reliance on long term debt to cover current operating expenses. Indeed, the Act itself specifically required the County to both gradually reduce the use of borrowed funds to pay tax certiorari obligations and to convert to PAYGO. In fact, the NIFA Act specifically permitted the County to treat tax certiorari borrowing as operating revenue at decreased levels in 2006 and 2007 and not at all thereafter assuming GAAP were followed. See Public Authorities Law § 3667(1).

**\*5** NIFA further found the $61 million in projected labor savings risky because those savings required legislative enactment to permit the County to reduce wages if violative of contracts and faced legal opposition even if passed. NIFA found the $26 million Long Island Bus Subsidy risky because the Metropolitan Transit Authority had removed that funding from its 2011 budget and indicated that Nassau County must resume total funding of its bus operation. NIFA found the

Red Light Camera Expansion risky because, *inter alia,* it required State approval. It found the $8.3 million in County Clerk fees risky because it required County Legislative approval. It found the $8 million restructuring of NIFA debt risky because it was not attainable. It found the $7.3 million in TPVA fines and $5.0 in Long island Expressway Patrol Surcharge risky because they required County and State Legislative approval, respectively. The $4.8 million savings in Inmate Healthcare was found speculative because it was dependent upon a yet to be entered contract. It found the proposed $3.4 million in net revenue for housing Suffolk inmates risky because it was dependent on both the completion of the construction of a cell block and the availability of 100 Suffolk prisoners. It found the proposed $2.3 million in parks fees speculative because any increase required the County Legislature's approval which was historically resisted and depended on new contested revenues in the form of advertising revenue and summer programs.

The $244.4 million in risky revenues NIFA found in the County's 2011 budget was more than twice the amount found in 2009. The Nassau County Comptroller issued a report similar to that of NIFA'S quantifying the risk items at $258.1 million and likewise, the County's Office of Legislative Budget Review issued a report quantifying budget risks at $245.7 million. Despite a presentation by the County Executive, NIFA's continuing concern caused it to retain Judith S. Kaye of Skadden, Arps, Slate, Meagher & Flon LLP to advise it.

The County enacted its multi-year budget plan including the 2011 budget on October 30, 2010, which contained revenues and cost savings which were found to be "risky" by NIFA. It added "contingencies" including a securitization of Mitchel Field leases equaling $30 million, potential County land sales totaling $25 million and $5.3 million in various expense reductions. Days later, November 4, 2010, Moody's downgraded the County's short-term and long-term credit rating and found that approximately $158 million of revenues and expenditures in the County's budget was risky.

NIFA made repeated requests for documents to support the County's budget and extensive talks took place between the County and NIFA's retained account-

ant, Grant Thornton, LLP. In fact, On December 29, 2010, the County Executive submitted a letter representing that he had reached an agreement with the County Legislature regarding the 2011 tax certiorari claims and that he had ordered $23 million in budget costs. In addition, that letter identified $157.9 million in new additional contingencies. At a meeting with NIFA on December 30, 2010, no further details regarding the new found $157.9 million new contingencies were provided. And, when GAAP was applied, as required by the statute, a projected deficit of $176 million was found by NIFA, which disallowed the $100 million borrowed funds and $27 million of the $30 million from the sale of Mitchel Field leases to be counted as operating revenues. On January 25, 2011, the County Executive announced an agreement with the Civil Service Employee's Association that would yield a savings of only $2 million, leaving the projected $61 million in labor savings unsupported.

**\*6** NIFA provided the County with yet another opportunity to provide additional information to alleviate its concerns regarding the County's budget. The County responded describing its position with supporting data.

Despite the fact that numerous risks were eliminated, NIFA found that an operating deficit of $119.5 million remained, plus $100 million in bonding for tax certiorari obligations. The County claimed that new found contingencies will result in additional revenues of $70.5 million resulting in a projected $49 million budget deficit not including the bond revenues. However, NIFA noted the new found additional contingencies were risky and the County had not even established that the legislature would approve of the new contingencies submitted to NIFA.

Ultimately, on January 26, 2011 NIFA enacted its resolution imposing a control period pursuant to Public Authorities Law § 3699(1)(b) on the ground that there existed a substantial likelihood and imminence of the County incurring a major operating fund deficit of one percent or more in the aggregate results of operations during 2011.

NIFA's resolution required the County to submit a

financial plan for 2011 by February 15, 2011, which eliminated what NIFA identified as unacceptable risks and to present guidelines representing the categories and types of contracts and other obligations to be reviewed by NIFA in carrying out its authority under the NIFA Act.

In its determination, NIFA specifically articulated numerous reasons for its imposition of a control period. Preliminarily, it noted that the Act required it to assess whether there was a substantial likelihood and imminence that the County would experience a one percent or more deficit in its operating funds assuming GAAP were followed and if so, to impose a control period. It noted that it had rejected budgets with smaller risks, i.e., $81 .7 million in 2001 which the County reduced to $6.3 million; $55 million in 2002; and $125 million in 2009, which the County reduced to $53 million. It also noted that in October 2000, it made clear that counting Reserve Fund balance surpluses as operating revenue violated the Act. It noted that from 2000 through 2004, the County amassed $285 million in reserves, which had dwindled to approximately $65 million and was not in accordance with NIFA's requirements. (See Public Authorities Law § 3667(4)(c)). And, it noted that no efforts to replenish that Reserve Fund balance were being made either, again, in violation of the Act. NIFA also noted that borrowing funds for tax certiorari obligations and budgeting that as operating revenue was supposed to be phased out and ultimately end and that while efforts had been made from 2006 to 2010 to PAYGO at least a portion of those obligations and finance only the excess, the 2011 budget reverted to 100% borrowing for tax certiorari obligations which was being treated as operating revenue, in direct contravention of not only the historic path away from that but more importantly, NIFA's goals.

**\*7** NIFA also stated that federal stimulus funding decreased from $40 million in 2009 and 2010 to $20 million in 2011; one-shot revenues of significant sizes weren't available; taxes weren't increased, in fact, the energy tax had been repealed; and, that County contracts which ran through 2015 prohibited layoffs through 2011.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- N.Y.S.2d ----, 2011 WL 1044556 (N.Y.Sup.), 2011 N.Y. Slip Op. 21103
**(Cite as: 2011 WL 1044556 (N.Y.Sup.))**

In its determination, NIFA stated that the County was returning to practices that precipitated the enactment of the NIFA Act. NIFA also noted that the budgetary risk for 2011 was more than twice that found unacceptable in 2009 and that its conclusion was in fact consistent with the County's Comptroller's and the County Office of Legislative Budget Review. NIFA noted Moody's downgrade of the County's credit rating and the numerous opportunities it had afforded the County to rectify its budget, which it found went unheeded.

NIFA noted that even without the bonding of the tax certiorari claims, there were $119 million in risky revenues. Coupled with $100 million in bonding, a total of $219 million existed. Even allowing new highly probable successful offset items identified by the County post-budget, i.e., Mitchel Field lease securitization, land sales and hiring freeze, the deficit remained at $49 million, again, nearly twice the one percent figure of $27million. NIFA noted that allowing the Tax Certiorari borrowing and the Mitchel Field lease proceeds to count as operating revenue was violative of GAAP. And, whether the Legislature would authorize the borrowing for the tax certiorari funds remained to be seen.

Pursuant to Public Authorities Law § 3369(2), the imposition of this control period affords NIFA significant power over the County. Essentially, while Public Authorities Law § 3669(2)(a)(i) requires NIFA to consult with the County in preparing its financial plan, NIFA is required to "prescribe the form of the final plan and the supporting information required in connection therewith" (Public Authorities Law § 3669[2][a][i] ), and to "exercise the right of approval, disapproval and modification with respect to the financial plan, including the revenue estimates contained therein" (Public Authorities Law § 3669[2][a][iii] ).

During a control period, Public Authorities Law § 3669(2)(b) requires NIFA "from time to time and to the extent it deems necessary or desirable in order to accomplish the purposes of [the Nassau Interim Finance Act ["the Act"] [to] (i) review the operations, management, efficiency and productivity of such county operations and of such covered organizations or portions thereof as [ NIFA] may determine, and make reports

thereon; (ii) audit compliance with the financial plan in such areas as [ NIFA] may determine; (iii) recommend to the county and the covered organizations such measures relating to their operations, management, efficiency and productivity as it deems appropriate to reduce costs and improve services so as to advance the purposes of [the Act]; and, (iv) obtain information of the financial condition and needs of the county and the covered organizations...."

**\*8** To that end, Public Authorities Law § 3669 (2)(c) requires NIFA to review so much of the County's financial statements and projections, budgetary data and information and management reports and materials that NIFA deems necessary or desirable and to inspect, copy and audit the County's books and records to the extent it deems necessary or desirable in order to accomplish the goals of the Act. Pursuant to Public Authorities Law § 3669(2)(d), NIFA is required to disapprove or approve contracts entered into by the County; pursuant to Public Authorities Law § 3669(2)(e), NIFA is required to approve borrowing by the County; pursuant to Public Authorities Law § 3669(2)(f), NIFA is required to order County officials to take such actions it deems necessary to accomplish the purposes of the Act; and, pursuant to Public Authorities Law § 3669(2)(g), NIFA is required to authorize withholding of transitional state aid during a control period. Pursuant to Public Authorities Law § 3669(3), NIFA has the power to declare an unlimited fiscal crisis and freeze wages until the end of the control period and pursuant to Public Authorities Law § 3669 (4)(a), the County's employees are specifically prohibited from incurring any obligations or liabilities or entering into any contracts which have not been authorized by NIFA during the control period.

In view of the extensive powers bestowed on NIFA by its imposition of a control period, the County has brought this Article 78 proceeding challenging NIFA's determination. While petitioners concede that this legislation was properly enacted in accordance with the constitution, petitioners claim that the control period to be exercised by NIFA under PAL § 3669(1)(b) is unconstitutional because once the interim finance period expired in 2008 pursuant to PAL § 3651(14), New York State

--- N.Y.S.2d ----, 2011 WL 1044556 (N.Y.Sup.), 2011 N.Y. Slip Op. 21103
**(Cite as: 2011 WL 1044556 (N.Y.Sup.))**

no longer had a substantial state interest in the county budget and its authority is now only limited to monitoring and reviewing the county budget. According to petitioners, when the interim finance period expired, the control period could not be exercised without section 3669 of the Public Authorities Law being reenacted by the New York State legislature in accordance with section 2(b)(1) of Article IX of the New York State Constitution. Lastly, the County maintains, in any event, that NIFA's determination is arbitrary and capricious because it is not only unfounded, but more importantly, diverges from its past determinations without explanation or reason.

**DECISION**

The petitioners have the burden of proving entitlement to a preliminary injunction. "Although the purpose of a preliminary injunction is to preserve the status quo pending a trial, the remedy is a drastic one, which should be used sparingly" ( *Trump on The Ocean, LLC v. Ash,* --- A.D.2d ----, 2011 WL 451660 [2nd Dept.2011], citing ( *McLaughlin, Piven, Vogel, Inc. v. W.J. Nolan & Co., Inc.,* 114 A.D.2d 165, 172 [2nd Dept 1986] ) since it "prevents litigants from taking actions that they would otherwise be legally entitled to take ... ( *Related Properties, Inc. v. Town Bd. of Town/Village of Harrison,* 22 AD3d 587, 590 [2nd Dept.2005], citing *Uniformed Firefighters Ass'n of Greater New York v. City of New York,* 79 N.Y.2d 241[1992] ). To obtain injunctive relief, the County must establish "(1) a likelihood of success on the merits, (2) irreparable harm in the absence of an injunction, and (3) a balance of the equities in favor of injunction." ( *Trump on the Ocean, LLC v. Ash, supra, citing Aetna Ins. Co. v. Capasso,* 75 N.Y.2d 860, 862 [1990]; *W.T. Grant Co. v. Srogi,* 52 N.Y.2d 496 (1981); *Apa Sec., Inc. v. Apa,* 37 AD3d 502, 503 [2nd Dept.2007] ). While issues of fact alone do not require the denial of preliminary injunctive relief, "to sustain its burden of demonstrating a likelihood of success on the merits, the [County] must demonstrate a clear right to relief which is plain from the undisputed facts." ( *Related Properties, Inc. v. Town Bd. of Town/Village of Harrison, supra,* at p. 590, citing *Gagnon Bus Co ., Inc. v. Vallo Transp. Ltd., supra; Dental Health Associates v. Zangenh),* 267 A.D.2d 421 [2nd

Dept.1999]; *Blueberries Gourmet v. Aris Realty Corp., 255 A.D.2d 348 [2nd Dept.1998* ] ). A temporary injunction should not be granted where the facts are in sharp dispute. (*Related Properties, Inc. v. Town Bd. of Town/Village of Harrison, supra, at p.* 591, citing *Blueberries Gourmet v. Aris Realty Corp., supra.*)

**CONSTITUTIONAL AUTHORITY OF NIFA**

**\*9** The New York State Legislature enacted a special law in the year 2000 which created the Nassau County Interim Finance Authority under Title 1 of Article -D of the Public Authorities Law. The special law was enacted at the request of the county executive of Nassau County, and approved by a vote of the Nassau County Legislature which is known as the home rule message embodied in section 2(b)(2) of Article IX of the New York State Constitution. While petitioners concede that this legislation was properly enacted in accordance with the constitution, petitioners claim that the control period to be exercised by NIFA under PAL § 3669(1)(b) is unconstitutional because once the interim finance period expired in 2008 pursuant to PAL § 3651 (14), New York State no longer had a substantial state interest in the county budget and its authority is now only limited to monitoring and reviewing the county budget. According to petitioners, when the interim finance period expired, the control period could not be exercised without section 3669 of the Public Authorities Law being reenacted by the New York State legislature in accordance with section 2(b)(1) of Article IX of the New York State Constitution.

Petitioners have the burden of showing by beyond a reasonable doubt that the control period provision of section 3669 of the Public Authorities Law is unconstitutional. (McKinney's Cons Laws of New York, Book 1, Statutes § 150, p. 320-321). A statute is presumptively constitutional and should be construed in such a manner as to uphold its constitutionality. ( *Schultz Management v. Board of Standards and Appeals of City of New York,* 103 A.D.2d 687, aff'd 64 N.Y.2d 1057, citing *Eaton v. New York City Conciliation,* 56 N.Y.2d 340, at 346). Moreover, "[t]he party alleging unconstitutionality [of a statute] has a heavy burden, one of demonstrating the infirmity beyond a reasonable doubt, and only as a last

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- N.Y.S.2d ----, 2011 WL 1044556 (N.Y.Sup.), 2011 N.Y. Slip Op. 21103

**(Cite as: 2011 WL 1044556 (N.Y.Sup.))**

resort will courts strike down legislative enactments on the ground of unconstitutionality." (*Schultz Management v. Board of Standards and Appeals of City of New York,* supra at 689, citing *Sgaglione v. Levitt,* 37 N.Y.2d 507, 515). "Thus, where an act is susceptible of two constructions, one of which will make it constitutional and the other unconstitutional, the former will be adopted." (McKinney's Cons Laws of New York, Book 1, Statutes § 150, p. 324)

The NIFA Act was enacted pursuant to Section 2(b)(2), and not section 2(b)(1), of Article IX of the New York State Constitution. Section 2(b)(2) of Article IX states, in pertinent part,

"Subject to the bill of rights of local governments and other applicable provisions of this constitution, the legislature: (1) Shall have the power to act in relation to the property, affairs or government of any local government ... by special law only (a) on request of two-thirds of the total membership of its legislative body or on request of its chief executive officer concurred in by a majority of such membership ..." (McKinney's Cons Laws of New York, Book 2, Art. 9, § 2(b)(2), p. 214).

**\*10** Concomitantly with the passage of Article IX of the New York State Constitution in relation to the bill of rights and home rule powers for local government, the New York State Legislature enacted Legislative Law section 55 which provided as follows:

"The legislature shall prescribe by rules to be promulgated from time to time by concurrent resolution of the Senate and Assembly the forms of requests to be submitted to it by counties, cities, towns and villages with respect to the enactment of special laws pursuant to paragraph two of subdivision (b) of section two of article nine of the constitution and the manner of communication of such requests to the legislature." (McKinney's Cons.Laws of NY, Book 32, section 55).

While section 55 of the Legislative Law references the requirement of compliance with section (2)(b) of Article IX of the New York State Constitution with respect to the enactment of special laws pursuant to the

home rule message, there is no mention in this statute that there be compliance with the re-enactment requirement provision of section (b)(1) of the Article IX of the New York State Constitution.

Petitioners claim that the control period to be exercised by NIFA under PAL § 3669 repealed, diminished, impaired or suspended the powers of the Nassau County government and therefore that statute must be re-enacted pursuant to section 2(b)(1) of Article IX of the New York State Constitution. The re-enactment provision of section 2(b)(1) of Article IX of the New York State Constitution provides as follows:

"Subject to the bill of rights of local governments and other applicable provisions of this constitution, the legislature: (1) Shall enact, and may from time to time amend, *a statute of local governments* (emphasis by court added) granting to local governments powers including but not limited to those of local legislation and administration in addition to the powers vested in them in this article. A power granted in such statute may be repealed, diminished, impaired or suspended only by enactment of a statute by the legislature with the approval of the governor at its regular session in one calendar year and the re-enactment and approval of such statute in the following year." (McKinney's Cons Laws of New York, Book 2, Art. 9, § 2(b)(1), p. 214).

However, excluded from petitioners argument is any reference to the Statute of Local Governments which the state legislature enacted in 1964 in accordance with section 2(b)(1) of Article IX of the New York State Constitution. (McKinney's Cons.Laws of NY, Book 35C, Statute for Local Governments, § 11). Subdivision two of Section 11 of the Statute of Local Governments entitled "Reservation of power by legislature" provides as follows:

"The legislature hereby excludes from the scope of the grants of powers to local governments in this statute and reserves to itself the right and power to enact any law described in this section notwithstanding the fact that it repeals, diminishes, impairs or suspends a power granted to one or more local governments in this statute:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- N.Y.S.2d ----, 2011 WL 1044556 (N.Y.Sup.), 2011 N.Y. Slip Op. 21103
**(Cite as: 2011 WL 1044556 (N.Y.Sup.))**

**\*11** 2. Any law enacted as provided by paragraph two of subdivision (b) of section two of article nine of the constitution on request of the legislative body of each affected local government, on request of the chief executive officer of each affected local government concurred in by its legislative body or, except in the case of the city of New York, on certificate of necessity from the governor."

Accordingly, any special law enacted pursuant to the home rule message of section 2(b)(2) of Article IX of the New York State Constitution becomes power reserved to the state legislature under section 11, subdivision two of the Statute of Local Governments. Therefore, because the NIFA Act was enacted at Nassau County's request pursuant to section 2(b)(2) of Article IX of the New York State Constitution, the NIFA Act's mandates upon the County are specifically excluded from the powers granted to the County by the Statute of Local Governments. The court finds that the re-enactment requirement of section 2(b)(1) of Article IX of the New York State Constitution applies only to powers granted by the Statute of Local Governments to Nassau County. The exclusion of the NIFA Act from the Statute of Local Governments powers under section 11 subdivision 2 of the Statute of Local Governments, because it was enacted pursuant to the home rule message of section 2(b)(2) of Article IX of the New York State Constitution, renders the re-enactment requirement of section 2(b)(1) of Article IX of the Constitution inapplicable.

There is no requirement that any part of the NIFA Act has to be reenacted under the provisions of section 2(b)(1) of Article IX of the New York State Constitution. The re-enactment provision of subdivision (b)(1) of section 2 is not subsumed within the home message rule of section 2(b)(2) of Article IX as to be a requirement for re-enactment every time a special law is enacted by the state legislature at the request of a local government. The constitution does not explicitly provide for it, nor does any statutory authority or case law exist to support petitioner's proposition. Rather the statutory provisions of Legislative Law section 55 and Statute of Local Governments section 11(2), when read

in conjunction with section 2(b) of Article IX of the New York State Constitution, suggest that the re-enactment requirement of section 2(b)(1) is inapplicable to special laws enacted under the home message rule.

Accordingly, the petitioners have failed to meet their heavy burden of showing the unconstitutionality of the control period statute of PAL § 3669 by beyond a reasonable doubt.

**STATUTORY AUTHORITY OF NIFA**
NIFA has declared a control period pursuant to PAL section 3669, subdivision (1)(b), which provides, in pertinent part, as follows;

"The authority shall impose a control period upon its determination at any time of the following events has occurred or that there is a substantial likelihood and imminence of such occurrence: (b) the county shall have incurred a major operating funds deficit of one percent or more in the aggregate results of operations of such funds during its fiscal year assuming all revenues and expenditures are reported in accordance with generally accepted accounting principles, subject to the provisions of this title ..."

**\*12** NIFA claims that the duration of its authority to exercise a control period is governed by PAL § 3669 (1) which the last sentence of that paragraph provides as follows: "Notwithstanding any part of the foregoing to the contrary, in no event shall any control period continue beyond the later of (i) January 1, 2030, or (ii) the date when all bonds of the authority are refunded, discharged, or otherwise defeased."

Petitioners assert that the control period can only be exercised during the interim finance period which expired in the year 2008. (PAL § 3651[14] ). Once that period expired, the state no longer had a state interest in the County's budget. Petitioners further state that pursuant to PAL § 3667(2) the County was only required to submit a financial plan to NIFA covering a four year period during the interim finance period or during the control period. Only during that specified period can NIFA pass a resolution under paragraph (2)(g) of PAL § 3667 if the county fails to modify or amend its budget at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- N.Y.S.2d ----, 2011 WL 1044556 (N.Y.Sup.), 2011 N.Y. Slip Op. 21103
**(Cite as: 2011 WL 1044556 (N.Y.Sup.))**

the request of NIFA for failing to contain projections of revenues and expenditures that are based upon reasonable and appropriate assumptions and methods of estimations. Petitioners claim that NIFA's use of projections of budget gaps is only proper in passing a resolution pursuant to PAL § 3667(2)(g) which is a proper trigger for exercising the control period under subdivision (1)(g) of PAL § 3669. However, according to petitioner, NIFA cannot utilize projected gaps in the budget in determining the substantial likelihood and imminence of occurrence of major operating funds deficit of one percent or more pursuant to PAL § 3669(1)(b) because that would be exercising predictive judgment' which is not provided for by statute, and that was only allowed during the interim finance period under PAL § 3667(2) which has expired. At the hearing, and in their brief, petitioners analogize to separate legislative acts enacted by the state legislature for the City of Buffalo and the County of Erie which mentioned the terms balanced budget' and projected budget gap' in determining the exercise of a control period by the state.

A fundamental rule of statutory construction when construing statutes under the same legislative act, namely section 3667 and section 3669 of the Public Authorities Law, is that the court must "take the entire act into consideration, or look to the act as a whole, and all sections of law must be read together to determine its fair meaning." (McKinney's Cons.Laws of NY, Book 1, § 97, p. 212-213). "A general expression or a single sentence detached from its context does not reveal the purpose of the statute as a whole, and particular provisions, therefore, should not be torn from their places and, so isolated, be given a special meaning at variance with the general purpose and spirit of the enactment." (McKinney's Cons.Laws of NY, Book 1, § 97, p. 214).

The NIFA act required Nassau County to comply with two separate and distinct reporting obligations. Under subdivision two of section 3667, the County was required to provide a four year financial plan during the interim finance period or control period with annual reports audited by NIFA. The financial plan was required to provide that the major operating funds of the county be balanced in accordance with generally accepted prin-

ciples. The financial plan was to be developed and approved by NIFA in accordance with the procedures established by subdivision two of section 3667. The interim finance period is defined by section subdivision 14 of section 3651 of the Public Authorities Law as follows:

**\*13** "Interim finance period" means the period of time from the effective date of this title until the date when (a) the authority shall determine, based on annual audit reports furnished in accordance with this title, that for each fiscal year, through and including fiscal year two thousand eight, that the county has adopted and adhered to budgets covering all expenditures the results of which did not show a major operating funds deficit when reported in accordance with generally accepted accounting principles, subject to the provisions of this title, and shall further determine that in the then current fiscal year there is a substantial likelihood that the results of the county's operations will not show a deficit in the major operating funds when so reported, and (b) the chief fiscal officer shall certify that securities sold by or for the benefit of the county during the fiscal year immediately preceding such date and the then current fiscal year in the general public market satisfied the financing requirements of the county during such period and that there is a substantial likelihood that such securities can be sold in the general public market from such date through the end of the next succeeding fiscal year in amounts which will satisfy substantially all of the capital and seasonal financing requirements of the county during such period in accordance with the financial plan then in effect." (McKinney's Cons.Laws of NY, Book 42, Public Authorities Law § 3651(14), 2011 Cumulative Pocket Part, p. 101).

According to that statute, the interim finance period expired in the fiscal year of 2008.

In addition to the four year financial plan, and the concomitant annual audit by NIFA with the power to issue new bonds under PAL § 3667(2) and § 3651(14), the county executive has an another reporting requirement to NIFA as stated under PAL § 3667 Subdivision 4 which, in pertinent part, provides as follows:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

"... In addition, except to the extent such reporting requirements may be modified pursuant to agreement between the authority and the county, for each fiscal year occurring during the interim finance period *or while bonds issued pursuant to this title are outstanding* (emphasis added by court), the county executive shall prepare a quarterly report of summarized budget data depicting overall trends of actual revenues and budget expenditures for the entire budget rather than individual line items and updated quarterly cash flow projections of receipts and disbursements. Such reports shall compare revenue estimates and appropriations as set forth in such budget and in the quarterly revenue and expenditure projections submitted therewith with the actual revenues and expenditures to date. Such reports shall also compare actual receipts and disbursements with the estimates contained in the cash flow projections, together with variances and their explanation ..." (McKinney's Cons.Laws of New York, Public Authorities Law, § 3667, 2011 Cumulative Pocket Part, p. 109-110).

**\*14** Therefore, subdivision four of section 3667 requires the county executive to provide quarterly reports to NIFA not only during the interim finance period but also "while bonds issued pursuant to this title are outstanding." This obligation continues even when the interim finance period has expired.

The purpose of the interim finance period as a separate and distinct reporting requirement is revealed by an examination of the legislative history of legislative enactments amending the definition of interim finance period' as specified in section 3651 subdivision 14 of the Public Authorities Law.

Under the initial legislation of chapter 84 of the laws of the year 2000, the interim finance period authorized NIFA to perform an annual audit, and to issue new bonds to finance the Tax Certiorari debt which authority was due to expire in 2004. (L.2000, Ch. 84). The explanation for the law as provided by the legislature states:

"It is further found and declared that authorization for the Nassau County Interim Finance period authority to issue debt shall be for four years only (other than any

refinancing of authority debt) and the agreements for financial and budgetary discipline between such interim finance period and the county shall be for only such interim finance period as is necessary under the standards set forth in this act to restore the county of Nassau to fiscal integrity." (New York Bill Jacket, 2000 S.B. 7930, Ch. 84).

However, the legislature amended subdivision 14 of section 3651 of the Public Authorities Law to extend the duration of the interim finance from 2002 until 2005 (2002 Sess. Law News of N.Y. CH. 528 (S.7636-A). The purpose of the 2002 legislation as stated in the Sponsor's Memorandum to the 2002 Legislation, Chapter 528, states as follows: "Section 1 amends section 3651 of the Public Authorities Law in regard to the definition of "Interim Finance Period" which extends the oversight authority of NIFA for one additional year if the county projects the need to finance property tax refunds for the year 2005." In 2003, legislation was again enacted to extend the duration of the interim finance period to 2007 with the stated purpose as follows:

"Senate Bill extends the oversight authority of the Nassau Interim Finance Authority ( NIFA). At present, NIFA has approved the County's four year financial plan, and should the Governor enact S. 5543, the *annual reporting and oversight of the County's debt management* (emphasis added by court) would continue for such time through and including fiscal year 2007...... The sole purpose and intent of this legislation is limited to the aforementioned extension of NIFA's annual reporting and oversight powers." (New York Bill Jacket, 2003 S.B. 5543, CH.314, p. 3).

The presiding county executive of Nassau County, Thomas Suozzi, opposed the legislature's proposed extension of the interim finance period to 2007 because "The extension of the interim finance period to 2007 is unnecessary and redundant. The NIFA act already contains a mechanism for continuing oversight: a control period would be triggered anytime NIFA bonds are outstanding and the County runs a negative operating Reserve Fund balance of one percent or greater....The additional oversight of an inter-

--- N.Y.S.2d ----, 2011 WL 1044556 (N.Y.Sup.), 2011 N.Y. Slip Op. 21103

**(Cite as: 2011 WL 1044556 (N.Y.Sup.))**

im finance period is, however, an additional financial burden to the County ..."

**\*15** (New York Bill Jacket, 2003 S.B. 5543, Ch. 314, p. 9).

In 2007, legislation was enacted to extend the interim finance period to 2008. (2007 Sess. Laws of N.Y. Ch. 364 (S.6014-A) (McKinney's).The Introducer's Memorandum in Support states, in pertinent part, the justification for the amendment as follows:

"This bill also amends the NIFA act to extend its authority to determine, based upon annual reports furnished in accordance with this title for each fiscal year through and including 2008, that the County adopts and carries out its plan in relation to debt management." (New York Sponsor's Memorandum, 2007 S.B. 6014A. P.2).

The Legislature's Memorandum in Support of the NIFA Act under Chapter 84 of the law of 2000 is instructive as to the legislature's intent as to the relationship between the statutes PAL § 3667 and § 3669. Under the subheading of "County Fiscal Oversight and Control," the Legislative Memorandum in Support of NIFA from the New York State Senate states, in pertinent part as follows:

"While the bill generally limits the authority oversight function to one of making recommendations, establishing financial plan guidelines and monitoring of the county's fiscal affairs ( §§ 3667-3668), the bill would impose the stricter fiscal constraints of a control period ( § 3669) ... The bill provides for regular authority review of the county's budgeting and financial plan compliance.."

(McKinney's 2000 Session Laws of New York, p. 1524).

The legislature expressed in its Legislative Findings and Declaration to Ch. 84 of the law of 2000, the NIFA Act, an ongoing state concern by stating

"It is in the public interest and is the policy of this state to assist municipalities such as the county of

Nassau in attempting to provide, without interruption, services essential to their inhabitants while meeting their obligations to the holders of their outstanding securities. The impairment of the credit of the county of Nassau may affect the ability of other municipalities in the state to issue their obligations at normal interest rates. Such effect is a matter of state concern." (McKinney's Cons Laws of New York, Book 42, Article 10-D, Historical and Statutory Notes, p. 242-243).

When subdivisions two and four of section 3667, and section 3669 of the Public Authorities Law are all construed together, a fair meaning of the NIFA act is revealed. There is no explicit statutory authority nor is there any fair meaningful interpretation of the legislative history and statutory language of those statutes that would support petitioners proposition that the control period must be exercised by NIFA during the interim finance period. The parties all agree that the interim finance period expired in 2008. However, NIFA's authority that expired in 2008 is the authority to conduct an annual audit, and to issue new debt obligations on behalf of Nassau County. (PAL § 3651[14] ). The county's obligation to submit a four year plan, and annual reports to NIFA under PAL § 3667(2) also expired. But the county still had an obligation to provide quarterly reports to NIFA under PAL § 3667(4) while bonds remained outstanding, and NIFA's authority to declare a control period under PAL § 3669(1) continued while the bonds remain outstanding.

**\*16** Petitioners rely on the case of *City of New York v. Patrolmen's Benevolent Ass'n,* (89 N.Y.2d 380 [1996] ) for the proposition in support of their position that a strict reading of the NIFA act is required to ascertain the stated purpose of the state concern. The issue in this case was whether a particular statute-Chapter 13 of the Laws of 1996-was unconstitutional because it was not enacted in compliance with the home rule requirements of Article IX, Sec. 2 of the State Constitution. At the time, the collective bargaining agreement between New York City and the defendant Patrolmen's Benevolent Association had expired on March 31, 1995 and the parties were unable to come to an agreement on a new

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- N.Y.S.2d ----, 2011 WL 1044556 (N.Y.Sup.), 2011 N.Y. Slip Op. 21103
**(Cite as: 2011 WL 1044556 (N.Y.Sup.))**

agreement. The following January, the City asked that pursuant to existing procedures an "impasse panel" be appointed to resolve the matter. At the same time the state legislature passed a law-Chapter 13-which granted to the Public Employees Relations Board (PERB) the exclusive right to resolve matters between these parties. The City maintained that the law was unconstitutional because it dealt directly with the "property, affairs or government" of the City and was not enacted to further a matter of significant state interest. The Court of Appeals agreed, holding that because this was a "special law" of New York City, and that there was not sufficient state interest, and a home rule message had not been requested, the statute was unconstitutional.

Of course, in the case before this court, the county requested and passed a home rule message which was likewise approved by the legislature and the governor. The significant state interest was clearly discernable within the home rule message itself and the legislative history of the NIFA Act. Therefore the court finds that Petitioners contention that the state interest expired at the conclusion of the interim finance period in 2008 and that the state legislature did not express a state concern within the NIFA Act is without merit, and their reliance upon the case of *City of New York v. Patrolmen's Benevolent Ass'n,* (supra) as controlling is misplaced and distinguishable from the action before this court.

The NIFA Act was enacted by the state legislature at the request of the county executive and the county legislature pursuant to the home message rule of the state constitution. (McKinney's Cons Laws of New York, Book 2, Art. 9, § 2(b)(2), p. 214). The state legislature expressed in its Legislative Findings and Declaration to Ch. 84 of the law of 2000, an ongoing state concern regarding the inhabitants of Nassau County and its obligations to the holders of their outstanding securities. (McKinney's Cons Laws of New York, Book 42, Article 10-D, Historical and Statutory Notes, p. 242-243). Furthermore, the Legislature's Memorandum in Support of the NIFA act under Chapter 84 of the law of 2000 shows the intent of the legislature to make the control period of PAL § 3669 a stricter fiscal constraint separate and apart from the constraints established under

PAL § 3667. (McKinney's 2000 Session Laws of New York, p. 1524). In addition, the letter of the former county executive Thomas Suozzi is indicative of the fact that the interim finance period imposed an additional obligation upon the County under PAL § 3667(2) to provide annual reports to NIFA in addition to the obligation that the County has to submit quarterly reports to NIFA during the interim finance period or while there are bonds outstanding. In the letter, there is a recognition by the county executive that the "The NIFA act already contains a mechanism for continuing oversight: a control period would be triggered anytime NIFA bonds are outstanding and the County runs a negative operating Reserve Fund balance of one percent or greater." (New York Bill Jacket, 2003 S.B. 5543, Ch. 314, p. 9).

**\*17** Finally, Nassau County issued bonds in December 2, 2010 for 125 million, and in November 16, 2010 for 270 million with a notice provision to potential new bond purchasers on page A-12, paragraph one, which stated "The interim finance period under the NIFA Act expired at the end of 2008," and then in paragraph 4 of that same notice stating "NIFA is further empowered to impose a control period, as defined in the NIFA Act, upon its determination that any one of the following events has occurred or that there is a substantial likelihood of its occurrence. ....(2)the County shall have incurred a major operating funds deficit of 1% or more in the aggregate in the results of operations during its fiscal year assuming all revenues and expenditures are reported in accordance with generally accepted accounting principles ("GAP") ... "(Notice of Cross-Motion, Exhibit 5, General Bond Obligation, December 2, 2010, p. A-12). Clearly as late as December of 2010, Nassau County recognized NIFA's authority to declare a control period even though the interim finance period expired.

The Court finds there is no merit to petitioners claim that NIFA should not be able to utilize a projected budget gap in determining under PAL § 3669(1)(b) that there is a substantial likelihood and imminence of the occurrence that the county shall have incurred a major operating funds deficit of one percent or more in the ag-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- N.Y.S.2d ----, 2011 WL 1044556 (N.Y.Sup.), 2011 N.Y. Slip Op. 21103
**(Cite as: 2011 WL 1044556 (N.Y.Sup.))**

gregate results of operations of such funds during its fiscal year. Petitioners state that the one percent budget deficit is not imminent' since it has not already occurred, and that NIFA should not be able to exercise the control period twenty six days into the new fiscal budget year, but should have to wait a year until the budget deficit has actually been incurred. Petitioners coin the phrase "predictive judgement" which term does not appear any where in the NIFA Act, and claim that NIFA cannot utilize predictive judgment in determining the one percent deficit for triggering the control period under PAL § 3669(1)(b).

Again, petitioners view the NIFA act piecemeal rather than as a whole. Clearly, even though the interim finance period expired, the bonds are still outstanding and the County's statutory obligation under PAL § 3667 (4) to submit quarterly reports to NIFA that contain "quarterly cash flow projections" and "quarterly revenue and expenditure projections submitted therewith with the actual revenues and expenditures" remain. (McKinney's Cons Laws of New York, Book 42, PAL § 3667(4), 2011 Cumulative Suppl., p. 110). Obviously, NIFA utilized those quarterly reports with projections for cash flow, and revenues and expenditures to reach its determination under PAL § 3669(1)(b) that there is a substantial likelihood and imminence that the County shall incur a major operating funds deficit of one percent or more in the operating funds. While petitioners are correct that the actual language of PAL § 3669(1)(b) does not use the word "projections", the quarterly reports to be submitted by the county executive to NIFA as required by PAL § 3667(4) does require the reports to contain quarterly cash flow projections as well as revenue and expenditure projections.

**\*18** It would appear that the sole purpose of the legislature requiring the County to provide said quarterly reports to NIFA would be to make use of same in determining whether it should exercise a control period under PAL § 3669(1)(b). Furthermore, the use of the word imminence" of occurrence in subdivision (1)(b) of section 3669 contemplates that the statute is forward looking in its application. The word "imminence" as defined by Websters Dictionary means something

"about to happen." Contrary to petitioners belief, a projected budget gap which signifies the County is about to incur a major operating funds deficit of one percent or more in the operating funds is a forward looking event contemplated by the statute. The statute does not state that the event under subdivision (1)(b) of section 3669 of the Public Authorities Law has had to already occur before NIFA could exercise a control period.

Finally petitioners referencing the language of other state legislative acts enacted for the City of Buffalo and Erie County in order to interpret the NIFA Act is an improper application of the rule of statutory construction. Section 97 of chapter six entitled "Construction and Interpretation" of the book of Statutes requires that the court only construe the parts of a single legislative act as a whole to determine its fair meaning and legislative intent. It does not apply to comparing separate unrelated legislative acts with one another. (McKinney's Cons.Laws of New York, Book 1, Statutes § 97, p. 211).

**ARBITRARY AND CAPRICIOUS**
The single remaining claim is that NIFA's determination is arbitrary and capricious.

"[A]n administrative determination is arbitrary and capricious when it exceeds the agency's statutory authority or [is made] in violation of the Constitution or laws of this State.' " ( Lipani v. New York State Div. of Human Rights, 56 AD3d 560, 561 [2nd Dept.2008], quoting Pasieka v. New York City Transit Authority, 31 AD3d 769, 770 [2nd Dept.2006] ); "Such an arbitrary administrative determination require[s] reversal, on the law, even though there is in the record substantial evidence to support the determination made ." (Lipani v. New York State Div. of Human Rights, supra, at p 561, quoting Matter of Charles A. Field Delivery Services Inc., 66 N.Y.2d 516, 520 [1985[).

A determination is also arbitrary and capricious if it "is without sound basis in reason and is generally taken without regard to the facts." ( Pell v. Board of Ed. of Union Free School Dist. No. 1 of Towns of Scarsdale and Mamaroneck, Westchester County, 34 N.Y.2d 222, 231 [1974] ). "[I]n a proceeding seeking judicial review

--- N.Y.S.2d ----, 2011 WL 1044556 (N.Y.Sup.), 2011 N.Y. Slip Op. 21103
(Cite as: 2011 WL 1044556 (N.Y.Sup.))

of administrative action, the court may not substitute its judgment for that of the agency responsible for making the determination, but must ascertain only whether there is a rational basis for the decision or whether it is arbitrary and capricious. Moreover, where, as here, the judgment of the agency involves factual evaluations in the area of the agency's expertise and is supported by the record, such judgment must be accorded great weight and judicial deference."

**\*19** ( *Flacke v. Onodonga Landfill Systems, Inc.,* 69 N.Y.2d 355, 363 [1987] citing *Eastern Milk Producers Co-op Assn, Inc. v. State Dept. Of Agriculture,* 58 N.Y.2d 1097 [1983]; *Matter of Fogelman v. New York State Dept. of Environmental Conservation,* 74 AD3d 809, 810 [2d Dept.2010] ).

A court may not "second-guess thoughtful agency decision making" or substitute [its] judgment for that of the agency for it is not [the Court's] role to "weigh the desirability of any action or [to] choose among alternatives." ( *Riverkeeper, Inc. v. Planning Bd. of Town of Southeast,* 9 NY3d 219, 232 [2007], quoting *Akpan v. Koch,* 75 N.Y.2d 561, 570 [1990], quoting *Jackson v. New York State Urbanl Development Co.,* 67 N.Y.2d 400 [1986]. "The courts may not weigh the evidence or reject the choice made by [an administrative agency] where the evidence is conflicting and room for choice exists.' " ( *New York City Transit Authority v. New York State Public Employment Relations Bd.,* 78 AD3d 1184, 1185 (2nd Dept.2010), quoting *Stork Restaurant v. Boland,* 282 NY256 [1940] ). In those circumstances, deference is afforded an agency's determination unless its determination is irrational or unreasonable. ( *Lacroix v. Syracuse Executive Air Service, Inc.,* 8 NY3d 348 [2007]. In fact, "[an agency] is entitled to a "high degree of judicial deference, especially when ... act[ing] in the area of its particular expertise,' " and thus petitioners bear the heavy burden of showing' that [an agency's] ... methodology is unreasonable and unsupported by any evidence.' " ( *Pinegrove Manor II, LLC v. Daines,* 72 AD3d 1096, 1097 [2nd Dept.2010], quoting *Nazarets Home of the Fransiscan Sisters v. Novello,* 7 NY3d 538 [2006], rearg den., 7 NY3d 922 [2006], quoting *Consulation Nursing Home v Commissioner of New York State Dept of Health,* 85 N.Y.2d 326, 331-332 [1995] ).

"[R]eviewing courts are not entitled to interfere in the exercise of discretion by an administrative agency unless there is no rational basis for such exercise of discretion or the action complained of is arbitrary or capricious.' " ( *Pinegrove Manor II, LLC v. Daines,* supra, at p. 1097[2nd Dept.2010] quoting *Matter of Glen Is. Care Ctr. v. Novello,* 306 A.D.2d 477, 478 [2nd Dept.2002] ).

"[J]udicial review of the propriety of any administrative determination is limited to the grounds involved by the agency in making its determination." ( *Missionary Sisters of Sacred Heart, Ill. v. New York State Div. of Housing and Community Renewal,* 283 A.D.2d 284, 288 [2nd Dept.2001] ) In affirming a determination, the court may not substitute what it considers to be a "more adequate or proper basis" for it. (*Montauk Imp., Inc. v. Proccacino,* 4 N.Y.2d 913, citing *Securities and Exchange Commission v. Chenery Corp,* 322 U.S. 194 [1947] ).

Nevertheless, "[a] determination of an administrative agency that neither adheres to its own prior precedent nor indicates its reason for reaching a different result on essentially the same facts is arbitrary and capricious." ( *Corona Realty Holdings, LLC v. Town of North Hempstead,* 32 AD3d 393, 395 [2nd Dept.2006], *Al Turi Landfill, Inc. v. New York State Department of Environmental Conservation,* 289 A.D.2d 231 [2nd Dept.2001] *affd.,* 98 N.Y.2d 758 [2002] ). "An agency's failure to provide a valid and rational explanation for its departure from its prior precedent mandates a reversal, even though there may be substantial evidence in the record to otherwise support the determination." (*Corona Realty Holdings, LLC v. Town of North Hempstead, supra,* at p. 395, quoting; *see also, Lucas v. Board of Appeals of Village of Mamaroneck,* 57 AD3d 784, 785-786 [2nd Dept.2008] ). "Where, however, [an agency] provides a rational explanation for reaching a different result on similar facts, the determination will not be viewed as either arbitrary or capricious." ( *In re Waidler,* 63 AD3d 953, 954 [2d Dept 2009] quoting *Matter of Berk v. McMahon;* 29 AD3d 902, 903 [2d Dept 2006], citing. Accordingly, "[e]ven where there has been a reversal of a prior administrative decision, it

--- N.Y.S.2d ----, 2011 WL 1044556 (N.Y.Sup.), 2011 N.Y. Slip Op. 21103
**(Cite as: 2011 WL 1044556 (N.Y.Sup.))**

will be upheld if the proffered reasons for the reversal or modification find rational support." ( *Stahl York Ave. Co., LLC v.. City of New York,* 76 AD3d 290, 296 [1st Dept.2010], lv den., 15 NY3d 714 [2010] ). An agency "may refuse to duplicate previous error; it may change its views as to what is the best interests of [its governed]; it may give weight to slight differences which are not easily discernible.' " (*In re Waidler,* supra, at p. 954 [2009], quoting *Knight v. Amelkin,* 150 A.D.2d 528 [2nd Dept.1989] ).

**\*20** Furthermore, where the pertinent facts are not essentially the same and are "markedly different," the agency is not required to distinguish its determination from its prior holdings. (*See, Mohawk Valley Organics, LLC v. New York State Dept. of Environmental Conservation,* 13 AD3d 938 [3rd Dept.2004], *lv den.,* 5 NY3d 704 [2005] ). The rule "does not ... require the [agency] to explicitly distinguish in its written decision each and every arguably similar case that it previously has decided." ( *In re Westney,* 262 A.D.2d 894 [3rd Dept.1999]; *Claim of Blount,* 217 A.D.2d 879, 8780 [3rd Dept.1995] ). "[D]espite some similarities between [a] matter ... and the prior cases, ... [a] decision ultimately reached by [an agency] is not inconsistent [if the matter] is sufficiently distinguishable" from the prior ones. (*In re Westney, supra* at p. 895.)

This court is not insensitive to the fact that NIFA's review appears to have become more stringent this year in comparison to the past. It is clear that some of the County's budgeting practices which NIFA previously allowed to one extent or another and on which the County clearly relied in drafting its budget were not permitted this year. In fact, it is questionable whether a control period would have been imposed if prior practices had been followed. Nevertheless, NIFA's determination appears to be supported by the record and the divergent methods employed here have been justified by both the present facts as well as NIFA's reasoning.

The determination that "there exist[ed] a substantial likelihood and imminence of the County incurring a major operating funds deficit of one percent or more in the aggregate results of operations during its fiscal year 2011 assuming all revenues and expenditures are repor-

ted in accordance with GAAP does not appear to be arbitrary and capricious. The County's budget totals $27 billion so a $27 million deficit requires NIFA's imposition of a control period under the Act. NIFA's conclusion in September 2010 that the risky revenues and savings totaled $244.4 million is grounded in sound accounting practice. Even when adjusted so as to allow certain revenues or savings which NIFA deemed risky, some of which were identified post-submission of the budget, a likelihood of a deficit greater than one percent remains. In fact, even the County's own Comptroller and Independent Budget Review Office have forecast similar deficits.

Contrary to the County's argument, whether there is a substantial likelihood and imminence of a one percent or greater deficit can and in fact ought to be determined now, not in February 2012 when the deficit will have already occurred. As the County maintains, the plain meaning of "substantial likelihood" is "considerably probably" and the plain meaning of "imminence" is "certain and very near, impending and on the point of happening...." To interpret Public Authorities Law § 3669(1)(b) as requiring NIFA to wait until the fiscal year is over to determine whether a one percent or larger deficit is substantially likely or imminent as the County would have this court do not only makes no sense, it contravenes the very purpose of the Act. Such an interpretation is in derogation of the principles of statutory interpretation as it essentially strips section 3669(1)(b) of the Act of its clear meaning.

**\*21** The County's reliance on its ability in prior years to avert the consequences of revenues and savings deficits that NIFA had found at risk and to end with a balanced budget hardly establishes that it is likely that it will be successful in doing so this year. More importantly, it does not establish that NIFA's present projection is unfounded. That conclusory assertion fails to establish that NIFA's finding is arbitrary and capricious.

Similarly unavailing is the County's reliance on Public Authorities Law § 3667(1) which, with specific limitations, permitted it to include funds borrowed to pay tax certiorari obligations as operating revenues from 2001 through 2007. The statute's silence with re-

spect to the County's right to continue that practice hardly establishes an unfettered right to do so. Rather, it is the requirement set forth in the Act to adhere to GAAP that governs and its application precludes that practice. Indeed, the allowance of that practice that was set forth in the statute was obviously done to enable an end run around the application of GAAP during those years. Furthermore, NIFA historically gradually required the County to employ at least in part PAYGO to pay tax certiorari obligations, to the tune of $150 million in 2008, 2009 and 2010. It was the County's attempt to completely reverse this process in 2011 which NIFA simply could not permit.

The County's complaint that NIFA'S disallowance of borrowed funds as operating revenue constituted an about face by NIFA is refuted throughout NIFA's public records. It repeatedly cautioned the County that this was in contravention of the goals of the Act and must be phased out.

The fact that NIFA allowed the County to budget a portion of funds borrowed for tax certiorari obligations as operating revenues in 2008-2010 does not establish that NIFA'S determination regarding the 2011 budget is incorrect, either. Not only does the projected deficit for 2011 exceed one percent even were the $100 million in borrowed funds permitted to count as operating revenues, which was not the case in 2008, NIFA is simply not precluded from correcting an egregious albeit inexplicable error of that magnitude; an error contributed to by representations by the County's bond counsel which was promoted by the County Attorney's office.

Moreover, as for NIFA'S alleged divergence from its prior practices and policy, not only are the facts here markedly different than in the past thereby disposing with the need for any explanation or distinction by NIFA, even were one required, it has been adequately provided. The present potential deficit is far greater than in 2008, 2009 and 2010 in which years the published risks were approximately $60 million. In fact, in 2009 NIFA expressed concern about 125.3 million in net risks which the County in response reduced to $53.4 million. In 2010, the permitted net risk was reduced to $62.1 million from $129.6 million. Now, not only has

the County abandoned PAYGO for its payment of tax certiorari obligations, the risks, even when cautiously amended, are $149 million. And, unlike in prior years, the county has been unable to assuage NIFA's concerns. The county's practice of borrowing funds for tax certiorari obligations and budgeting them as operating revenue was clearly in the process of being phased out but in the 2011 budget has returned to 100% borrowing. Similarly, reserves have fallen to unprecedented lows. To characterize NIFA's act in imposing a control period as in direct contravention of its prior positions would be inaccurate. As for the County's complaints that NIFA acted in defiance of the Act by failing to assist it by making recommendations, the Act does not require that as a prerequisite to the imposition of a control period.

**\*22** The County's reliance on the distinction between the NIFA Act and similar Acts which govern the cities of Buffalo and the County of Eerie in which a control period is permitted to be imposed if those entities fail to adopt a balanced budget fails. (See, New York Public Authorities Law Sec. 3959(1)(a); and 3858(1)(a)). Clearly, the authority's power to impose a control period in those municipalities is greater than in Nassau County. Nevertheless, what justifies the imposition of a control period here is a finding that there exists a substantial likelihood and imminence of the county incurring a major operating funds deficit of one percent or more in the aggregate results of operations during its fiscal year 2011 applying GAAP. (Public Authorities Law § 3669(1)(b)). Interpreting the Act as permitting NIFA to impose a control period does not violate any principles of statutory construction: NIFA is not being permitted to impose a control period based solely on the county's failure to adopt a balanced budget; rather, it is based upon the substantial likelihood and imminence of a one percent deficit.

In conclusion, the County has not sufficiently established a likelihood of success on the merits to entitle it to injunctive relief. Furthermore, whether the County would sustain irreparable harm absent injunctive relief is highly questionable. Indeed, on January 28, 2011, two days after NIFA declared the imposition of a control period, Moody's declared "NIFA's exercise of its right

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- N.Y.S.2d ----, 2011 WL 1044556 (N.Y.Sup.), 2011 N.Y. Slip Op. 21103

**(Cite as: 2011 WL 1044556 (N.Y.Sup.))**

to move to a hard controls board from an advisory board is a credit positive for the County as it should help stabilize financial operations. However, if the County executive challenges the legality of the boards right to move to hard control ... the County could enter into a period of greater budgetary and liquidity stress until the dispute is resolved.. In the event the executive files a legal challenge to the boards right to observe additional control, the rating may be placed on review for possible downgrade."

And, in this court's view, a balancing of the equities tips decidedly in favor of NIFA. To prevent it from exercising the powers it has been entrusted with by the NIFA Act to employ which after careful thought and a detailed thorough analysis it has found to be required to do by the Act would essentially render it powerless. Indeed, under the circumstances, injunctive relief would cast a shadow over the power of state agencies in general.

**CONCLUSION**

The County's motion for a preliminary injunction is denied.

The Act was enacted pursuant to a Home Rule Message from the County and therefore was not required to be enacted and reenacted in the subsequent year pursuant to Article IX, Section 2(b)(1) of the New York State Constitution. In any event, a substantial state concern was articulated in the history of the Act. The County's claim that the Act is unconstitutional fails and is dismissed pursuant to CPLR 3211(a)(1).

The time during which NIFA may impose a control period under the Act on the grounds relied on by NIFA, Public Authorities Law § 3669(1)(b), has not expired. Accordingly, the County's claim that NIFA lacks the authority to impose a control period under the Act also fails and is dismissed pursuant to CPLR 3212(a)(1).

**\*23** The County has advanced a valid claim insofar as it maintains that NIFA's determination that "there exist[ed] a substantial likelihood and imminence of the County incurring a major operating funds deficit of one percent or more in the aggregate results of operations

during its fiscal year 2011 assuming all revenues and expenditures are reported in accordance with [GAAP]" is arbitrary and capricious. That claim is not subject to dismissal pursuant to CPLR § 3211(a)(1), nor is it subject to dismissal pursuant to CPLR § 3211(a)(7) as the allegations, to which this court's review is limited on such an application, advance a viable claim. (See, *Scott v. Commissioner of Correctional Services,* 194 A.D.2d 1042 [3rd Dept.1993], citing *Nationwide Cellular Services, Inc. v. Public Service Com'n of State of NY,* 180 A.D.2d 24 [3rd Dept.1992], *lv den.,* 80 N.Y.2d 757[1992]. Nevertheless, pursuant to CPLR § 3211(c), NIFA's motion to dismiss the County's claim that its determination is arbitrary and capricious is hereby converted to a motion for summary judgment. The County is directed to serve and submit its opposition thereto on or before March 29, 2011 and NIFA is directed to submit a Reply on or before April 18, 2011, on which date the matter will be submitted for decision. *See, ( Nassau BOCES Cent. Council of Teachers by Dreaper on Behalf of Adult Educ. Instructors v. Board of Co-op. Educational Services of Nassau County,* 63 N.Y.2d 100 [1984]; *230 Tenants Corp. v. Board of Standards and Appeals of City of New York,* 101 A.D.2d 53 [1st Dept.1984] ).

This constitutes the decision and order of this Court.

N.Y.Sup.,2011.

County of Nassau v. Nassau County Interim Finance Authority

--- N.Y.S.2d ----, 2011 WL 1044556 (N.Y.Sup.), 2011 N.Y. Slip Op. 21103

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

```
 1  UNITED STATES DISTRICT COURT

 2  EASTERN DISTRICT OF NEW YORK
    ---------------------------------------------x
 3  ACORN (THE NEW YORK ASSOCIATION OF
    COMMUNITY ORGANIZATIONS FOR REFORM
 4  NOW), MHANY Management Inc., VIC DEVITA,
    FRANCINE MCCRAY,
 5
                           Plaintiffs,
 6
            vs.
 7
    COUNTY OF NASSAU, INCORPORATED VILLAGE
 8  OF GARDEN CITY, AND GARDEN CITY BOARD OF
    TRUSTEES,
 9
                           Defendants.
10  ---------------------------------------------x

11

12                         One West Street
                           Mineola, New York
13
                           September 28, 2009
14                         10:08 a.m.

15

16        DEPOSITION of CARL SCHROETER, taken by

17  Plaintiffs, pursuant to Notice, before

18  Jeffrey Benz, a Certified Realtime Reporter,

19  Registered Merit Reporter and Notary Public within

20  and for the State of New York.

21

22

23        ELLEN GRAUER COURT REPORTING CO. LLC
             126 East 56th Street, Fifth Floor
24                New York, New York 10022
                       212-750-6434
25                     REF: 94804
```

```
 1   A P P E A R A N C E S:

 2

 3   HOGAN LOVELLS US LLP

 4   Attorneys for Plaintiffs

 5        875 Third Avenue
         New York, New York 10022
 6
     BY:  SABRINA H. COCHET, ESQ.
 7             - AND -
         ANDREW J. SEIN, ESQ.
 8       212-918-3000 (Telephone)
         sabrina.cochet@hoganlovells.com (E-mail)
 9       212-918-3100 (Fax)

10

11

12   LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

13   Attorneys for Plaintiffs

14        1401 New York Avenue, NW
         Washington, DC   20005
15
     BY:  ABIGAIL SHAFROTH, ESQ.
16       202-662-8342 (Telephone)

17

18

19   NASSAU COUNTY OFFICE OF THE COUNTY ATTORNEY

20   Attorneys for Defendant County of Nassau

21        One West Street
         Mineola, New York   11501
22
     BY:  RALPH J. REISSMAN, ESQ.
23       Deputy County Attorney
         516-571-3046 (Telephone)
24       rreissman@nassaucountyny.gov (E-mail)
         516-571-6604 (Fax)
25
```

```
 1   A P P E A R A N C E S (Cont'd):

 2

 3   CULLEN and DYKMAN LLP

 4   Attorneys for Defendant Garden City

 5        100 Quentin Roosevelt Boulevard
          Garden City, New York   11530
 6
     BY:  DOUGLAS J. BOHN, ESQ.
 7        516-357-3879 (Telephone)
          dbohn@cullenanddykman.com (E-mail)
 8        516-296-9155 (Fax)

 9

10   ALSO PRESENT:

11        VINCENZO PETULLA, Videographer

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          SCHROETER

2    hearing rooms, you know, how many offices for the

3    court officers, the County Attorneys, the

4    probation people, you know, the public areas of a

5    courthouse.

6              So we had a -- an architect doing the

7    program design, and with the program design that

8    could fit in the different scenarios, different

9    buildings.

10        Q.   Okay.  And so one of the options you

11   were considering was staying on the site either by

12   constructing a brand-new courthouse or renovating

13   and extending the --

14        A.   There was no way we could renovate and

15   extend, you know, the current building, but one of

16   the -- we had a couple of different scenarios over

17   there, but most of them involved building a new --

18   a new courthouse and then moving in there, and

19   then perhaps renovating the old section or

20   demolishing it for parking.

21        Q.   Did you also consider moving the family

22   court to another location?

23        A.   There were several other locations that

24   were reviewed and considered, and in fact, when

25   the election came, no final decision had been made

```
 1                          SCHROETER
 2   on the family court, the time ran out for the
 3   Suozzi administration to make a decision.
 4        Q.   So this started -- this process started
 5   in 2007, and --
 6        A.   I want to say -- it could have been as
 7   early as 2005, 2006, but it was, you know, a two-
 8   or three-year process.
 9        Q.   Okay.
10        A.   And that ended with the new
11   administration coming in, which happened January
12   2010, that process I'm talking about, and I'm sure
13   we'll get to the Mangano process.
14        Q.   Was -- at that time in the 2007, 2008
15   period, was -- did the County consider whether
16   it -- it could move the family court to 101 County
17   Seat Drive?
18        A.   Those -- there was an option.
19        Q.   Was it a preferred option?
20             MR. REISSMAN:   Objection to the form of
21        the question.
22        A.   The -- you know, it was an evolving
23   process, like I said, no decision was made, and
24   the Suozzi administration, you know, had run out
25   of time.  I can't predict how -- you know, if --
```

38

1                          SCHROETER
2    what conclusion they would have come to.
3         Q.   So you're telling me that Mr. Suozzi
4    never made the decision not to move the family
5    court to 101 County Seat Drive?
6         A.   There was never a decision made how to
7    solve the county -- the family court problem by
8    the Suozzi administration.  There was never a
9    final decision.
10        Q.   Okay.
11        A.   There were -- might have narrowed from
12   the eight options to three options, but there was
13   never a final decision made.
14        Q.   Can you tell me what were the issues,
15   and by that I mean the problems or concerns that
16   the County had, with moving the family court to
17   the -- the option of moving the family court to
18   101 County Seat Drive?
19        A.   I'm sorry, I missed the key word in
20   there.  What was --
21        Q.   Of course, no problem, I'll rephrase.
22             When the County was considering
23   different options, I'm guessing it was considering
24   the pros and cons of each option.  And my question
25   is:  What were the pros and cons of moving the

1                          SCHROETER

2              But the current zoning is that

3    residential zoning.  There's two different

4    zonings, one for one side of the street and one

5    for the other side of the street.

6         Q.  Will the County need to seek a new

7    zoning from Garden City in order to renovate or

8    construct a placement for the family court on 101

9    County Seat Drive?

10        A.  My opinion -- I'm not a lawyer.  My

11   opinion is that the County would have the right to

12   do that without a rezoning.  I have been involved

13   with several meetings where this was discussed,

14   and, you know, we feel as though that, you know,

15   it's consistent with the use in the area, and that

16   we have the authority to take one of our buildings

17   and use it for a government use that's not

18   inconsistent with the area.

19             We have -- I think I said we have

20   matrimonial court -- county court, where we do a

21   lot of criminal work, Supreme Court, where most of

22   the civil work is done, and matrimonial I guess is

23   somewhere in the middle.  But, no, to use this as

24   a courthouse would not -- in my personal opinion

25   we would not have to seek a rezoning.

```
1                C E R T I F I C A T E
2
3    STATE OF NEW YORK )
4                     )  Ss.:
5    COUNTY OF NASSAU )
6
7         I JEFFREY BENZ, a Certified Realtime
8    Reporter, Registered Merit Reporter and Notary
9    Public within and for the State of New York, do
10   hereby certify:
11        That the witness whose examination is
12   hereinbefore set forth was duly sworn by me and
13   that this transcript of such examination is a true
14   record of the testimony given by such witness.
15        I further certify that I am not related to
16   any of the parties to this action by blood or
17   marriage and that I am in no way interested in the
18   outcome of this matter.
19        IN WITNESS WHEREOF, I have hereunto set my
20   hand this 8th of October, 2010.
21
22
23
24   --------------------------
25   JEFFREY BENZ, CRR, RMR
```



1  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK
2  - - - - - - - - - - - - - - - - - - - - X
   MHANY MANAGEMENT, INC., VIC DEVITA,
3  and FRANCINE MCCRAY,

4
                          Plaintiffs,
5
              -and-
6

7  NEW YORK COMMUNITIES FOR CHANGE,
   INC.,
8

9                         Plaintiff-Intervenor,

10
              -against-            05-CV-2301
11                                 (ADS)(WDW)

12
   COUNTY OF NASSAU, INCORPORATED
13  VILLAGE OF GARDEN CITY, and GARDEN
   CITY BOARD OF TRUSTEES,
14

15
                          Defendants.
16  - - - - - - - - - - - - - - - - - - - - X

17
                          February 1, 2011
18                        10:15 a.m.

19                        556 Peninsula Boulevard
                          Hempstead, New York
20

21      DEPOSITION of DIANE GOINS, the witness herein,

22  taken by the attorneys for Defendants, Pursuant to

23  Notice, held at the above-mentioned time and place,

24  before Alec Dazenski, a Notary Public in and for the

25  State of New York.


                    SEVERIN & ASSOCIATES, INC.
                        1 South View Court
                     Bayville, New York  11709
               TEL. (516) 628-1402 - FAX (516) 628-0423

2

1   A P P E A R A N C E S:

2

3           LAWYERS' COMMITTEE FOR CIVIL RIGHTS
            UNDER LAW
4                   Attorneys for Plaintiff
                    MHANY MANAGEMENT, INC. and NEW YORK
5                   COMMUNITIES FOR CHANGE, INC.
                    1401 New York Avenue, N.W.
6                   Suite 400
                    Washington, D.C. 20005-2124
7
            BY:  JOSEPH D. RICH, ESQ.
8           BY:  IZUKANNE EMEAGWALI, ESQ.

9

10          HOGAN LOVELLS
                    Attorneys for Plaintiffs
11                  VIC DEVITA and FRANCINE MCCRAY
                    875 Third Avenue
12                  New York, New York  10022

13          BY:  LUZ MARIA HENRIQUEZ, ESQ.

14

15          OFFICE OF THE COUNTY ATTORNEY
                    Attorney for COUNTY OF NASSAU
16                  One West Street
                    Mineola, New York  11501
17
            BY:  RALPH REISSMAN, Deputy County Attorney
18

19

20          CULLEN and DYKMAN, LLP
                    Attorneys for Defendants
                    INCORPORATED VILLAGE OF GARDEN CITY
21                  and GARDEN CITY BOARD OF TRUSTEES
                    100 Quentin Roosevelt Boulevard
22                  Garden City, New York  11530

23          BY:  CYNTHIA AUGELLO, ESQ.

24

25                  ***     **     ***


                    SEVERIN & ASSOCIATES, INC.
                        1 South View Court
                    Bayville, New York  11709
            TEL. (516) 628-1402 - FAX (516) 628-0423

Goins - Direct                    42

```
2        read back by the Reporter.)
3        A    Why not?  It's a property that could
4  have been -- like I said, part of it could have
5  been for affordable housing, so why not?
6        Q    Did you know specific people who
7  wanted to move there?
8        A    I would want to move there, let's talk
9  about me because specifically I would want to
10 move there.  I've lived on Long Island all my
11 life and to be able to live in the area where
12 services are good and safe, it would be a great
13 opportunity to live there, where you can step
14 outside and you don't have to have your neighbor
15 call to make sure you made it to your car.  So
16 yes, let's talk about me.
17       Q    That's perfect, that's pretty much
18 where I was going.  For safety you would want
19 to live there; there being Garden City just in
20 general?
21       A    There being Garden City, there being
22 East Meadow, there being Levittown, all the areas
23 that safety is not an issue like where I live.
24       Q    So basically outside of Hempstead?
25       A    Yes.  It could be anywhere.
```



SEVERIN & ASSOCIATES, INC.   *   (516) 628-1402

69

1

2          C E R T I F I C A T E

3

4          I, Alec Dazenski, a Notary Public in and

5     for the State of New York, do hereby certify:

6          That the testimony of DIANE GOINS was held

7     before me at the aforementioned time and place.

8          That said witness was duly sworn before the

9     commencement of the testimony; that the testimony

10    was taken stenographically by me and then

11    transcribed under my direction; that the parties

12    were represented by Counsel as appears herein.

13         That the within transcript is a true record

14    of the Examination Before Trial of said witness.

15         That I am not connected by blood or

16    marriage with any of the parties.  I am not

17    interested directly or indirectly in the matter

18    in controversy, nor am I in the employ of any of

19    the Counsel.

20         IN WITNESS WHEREOF, I have hereunto set my

21    hand this 9th day of February 2011.

22

23

24                              Alec Dazenski

25

SEVERIN & ASSOCIATES, INC.   *   (516) 628-1402

**JA 3051**



Hogan
Lovells

Hogan Lovells US LLP
875 Third Avenue
New York, NY 10022
T +1 212 918 3000
F +1 212 918 3100
www.hoganlovells.com

August 18, 2011

**By Electronic Mail**

Ralph Reissman
Office of the Nassau County Attorney
One West Street
Mineola, NY 11501-4820

Re: *MHANY Management Inc. v. County of Nassau*, No. 05-cv-2301

Dear Mr. Reissman:

On July 26, 2011, Judge Wall ordered that "Defendant Nassau County is, of course, under a continuing duty to provide documents responsive to prior demands and thus, to the extent any such demands exists, defendant must supplement its responses." (Dkt. No. 276.)

We have not yet received supplemented responses, as ordered by the Court. I remind you that documents and communications regarding Nassau County's final decision to re-locate its family courthouse to the Social Services Site, rather than sell the Social Services Site to generate revenue for the County, are directly responsive to Plaintiffs' Fourth Request for Production of Documents to Defendant County of Nassau, dated July 12, 2010.

By way of example only, the County has provided no documents and communications regarding the required NIFA approval for the family court project at the Social Services Site. And though the County provided the "Contract Details" of the LiRo Program and Construction Management, P.C. contract, the County has not provided the contract itself. Nor has the County provided any communications or documents regarding the required bonding for the project, other than a portion of the County's Capital Improvement Plan for 2011-2013. Perhaps most importantly, the County has provided no recent communications or documents (including electronic documents, such as emails) regarding the final decision itself; the last production Plaintiffs received from the County in response to the Fourth Request was in September of 2010. The County has been similarly derelict in supplementing its responses to the Fourth Request as regards the Ring Road Site; Plaintiffs have received no documents *at all* regarding the status of the Ring Road Site since September of 2010.

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia. Hogan Lovells refers to the international legal practice comprising Hogan Lovells US LLP, Hogan Lovells International LLP, Hogan Lovells Worldwide Group (a Swiss Verein), and their affiliated businesses with offices in: Abu Dhabi Alicante Amsterdam Baltimore Beijing Berlin Brussels Caracas Colorado Springs Denver Dubai Dusseldorf Frankfurt Hamburg Hanoi Ho Chi Minh City Hong Kong Houston London Los Angeles Madrid Miami Milan Moscow Munich New York Northern Virginia Paris Philadelphia Prague Rome San Francisco Shanghai Silicon Valley Singapore Tokyo Ulaanbaatar Warsaw Washington DC Associated offices: Budapest Jeddah Riyadh Zagreb

Ralph Reissman                          - 2 -                          August 18, 2011

       We expect that you will produce responsive documents no later than August 24, 2011. Failure to produce responsive documents is a direct violation of the Court's July 26, 2011 order.

Sincerely,

Stanley J. Brown

Partner
stanley.brown@hoganlovells.com
D +1 212 918 3692

Enclosures

cc:    James G. Ryan, Jennifer A. McLaughlin, Joseph D. Rich, Linda Mullenbach, Frederick Brewington

# Hogan Lovells

Hogan Lovells US LLP
875 Third Avenue
New York, NY 10022
T +1 212 918 3000
F +1 212 918 3100
www.hoganlovells.com

August 29, 2011

**By Electronic Mail**

Ralph Reissman
Office of the Nassau County Attorney
One West Street
Mineola, NY 11501-4820

Re:  *MHANY Management Inc. v. County of Nassau*, No. 05-cv-2301

Dear Mr. Reissman:

I write in response to your letter dated August 18, 2011, in which you claim that the County's entire supplementation of its September 2010 document production consists of *one document*, notwithstanding that since that time, the County allegedly finalized a decision to move the Nassau County family court building (the "Family Court") to the Social Services Site – a decision that is highly relevant to this matter, and one that the County has testified would require the completion of various legislative and logistical procedures.

It is clear that when Nassau County last produced documents in this matter, the County had made no final decision on whether to move the Family Court building to the Social Services Site, as opposed to selling the Site to generate revenue for the County.  On September 10, 2010, Carl Schroeter, testifying on behalf of the County, unequivocally stated that the decision to make such a move had not been finalized, and he went on to describe the various steps and procedures required for such finalization to occur.  (*See, e.g.,* Transcript of 9/28/2010 Deposition of C. Schroeter 77:8-14; 92:2; 99:11; 117:19-118:9; 142:16-20; 146:14-20).  It is equally clear that the County is now asserting that, not only is the decision to move the Family Court to the Social Services Site final, this "final" decision now moots Plaintiffs' entire case.

Despite this significant change in Nassau County's position and – by the County's own admission – the number of measures such change would require, the County had not produced any documents reflecting the finalization of the decision to move the Family Court.  Accordingly, I wrote to "remind" you that documents and communications regarding Nassau County's final decision to re-locate its Family Court to the Social Services Site are directly responsive to Plaintiffs' Fourth Request for Production of Documents to Defendant County of Nassau, dated July 12, 2010.  Under the Federal Rules and the Court's July 26, 2011 order, Nassau County was required to supplement its responses to our discovery requests.

You responded in less than five hours with a "document production" consisting of a single contract.

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia.  Hogan Lovells refers to the international legal practice comprising Hogan Lovells US LLP, Hogan Lovells International LLP, Hogan Lovells Worldwide Group (a Swiss Verein), and their affiliated businesses with offices in: Abu Dhabi  Alicante  Amsterdam  Baltimore  Beijing  Berlin  Brussels  Caracas  Colorado Springs  Denver  Dubai  Dusseldorf  Frankfurt  Hamburg  Hanoi  Ho Chi Minh City  Hong Kong  Houston  London  Los Angeles  Madrid  Miami  Milan  Moscow  Munich  New York  Northern Virginia  Paris  Philadelphia  Prague  Rome  San Francisco  Shanghai  Silicon Valley  Singapore  Tokyo  Ulaanbaatar  Warsaw  Washington DC  Associated offices: Budapest  Jeddah  Riyadh  Zagreb

Plaintiffs find it inconceivable that, if the County has in fact rendered a final decision to move its Family Court to the Social Services Site, there would only be *one single document* related to this decision. Surely there are, at the very least, emails, memoranda and correspondence among those with responsibility to make and implement such a determination, including with the Nassau County Interim Finance Authority, the entity that must approve all significant County contracts and bonding.

We therefore repeat our demand that you *search for* all responsive documents and produce the same by September 2, 2011. This search should include all custodians involved in the decision, up to and including the County Executive. If it is your position that such search was already conducted, you should confirm this in writing with a description of how and where the search was conducted, which custodians' files were searched, and what search terms, if any, were given to the County's IT department so that an adequate search of relevant emails and other electronically stored documents could be conducted. We also expect an up-to-date privilege log reflecting all responsive documents that are being withheld on privilege grounds. Failure to do so will leave us no choice but to`move to compel.

Sincerely,

Stanley J. Brown

Partner
stanley.brown@hoganlovells.com
D +1 212 918 3692

Enclosures

cc:    James G. Ryan, Jennifer A. McLaughlin, Joseph D. Rich, Linda Mullenbach, Frederick Brewington

## CERTIFICATE OF SERVICE

I, Michael A. Carvin, hereby certify that on August 1, 2014, I filed an electronic copy of the foregoing JOINT APPENDIX and SPECIAL JOINT APPENDIX on the Court's ECF service, which caused it to be served on all other parties or their counsel of record.


/s/ Michael A. Carvin
Michael A. Carvin


Dated: August 1, 2014