# 14-1634(L) &
## 14-1729(XAP)

## United States Court of Appeals for the Second Circuit

MHANY MANAGEMENT, INC., AKA NEW YORK ACORN HOUSING
COMPANY,

*Plaintiff – Appellee – Cross-Appellant*,

NEW YORK COMMUNITIES FOR CHANGE, INC.,

*Intervenor – Plaintiff – Appellee – Cross-Appellant*,

ACORN, THE NEW YORK ASSOCIATION OF COMMUNITY
ORGANIZATIONS FOR REFORM NOW, DAPHNE ANDREWS, VIC
DEVITA, VERNON GHULLKIE, NATALIE GUERRIDO, NEW YORK
ACORN HOUSING COMPANY, INC., LISBETT HUNTER, FRANCINE
MCCRAY,

*Plaintiffs*

v.

COUNTY OF NASSAU, COUNTY OF NASSAU PLANNING COMMISSION,
COUNTY OF NASSAU OFFICE OF REAL ESTATE & DEVELOPMENT

*Defendants – Cross-Appellees*,

INCORPORATED VILLAGE OF GARDEN CITY, GARDEN CITY BOARD
OF TRUSTEES,

*Defendants – Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK (SPATT, D.J.)

**DEFENDANTS-APPELLANTS' BRIEF ON APPEAL**

*Counsel Listed on Inside Cover*

Michael Carvin
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC  20001
(202) 879-3939

*Attorney for Defendants –
Appellants*

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ...................................................1

STATEMENT OF THE ISSUES.....................................................1

STATEMENT OF THE CASE ........................................................2

    A.    The Social Services Site And BFJ's Initial Proposals ..............4

    B.    Local Residents Express Ordinary Concerns About The Development ..................................................................7

    C.    The Village Adopts A Less Dense Zoning Proposal ..............11

    D.    The County Announces Its Intent To Sell The Site ................13

    E.    This Litigation....................................................................13

SUMMARY OF ARGUMENT .......................................................16

STANDARD OF REVIEW ............................................................20

ARGUMENT ..............................................................................20

I.    THERE IS NO JUSTICIABLE CONTROVERSY BECAUSE THERE NEVER WOULD HAVE BEEN AFFORDABLE HOUSING AT THE SITE REGARDLESS OF THE VILLAGE'S DECISION. ...............................................20

    A.    This Case Is Moot Because The County's Decision Eliminated Any Cognizable Present Or Future Harm To Plaintiffs. ..........................................................................22

    B.    Because The County Always Intended To Sell To The Highest Bidder, Plaintiffs Never Could Have Built Or Resided In Affordable Housing At The Site Anyway. ...........29

II.    DEFENDANTS DID NOT KNOWINGLY RESPOND TO RACIST OPPOSITION IN ADOPTING R-T ZONING.................32

    A.    The District Court Held Defendants Liable Merely Because Public Opposition "Could Have Been Construed" As Racially Motivated. .........................................33

    B.    Defendants Did Not Knowingly Respond To Racist Feedback. ..........................................................................38

        1.    There was no evidence that opposition to affordable housing was racially motivated...................38

i

# TABLE OF CONTENTS
(continued)

**Page**

    2.    Concerns about higher-density development, not fears about affordable housing, drove public opposition. ............................................................40

    3.    Nothing in the process leading up to the decision or the substance of that decision suggests Defendants must have been acting in knowing response to racist input. ...................................43

  C.   The District Court Wrongly Put The Burden On Defendants To Prove They Would Have Made The Same Decision. .................................................46

III.   PLAINTIFFS' DISPARATE IMPACT CLAIM FAILS BECAUSE THE VILLAGE'S ISOLATED DECISION TO ADOPT R-T ZONING WAS THE LEAST DISCRIMINATORY MEANS OF MEETING ITS GOALS. ..........50

  A.   Disparate Impact Liability Must Be Carefully Limited To Avoid Judicial Micromanagement Of Every Zoning Decision. .................................................51

  B.   Disparate Impact Plaintiffs May Not Challenge A Single, Isolated Decision. .....................................55

  C.   R-T Zoning Was The Least Discriminatory Means For Serving The Village's Legitimate Interests ...........58

CONCLUSION ............................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Acevedo v. Nassau Cnty., N.Y.*,
 500 F.2d 1078 (2d Cir. 1974) ....................................................23

*Arizonans for Official English v. Arizona*,
 520 U.S. 43 (1997)......................................................................24

*Baltimore Neighborhoods, Inc. v. LOB, Inc.*,
 92 F. Supp. 2d 456 (D. Md. 2000)..............................................27

*Boyd v. Lefrak Org. & Life Realty, Inc.*,
 509 F.2d 1110 (2d Cir. 1975) ......................................................38

*Brown v. City of Oneonta*,
 221 F.3d 329 (2d Cir. 1999) ........................................................50

*Cabrera v. Jakabovitz*,
 24 F.3d 372 (2d Cir. 1994) ..........................................................47

*Cifra v. Gen. Elec. Co.*,
 252 F.3d 205 (2d Cir. 2001) ........................................................20

*City of Los Angeles v. Lyons*,
 461 U.S. 95 (1983)......................................................................27

*Cook v. Colgate Univ.*,
 992 F.2d 17 (2d Cir. 1993) ..........................................................24

*Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*,
 316 F.3d 357 (2d Cir. 2003) ........................................................30

*Fox v. Bd. of Trs. of State Univ. of N.Y.*,
 42 F.3d 135 (2d Cir. 1994) ..........................................................23

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Gallagher v. Magner*,
  619 F.3d 823 (8th Cir. 2010) ........................................................50, 51

*Griggs v. Duke Power Co.*,
  401 U.S. 424 (1971)........................................................................52

*Gross v. FBL Financial Services, Inc.*,
  557 U.S. 167 (2009).........................................................18, 47, 48

*Hack v. Pres. & Fellows of Yale College*,
  237 F.3d 81 (2d Cir. 2000) .............................................................59

*Holder v. Hall*,
  512 U.S. 874 (1994).......................................................................53

*Huntington Branch, NAACP v. Town of Huntington*,
  844 F.2d 926 (2d Cir. 1988) ...............................................50, 54, 59

*Irish Lesbian & Gay Org. v. Giuliani*,
  143 F.3d 638 (2d Cir. 1998) ..........................................................27

*Iron Arrow Honor Society v. Heckler*,
  464 U.S. 67 (1983) (*per curiam*) ..........................................22, 23

*Kreisler v. Second Ave. Diner Corp.*,
  731 F.3d 184 (2d Cir. 2013) (*per curiam*)...............................20, 25

*LeBlanc-Sternberg v. Fletcher*,
  67 F.3d 412 (2d Cir. 1995) .......................................................32, 36

*Lewis v. Continental Bank Corp.*,
  494 U.S. 472 (1990)................................................................22, 23

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)...........................................................30, 31, 32

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Nikolich v. Vill. of Arlington Heights, Ill.*,
　870 F. Supp. 2d 556 (N.D. Ill. 2012)..................................................56

*Pers. Admin. of Mass. v. Feeney*,
　442 U.S. 256 (1979)..............................................................33, 34

*Powell v. McCormack*,
　395 U.S. 486 (1969)....................................................................26

*Price Waterhouse v. Hopkins*,
　490 U.S. 228 (1989)................................................................47, 48

*Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*,
　294 F.3d 35 (2d Cir. 2002) ...............................................33, 55, 56, 57

*Reidt v. Cnty. of Trempealeau*,
　975 F.2d 1336 (7th Cir. 1992) .........................................................56

*S.-Suburban Hous. Ctr. v. Greater S. Suburban Bd. of Realtors*,
　935 F.2d 868 (7th Cir. 1991) ..........................................................27

*Salute v. Stratford Greens Garden Apts.*,
　136 F.3d 293 (2d Cir. 1998) ...........................................................60

*Savoie v. Merchants Bank*,
　84 F.3d 52 (2d Cir. 1996) .............................................................21

*Smith v. Town of Clarkton*,
　682 F.2d 1055 (4th Cir. 1982) ........................................................36

*Spencer v. Kemna*,
　523 U.S. 1 (1998)....................................................................22

*St. Mary's Honor Ctr. v. Hicks*,
　509 U.S. 502 (1993)..................................................................33

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Swierkiewicz v. Sorema, N.A.*,
    534 U.S. 506 (2002)......................................................................59

*Thompson v. N. Am. Stainless, LP*,
    131 S. Ct. 863 (2011).................................................................32

*Tsombanidis v. W. Haven Fire Dept*,
    352 F.3d 565 (2d Cir. 2003) ........................................33, 50, 51, 54

*U.S. Naval Inst. v. Charter Commc'ns, Inc.*,
    875 F.2d 1044 (2d Cir. 1989) ...................................................20

*United States v. Cerna*,
    603 F.3d 32 (2d Cir. 2010) .......................................................20

*United States v. City of Yonkers*,
    96 F.3d 600 (2d Cir. 1996) .........................................32, 36, 37, 38

*United States v. Mass. Mar. Acad.*,
    762 F.2d 142 (1st Cir. 1985)......................................................27

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    133 S. Ct. 2517 (2013)...............................................................48

*Valley Forge Christian Coll. v. Ams. United for Separation of Church
    & State*, Inc.,
    454 U.S. 464 (1982)..................................................................21

*Ventura Vill., Inc. v. City of Minneapolis*,
    318 F. Supp. 2d 822 (D. Minn. 2004).........................................55

*Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*,
    429 U.S. 252 (1977)....................................................33, 34, 49, 50

*Warth v. Seldin*,
    422 U.S. 490 (1975)..............................................................24, 25

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

STATUTES

28 U.S.C. § 1291 ....................................................................1

28 U.S.C. § 1343 ....................................................................1

28 U.S.C. § 2201 ....................................................................1

29 U.S.C. § 623(a)(1) ...........................................................48

42 U.S.C. § 2000e-2(m) ......................................................48

42 U.S.C. § 3604(a) ..........................................21, 25, 34, 37, 48

42 U.S.C. § 3613… ...............................................................1

REGULATIONS AND REGULATORY MATERIALS

24 C.F.R. § 100.500(c)(2) ....................................................51

24 C.F.R. § 100.500(c)(3) ................................................51, 59

78 Fed. Reg. 11460 (Feb. 15, 2013) .................................59

MISCELLANEOUS

114 Cong. Rec. 2275 (Feb. 6, 1968) ................................53

## JURISDICTIONAL STATEMENT

Although the district court lacked jurisdiction to decide this case under Article III, it had statutory subject matter jurisdiction under 28 U.S.C. § 1343, 28 U.S.C. § 2201, and 42 U.S.C. § 3613.  It entered final judgment against the Incorporated Village of Garden City and the Garden City Board of Trustees (the Village or Defendants) on April 22, 2014.  SJA431.  They noticed their appeal on May 5, 2014.  JA436.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether Nassau County's decision to keep the Site mooted Plaintiffs' claims by eliminating any reasonable likelihood that the Village's decision could injure them.

2.      Whether Plaintiffs lacked standing because no affordable housing developer could have competed against a market-rate bid.

3.      Whether Defendants intentionally discriminated on the basis of race by responding to residents' legitimate, race-neutral concerns such as traffic, school overcrowding, and property values.

4.      Whether a single, isolated zoning decision that best served the Village's legitimate interests suffices to establish disparate impact liability.

## STATEMENT OF THE CASE

In 2002, Nassau County decided to raise revenue by selling certain properties, including one in the Incorporated Village of Garden City where its old Social Services building stood. The County asked the Village to rezone the Site to allow private uses. The Village agreed and, working through a consulting firm and a subcommittee, proposed a scheme—CO-5(b) with "Residential-Multifamily" or "R-M" housing controls—that would have allowed commercial, office, or residential development at the Site, including up to 311 multi-family units. Residents, however, voiced ordinary concerns about the proposal: it would leave traffic problems in the area unresolved, it might overburden local schools, and so on. Some also worried it might lower property values by including affordable housing. In response to these mundane concerns, the Village adopted a less intensive development proposal—"Residential-Townhouse" or "R-T"—that eliminated office use and allowed multi-family housing only on a portion of the Site. The County then solicited bids.

This unremarkable series of events then took a remarkable turn. The New York Association of Community Organizations for Reform Now (NY ACORN) and the New York ACORN Housing Company (NYAHC) filed suit against the Village and the County, alleging that the Village racially discriminated by adopting

R-T zoning.[1]  Remarkably, Judge Spatt of the Eastern District of New York, in an unreported opinion, agreed.  He held that Defendants intentionally discriminated on the basis of race by responding to residents' concerns, a few of which related to affordable housing and "at least could have been construed" to reflect racism.  He also accepted Plaintiffs' disparate impact claim because he believed that the one-off adoption of R-T zoning disproportionately affected minority housing opportunities.

The district court never should have entered judgment.  Even if the Village had adopted Plaintiffs' preferred zoning, Plaintiffs lacked standing to challenge that decision because a market-rate developer would have inevitably outbid an affordable housing developer anyway.  And whatever effect the Village's decision might have had on Plaintiffs in 2005, it cannot have any now.  In 2011, the County announced it would build a court complex at the Site, not sell it.  Whether or not the Village violated the law in adopting R-T zoning, there will never be *any* housing there.

The court's merits decisions were just as wrong.  Liability for intentional discrimination exists only if municipal officials harbor racist motives themselves or *knowingly* respond to substantial racial opposition.  Nonetheless, the district

---

[1] NYAHC is now MHANY Management, Inc., and New York Communities for Change intervened after NY ACORN disbanded.  SJA141.  Defendants refer to them as "Plaintiffs."

court held Defendants liable merely because some residents expressed concerns about affordable housing and those concerns "could have been construed" to reflect racism.  Similarly, disparate impact liability must relate to a municipality's general policies and procedures, not one-off decisions.  Nonetheless, the district court held Defendants liable because they allegedly *departed* from their general zoning practices in adopting R-T zoning for the Site.  Both holdings are not only legally erroneous, but mischaracterize, ignore, or inadequately consider the evidence establishing that the Village adopted R-T zoning as a tailored response to a host of legitimate race-neutral concerns—not because of a few residents' concerns about affordable housing, let alone because of race.

### A.    The Social Services Site And BFJ's Initial Proposals

The former Social Services Building sits on a 21.44 acre plot on the eastern side of County Seat Drive.  On the western side, another County building and garage take up 3.03 more acres.  These pieces form the Social Services Site, part of an 84.76 acre parcel that hosts a number of County buildings.  JA176.  Single-family homes border the Site on the east and south, while commercial uses neighbor it to the west.  JA895.  Eighty-five percent of the Village's housing is single-family.  JA179.

The County owned these properties, but the Village zoned them under its "Public" or "P" Zone to recognize their government use.  JA176.  But in May

4

2002, then-Nassau County Executive Suozzi designed a plan to sell some properties for revenue. JA176; JA562. The County placed the Site on its list and hoped to sell to a luxury high-rise housing developer. JA176; JA551; JA561.

To facilitate the sale, the County asked the Village to rezone the Site for private use. JA176. The Village agreed, created the P Zone Committee (comprised of three Trustees), and retained Buckhurst Fish and Jacquemart (BFJ) as a consultant. JA177. In November 2002, BFJ issued the first of several reports addressing "possible approach[es]" to rezoning the Site. JA2090. In those "first thoughts," BFJ proposed a new zoning designation—"Commercial/Office-5" or "CO-5"—for the Site. *Id.*; JA2092. That proposal would have allowed offices, single-family homes, townhouses, or multi-family units at the Site, including theoretically up to 440 apartments. JA289-90; JA817; JA827; SJA124. BFJ estimated that around fifty schoolchildren would reside there by comparing the development to "other high-end condo and rental developments." JA2093.

BFJ's "first thoughts" were modified throughout 2002 and 2003. In April 2003, BFJ proposed subdividing the P Zone into CO-5(a) and CO-5(b) zones, the latter to cover the Site. JA1381. It proposed extending "Residential-Multifamily" or "R-M" zoning controls for residential components of CO-5(b), which would have allowed 311 multi-family units. JA1382. Again the proposal was geared toward high-end uses such as "garden apartments or townhouses" "likely to attract

5

empty-nesters or younger couples." *Id.* BFJ predicted the development would produce between 62 and 93 new schoolchildren. *Id.*; JA1078. It did not address traffic.

On May 29, 2003, BFJ presented its recommendation at an informal public forum, where residents expressed concerns about traffic and schoolchildren. JA268; SJA125. In July 2003, BFJ issued another study that kept the CO-5(b) and R-M zoning controls in place. JA1123. BFJ's study did not address traffic concerns, though it again predicted that multi-family units would have a smaller impact on schools than single-family housing because they would be "aimed at young couples and empty nesters." *Id.*

The P Zone Committee adopted BFJ's latest proposal as its recommendation to the Board in July. JA1116. In September, BFJ drafted an Environmental Assessment Form that concluded the proposed development would not "result in the generation of traffic significantly above present levels." However, it estimated that the project would create "an additional 111 AM peak hour trips and an additional 134 PM peak hour trips" over the existing use. JA1155; JA1160. BFJ's later estimates indicated that the proposed number of apartments would also have produced more than double the number of daily trips as 90 single-family houses or 150 townhouses. JA325; JA1289. Relying on the 0.2 to 0.3 student per unit

figure, BFJ estimated that R-M zoning [2] would generate 71 to 107 extra schoolchildren.  JA1158.[3]

In October, BFJ presented its proposal at another informal public forum, SJA126, and in November it presented its third report to the P Zone Committee, JA1154.  That report contained additional changes.  Although R-M controls typically allowed one single-family home per 6,000 square foot lot, BFJ's revised proposal allowed one per 8,000 square foot lot to reduce the potential impact on schools and other public services.  JA277; JA1190.  The Floor Area Ratio—the ratio between permitted square feet of development and lot size—was lowered for similar reasons.  JA1190.  The Board of Trustees accepted the Committee's revised recommendations in November.  SJA126.

### B.    Local Residents Express Ordinary Concerns About The Development

The Village Code requires a formal hearing before new zoning ordinances are adopted.  JA816; JA890.  The Board forwarded a proposed ordinance embodying the proposal to a hearing on December 4, 2003, JA1995, and the first session was held on January 8, 2004, JA1394.  From first to last, residents' concerns focused on run-of-the-mill issues at the heart of local zoning—traffic,

---

[2] References to "R-M zoning" are shorthand for "CO-5(b) zoning with R-M residential controls" because R-M zoning was never a stand-alone proposal.

[3] BFJ's projections stemmed from a predicted 355 residential units, a number reached by including development on both parts of the Site.  JA272.

parking, taxes, and so on.  JA1424 (traffic nearby was "horrendous"); JA1409 (asking about traffic studies); JA1429 (parking was "[p]robably the biggest issue"); JA1428 (tax benefits); JA1431-32 (employees' needs).  No one said anything about affordable housing, and no one said anything related to race.

Before the second session, Trustee Bee of the P Zone Committee met with the Eastern Property Owners' Association.  Most of the residents who voiced concerns there asked Trustee Bee to "keep density down and reduce traffic congestion."  JA1665.  In response to a question about whether the zoning proposal would allow "'affordable' housing," Trustee Bee noted that such housing was technically possible but that "economics" indicated a developer would build "high-end housing."  *Id.*  No one said anything about race.

The second session of the public hearing took place on February 5, 2004. JA1208.  Everyday concerns dominated this one too.  Many residents complained about the existing traffic at the Site and worried that the proposal would exacerbate it or leave it unresolved.  JA1242 (traffic was "horrendous" and thus the speaker would prefer "single family housing where you have a lot less cars"); JA1256 (traffic had gone unaddressed "for many years").  Others worried about the impact on schools, expressing the view that "[i]f you have 311 units you will have more children potentially in there" than in single-family homes.  JA1255; JA1260. Some residents disliked how the proposal allowed for a mix of business and

8

residential use, JA1245; JA1277, and others fretted that it could raise taxes or hurt property values, JA1261.

For these reasons, many who spoke preferred single-family zoning to the higher density possibilities in R-M zoning.  JA1249-50 (explaining why residents were "not against residential," but rather "multi-level residential").  Some also preferred a lower-density approach because they felt it was more in keeping with Garden City as a whole.  As one explained, she moved from Brooklyn "so that when [she] walked out of [her] house [she] did not turn to [her] left and see apartment buildings," even "beautiful" ones like the one next to her old residence. JA1252-53.  Another explained, "Garden City started as a neighborhood of single family homes and it should remain as such," with lower-density zoning that reflected the "flavor and character of what Garden City is now."  JA1243.

One resident referred to "affordable housing."  Speaking to Mr. Suozzi, she stated:  "You said you wanted it to be upscale, from what I understand from what [Trustee] Peter Bee said the last time, is that they wanted it to be affordable housing."  JA1236.  Mr. Suozzi explained that the County would make more money "selling it to upscale housing" and thus that the County was "not interested in building affordable housing there."  *Id.*  The next resident, "concerned about a huge amount of apartments that come on and depress the market for any co-op owner in this Village," asked how the County could "guarantee that it's going to be

9

upscale and has there been studies that there has been enough demand for the project." JA1237. Mr. Suozzi indicated that the County could put deed restrictions on the property but that they were unnecessary because the County would maximize revenue "by selling [the Site] for upscale housing." *Id.* No one said anything about race.

Village officials, BFJ personnel, and Mr. Suozzi responded in part to some concerns. Mr. Suozzi stated that it was "irrational" to worry about R-M zoning creating more traffic because employees would no longer be commuting to the Site. JA1238-39. He emphasized, however, that any actual development would be preceded by real traffic studies. JA1239. Similarly, Trustee Negri responded to questions about school overcrowding and taxes by citing BFJ's statistical estimates, but as these figures acknowledged, multi-family development (even targeted to young couples and empty nesters) would create more schoolchildren than townhouses. JA1256. Officials stressed that nothing was final, that the point of the meeting was to get residents' input, and that they would do what they felt was best for the Village. JA1269-70; JA1273-74.

After the meeting, someone produced a flyer that asked "WILL GARDEN CITY PROPERTY VALUES DECREASE IF OVER 300 APARTMENTS ARE BUILT AT THE SITE OF THE SOCIAL SERVICES BUILDING?" JA1632; *id.* (asking in similar terms about traffic and schools). Fish and a few Trustees saw

10

this flyer, which also raised questions about whether a bill then pending in the New York Legislature would require affordable housing in new developments.  SJA129. Similarly, a few residents who spoke at a March 18, 2004 Board meeting asked about the bill's relevance to the Site, and one urged the Board to "play it safe." JA1660.  Residents again expressed their concerns about "increased traffic" and other mundane matters.  JA1661-62.

## C.    The Village Adopts A Less Dense Zoning Proposal

In April 2004, BFJ again reworked its proposal.  In part to "minimize traffic impact" and to "differentiate townhouses," BFJ reduced the intensity of office use, lowered the number of multi-family units to 215, lowered the number of townhome units, and put a 0.4 Floor Area Ratio cap on single-family use.  JA1358.  The number of new schoolchildren were now projected to be the same whether a developer built multi-family units or townhouses, though BFJ also estimated that apartments would generate more than 500 more car trips per day than townhouses. JA1288-89.  BFJ presented its proposal at an April 22, 2004 public meeting. JA1279.

BFJ personnel then reviewed the public comments with the Village's administrator, its building superintendent, and its counsel.  JA1360.  To "provide a significant response to the concern that has been previously expressed over traffic," in May 2004 BFJ again revised its proposal to eliminate office use at the

11

Site. *Id*. Because multi-family housing "was the next highest generator of traffic," it also prohibited multi-family housing on the eastern portion of the Site, though it allowed multi-family housing on the west with a special use permit. *Id*. BFJ changed the proposed label from CO-5(b) to "Residential-Townhouse" or "R-T." *Id*. BFJ did not prepare a new draft Environmental Assessment Form because the revised proposal called for less intensive development.

On May 20, 2004, the Village held a public hearing on R-T zoning. JA1437. Mr. Fish explained that "there was a concern that if the whole 25 acres were developed for multi family it would generate too much traffic and [would not] serve as a true transition" between the garages abutting the western side and the standalone single-family homes nearby. JA1471. While some worried that even townhouses would generate too much traffic and burden schools, JA1473; JA1487, Mr. Fish explained that townhomes and standalone houses would likely generate a similar number of cars and that single-family homes would likely produce more schoolchildren, JA1475.[4] Near the end of the meeting, an ACORN member asked Garden City "to share and build affordable housing in [its] community." JA1499. No Village resident or official mentioned affordable housing or race, and no other person associated with Plaintiffs made any other comment.

---

[4] The Village's planning expert later testified that R-T zoning met the Village's objectives better than CO-b(5) zoning because it more strongly mitigated against potential adverse effects, created a better transition, responded to public feedback, and explicitly provided guidelines for townhouses. JA899.

### D.    The County Announces Its Intent To Sell The Site

On June 3, 2004, the Village adopted the new R-T zoning, SJA132, and in July 2004 the County solicited offers for the Site, JA1807.  The County's Request for Proposal (RFP) set a minimum $30 million price and reiterated its desire to sell to the highest bidder.  JA1811; JA1814.  NYAHC did not believe it could develop affordable housing under R-T zoning, SJA132-34, but it submitted a "protest" proposal (offering to lease the property for $5 million and construct 2,000 units on it) in September 2004.  JA740; JA1518.  The County ultimately accepted a bid of $56.5 million from Fairhaven Properties.  SJA133; JA1509 (total of $58,091,000 including other acquisition costs).

Months later, NYAHC's housing developer Ismene Speliotis sketched out "*pro forma*" estimates to see whether NYAHC could have produced affordable housing under R-M controls.  JA741.  They showed that, as the percentage of affordable housing in a development decreases, the bid it can support increases.  JA1531.

### E.    This Litigation.

In May 2005, NYAHC, NY ACORN, and several individuals sued Defendants and the County for allegedly violating federal housing law.   In February 2010, NY ACORN disbanded, and in April 2010, Judge Spatt—after Judge Bianco's recusal, JA91—granted NYCC's motion to intervene as NY

ACORN's "practical successor." SJA117-18. MHANY Management remained as NYAHC's successor.

Meanwhile, Edward Mangano took over as County Executive in 2010. Fairhaven's 2004 purchase agreement had never closed, JA179, and the County revisited its decision to sell the Site because of unrelated difficulties with other County property. By February 2011, it chose to relocate the Nassau County Family Court to a new Family and Matrimonial Court Complex located in part on the Site. JA115-18. By July 2011, the County Legislature had authorized $112 million in funding, the County's architect had drafted plans, and the County had contracted with a construction management company. JA107; JA118.[5]

Nonetheless, the district court denied Defendants' summary judgment motion. SJA44-78. However, it granted the County's motion because the County had no authority or duty to override the Village's zoning decision and committed no act that disparately impacted minorities. SJA78-84; SJA90-102. The individual plaintiffs' claims later dropped out too. SJA136.

After a bench trial, the district court held Defendants liable under disparate treatment and disparate impact theories. SJA118. It first concluded that MHANY and NYCC had standing because Ms. Speliotis's estimated bids—produced under *R-M* assumptions—were sufficiently close to Fairhaven's winning *R-T* bid that

---

[5] There is currently a construction fence surrounding the Site.

14

NYAHC could have made a "directly competitive" bid and NYCC's members could have obtained desired affordable housing there.   SJA140; SJA142.

The court then held that the County's decision to keep the Site did not moot the case.  It reasoned that Plaintiffs' "injury" occurred at the time of the zoning change.  SJA144-45.  Therefore, even if the County had changed its mind *before* Plaintiffs filed suit, there would be a live controversy.  SJA144.  The court also reasoned that it could still order declaratory or injunctive relief unrelated to the Site.  SJA145-46.

The court then held Defendants liable for intentional discrimination. SJA118.  It acknowledged that R-T zoning served the Village's legitimate interests in reducing traffic and promoting townhomes, though it did not decide whether R-T zoning furthered other interests (such as concerns about school overcrowding). SJA159-60.   It concluded, however, that Defendants were also motivated by opposition to affordable housing that "could have been construed as" racially motivated and that, given the sequence of events, Defendants had not proven they would have adopted R-T zoning absent this potentially-known racist opposition. SJA156; SJA160-61; SJA165-67; SJA180.[6]

---

[6] The court also accepted Plaintiffs' Section 1983 Equal Protection claims. SJA175-76.  It rejected their Section 1982 claims because they had no "cognizable property interest in … planned affordable housing."  SJA176.

The court also accepted Plaintiffs' disparate impact claim. It acknowledged such claims cannot be raised against "one specific act," but it refused to apply the principle here because the Village enacted a "generally applicable zoning law." SJA172-73. Since fewer minorities would live at the Site under R-T zoning than R-M zoning and since Defendants had supposedly not proven the absence of less discriminatory alternatives to meet the Village's interests in traffic or townhomes, it held Defendants liable. SJA175.

The court entered judgment on April 22, 2014. SJA431. This appeal and Plaintiffs' cross-appeal against the County followed.

## SUMMARY OF ARGUMENT

**I.** For reasons having nothing to do with R-T zoning, there never will be and never would have been any housing at the Site. This case was never live to begin with, and it is dead now.

**A.** Federal courts may answer legal questions only if the plaintiff still has a stake in the outcome: it must have suffered (or be about to suffer) an injury that remains traceable to the defendant's conduct and redressable by the court. Here, Plaintiffs' suit claims that, but for the decision to adopt R-T zoning, NYAHC would have built (and NYCC's members would have resided in) affordable housing at the Site. But given the County's decision, there will be no housing there regardless of whether the Village unlawfully adopted R-T zoning.

16

The district court avoided this conclusion by reasoning that Plaintiffs were injured at the moment the Village adopted R-T zoning.  But any potential injury to Plaintiffs' rights to build or live in affordable housing traceable to Defendants' zoning decision was eradicated by the County's subsequent action—if the Village adopted R-M zoning tomorrow, there will still never be apartments at the Site.  The court also kept the case going because Plaintiffs had requested prospective relief not tied to the Site.  That relief, however, will not redress their alleged injury, nor will it prevent any future harm that might stem from the Village's decision.  Given the County's decision, there *can be* no future effects from that decision.

    **B.**    Plaintiffs never had standing anyway because they could not have built or resided in affordable housing at the Site.  The County insisted on selling to the highest bidder, and any proposed affordable housing developer would have been outbid by an ordinary market-rate developer.  Since the County's bid criteria, not R-T zoning, caused any injury here, Plaintiffs' injuries are not fairly traceable to the Village's irrelevant zoning decision.

**II.**    Defendants responded to the admittedly legitimate, race-neutral concerns of Village residents.  They cannot be held liable just because the district court believed some of those concerns *could have* been racially motivated.

    **A.**    To overturn a decision based on decision-makers' response to public opposition, a plaintiff must prove that the decision-makers knowingly acted on

17

racist fears. The district court, however, held Defendants liable simply because it found that public opposition to affordable housing could have been construed as racially motivated, not because Defendants knew it was. That cannot be the law. Otherwise, federal courts will condemn legitimate exercises of local democracy simply because they could have unknowingly been motivated by race, not because they actually were.

**B.** The district court could not have found liability under the proper standard. There was no evidence that opposition to affordable housing was racially motivated—let alone that the Trustees knew as much—and there was overwhelming evidence that concerns related to higher-density housing (such as traffic), not affordable housing, drove public worry. Nothing in the process leading up to or the substance of R-T zoning suggests that Defendants must have been responding to racially motivated fears.

**C.** The district court wrongly required Defendants to prove they would have adopted R-T zoning absent opposition to affordable housing. But *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), held that where a statute simply prohibits conduct taken "because of" a protected characteristic, the plaintiff must prove but-for causation. That holding controls Plaintiffs' claims here.

**III.** The district court's disparate impact holding expands disparate impact liability and precludes local governments from pursuing their legitimate ends.

18

**A.**      Title VII disparate impact liability gives employers exactly what they should want:  job-selection criteria that produce the most capable workforce.  FHA disparate impact liability, however, often runs counter to landlords' and municipalities' legitimate interests in making money, controlling density, and so on.  And unlike employers' interest in the most qualified workforce, there is no objective criterion by which to measure the right rent to charge or the perfect density.  Unless carefully calibrated, FHA disparate impact liability threatens to substitute a federal judge's idea of good policy for local officials' and to force municipalities to maximize minority opportunities at every turn.

**B.**      Accordingly, this Court has held that plaintiffs must challenge general policies, not particular acts.  Otherwise, municipal decision-makers would face prima facie liability every time they chose a specific course of action that did not maximize minority opportunities.   Here, however, Plaintiffs challenge the Village's one-off decision to zone a 24-acre parcel in a particular way.   If Defendants can be held liable here, then every municipal zoning decision, no matter how targeted, must consciously increase minority housing opportunities.

**C.**      In any event, Defendants cannot be held liable because R-T zoning served the Village's admittedly legitimate interests better than any alternative.  In reaching a contrary conclusion, the district court erred first by placing the burden to prove less discriminatory alternatives on Defendants.  It erred again by forcing

the Village to accept second-rate means of fulfilling its legitimate interests and by ignoring other interests altogether.

## STANDARD OF REVIEW

This Court reviews questions about mootness and standing de novo. *See Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187 n.2 (2d Cir. 2013) (*per curiam*). It reviews pure legal questions without deference.

Findings of intentional discrimination are reviewed for clear error. *See Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 213 (2d Cir. 2001). Clear errors exist where the district court "failed to synthesize the evidence in a manner that accounts for conflicting evidence or the gaps in a party's evidentiary presentation; incorrectly assessed the probative value of various pieces of evidence; or failed to weigh all of the relevant evidence before making its factual findings." *United States v. Cerna*, 603 F.3d 32, 39 (2d Cir. 2010) (internal quotation marks omitted). "[A] finding of fact that is predicated on a misunderstanding of the governing rule of law" receives no deference. *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 875 F.2d 1044, 1049 (2d Cir. 1989) (internal quotation marks omitted).

## ARGUMENT

### I. THERE IS NO JUSTICIABLE CONTROVERSY BECAUSE THERE NEVER WOULD HAVE BEEN AFFORDABLE HOUSING AT THE SITE REGARDLESS OF THE VILLAGE'S DECISION.

Federal courts may resolve only "cases" or "controversies." U.S. Const. art. III, § 2. Whether couched in terms of ripeness, standing, or mootness, this core

20

restriction prohibits courts from issuing advisory opinions that do not resolve live, ongoing controversies.  *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, *Inc.*, 454 U.S. 464, 472 (1982).  Instead, courts may resolve only cases in which the parties have skin in the game:  the plaintiff alleges the defendant has harmed or will immediately harm it, and the court could remedy or prevent that injury by answering the legal question in dispute and providing effective relief.  If resolving the parties' disagreement will have no "real-world consequences," *Savoie v. Merchants Bank*, 84 F.3d 52, 57 (2d Cir. 1996), the court cannot resolve it at all.

Plaintiffs demand the kind of advisory opinion that Article III forbids.  The reason there will be no (affordable) housing on the Site is because the County has decided to build a courthouse there, not because of the Village's zoning decision.  Accordingly, no zoning decision by the Village has inflicted any continuing injury on Plaintiffs that can be redressed by the prospective relief they seek.  And resolving whether the Village's R-T zoning decision *would have* violated federal law *if* it had "ma[de] unavailable" the housing that Plaintiffs desired, 42 U.S.C. § 3604(a), will not resolve any "case or controversy"—either way, they will not have the housing they sought—but will only be an advisory opinion concerning an irrelevant hypothetical.

## A.    This Case Is Moot Because The County's Decision Eliminated Any Cognizable Present Or Future Harm To Plaintiffs.

Federal courts may decide "only … *ongoing* cases or controversies." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990) (emphasis added). "[T]hroughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (internal quotation marks omitted).  Where intervening acts of third parties have made it such that the defendant's conduct—legal or not—cannot affect the plaintiff, the case is moot:  the plaintiff has suffered no legally cognizable injury traceable to the defendant's actions, and the court cannot redress that nonexistent injury because any ordered relief will not change the outcome.

These principles are as well-established as they are straightforward.  In *Iron Arrow Honor Society v. Heckler*, 464 U.S. 67 (1983) (per curiam), for example, an all-male club sued a federal official, alleging that his interpretation of a regulation caused the University of Miami to deny it access to university facilities in order to avoid problems with federal grants.  After years of litigation, however, the University announced it would bar the society from its facilities regardless of the official's interpretation.  *See id.* at 69-70.

The case was "classically" moot.  "[N]o resolution of the present dispute between these parties can redress Iron Arrow's asserted grievance" because the

University would not allow Iron Arrow access to its facilities "[w]hatever the correctness of the Secretary's interpretation of the regulation in question." *Id.* at 70-71; *see also Lewis*, 494 U.S. 472 (case was moot after Congress enacted a statute that doomed the plaintiff's dormant Commerce Clause claim); *Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135, 140 (2d Cir. 1994) (declaratory and injunctive claims are moot where it is "impossible for the courts, through the exercise of their remedial powers, to do anything to redress the injury" (internal quotation marks omitted)).

Under this blackletter law, the County's decision to build a courthouse on the Site mooted this case.  Plaintiffs' suit against the Village was and remains premised on the claim that, but for the zoning decision, an affordable housing developer would have placed a winning bid for the Site and minority members of the NYCC would have resided there.  JA82-85; JA144-56.  Indeed, the district court recognized that Plaintiffs' specific claim concerning a "particular site [on which to] build" allowed their claim to survive a motion to dismiss, distinguishing it from claims alleging a general desire for low-income housing without specifying a particular, available location.  SJA13; *see Acevedo v. Nassau Cnty., N.Y.*, 500 F.2d 1078, 1080-81 (2d Cir. 1974) ("Appellees have no constitutional or statutory duty to provide low income housing.").  "The focus point of this controversy [has]

undoubtedly [been] Garden City's allegedly discriminatory zoning practices as to the … Site." SJA134.

Given the County's decision, however, there will be no housing on the Site, *regardless* of whether the Village discriminated in zoning. Obviously, if the County had decided to keep the property before Plaintiffs sued, Plaintiffs would have lacked standing. In *Warth v. Seldin*, 422 U.S. 490 (1975), the Court denied standing to challenge allegedly discriminatory zoning ordinances to plaintiffs who could not purchase the housing in question and to a developer because there was no allegation that its earlier proposed project "remained viable" or that "respondents' actions continued to block a then-current construction project." *Id.* at 517. But as the Supreme Court has repeatedly emphasized, mootness is "standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997). Thus, the County's decision killed the controversy now just as much as it would have had the County changed its mind in 2005. *See Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993).

For two meritless reasons, the district court claimed that this fundamental limit on federal judicial power somehow did not apply. *First*, the court stated that prospective relief is somehow justified because "Plaintiffs' injuries occurred at the

24

time of the zoning change, prior to the 'no sale' decision." SJA145. But if the zoning change did not "make unavailable or deny a dwelling," then it did not "injure" Plaintiffs. 42 U.S.C. § 3604(a). To be sure, the Village's zoning decision (if discriminatory) *would have* injured Plaintiffs *if* it caused the denial of their desired housing. But since the housing was actually denied because of the County's intervening decision, any *potential* injury traceable to the Village's decision never eventuated. In short, the Village's 2004 zoning decision had no effect on Plaintiffs at the time of the district court's judgment, rendering any controversy between the parties moot and any prospective relief meaningless and unavailable. Indeed, as the district court itself candidly acknowledged, its contrary view would mean that the court could resolve this case even if that "no sale" decision *preceded* Plaintiffs' complaint. SJA144. *But see Warth*, 422 U.S. at 517 (plaintiffs must show the proposal "remained viable … when th[e] complaint was filed").

*Second*, the district court opined that there was "still a live controversy" "in spite of the fact that the Social Services site will no longer be sold" because Plaintiffs requested "injunctive relief" that "do[es] not relate specifically to the Social Services site itself." SJA145; SJA144 ("[T]he County's decision simply … mooted certain types of relief."). But, of course, the question is not whether

Plaintiffs *sought* relief in addition to the relief directly remedying their injury, but whether any of their requested relief would *redress* that injury.

Remarkably, the district court conceded it would not. In its remedial opinion, the court recognized that the "violation" here "was the specific action by the Defendants to eliminate R-M zoning and endorse R-T zoning," and it acknowledged that *even Site-specific relief*—a directive to rezone the Site— "would not, without further action by third-parties, remedy the … violations in this case." SJA193; SJA195. And Plaintiffs are not entitled to relief *ancillary* to redressing their claimed (but now moot) injury if they could not even benefit from relief that would *directly remove* the source of their claimed (but now moot) injury.

To be sure, "[w]here several forms of relief are requested and one of these requests subsequently becomes moot, the Court has still considered the remaining requests." *Powell v. McCormack*, 395 U.S. 486, 496 n.8 (1969). This principle applies, however, only where a court could grant one of the alternative forms of relief. But, as explained above, no lawful relief remains available here because none of Plaintiffs' requested relief will redress or prevent any injury to Plaintiffs or resolve a live controversy that affects their lives.

Plaintiffs never requested retrospective relief in damages, likely because they suffered no financial harm. *See infra* 29-32. And courts cannot order *any* prospective relief—injunctive or declaratory—for prior actions unless those

26

actions still have an ongoing, present effect on the plaintiff at the time of judgment. *See, e.g.*, *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 647 (2d Cir. 1998) (request for declaratory or injunctive relief is moot "when interim relief or events have eradicated the effects of the defendant's act or omission"); *cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 104-05 (1983). Indeed, the district court's citations prove as much. *See S.-Suburban Hous. Ctr. v. Greater S. Suburban Bd. of Realtors*, 935 F.2d 868, 881 (7th Cir. 1991) (sale of certain properties did not moot claims "*for damages*" (emphasis added)); *United States v. Mass. Mar. Acad.*, 762 F.2d 142, 157-58 (1st Cir. 1985) (upholding a permanent injunction barring repeat discrimination because "[t]here was ample basis … from which the court could reasonably fear reversion to earlier discriminatory practices"); *Baltimore Neighborhoods, Inc. v. LOB, Inc.*, 92 F. Supp. 2d 456 (D. Md. 2000) (ordering retrofitting because the "physical barriers" to residing in the apartments remained and the statute authorized organizational plaintiffs to act as "private attorney[s] general").

Here, unlike every case cited by the district court, there are no future threats of discrimination against Plaintiffs to be prevented or any lingering effects to be undone. The County's choice to keep the property eliminated any possibility that the Village's zoning decision actually affected anyone, so there are no effects at all, let alone lingering ones. The only ongoing effect even indirectly referenced by

27

the district court is the "alleged lack of affordable housing, and hence a lack of residential integration" in Garden City. SJA146 (internal quotation marks omitted). But, again, Plaintiffs' zoning decision at the Site could not possibly have contributed to a lack of affordable, integrated housing because it did not result in the denial of such housing.[7]

Moreover, no other decision or policy by the Village even arguably affected Plaintiffs because Plaintiffs did not allege, and the district court did not find, either that the Village had some identifiable general zoning policy that discriminatorily excluded minorities elsewhere or that Plaintiffs desired to reside at (or build on) specific non-Site properties but were thwarted from doing so by R-T zoning.[8] Rather, the court and Plaintiffs attacked the Village's supposed *departure* from its ordinary, race-neutral zoning policies that purportedly would have resulted in R-M zoning. SJA152-56; SJA193 ("The violation was not, as the Plaintiffs assert, the history of segregation and the absence of affordable housing in Garden City."). And, as to prospective prohibitory injunctive relief against "other discriminatory acts," SJA145, any future activity by Garden City cannot possibly affect Plaintiffs

---

[7] As the district court itself acknowledged, the Village's decision would have a current effect only "*if the County changed course and decided to sell the property.*" SJA187 (emphasis added).

[8] The Plaintiffs generally alleged a history and "policy" of segregation in the Village, JA142-44, but they did not allege that R-T zoning blocked integrated housing anywhere else or request relief at any other site.

28

because, again, no Plaintiff has indicated any desire to obtain or build housing at any specific Garden City location other than at the Site, and the Village's decision to adopt R-T zoning for the Site would not impede such efforts anyway.[9]

In short, once the Site was rendered unavailable by the County, the Plaintiffs were no differently situated than minorities residing in Hawaii—neither group has a "personal stake" in a live controversy with the Village or can be "injured" by the Village, because neither group has specific plans that would render them susceptible to any discriminatory zoning practices by the Village or by the Village's alleged failure to "overcome the perpetuation of segregation." SJA145.

### B. Because The County Always Intended To Sell To The Highest Bidder, Plaintiffs Never Could Have Built Or Resided In Affordable Housing At The Site Anyway.

Plaintiffs also failed to prove standing even before the County changed its mind. To prove standing, a plaintiff must suffer an "injury in fact" that is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." "[I]t must [also] be

---

[9] The district court claimed that it could "grant some [Site-specific] relief" because the County stated it "need[ed] finality on the issue of whether plaintiffs' demand for injunctive relief will bar construction where the decision to build has been made final." SJA144 (internal quotation marks omitted). This makes no sense. The County needed clarity *when it was still a defendant*; Plaintiffs sought an injunction prohibiting a sale under R-T zoning and demanding that the County issue an RFP under R-M zoning, and it may have been unclear whether that request could block the County's own development. JA157-58. Once the County was dismissed, the court could not order it to do anything.

29

likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks omitted). Standing "must be supported adequately by the evidence adduced at trial"—that is, the plaintiff must prove its standing by a preponderance of the evidence. *Id.*; *cf. Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 363 (2d Cir. 2003) (at pleading stage plaintiffs must allege facts showing "a substantial probability that housing with greater minority occupancy would have been built" absent defendant's actions (internal quotation marks omitted)).

Plaintiffs' alleged injury of being denied affordable housing at the Site is not "fairly traceable" to the Village's *rejection* of R-M zoning because their bid would not have succeeded *under* R-M zoning.  If an affordable housing developer would have been outbid by a market-rate housing developer anyway, then the failure of such a developer to purchase the Site was caused by the County's unchallenged decision to select the highest bid, not by R-T zoning.  *See Lujan*, 504 U.S. at 560-61.

Plaintiffs' own evidence demonstrates that any affordable housing developer would have been outbid by a market-rate developer.  Ms. Speliotis's "*pro formas*" showed that, as the percentage of affordable housing *decreases*, the bid the project can support *increases*.  By her estimates, every 5% reduction in affordable housing

30

led to a $13 million increase in supportable bid costs.  JA1531.  Thus, while two hypothetical projects with 25% affordable housing could both support acquisition costs of *$31.1* million, projects with 20% or 15% affordable housing could support higher acquisition bids of *$43.6* million and *$56.1* million.  *Id.*  Any bid with a meaningful affordable housing component would thus have been rejected in favor of a higher, market-rate bid.

For this reason, Plaintiffs did not even try to show that the "*pro forma*" estimates would have exceeded or been competitive with other bids had the Village adopted R-M zoning.  Indeed, Ms. Speliotis's estimated $56.1 million in total acquisition costs under R-M zoning was $2 million *less* than Fairhaven's winning R-T bid of $58.1 million.  JA1508-09.  Since R-M zoning would have provided *more* housing units than Fairhaven projected, a market-priced multi-family developer would have outbid Plaintiffs' affordable housing proposal by even *more* under *R-M* zoning.  The absence of affordable housing was thus not "fairly traceable" to the Village's conduct.  *Lujan*, 504 U.S. at 560-61.

The district court's conclusion that Plaintiffs did *not* need to prove an affordable housing developer likely would have acquired the property under R-M zoning is irreconcilable with basic standing principles.  Again, since Plaintiffs did not establish that, "but for" the Village's zoning decision, they would have built (and lived in) affordable housing at the Site, their alleged injury is not "fairly

31

traceable" to that decision. *Thompson v. N. Am. Stainless, LP*, 131 S. Ct. 863, 869 (2011); *Lujan*, 504 U.S. at 560-61. Plaintiffs—not Defendants—are thus asking the Court to engage in "undue speculation." SJA140 (internal quotation marks omitted).

## II. DEFENDANTS DID NOT KNOWINGLY RESPOND TO RACIST OPPOSITION IN ADOPTING R-T ZONING.

The district court's merits decisions were just as bad. To create a prima facie case, disparate treatment plaintiffs must prove that "animus against the protected group was a significant factor in the position taken by the municipal decision-makers." *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995) (internal quotation marks omitted). To do so, a plaintiff may show that impermissible animus was a significant factor either in the position taken "by the municipal decision-makers themselves or by those to whom the decision-makers were *knowingly* responsive." *Id.* (emphasis added). That limitation is crucial: officials cannot be liable for the secretly racist views of their constituents. Plaintiffs must thus demonstrate that the defendants "*knew that a significant portion of the public opposition was racially inspired[] and [that] their public acts were a direct response to that opposition.*" *United States v. City of Yonkers*, 96 F.3d 600, 613 (2d Cir. 1996) (internal quotation marks omitted).

"If the plaintiffs make out a prima facie case, then the burden of production shifts to the defendants to provide a legitimate, nondiscriminatory reason for their

decision." *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002). If they do, the burden-shifting framework "drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993). "[T]he sole remaining issue [is] discrimination *vel non*." SJA149 (internal quotation marks omitted, alteration in original). Following *Arlington Heights*, courts examining intentional discrimination (at either stage) consider "the decision's historical background," "departures from the normal procedural sequences," "departures from normal substantive criteria," "the discriminatory impact of the governmental decision," and "the specific sequence of events leading up to the challenged decision." *Tsombanidis v. W. Haven Fire Dept*, 352 F.3d 565, 580 (2d Cir. 2003) (internal quotation marks omitted).

Defendants responded to constituents' concededly legitimate concerns, and not even the district court could conclude that Defendants knew those concerns were racially motivated. Even if Plaintiffs had demonstrated some impermissible racial motive sufficient to create a prima facie case, the Village's ultimate decision would have been the same regardless given its legitimate interests in R-T zoning.

### A. The District Court Held Defendants Liable Merely Because Public Opposition "Could Have Been Construed" As Racially Motivated.

Disparate treatment claims under the FHA and the Fourteenth Amendment succeed only where a defendant acts "'because of, not merely 'in spite of,'" the harmful effects on a protected group. *Pers. Admin. of Mass. v. Feeney*, 442 U.S.

33

256, 279 (1979); 42 U.S.C. § 3604(a) (prohibiting acts that "make unavailable or deny[] a dwelling to any person because of race …").  Here, however, the district court expressly and repeatedly found that the "the enactment of R-T zoning advanced certain legitimate, bona fide government interests—namely, reducing traffic and providing for the construction of townhomes."  SJA174; *e.g.*, SJA166 ("concerns about traffic and townhomes" were "borne out by the record").

How, then, did the court conclude that Defendants made their decision "because of" race, rather than because of these legitimate, non-racial factors?  It was *not* because it found a history of racial discrimination, evidence of procedural departures, or gross substantive deficiencies in R-T zoning—the district court found no significant evidence regarding the first two of these factors, and it ignored the third.  SJA150-52; SJA156-57.  Rather, the district court held them liable because of "the considerable impact that [the Village's] zoning decision had on minorities in that community" and because of "the sequence of events involved in the Board's decision to adopt R-T zoning instead of R-M zoning after it received public opposition to the prospect of affordable housing in Garden City."  SJA161.

Of course, disparate impact is not enough by itself to create a prima facie case or ultimate liability—otherwise there would be no difference between disparate impact and disparate treatment claims.  *Cf. Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 (1977); *Feeney*, 442 U.S. at 279.

34

In any event, Plaintiffs have not demonstrated a disparate impact. *See infra* 58 n.16.

The validity of the district court's decision, then, turns on its concerns about Defendants' response to public opposition. It found, for instance, that the sequence of events contributed to Plaintiffs' prima facie case because it believed Defendants acted in response to "real opposition" to affordable housing. SJA156. It again focused on that sequence in concluding that Defendants were in fact motivated in part by discriminatory intent. SJA161. And even though Defendants had legitimate, bona fide reasons to adopt R-T zoning, "it decline[d] to hold that … the Board would have" adopted R-T zoning "even if discrimination played no role" because it believed the Board acted on those interests only *after* public opposition. SJA166-67.

The district court's dispositive emphasis on Defendants' reacting to some allegedly racial public opposition, however, rested on both an erroneous interpretation of the relevant legal standard and a clearly erroneous interpretation of the record. The district court found the Village's officials liable for intentional discrimination solely on the ground that "at least *some* of the expressions by Garden City residents of disapproval for affordable housing reflected race-based animus *or at least could have been construed as such by the Board*." SJA156 (emphasis added); SJA180 (reiterating this language in conclusion).

35

But to create even a prima facie case based on public officials' reaction to public opposition, the question is not whether the *court* interprets *some* private comments to "reflect race-based animus," or whether the Board *could* have done so. Instead, the plaintiff must show that the public officials "*knew* that a *significant* portion of the public opposition was racially inspired[] and [that] their public acts were a *direct* response to that opposition." *Yonkers*, 96 F.3d at 613 (emphasis omitted). This is the standard adopted in every case finding intentional discrimination on the basis of citizen input. *See LeBlanc-Sternberg*, 67 F.3d at 425 (plaintiff must show that "animus against the protected group was a significant factor in the position taken … by those to whom the decision-makers were *knowingly* responsive" (emphasis added)); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1062-63, 1066-67 (4th Cir. 1982) (there was "no doubt" the defendants "*knew* that a significant portion of the public opposition was racially inspired" because of racial slurs, direct official testimony, and otherwise-inexplicable government conduct (emphasis added)). Under this clear standard, it is not enough to show that citizens opposed *affordable housing* or that expressed opposition based on such race-neutral factors *could have* reflected unstated racial animus. Instead, Plaintiffs must show that the government officials "*knew*" it was "racially inspired." *Yonkers*, 96 F.3d at 613.

36

This has to be the standard. Otherwise, all public decisions that are made in light of legitimate non-racial factors would be condemned simply because some private citizens' legitimate, race-neutral considerations "could be" interpreted as expressing race-based opposition, given the statistical correlation between non-racial factors (such as income) and certain racial groups. This would impermissibly expand the reach of the FHA's intentional discrimination standard to encompass actions not taken "because of" prohibited criteria, 42 U.S.C. § 3604(a), and it would deprive democratically elected officials of the ability to enact their view of optimal public policy, solely because a handful of citizens supported that policy in non-racial terms susceptible to being interpreted as racial code words. Moreover, invalidating otherwise legitimate public policy decisions based on *ambiguous* public statements absent clear evidence that public officials *knew* they were racially motivated would penalize and deter public input into local decisions, for fear that one ambiguous comment would doom meritorious, race-neutral decisions.

It is inherently perilous to ascribe improper motivations to public officials based on some private citizens' statements. As a result, as *Yonkers* and every other case recognizes, such a ruling of imputed intent must be carefully limited to cases where public officials actually knew that the positions they were accepting were, in fact, race-based.

37

**B.    Defendants Did Not Knowingly Respond To Racist Feedback.**

The decision below vividly illustrates how an erroneous understanding of the *Yonkers* standard authorizes (or compels) the federal judiciary to impermissibly override legitimate democratic decision-making.  Indeed, the district court could not have permissibly found discriminatory treatment under the correct test.

As explained above, the district court itself acknowledged that, absent the Court's concerns about public feedback, the Village's decision to enact R-T zoning would have been upheld:  Defendants had legitimate, bona fide reasons for adopting it, and the FHA's disparate treatment provision does not allow courts to "second-guess citizens and decision-makers' legitimate concerns" absent impermissible animus.  SJA160.   Nonetheless, the court countermanded the Village's decision because of a potential connection between racism and opposition to affordable housing, the alleged relationship between affordable housing and opposition to R-M zoning, and its perception that Defendants based their decision on this opposition.  None of this, however, suffices to prove that Defendants knowingly responded to racist opposition.

**1.    There was no evidence that opposition to affordable housing was racially motivated.**

"[A]n equivalency between race and income has been rejected by the Supreme Court." *Boyd v. Lefrak Org. & Life Realty, Inc.*, 509 F.2d 1110, 1112-13 (2d Cir. 1975).  It is not enough, then, to show that residents opposed affordable

38

housing.  Instead, they must have done so for racist reasons, and Defendants must have known as much.

The district court could not find any remotely racist statements related to affordable housing—it candidly admitted there were none, throughout months of public feedback on R-M zoning.  SJA154-55.  Operating under its watered-down "could be construed as such" standard, the district court instead found that "affordable housing" might have been a racial "code word" because the Village's current residents are largely white, while those who would have resided in new affordable housing would be proportionately less so.  SJA155-56 (internal quotation marks omitted).  Thus, on the district court's view, in order to avoid a decade of litigation (and liability), Defendants had to *assume* that a significant percentage of the (handful of) residents opposed to affordable housing were closeted racists because of their skin color, even though other concerns dominated public feedback and even though the connection between affordable housing and race is tenuous enough that the Village could have enacted a flat ban on such housing.  That cannot be the law.

The district court also noted a "single instance" in which someone mentioned concerns about "changing the Village's 'character' and 'flavor.'"  SJA154.  Her words, however, were hardly sinister.  She wanted zoning in the area to "remain R-8"—a reference to a larger lot sizes, JA277—and therefore in the

"flavor and character of what Garden City is now" because "Garden City started as a neighborhood of single family homes and it should remain as such." JA1243. Even if she had intended these words about density to obliquely convey her supposedly racist opposition to affordable housing, there is no evidence that any Village official understood them in this fashion. Rather, they testified that they did not believe *anyone* made racially-motivated comments at all, JA490; JA543; JA818; JA819, and the district court did not question their credibility.[10]

### 2.    Concerns about higher-density development, not fears about affordable housing, drove public opposition.

Because the district court never found that Defendants knew opposition to affordable housing was racially motivated, the Village's decision was lawful regardless of whether such opposition caused them to adopt R-T zoning. In any event, the potential problems associated with more intensive development—*not* concerns about affordable housing—fueled residents' worries. Public comment

---

[10] In its factual summary, the district court noted one resident's comments about "overburdened and overcrowded" schools and "overrun" sanitation, as well as another's reference to "'that whole section of people' who use the bus to access the Department of Social Security." SJA128. The district court did not rely on these comments in finding race-based animus, and for good reason. The first resident's concerns—parking, schools, overcrowding—related to more dense multi-family housing, not affordable housing or race. JA1259-60. And the second speaker did not disparagingly refer to potential residents of affordable housing. Instead, this mother of two children asked Village officials to close a bus route on her busy street because the bus served "that whole section of people who need to get where they need to go be it courts or social services," a service that would no longer be needed "since we won't be having social services" at the Site. JA1243.

overwhelmingly focused on the mundane problems locals worry about when zoning decisions put more people in less space:  traffic, school overcrowding, and so on.  *See supra* 7-11.  Affordable housing, by contrast, was not mentioned *at all* in the initial public hearing session, *see* JA1394, and as the district court acknowledged, those words were used exactly *once* by residents during the second session.  SJA154.  "Traffic" and "school," by contrast, came up dozens of times, *id.*, just as they and other routine concerns dominated every public discussion.

Indeed, the district court's leading "proof" that concerns about affordable housing drove the switch to R-T zoning demonstrates just the opposite.  It suggested that Trustee Bee—and by implication the Board—suspiciously reversed his position regarding affordable housing.  He had supposedly agreed that the Village "demographically ha[d] a need for affordable housing" at a property owners' association meeting, but then changed his mind about the desirability of such housing at the Site after opposition to R-M zoning.  SJA127; SJA152-53.

The district court crucially misquoted the record.  Trustee Bee never changed his view on *affordable* housing at the Site (he never thought it would be built there), but only his view on the *multi-family* housing facilitated by R-M zoning.  Trustee Bee never stated that the Village "demographically ha[d] a need for *affordable* housing" or suggested that R-M zoning at the Site would facilitate such housing.  SJA127; SJA152 (emphasis added).  Rather, as he expressly stated

41

at the same meeting (and as every other official involved in the planning process agreed), the "economics would indicate that a developer would likely build *high-end* housing" under R-M zoning.  JA1665 (emphasis added).  Instead, Trustee Bee stated that the Village "demographically ha[d] a need for *multi-family*" housing. *Id.* (emphasis added).  That Trustee Bee had a change of heart regarding multi-family *luxury* housing says nothing about whether he (or anyone else) believed residents opposed R-M zoning because it might lead to affordable housing, much less because they were racists.

The district court also briefly "note[d] the flyer against multi-family housing on the Social Services Site" in concluding that opposition to affordable housing must have driven the Trustees' decision.  SJA180.  Like Trustee Bee's remarks, however, that flyer—seen by only two of the Trustees, SJA129—demonstrates that other concerns dominated public discussion.  Its three bold questions asked about property values, traffic, and school impact.  JA1632.  It only raised concerns about affordable housing in the context of discussing how that housing could decrease neighboring property values by requiring particularly low rents.  *Id.*[11]

---

[11] The district court's factual recitation further described some residents' inquiries into how proposed State legislation requiring affordable housing could affect the Site.  SJA129-30.  The district court did not rely on these inquiries, again for good reason.  No one mentioned this legislation at either session of the public hearing, the supposed focal points of racist feedback.

42

### 3. Nothing in the process leading up to the decision or the substance of that decision suggests Defendants must have been acting in knowing response to racist input.

To bolster its conclusion, the district court noted that BFJ and the Village spent less time considering R-T zoning than the CO-5(b) proposal, and it pointed out that BFJ and several Village administrators, meeting without the members of the P Zone Committee, made the switch to R-T zoning after BFJ presented its already-reduced proposal to the public in April 2004. SJA153-54. Neither fact raises any suspicion. BFJ, the Village Trustees, and Village residents had discussed the zoning of the Site for more than a year, so there was no need to spend additional time discussing the same issues once they settled on a preferable lower-density approach. As for the changes after the meeting, the district court never explained how *BFJ*'s decision to revise the proposal *without* the Trustees demonstrates that the Trustees knowingly adopted R-T zoning in response to racist input. Mr. Fish also explained that the P Zone Committee's job was complete once the public hearing was held, JA281, so there was no need to include them.

The district court also quibbled with the relative merits of R-T zoning. It *repeatedly acknowledged*, however, that R-T zoning fostered legitimate Village interests in reducing traffic and promoting townhomes. SJA160-61; SJA166-67; SJA174. Those findings should have ended this case: it never found that Defendants knew opposition to R-M zoning was racially motivated, and the FHA

43

does not authorize federal courts to flyspeck legitimate race-neutral zoning decisions.

In any event, the court's criticisms were baseless.  Take first traffic, which was repeatedly mentioned as a concern.  *See supra* 7-11.  Plaintiffs' own preferred preliminary estimates demonstrated that R-T zoning would have produced half as much peak traffic as R-M zoning.  JA2102.  In keeping with this prediction, BFJ later estimated that 311 multi-family units would create more than twice as many daily trips as single-family homes or townhomes.  SJA157-58.

The district court recognized the Village's interest in traffic but discounted its importance because some of BFJ's traffic numbers were produced after public opposition to R-M zoning and because it was "not clear that traffic under R-M zoning would be significantly worse under R-Z [sic] zoning, if worse at all." SJA167.  The court's timing point makes no sense.  BFJ personnel and Village officials made clear that BFJ had not done a full traffic study, JA1409; JA1419; JA1240, residents expressed concerns about traffic throughout the day, not just rush hour, JA1257, and BFJ's later numbers tracked its earlier predictions, JA1289 (listing peak AM and daily trips for apartments, townhouses, and single-family homes under the first April 2004 revision to R-M zoning); JA1159-60 (listing peak trips for apartments under the September 2003 R-M proposal).  The court's point about uncertainty is even worse.  The Trustees' decision to adopt a more

conservative approach to traffic in the face of doubt suggests, at worst, only that they chose among legitimate alternatives, perhaps because their constituents were more risk-averse about increased traffic. It says nothing about whether they knowingly acted in response to racial opposition.

So too with the Village's interest in promoting townhouses. The district court acknowledged that R-T zoning fostered townhome development by defining townhomes within the Village's zoning code for the first time. SJA160. It discounted this interest because there was supposedly no evidence reflecting a desire to foster townhomes prior to the rise in public opposition. SJA167. This was simply untrue: the Village's longtime Building Superintendent testified that "[t]here were discussions for years before [the zoning decision] that recognized the fact that the village did not have [townhomes] available to prospective buyers" as an explicitly defined form of housing. JA879.

The district court also ignored some of the Village's other bona fide reasons for adopting R-T zoning. Many residents took the commonsense position that 311 multi-family units would generate more schoolchildren than single-family homes or townhomes would. *E.g.*, JA1253. To be sure, BFJ estimated that, *if* the units were aimed at "young couples and empty nesters," they would likely produce roughly the same number of schoolchildren as single-family homes (though more than townhomes). But "even a slight change in the resident mix would have

45

significantly altered these numbers," and the citizen commenters might well have reasonably thought that the resident mix would *not* be "empty nesters" and "young couples." SJA158. Critically, in this regard, the district court never found that these concerns about more schoolchildren were objectively wrong or unreasonable—it simply noted the parties' different positions and then ignored the issue in its analysis. *Id.*[12] Only by discounting some of the Village's admittedly legitimate interests and ignoring others could the district court conclude that Defendants even *could have* been motivated by (secretly) racist opposition to affordable housing.[13]

### C. The District Court Wrongly Put The Burden On Defendants To Prove They Would Have Made The Same Decision.

---

[12] This failure, like the court's failure to determine whether Defendants actually knew opposition was racially motivated, may have stemmed from its repeated insistence that it had to decide whether the evidence supported a "reasonable inference that prohibited discrimination occurred." SJA149; SJA159 (internal quotation marks omitted). That standard, appropriate at summary judgment, does not apply after a bench trial.

[13] The district court rejected the Village's interest in promoting a smoother transition because R-M zoning also would have provided "a form of transition." SJA160. Again, however, it was not the district court's prerogative to select among reasonable zoning alternatives, and R-T zoning provided a better form of transition anyway. Under CO-5(b) zoning, an office building could have been built directly across the street from the single-family homes on Washington Avenue, with single-family homes behind that building and up against the parking garages that border the Site. JA878. Under R-T zoning, the single-family homes to the east of the Site would blend into single-family homes or townhomes on the eastern portion of the Site, with multi-family homes on the western side blending into neighboring commercial uses. JA899.

Given the above, the proper allocation of burdens in this case is irrelevant. To invalidate the Village's admittedly legitimate interests in R-T zoning, the district court had to find that Defendants acted in *knowing* response to racist feedback. It did not do so, and it could *not* have done so given the record.

In any event, however, the district court wrongly required Defendants to prove that they would have adopted R-T zoning even if there had never been any (potentially) racist opposition to affordable housing. SJA161-65. It derived this requirement—which absolved Plaintiffs of their ordinary need to prove but-for causation—from *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), a Title VII mixed-motive case decided before Congress amended Title VII in the Civil Rights Act of 1991. SJA167; *see also Cabrera v. Jakabovitz*, 24 F.3d 372, 382-83 (2d Cir. 1994) (if FHA plaintiff proves race was a substantial factor, the defendant may affirmatively defend on the grounds that it would have made the same decision anyway). Because it found that "the Garden City Defendants failed to prove that they would have made the same decision absent discriminatory considerations," it held them liable. SJA167.

The district court's mixed motive framework—not briefed by the parties below because of Plaintiffs' focus on pretext—contradicts *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009). There, the Court noted that the ADEA, unlike Title VII, prohibits only conduct taken "because of" an individual's age, not where

47

age is only "a motivating factor." *See id.* at 174-75 (quoting 42 U.S.C. § 2000e-2(m) (Title VII), 29 U.S.C. § 623(a)(1) (ADEA)). Focusing on the plain meaning of "because of," the Court then held that *Price Waterhouse*'s burden-shifting framework (as later modified by Congress) does *not* apply to ADEA claims. Instead, ADEA plaintiffs *always* bear the "burden of persuasion" to establish that "age was the 'but-for' cause of the challenged employer decision." *Id.* at 177-78; *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2527 (2013) (requiring plaintiff to prove but-for causation in Title VII retaliation cases because the statute prohibited retaliation "because of" protected conduct).

*Gross* controls here. Like the ADEA (but unlike Title VII), the FHA only prohibits persons from "mak[ing] unavailable or deny[ing] a dwelling … *because of* race … ," 42 U.S.C. § 3604(a) (emphasis added), with no mention of substantial motivating factors. And like the ADEA (but unlike Title VII), Congress left the FHA's relevant provisions intact when responding to *Price Waterhouse*. *See Gross*, 557 U.S. at 174; SJA164. Thus, in keeping with "the ordinary default rule that plaintiffs bear the risk of failing to prove their claims," *Gross*, 557 U.S. at 177 (internal quotation marks omitted), Plaintiffs had to prove that race was the dispositive, "because of" reason for adopting R-T zoning, not just a motivating factor. Because the district court wrongly required Defendants to prove the

absence of but-for causation (and because Plaintiffs cannot meet that burden), the district court's decision must be reversed.

*    *    *

Shortly after the 1968 race riots, Lincoln Green asked a suburb of Chicago to rezone a parcel so that it could develop affordable housing. *See Arlington Heights*, 429 U.S. at 257. Public meetings to address the request "drew large crowds," and "many of those attending were quite vocal and demonstrative in opposition to Lincoln Green." *Id.* Indeed, "[s]ome of the comments … addressed what was referred to as the 'social issue'—the desirability or undesirability of introducing at this location … low- and moderate-income housing, housing that would probably be racially integrated," and some of those commenters "might have been motivated by opposition to minority groups." *Id.* at 257-58, 269. Nonetheless, citing concerns about property values and a desire to limit multi-family housing to areas that could "serve as a buffer between single-family development and land uses thought incompatible, such as commercial or manufacturing districts," Arlington Heights denied the request. *Id.* at 258.

The Supreme Court held that Lincoln Green "simply failed to carry [its] burden of proving that discriminatory purpose was a motivating factor in the Village's decision." *Id.* at 270. Here, however, with far less (if any) evidence of discriminatory intent, the district court concluded that Defendants adopted R-T

49

zoning in response to (potentially) racist public comment and that Defendants would not have done so absent that racist opposition. Those conclusions, premised on misunderstandings about the relevant law, mistakes about the essential facts, and a willingness to assume that the Village's residents were racists because of their skin color, must be reversed.[14]

## III. PLAINTIFFS' DISPARATE IMPACT CLAIM FAILS BECAUSE THE VILLAGE'S ISOLATED DECISION TO ADOPT R-T ZONING WAS THE LEAST DISCRIMINATORY MEANS OF MEETING ITS GOALS.

In this Circuit, plaintiffs may bring FHA disparate impact challenges to zoning policies under certain circumstances. *See Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926 (2d Cir. 1988).[15] A plaintiff makes a prima facie case by showing "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Tsombanidis*, 352 F.3d at 575 (internal quotation marks, citations, and emphasis omitted). If the

---

[14] Because Defendants did not intentionally discriminate, Plaintiffs' Section 1981 and Section 1983 Equal Protection Clause claims fail too. *See Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 1999) (§ 1981 claims); *Arlington Heights*, 429 U.S. at 265 (§ 1983 claims).

[15] Defendants preserve their argument that the FHA does not include disparate impact liability for Supreme Court review. *See Gallagher v. Magner*, 636 F.3d 380, 381-83 (8th Cir. 2010) (Colloton, J., dissenting from denial of rehearing en banc), *cert. granted*, 132 S. Ct. 548 (2011), *cert. dismissed by the parties*, 132 S. Ct. 1306 (2012).

plaintiff meets this burden, the defendant must prove that "its actions furthered …
a legitimate, bona fide governmental interest … ."  *Id.*; *see also* 24 C.F.R.
§ 100.500(c)(2).  The plaintiff must then prove that those interests "could be served
by another practice that has a less discriminatory effect."   24 C.F.R.
§ 100.500(c)(3); *see, e.g.*, *Gallagher v. Magner*, 619 F.3d 823, 834 (8th Cir. 2010)
(plaintiff must prove "a viable alternative means" (internal quotation marks
omitted)).  *But see Tsombanidis*, 352 F.3d at 575 (suggesting defendant must prove
absence of alternative).

Here, Plaintiffs challenge a single isolated zoning decision, not the Village's
general zoning policies.  And even if they had made a prima facie case, the Village
enacted R-T zoning in order to respond to residents' legitimate concerns in the
least discriminatory way possible.

### A.   Disparate Impact Liability Must Be Carefully Limited To Avoid Judicial Micromanagement Of Every Zoning Decision.

In the FHA context, disparate impact liability poses special dangers of
improperly authorizing the federal judiciary to override wholly legitimate
municipal decisions, in order to replace those decisions with a different policy
solely because it maximizes minority percentages. Title VII's disparate impact
standard imposes on employers only policies that every economically rational
employer *would want*—"job-related" selection criteria that produce a *better
qualified* workforce than that resulting from the invalidated arbitrary, non-job-

51

related selection criteria. *See Griggs v. Duke Power Co.*, 401 U.S. 424 (1971). Thus, in the employment context, although the judiciary is overriding the employer's management decisions, the disparate impact remedy is objectively *assisting* the employer by replacing selection criteria that are illegal precisely because they are not job-related with those which better identify the best person for the job. Since employers would have no objective reason to eschew the best, merit-based selection criteria, the interest of minority employees (in eliminating exclusionary employment barriers) align with the employer's interest (in choosing the best qualified employees).

In the Title VIII housing context, however, invalidating policies because they disproportionately affect minorities often will be adverse to the defendant's fully legitimate economic or other interests, and there will be no objective basis for concluding that a reasonable housing defendant would have adopted the alternative with less impact. Most obviously, prohibiting landlords from charging higher rents because they disproportionately exclude minorities would directly harm the landlords' economic interests by requiring lower rents than the market permits. In the municipal housing context, as this very case illustrates, prohibiting practices because they disproportionately affect minorities would also often be contrary to the government's wholly legitimate economic or other interests—for example, by requiring the County to accept a *lower* bid to facilitate "affordable" housing or by

52

requiring the Village to abandon its legitimate residential density goals, solely to increase minorities' presence.  But since there is no *objective* basis for the judiciary to require, say, more residential density than a defendant municipality desires, requiring such policies under Title VIII would simply substitute the federal judiciary's own policy judgments for those of democratically elected officials.

Of course, Congress never intended to authorize this kind of policy-based judicial override of local zoning decisions.  As Title VIII's Senate sponsor noted, "[a]ll that legislation such as this would do would be to eliminate the discriminatory business practices which might prevent a person economically able to do so from purchasing a house regardless of his race."  114 Cong. Rec. 2275 (Feb. 6, 1968) (statement of Sen. Mondale).  Similarly, other disparate impact civil rights laws do not authorize requiring the lesser-impact alternative unless it is *objectively* superior.  *See Holder v. Hall*, 512 U.S. 874, 880-82 (1994) (plurality op.) (rejecting disparate "results" challenge to the size of a local commission under Section 2 of the Voting Rights Act because there is "no objective and workable standard" suggesting that the lesser-impact five-seat option should be used in local governments and "no principled reason why one size should be picked over another").

This Court's FHA jurisprudence is no different.  While it prohibits arbitrary or objectively illegitimate barriers that disproportionately harm minorities, it does

not authorize overriding legitimate policies to maximize minority participation. *See Tsombanidis*, 352 F.3d at 575 (prohibiting only policies that are not tailored to "legitimate, bona fide governmental interest[s]"); *Huntington Branch*, 844 F.2d at 939 (courts must determine whether site-specific concerns would "justify a reasonable official in making" the challenged decision).

To minimize such concerns about judicial policy-making and minority maximization mandates, this Circuit has imposed basic limitations on FHA disparate impact liability.  As discussed below, however, the district court violated two of those fundamental limitations.  First, while this Court has squarely precluded disparate impact challenges to a "specific" housing decision—because that would involve the judiciary in micro-managing individual fact-bound decisions and establish *prima facie* liability every time the municipality did not choose the specific minority-maximizing alternative—the district court nonetheless adopted just such a disparate impact theory.  Second, although this Court has authorized invalidating municipal housing decisions only if the *defendants'* legitimate, *bona fide* policies could be served equally well by policies with less disparate impact, the district court invalidated the Village's zoning decision because there would have been less disparate impact under different alternatives that did *not* equally accomplish the Village's legitimate goals.  Both of these decisions were clear legal error and must be corrected to avoid fundamentally

54

converting Title VIII's antidiscrimination provisions into a mandatory minority-maximization scheme.

### B. Disparate Impact Plaintiffs May Not Challenge A Single, Isolated Decision.

This Court has emphasized that disparate impact liability does not exist where a plaintiff challenges a defendant's one-off act.  In *City of Middletown*, the plaintiff brought a disparate impact claim against the city's denial of its request for a special-use permit to construct a halfway house for recovering alcoholics and their children.  *See* 294 F.3d at 43, 52-53.  Even though the court *reversed* the district court's grant of summary judgment against the plaintiffs on their disparate *treatment* claim, it granted summary judgment against them on their disparate impact claim:  because the plaintiff challenged "one specific act" rather than a "facially neutral policy or practice," that claim could not go forward.  *Id.* at 52-53; *see also, e.g.*, *Ventura Vill., Inc. v. City of Minneapolis*, 318 F. Supp. 2d 822, 827-28 (D. Minn. 2004), *aff'd*, 419 F.3d 725 (8th Cir. 2005).

That rule makes sense.  Where a plaintiff challenges a specific act rather than a general policy, "[n]o comparison of the act's disparate impact on different groups of people is possible."  *City of Middletown*, 294 F.3d at 53.  As a result, if plaintiffs could bring such challenges, "nearly every zoning decision would be a source of potential liability" because "[e]very denial would by definition impact the group of people applying and not other groups, so that disparate impact on a

55

protected class could always be shown if most of the proposed residents … shared some protected characteristic." *Nikolich v. Vill. of Arlington Heights, Ill.*, 870 F. Supp. 2d 556, 564 (N.D. Ill. 2012). Indeed, under this regime federal courts would micro-manage every discrete housing decision by those empowered to make them and penalize selection of the non-minority-maximizing alternative with, at a minimum, prima facie FHA liability and severe litigation costs. This is why, even in the Title VII context, Plaintiffs cannot establish disparate impact "where you have just one isolated decision," but must instead identify a policy or practice causing the impact. *Reidt v. Cnty. of Trempealeau*, 975 F.2d 1336, 1341 (7th Cir. 1992) (internal quotation marks omitted). And, as noted, the dangers of doing so in the FHA context are far greater, given the absence of an objective standard for assessing the "right" decision.

Plaintiffs' claims raise precisely these concerns. They do not allege that the Village's zoning ordinances generally prohibit affordable housing, nor do they allege that its general zoning practices do. Indeed, they praise the "long, careful, deliberate process and formal procedures" that led to the initial proposals with R-M zoning, JA1014, and complain only about the Village's supposed *departure* from them in applying R-T zoning to the Site. Just as in *City of Middletown*, then, Plaintiffs challenge a single decision about a single piece of property, for which there is no relevant comparison group.

56

The district court concluded that *City of Middletown* does not apply because the Village enacted a "generally applicable zoning law" rather than "den[ying] … a single-use permit."  SJA173.  This formalistic distinction is without a difference here.  To be sure, the Village Code now specifies that, in R-T districts, "[m]ultifamily dwellings … may only be located west of County Seat Drive."  Village Code § 200-16.1(A)(3)(c).  But the Village created R-T zoning specifically to cover the Site, JA1349, it was expected that one developer would purchase the Site and build it out, *e.g.*, JA1811, and Plaintiffs have not raised any complaints about any other application of R-T zoning anywhere else.  That the Village regulated development on this 24.5-acre parcel via a zoning ordinance rather than by administratively denying a variance request cannot possibly matter.  Either way, the decision affected only particular developers for a particular Site, threatening to impose disparate impact liability just because the Village's decision failed to maximize low-income housing opportunities.

Indeed, this case illustrates that possibility.  R-T zoning *increased* the likely number of minorities residing in Garden City because P zoning allowed no residential uses.  JA194; SJA173.  Nonetheless, the district court found a disparate impact because the proposed R-M zoning could have allowed more minority residents.  SJA174.  But why stop there?  The 2,000 units in Plaintiffs' "protest" proposal certainly would have included more minority residents than the 311 units

57

that could have been constructed under R-M zoning.  If a prima facie case is established by showing that adopting one "generally applicable" scheme for the Site led to fewer expected minority residents than another proposed alternative, then the Village would face liability for adopting a 311 unit R-M proposal over a 2,000 (or 312) unit proposal.

The district court tried to assuage these fears by reasoning that the only relevant "fram[e]" was the disparity between R-M and R-T zoning.  SJA173.  It never explained, however, how this limitation comports with its theory.  If, as the district court's opinion suggests, all that matters is whether Proposal A produces greater housing opportunities for protected groups than Proposal B, all plaintiffs need to do to create a prima facie case is put forward a minority-maximizing alternative for every local zoning decision.  By ignoring the differences between the Village's isolated decision to adopt R-T zoning and the *general* policies and procedures that Title VIII actually addresses, the district court thus found prima facie liability simply because the Village did not maximize affordable housing.[16]

### C.    R-T Zoning Was The Least Discriminatory Means For Serving The Village's Legitimate Interests

Even if Plaintiffs had raised a prima facie case of disparate treatment, the race-neutral concerns addressed by R-T zoning justified that outcome.  The district

---

[16] The district court also clearly erred in finding that Plaintiffs demonstrated a disparate impact because no affordable housing developer could have submitted a competitive bid anyway.  *See supra* 29-32.

court found that "the enactment of R-T zoning advanced … legitimate, bona fide government interests" in reducing traffic and promoting townhomes (though it again ignored other interests such as minimizing the risks of school overcrowding, maintaining property values, and responding to residents' concerns). SJA174; *see supra* 47-50. Nonetheless, the district court held that Defendants did not prove the absence of less discriminatory alternatives because R-M zoning "reduced traffic significantly as compared to the *P-zone*" and because townhomes could have been incorporated into a plan that allowed for more multi-family housing. SJA174-75 (emphasis added).

This analysis began from the mistaken premise that Defendants bore the burden of proving the absence of less discriminatory alternatives. Although this Court's cases suggest that defendants bear this burden, *see Huntington Branch*, 844 F.2d at 936, recently promulgated regulations by the expert agency—as well as the pre-existing law in every other circuit to have addressed the issue—place that burden on the plaintiff. *See* 24 C.F.R. § 100.500(c)(3); 78 Fed. Reg. 11460, 11462 & n.34 (Feb. 15, 2013) (collecting cases). This approach makes sense, as it follows the Title VII framework that this Court has consciously borrowed in Title VIII cases. *See, e.g.*, *Huntington Branch*, 844 F.2d at 934-35; *Hack v. Pres. & Fellows of Yale College*, 237 F.3d 81, 93-102 (2d Cir. 2000), abrogated on other grounds by *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002), (Moran, D.J.,

dissenting on other grounds) (tracing relationship between Title VII and Title VIII and recognizing that the plaintiff must prove this point).

In any event, the district court independently erred by requiring the Village to accept a less desirable alternative to R-T zoning. Once again, it relied on a comparison between traffic under R-M zoning and existing traffic under P zoning to conclude that R-M zoning would have served its interest in reduced traffic. SJA174. The question for the Village and its residents, however, was whether R-M zoning would create worse traffic than *R-T* zoning, which it undisputedly would have. Title VIII does not require defendants to accept second-best solutions to their legitimate problems. As for fostering townhomes, the district court again substituted its judgment for Defendants'. Any proposal with multi-family use on the eastern side of County Seat Drive would have decreased the possible number of townhomes at the Site (and increased traffic)—Plaintiffs' case is, after all, premised on the notion that the Site would have been covered by multi-family units. In short, the district court's analysis is akin to precluding a landlord from increasing the rent $50 because a $25 increase would have had lesser impact. *See Salute v. Stratford Greens Garden Apts.*, 136 F.3d 293, 302 (2d Cir. 1998) (rejecting disparate impact claim premised on refusal to accept Section 8 applicants because landlords may legitimately choose not to participate).

Finally, the interests the district court did not consider would not have been adequately served by R-M zoning either. Any large-scale multi-family development could have produced a large number of schoolchildren if occupied by ordinary families, SJA158, and many residents legitimately viewed *any* multi-family (or even non-single-family) use at the Site as too intensive, JA1473; JA1487.

## CONCLUSION

For these reasons, the judgment below should be vacated and remanded with instructions to dismiss for want of jurisdiction. Otherwise, it should be reversed.

## REQUEST FOR ORAL ARGUMENT

While the district court's errors are clear, Defendants respectfully request oral argument to answer any questions the Court may have.

Dated:        August 1, 2014

Respectfully submitted,
/s/ Michael A. Carvin
Michael A. Carvin
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20001
(202) 879-3939

*Attorney for Defendants-Appellants*
*Incorporated Village of Garden City and*
*Garden City Board of Trustees*

61

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(A).  It contains 13,996 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman type.


/s/ Michael A. Carvin
Michael A. Carvin


Dated:  August 1, 2014

## CERTIFICATE OF SERVICE

I, Michael A. Carvin, hereby certify that on August 1, 2014, I filed an electronic copy of the foregoing DEFENDANTS-APPELLANTS' BRIEF ON APPEAL on the Court's ECF service, which caused it to be served on all other parties or their counsel of record.


/s/ Michael A. Carvin
Michael A. Carvin


Dated:  August 1, 2014