# 14-1634-cv(L), 14-1729-cv(XAP)

## United States Court of Appeals

*for the*

## Second Circuit

MHANY MANAGEMENT, INC., AKA New York Acorn Housing Company,

*Plaintiff-Appellee-Cross-Appellant,*

NEW YORK COMMUNITIES FOR CHANGE, INC.,

*Intervenor-Plaintiff-Appellee-Cross-Appellant,*

ACORN, THE NEW YORK ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW, DAPHNE ANDREWS, VIC DEVITA, VERNON GHULLKIE, NATALIE GUERRIDO, NEW YORK ACORN HOUSING COMPANY, INC., LISBETT HUNTER, FRANCINE McCRAY,

*Plaintiffs,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLEE-CROSS-APPELLANT AND INTERVENOR-PLAINTIFF-APPELLEE-CROSS-APPELLANT

JOSEPH D. RICH
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
 UNDER LAW
1401 New York Avenue, NW, Suite 400
Washington, DC 20005
(202) 662-8600

– and –

FREDERICK K. BREWINGTON
LAW OFFICES OF FREDERICK K. BREWINGTON
556 Peninsula Boulevard
Hempstead, New York 11550
(516) 489-6959

*Attorneys for Plaintiff-Appellee-Cross-
 Appellant and  Intervenor-Plaintiff-
 Appellee-Cross-Appellant*

IRA M. FEINBERG
STANLEY J. BROWN
CHAVA BRANDRISS
BENJAMIN A. FLEMING
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
(212) 918-3000

*Attorneys for Plaintiff-Appellee-
 Cross-Appellant*

– v. –

COUNTY OF NASSAU, COUNTY OF NASSAU PLANNING COMMISSION,
COUNTY OF NASSAU OFFICE OF REAL ESTATE & DEVELOPMENT,

*Defendants-Cross-Appellees,*

INCORPORATED VILLAGE OF GARDEN CITY,
GARDEN CITY BOARD OF TRUSTEES,

*Defendants-Appellants.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellees-Cross-Appellants New York Communities for Change, Inc. and MHANY Management Inc. state that they are both not-for-profit corporations that do not issue stock. Neither has a parent corporation.

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................ 1

JURISDICTIONAL STATEMENT .......................................................... 6

COUNTER-STATEMENT OF THE ISSUES AND STATEMENT OF
THE ISSUES ON CROSS-APPEAL ...................................................... 6

STATEMENT OF THE CASE ................................................................ 8

    A.    The Relevant Facts ............................................................... 8

        1.    Racial Segregation and Affordable Housing in Nassau
              County. ............................................................... 8

        2.    The County Asks Garden City to Re-zone the Social
              Services Site. ..................................................... 10

        3.    BFJ and the Trustees Endorse R-M Zoning ............................. 11

        4.    Affordable Housing Becomes a Concern. ................................. 14

        5.    Impact of the Balboni Bill ......................................... 16

        6.    The Trustees Abruptly Change Course. ................................. 18

        7.    The County Approves the Zoning. ................................. 20

        8.    The Effect of R-T Zoning. ......................................... 22

        9.    Plaintiffs' Continued Opposition. ................................. 23

        10.    The County's RFP and the Plaintiffs' Response. .................... 23

        11.    The Ring Road Proposal. ......................................... 25

    B.    Proceedings in the District Court ....................................... 26

        1.    The Complaint and Motion to Dismiss ................................. 26

        2.    The Summary Judgment Rulings. ................................. 28

i

3.      The Court's Post-Trial Findings and Conclusions....................29

4.      The Decision on Remedies and Final Judgment......................32

SUMMARY OF ARGUMENT ........................................................33

    Garden City's Appeal ...........................................................33

    Cross-Appeal Against Nassau County ........................................37

STANDARDS OF REVIEW ..........................................................39

ARGUMENT: GARDEN CITY'S APPEAL ........................................40

I.     THIS CASE IS JUSTICIABLE. ........................................40

    A.     Plaintiffs Have Standing. ...........................................40

    B.     The Case Is Not Moot. ..............................................45

         1.     The District Court Properly Granted Broad
               Equitable Relief. ...............................................46

         2.     Site-Specific Relief Can Still Be (and Has Been)
               Granted. .........................................................49

II.    THE DISTRICT COURT PROPERLY FOUND
      GARDEN CITY LIABLE FOR INTENTIONAL
      DISCRIMINATION..........................................................51

    A.     There is No Clear Error in the District Court's Finding
         That Garden City Enacted R-T Zoning With
         Discriminatory Intent. ...............................................52

1.     The District Court Found That Garden City
       *Knowingly* Responded to Discriminatory Animus. ........54

2.     The District Court Properly Found that Opposition
       to R-M Zoning Was Race-Based. ...................................57

3.     The District Court Properly Weighed the Evidence
       and Rejected Garden City's Reliance on Non-
       Discriminatory Justifications. ..........................................61

B.   The District Court Did Not Err In Assigning the Burden
     of Proof, and Found that Plaintiffs Proved "But-For"
     Causation. ................................................................................67

III.   THERE WAS NO LEGAL ERROR IN THE DISTRICT
       COURT'S DISPARATE IMPACT HOLDING. ...............................71

A.   This Circuit and Courts Across the Country Have Long
     Applied Disparate Impact Liability to Exclusionary
     Zoning Laws. ..........................................................................72

B.   The District Court Correctly Held that R-T Zoning Had
     an Adverse Impact on Minorities and Perpetuated
     Segregation. ............................................................................74

1.     Garden City Misapplies *Middletown* .............................75

2.     Garden City Ignores that R-T Zoning Also
       Perpetuated Segregation. ................................................77

C.   Plaintiffs Proved That R-M Zoning Was the Less
     Discriminatory Alternative. ....................................................78

ARGUMENT:  CROSS-APPEAL AGAINST THE COUNTY ............................81

I.   THE DISTRICT COURT ERRED IN HOLDING THAT
     THE COUNTY BEARS NO RESPONSIBILITY FOR
     R-T ZONING. ..........................................................................81

A.   The County Knew That Opposition to R-M Zoning Was
     Racially Animated. ..................................................................81

B.   The County Had Legal Responsibility for R-T Zoning. ...........82

iii

1.    R-T Zoning Was Only Enacted After Approval by the County's Planning Board...........................................83

2.    New York Law Gave the County Authority to Override Discriminatory Zoning. ...................................85

II.    THE COUNTY'S ADMITTED POLICY OF DIRECTING AFFORDABLE HOUSING TOWARD MINORITY COMMUNITIES WAS AN ADDITIONAL BASIS FOR LIABILITY. ...................................................................89

CONCLUSION ......................................................................94

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACORN v. Cnty. of Nassau,*
2006 WL 2053732 (E.D.N.Y. July 21, 2006)....................................27

*Adarand Constructors, Inc. v. Slater,*
528 U.S. 216 (2000)............................................................49

*Aman v. Cort Furniture Rental Corp.,*
85 F.3d 1074 (3d Cir. 1996) ..................................................58

*Anderson v. City of Bessemer City,*
470 U.S. 564 (1985)........................................................39, 52

*Arizonans for Official English v. Arizona,*
520 U.S. 43 (1997)............................................................48

*Blackshear Residents Org. v. Hous. Auth. of City of Austin,*
347 F. Supp. 1138 (W.D. Tex. 1971) ..........................................93

*Boyd v. Lefrak Org.,*
509 F.2d 1110 (2d Cir. 1975) ..............................................59, 60

*Brady v. Town of Colchester,*
863 F.2d 205 (2d Cir. 1988) ..................................................39

*Chafin v. Chafin,*
133 S. Ct. 1017 (2013)........................................................45

*Cnty. of L.A. v. Davis,*
440 U.S. 625 (1979)..........................................................45

*Crown Commc'n N.Y., Inc. v. Dep't of Transp. of State of N.Y.,*
4 N.Y.3d 159 (2005)..........................................................85

*Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.,*
417 F.3d 898 (8th Cir. 2005) ..................................................80

*Delaney v. Bank of Am. Corp.,*
766 F.3d 163 (2d Cir. 2014) ..................................................70

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*,
 631 F.3d 42 (2d Cir. 2011) ...............................................................63

*Freeman v. Pitts*,
 503 U.S. 467 (1992)..........................................................................58

*Friends of the Earth, Inc. v. Laidlaw*,
 528 U.S. 167 (2000).............................................................40, 41, 49

*Fund for Animals v. Babbitt*,
 89 F.3d 128 (2d Cir. 1996) ...............................................................45

*Gautreaux v. Romney*,
 448 F.2d 731 (7th Cir. 1971) .....................................................45, 93

*Gorzynski v. JetBlue Airways Corp.*,
 596 F.3d 93 (2d Cir. 2010) ...............................................................68

*Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish*,
 641 F. Supp. 2d 563 (E.D. La. 2009).........................................53, 59

*Greene v. United States*,
 13 F.3d 577 (2d Cir. 1994) ...............................................................68

*Gross v. FBL Financial Services, Inc.*,
 557 U.S. 167 (2009)...................................................................passim

*Hart v. Cmty. Sch. Bd. of Brooklyn*,
 383 F. Supp. 699 (E.D.N.Y. 1974) ...................................................86

*Havens Realty Corp. v. Coleman*,
 455 U.S. 363 (1982)..........................................................................40

*Hicks v. Weaver*,
 302 F. Supp. 619 (E.D. La. 1969).....................................................93

*Hills v. Gautreaux*,
 425 U.S. 284 (1976)..........................................................................93

*Holcomb v. Iona Coll.*,
 521 F.3d 130 (2d Cir. 2008) .............................................................58

*Hunter v. Underwood*,
  471 U.S. 222 (1985)...........................................................................51

*Huntington Branch, N.A.A.C.P. v. Town of Huntington*,
  668 F. Supp. 762 (E.D.N.Y. 1987) ...........................................passim

*Huntington Branch, N.A.A.C.P. v. Town of Huntington*,
  689 F.2d 391 (2d Cir. 1982) .................................................41, 42, 44

*Huntington Branch, N.A.A.C.P. v. Town of Huntington*,
  844 F.2d 926 (2d Cir. 1988) .....................................................passim

*Inclusive Communities Project, Inc. v. Texas Dep't of Hous. & Cmty.
  Affairs*,
  747 F.3d 275 (5th Cir. 2014) ...........................................................72

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
  456 U.S. 844 (1982)...........................................................................52

*Iron Arrow Honor Soc'y v. Heckler*,
  464 U.S. 67 (1983)............................................................................49

*Jackson v. Okaloosa Cnty.*,
  21 F.3d 1531 (11th Cir. 2011) ...................................................73, 91

*Knox v. Servs. Emps. Int'l Union Local 1000*,
  132 S. Ct. 2277 (2012).....................................................................50

*Kwan v. Andalex Grp. LLC*,
  737 F.3d 834 (2d Cir. 2013) ............................................................70

*LeBlanc-Sternberg v. Fletcher*,
  67 F.3d 412 (2d Cir. 1995) ................................................46, 54, 57

*Lorillard v. Pons*,
  434 U.S. 575 (1978)..........................................................................69

*M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*,
  689 F.3d 263 (2d Cir. 2012) ............................................................39

*Matter of Monroe Cnty. (City of Rochester)*,
  72 N.Y.2d 338 (2012).......................................................................85

vii

*McDonald v. Verble*,
   622 F.2d 1227 (6th Cir. 1980) ............................................................48

*Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*,
   558 F.2d 1283 (7th Cir. 1977) .....................................................73, 76

*MHANY Mgmt. Inc. v. Cnty. of Nassau*,
   843 F. Supp. 2d 287 (E.D.N.Y. 2012) ............................................28

*MHANY Mgmt. Inc. v. Inc. Vill. of Garden City*,
   4 F. Supp. 3d 549 (E.D.N.Y. 2014) ................................................32

*MHANY Mgmt. Inc. v. Inc. Vill. of Garden City*,
   985 F. Supp. 2d 390 (E.D.N.Y. 2013) ............................................29

*Mitchell v. Shane*,
   350 F.3d 39 (2d Cir. 2003) ..............................................................39

*Otero v. N.Y.C. Hous. Auth.*,
   484 F.2d 1122 (2d Cir. 1973) .....................................................72, 86

*Park View Heights Corp. v. City of Black Jack*,
   605 F.2d 1033 (8th Cir. 1979) .........................................................46

*Powell v. McCormack*,
   395 U.S. 486 (1969) .........................................................................45

*Price Waterhouse v. Hopkins*,
   490 U.S. 228 (1989) .........................................................................68

*Pullman-Standard v. Swint*,
   456 U.S. 273 (1982) .........................................................................51

*Rajamin v. Deutsche Bank Nat'l Trust Co.*,
   757 F.3d 79 (2d Cir. 2014) ..............................................................39

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000)) ........................................................................62

*Regional Economic Community Action Program, Inc. v. City of Middletown*,
   294 F.3d 35 (2d Cir. 2002) .......................................................passim

*Rent Stabilization Ass'n of City of N.Y. v. Dinkins*,
     5 F.3d 591 (2d Cir. 1993) ...................................................................39

*Res. Advisory Bd. v. Rizzo*,
     564 F.2d 126 (3d Cir. 1977) .............................................................73

*Robinson v. 12 Lofts Realty, Inc.*,
     610 F.2d 1032 (2d Cir. 1979) ...........................................................69

*Scott v. Greenville Cnty.*,
     716 F.2d 1409 (4th Cir. 1983) ..........................................................42

*Smith & Lee Assocs., Inc. v. City of Taylor*,
     13 F.3d 920 (6th Cir. 1993) ..............................................................53

*Smith v. Town of Clarkton*,
     682 F.2d 1055 (4th Cir. 1982) ..............................................46, 59, 73

*Sunrise Dev., Inc. v. Town of Huntington*,
     62 F. Supp. 2d 762 (E.D.N.Y. 1999 ..................................................31

*United States ex rel. Anti-Discrimination Ctr. of Metro. N.Y., Inc. v.
     Westchester Cnty.*,
     668 F. Supp. 2d 548 (S.D.N.Y. 2009) ...............................................92

*United States v. City of Black Jack*,
     508 F.2d 1179 (8th Cir. 1974) ..........................................................73

*United States v. City of Parma*,
     661 F.2d 562 (6th Cir. 1981) ...............................................46, 73, 74

*United States v. City of Yonkers*,
     96 F.3d 600 (2d Cir. 1996) .........................................................87, 88

*United States v. Yonkers Bd. of Educ.*,
     837 F.2d 1181 (2d Cir. 1987) ...........................................47, 57, 59, 91

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
     133 S. Ct. 2517 (2013)......................................................................69

*Village of Arlington Heights v. Metropolitan Housing Development
     Corporation*,
     429 U.S. 252 (1977)...................................................................passim

ix

*Warth v. Seldin*,
    422 U.S. 490 (1975) ................................................................40

*We're Assocs. Co. v. Bear*,
    317 N.Y.S.2d 59 (2d Dep't 1970) ............................................83

*Westhab, Inc. v. Village of Elmsford*,
    574 N.Y.S.2d 888 (Sup. Ct. Westchester Cnty. 1991) ..............85

*Young v. Pierce*,
    544 F. Supp. 1010 (E.D. Tex. 1982) ........................................86

## STATUTES AND REGULATIONS

24 C.F.R. § 100.500(c)(3) .............................................................78

28 U.S.C. § 1291 ............................................................................6

28 U.S.C. § 1343 ............................................................................6

28 U.S.C. § 2201 ............................................................................6

42 U.S.C. § 1981 ....................................................................26, 30

42 U.S.C. § 1982 ..........................................................................26

42 U.S.C. § 1983 ....................................................................26, 30

42 U.S.C. §2000d ...........................................................89, 92, 93

42 U.S.C. § 3601 ..........................................................................72

42 U.S.C. § 3604(a) ................................................................26, 72

42 U.S.C. § 3608(e) ................................................................27, 88

42 U.S.C. § 3613 ......................................................................6, 46

78 Fed. Reg. 11460 (Feb. 15, 2013) ...........................................80

N.Y. Gen. Mun. Law § 239-m ..............................................20, 83

**FEDERAL RULES**

Fed. R. App. P. 28.1 ................................................................1

Fed. R. App. P. 32 ..................................................................1

Fed. R. Civ. P. 52(a).........................................................39, 51

**LEGISLATIVE HISTORY**

Pub. L. No. 100-430, 102 Stat. 1619 ......................................69

## PRELIMINARY STATEMENT

This case involves the validity of a discriminatory zoning ordinance adopted by appellant, the Incorporated Village of Garden City (together with appellant Garden City Board of Trustees, "Garden City" or the "Village"), in 2004 to prevent the development of affordable housing in Garden City and a feared influx of African-Americans and Latinos. After eight years of litigation and a three-week trial, the District Court (Spatt, J.) held that Garden City's ordinance was adopted with the intent to discriminate on the basis of race and national origin, in violation of the Fair Housing Act, other civil rights statutes, and the Constitution. The Court also held that the ordinance had a disparate impact on these minorities, in violation of the Fair Housing Act.

Garden City is a picturesque white enclave in Nassau County, New York. Nassau County is one of the most segregated counties in the country. Garden City is 97% white, while the surrounding towns are predominantly black and Hispanic, including Hempstead (84% minority), Uniondale (79%) and East Garden City (67%). Discriminatory zoning, often driven by local opposition to affordable housing, has played a major role in maintaining this segregation.

In 2002, defendant-cross-appellee County of Nassau ("the County") asked Garden City to rezone a parcel of County-owned land in Garden City so that the County could sell it for residential, multi-family development. Garden City's

1

planning consultant therefore proposed zoning that included multi-family residential zoning controls ("R-M" zoning). Garden City residents had the opportunity to provide feedback at public forums, and some expressed concerns about traffic and school crowding, which Garden City officials rebutted as unfounded. In late 2003, Garden City determined that R-M zoning met its objectives, and moved the proposed zoning law forward to the required public hearing.

Then, in early 2004, the spectre of "affordable housing" arose. A bill pending in the state legislature would have required a percentage of all new housing to be affordable. Garden City residents began demanding that the property be zoned to prohibit multi-family housing, not only because of traffic and schoolchildren, but also because affordable housing might be built. If that happened, residents complained, people who would change "the flavor and character" of Garden City might move in. Agitated residents protested that R-M zoning would result in "full families living in one bedroom townhouses," or "ten people in an apartment." Residents came out in force to public meetings and expressed strident opposition to affordable housing. As Garden City emphasizes in its brief, no one explicitly discussed race – not surprising, because it was 2004, in a New York suburb, not 1962 in the Jim Crow South – instead, opponents used coded language that implicitly referred to race. And everyone knew that the

2

people most likely to occupy affordable housing in Nassau County are African-American and Latino. Indeed, former County Executive Thomas Suozzi called residents' opposition "irrational" and "racist," and Village Trustee Peter Negri admitted that housing occupied by low income minorities was not consistent with the "character" of Garden City.

In response to this backlash, Garden City abruptly changed course and hastily enacted a new zoning designation – "R-T," for "Residential Townhouse" – which made affordable housing at the site impossible. Members of the New York Association for Community Reform Now ("ACORN") – an original plaintiff in this case, later replaced by its practical successor, New York Communities for Change ("NYCC") – and plaintiff MHANY Management Inc. ("MHANY") – an affordable housing developer – objected to the R-T zoning as discriminatory, but Garden City enacted it anyway. Under New York law, the Nassau County Planning Commission was required to review the ordinance and could have disapproved it. But the County instead ignored what it knew to be race-based animus on the part of Garden City.

ACORN, MHANY and several individuals who have since dismissed their claims brought suit in 2005, challenging the actions of Garden City and Nassau County under the Fair Housing Act, other civil rights statutes, and the Constitution. In 2012, the District Court denied Garden City's motion for summary judgment but

3

granted the County's motion, holding that the County was not causally responsible for the alleged discriminatory conduct of Garden City.

The District Court held a three-week trial regarding Garden City's liability in June 2013, and had the opportunity to assess the credibility of the witnesses, including Garden City officials. In December 2013, the Court issued its opinion, holding that Garden City's decision to abandon R-M zoning and adopt R-T zoning was made with an impermissible discriminatory intent. The Court carefully evaluated the evidence under the multi-factored inquiry established by the Supreme Court in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977), and made extensive factual findings, which are amply supported by the record. Although the District Court found that Garden City presented some facially legitimate justifications for R-T zoning, the District Court was unpersuaded by them, and held that intentional discrimination was the "significant" and "determinative" factor in Garden City's zoning decision.

Garden City challenges that conclusion on this appeal. Despite its strained efforts to manufacture a legal issue, Garden City's appeal, at bottom, asks this Court to overturn the District Court's careful assessment of the evidence. But Garden City identifies no clear error in the District Court's decision, and there is no basis for this Court to reverse.

4

The District Court also held that Garden City independently violated the Fair Housing Act because its zoning decision had a disparate impact on minorities in Nassau County and perpetuated racial segregation. The District Court's findings on the disparate impact of Garden City's zoning are unimpeachable, and Garden City does not challenge them here. Rather, relying on *Regional Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35 (2d Cir. 2002), Garden City claims that the "one-off" nature of Garden City's decision precludes any disparate impact claim. However, Garden City vastly overreads that case; its holding with respect to a zoning variance application for which no comparitive analysis of disparate effect was possible has no bearing here, and it is well-established that disparate impact analysis is properly used in reviewing generally applicable zoning ordinances under the Fair Housing Act. Moreover, Garden City completely ignores that the District Court independently found disparate-impact liability because R-T zoning perpetuated segregation.

The District Court erred, however, in granting summary judgment to the County, and that is the basis for Plaintiffs' cross-appeal. The District Court found that the County was not causally responsible for R-T zoning, and ended its inquiry there. But the District Court ignored that the County was required by law to review the zoning, yet failed to disapprove it despite the County's admitted knowledge that R-T zoning was a capitulation to racial animus. Moreover, the

5

District Court ignored that Plaintiffs' discrimination claims against the County were not limited to the Garden City site, and also challenged the County's policy of placing federally-funded affordable housing in predominantly minority municipalities. Plaintiffs alleged that this housing policy was designed to maintain segregation, and at a minimum raised triable issues of fact as to whether the County violated both the Fair Housing Act and Title VI of the Civil Rights Act of 1964, which prohibits discrimination in programs receiving federal funding.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. §§ 1343 and 2201 and 42 U.S.C. § 3613. The District Court entered final judgment on April 22, 2014. SJA203-12. Garden City timely noticed its appeal on May 5, 2014. JA1042. Plaintiffs noticed their cross-appeal against the County on May 16, 2014. JA1043-44. This Court has jurisdiction over the appeals under 28 U.S.C. § 1291.

## COUNTER-STATEMENT OF THE ISSUES AND STATEMENT OF THE ISSUES ON CROSS-APPEAL

1. Whether the District Court correctly determined that Plaintiffs had standing, where the District Court found that (a) MHANY would have submitted a competitive bid if Garden City had not adopted zoning making it impossible to build affordable housing and (b) members of NYCC were denied an opportunity to live in Garden City.

6

2.      Whether Plaintiffs' claims are moot, even though the District Court was able to grant affirmative injunctive relief to redress their injuries.

3.      Whether the District Court's finding that Garden City enacted R-T zoning with discriminatory intent, in response to racially-animated opposition to affordable housing, should be overturned as clearly erroneous.

4.      Whether the District Court correctly held Garden City liable under a disparate impact theory for adopting a generally-applicable zoning ordinance that had a demonstrably disproportionate effect on protected minorities and perpetuated segregation.

5.      Whether the District Court erred in granting the County's motion for summary judgment on the ground that the County was not responsible for Garden City's zoning, where Plaintiffs offered substantial evidence that the County *knew* that opposition to R-M zoning was racially-based and a County agency was required by law to approve the zoning.

6.      Whether the District Court erred in dismissing Plaintiffs' claims against the County, where it overlooked Plaintiffs' contentions that the County's explicit policy of steering federally-funded affordable housing to predominantly minority communities violated the Fair Housing Act and Title VI of the Civil Rights Act of 1964.

7

## STATEMENT OF THE CASE

**A.    The Relevant Facts**

**1.    Racial Segregation and Affordable Housing in Nassau County.**

Nassau County is highly segregated by race. JA195, 2479-80. Garden City is an extreme example: its population was 97.4% white in 2000, SJA120; JA197, 2266-67, while several surrounding communities, including Hempstead, Uniondale, and East Garden City, are majority-minority. JA196, 197, 2187, 2771.[1]

Minorities make up a disproportionate share of very-low income households in the County. SJA119; JA2749. In 2000, 41.4% of very low income renter households in the County were black or Latino, even though only 14.8% of all households were minorities. SJA119; JA199. Blacks and Latinos also comprised 88% percent of the waiting list in Nassau County for Section 8 housing. SJA119; JA203.

Most affordable housing in Nassau County is located in areas with high minority populations. JA2749.[2] This is the result of County policy, which

---

[1]    By "minority," we refer to African-American and Latino people. SJA119; JA196. "Majority-minority" refers to communities where minorities constitute the majority of the population.

[2]    "Affordable housing" is defined as housing that is financially attainable – *i.e.* requiring no more than 30% of a household's income – for households earning 80% or less of the median income for the Nassau-Suffolk Metropolitan Statistical Area. SJA119; JA348.

intentionally places affordable housing in high-minority areas. JA2575, 2651, 2854.[3] The County has maintained this policy even though it has repeatedly acknowledged that racial animus and local opposition are serious obstacles to integrated affordable housing, and that communities with few minorities often use zoning to maintain the status quo. *See*, *e.g.*, JA2231, 2306-07, 2584, 2633, 2832. As former County Executive Suozzi testified, "pervasive structural and institutional racism . . . remains omnipresent in Long Island" and "exclusionary zoning and lethargic government fair-housing enforcement" allow the situation to persist. JA2234.[4]

There is no affordable housing in Garden City. SJA120; JA348, 873. Garden City has refused to join the Nassau County Urban Consortium, a group of municipalities eligible to receive federal funding to support affordable and fair housing. SJA120-21; JA348.

---

[3]     Factual statements relevant only to the County's liability are supported by references to the summary judgment record, rather than the trial record.

[4]     County officials are well aware that exclusionary local zoning decisions play a key role in maintaining this segregation. Rosemary Olsen, former Director of the Nassau County Office of Housing and Intergovernmental Affairs, explained that County towns "are concerned [that] if they develop multi-family housing in their communities that they will attract people that are different from themselves." JA2491; *see also* JA2478, 2482 (former Deputy County Executive for Economic Development, Patrick Duggan: "people who don't want people of different races living in their communities . . . elect their elected officials to do the will of the people").

9

     **2.**     **The County Asks Garden City to Re-zone the Social Services Site.**

In May 2002, the County decided to sell surplus properties to raise revenue, SJA122, including an approximately 25-acre parcel which formerly housed the Nassau County Department of Social Services ("DSS"), located on County Seat Drive in Garden City (the "Social Services Site" or "Site"). SJA122; JA176, 2097. The vacant DSS building sits on 21.44 acres east of County Seat Drive. SJA122; JA176. The remaining 3.03 acres of the Site are west of County Seat Drive, on a narrow sliver of land that backs up to Sears and a parking garage. SJA122; JA180, 283, 2099. The Site is the southernmost portion of an 84.76 acre parcel containing other County buildings. SJA122; JA176, 2096. The entire parcel, including the Site, was zoned "P," for public use, and was known as the "P-Zone." SJA122; JA176. The County wanted to sell the Site for residential, multi-family development, and requested that Garden City re-zone the Site to permit that use. SJA122-23; JA176, 551, 554.

In June 2002, Garden City created a three-member committee of its Board of Trustees (Peter Bee, Peter Negri and Gerard Lundquist) – the "P-Zone Committee" – to make re-zoning recommendations. SJA123; JA177, 1365. The Trustees retained consultant Frank Fish and his firm, Buckhurst, Fish and Jacquemart ("BFJ"). SJA123; JA255, 493. Garden City had used BFJ in the past, respected its

work, and generally adopted its recommendations. SJA123; JA255. The Village also hired zoning counsel John Kiernan. SJA123; JA349.

### 3. BFJ and the Trustees Endorse R-M Zoning.

In September 2002, BFJ, Village Superintendent of Buildings Michael Filippon and the P-Zone Committee agreed on a set of planning principles to guide the rezoning process. SJA123; JA257-60, 833, 1063, 2090-91. Among other things, they provided that any development should "be consistent with the existing character . . . of Garden City"; "not overburden roads, utilities, and schools"; and "protect[ ] . . . the environment . . . through compliance with the State Environmental Quality Review." SJA123-24; JA1063.

Over the next eighteen months, BFJ met repeatedly with the P-Zone Committee and the public; issued three zoning studies; prepared a draft Environmental Assessment Form ("EAF"), as required by the State Environmental Quality Review Act ("SEQRA"); and sent numerous memoranda to Garden City officials. SJA124-27. All of the documents issued after April 29, 2003 recommended a Commercial-Office ("CO-5b") zone for the Site, with R-M controls for the residential component. SJA124-27; *see, e.g.*, JA1078, 1123, 1139, 1197, 1351, 1380-82. R-M zoning would have allowed 311 multi-family units east of County Seat Drive, and a total of 355 multi-family units on the entire Site. SJA124-27; JA177-78, 1078, 1154.

11

R-M zoning permitted a range of housing – multi-family, townhomes, or detached single-family homes – as-of-right. SJA1052-53; JA266, 834, 1078, 1123, 1197. R-M controls represented the *lowest density* multi-family housing available in the Garden City Code. JA261, 265, 1203. R-M zoning would not permit construction of a high-rise apartment building. JA266.

During 2003, the P-Zone Committee sought public comment by holding two public sessions (in May and October) and attending meetings of local property owners' associations. SJA28-29; JA350, 353, 1085-1102, 1163-83, 1880. Some residents expressed concerns regarding potential traffic, school crowding and the aesthetics of multi-family housing. SJA125; JA266-68, 276-77. Notwithstanding these concerns, the P-Zone Committee recommended R-M zoning. SJA125-27; JA277, 287. The P-Zone Committee found this recommended zoning satisfied Garden City's planning principles because it matched the character of surrounding neighborhoods, minimized impacts on schools and traffic, and provided a transition zone between the surrounding single-family and office uses. JA1115-16, 1123-24.

BFJ issued a draft Environmental Assessment Form in September 2003. SJA125; JA269, 1134-62. The EAF concluded that the proposed zoning would "not have a significant impact on the environment." SJA125; JA270, 1146. Specifically, the EAF concluded that multi-family housing at the Site would:

12

(1) not "result in the generation of traffic significantly above present levels," SJA125; JA270, 1155; (2) have a minimal impact on schools, SJA125; JA272-73, 276-77, 1158; (3) create transition, SJA125; JA271, 273, 1137, 1162; (4) maximize existing zoning tools, SJA125; JA273, 1161-62; (5) respect the character of surrounding neighborhoods, SJA125; JA1161-62; and (6) have positive aesthetic impacts, SJA126; JA273, 1161-62. The impacts of the proposed zoning were so minimal that BFJ concluded a full Environmental Impact Statement was not required under SEQRA. JA270, 831-32, 1146.

BFJ issued a final report in November 2003, which made minor changes to respond to the public comments, and included draft text for a new ordinance including R-M zoning. SJA126; JA277, 1184-1207. The P-Zone Committee endorsed this report, and sent it to the full Board for approval. SJA126; JA277-79, 495, 1393.

In December 2003, the full Board of Trustees accepted the P-Zone Committee's recommendations. SJA126; JA353, 1980. The Board unanimously declared that the zoning would have "no impact on the environment," as required by SEQRA, and moved proposed Local Law 1-2004 to public hearing. SJA126; JA353-54, 545, 1996. This was the last step required before the Board could enact the new zoning law. JA354.

The public hearing on proposed Local Law 1-2004 was held in January 2004.

13

Trustee Bee explained the careful deliberations that led to the R-M zoning proposal, and why the P-Zone Committee recommended it. JA1395-96. Some residents again raised concerns, focusing on traffic, schoolchildren, and whether large high-rise apartment buildings could be built. SJA127; JA1409, 1424, 1427, 1431, 1434. The Trustees, Fish, Filippon and Village Administrator Robert Schoelle explained that these concerns were unfounded. JA1405, 1413, 1430, 1435-36. The Board scheduled a second public hearing for February 5, 2004. JA501, 1436.

### 4. Affordable Housing Becomes a Concern.

In the following weeks, something changed. On January 20, 2004, questions regarding whether affordable housing would be permitted at the Site were raised for the first time at a meeting of the Eastern Property Owners' Association ("EPOA"). JA1665, 502.[5] In response, Trustee Bee explained that affordable housing was possible under R-M zoning. JA1665, 501.

The February 5, 2004 continuation of the public hearing on Local Law 1-2004 attracted a large crowd. JA360, 1209. The first citizen to comment asked whether Bee's statement about affordable housing was true. SJA127; JA1231,

---

[5]     Garden City has four Property Owners' Associations ("POAs"), which are open to homeowners in the Village by geographic location. JA177, 182, 347. The POAs act as liaisons between Village government and people living in their "jurisdictions." SJA123; JA347. The Site is within the "jurisdiction" of the EPOA. SJA123; JA347.

1236, 1238.  Residents demanded a "guarantee" that development at the Site would be "upscale," rather than "low income" or "affordable"; expressed concerns that multi-family housing would "depress the market"; and urged officials to adopt zoning reflecting "the flavor and character of what Garden City is now."  SJA128; JA1231, 1236-37, 1239, 1241-43.

Careful not to speak explicitly about race, residents expressed concerns about "full families living in one bedroom townhouses," resulting in "overburdened and overcrowded" schools and "overrun" sanitation; about creating a "multi-housing community . . . [with] four people or ten people in an apartment"; and about traffic caused by "that whole section of people" who use the bus to access the Department of Social Services.  SJA128; JA1260, 1275.  Village residents spoke of the need to protect Garden City as it is now, calling it a "gem" and saying they were "proud to live" in the "beautiful one family houses" that "grace" the town.  JA1244, 1264.

County Executive Suozzi attended the February 2004 meeting, and clearly recalled the opposition to affordable housing.  JA550, 552-53, 556, 562.  Village residents were agitated, and were "yelling" at him.  JA1246.  Suozzi admitted that, in his view, this opposition was motivated at least in part by racism.  JA556; 2266-63.  Nevertheless, he attempted to mollify the crowd by saying that affordable housing could be prohibited through deed restrictions or other measures.  JA552,

562, 1237, 1239, 1246, 1253. He also told residents that, while "there is a great need for affordable housing" in the County, "Garden City is not the location." JA631, 1236. Instead, "upscale housing" was what the County thought was "in the character of Garden City and would be appropriate." JA1236.

Attendees at the meeting also voiced concerns about the impact multi-family housing might have on traffic, schools, and the "character" of the neighborhood. JA1237-40, 1242-43, 1253-54, 1259-61. But Garden City officials and BFJ again explained that the zoning proposal would actually have a positive impact on traffic, schools, and neighborhoods. JA553-54, 1214, 1231, 1238-39, 1249, 1255-56. Suozzi bluntly rejected a resident's concern about traffic as "irrational." SJA129; JA1239.[6]

### 5. Impact of the Balboni Bill.

Village residents' fears about affordable housing stemmed in part from a bill then pending before the State Legislature, sponsored by Senator Michael Balboni

---

[6] Garden City officials were well aware that racial discrimination was a problem in Garden City generally. In February 2004, ACORN released a study entitled "Whites Only," which documented racial steering by realtors in and around Garden City. SJA121; JA652-53. Garden City Mayor Barbara Miller and Administrator Schoelle were both aware of this study. JA660-61. ACORN also raised awareness about racial discrimination its members had experienced in Garden City parks. JA664-65. This eventually led to an investigation by the New York Attorney General, which, in 2005, "determined that Garden City enforced a local requirement limiting the use of its parks to Garden City residents in a racially discriminatory manner." SJA121-22.

and Assemblyman Thomas DiNapoli (the "Balboni Bill"). SJA129-30; JA360-63. Residents worried that the Balboni Bill would *require* a percentage of any multi-family housing development at the Site to be affordable. JA360-63, 1632, 1660.

Concerns about the Balboni Bill were raised at a series of meetings in 2004. JA360-61, 503. At a February 10 EPOA meeting, questions were raised about "how recently proposed state legislation requiring that new development include affordable housing would impact the proposed zoning change." JA1984. Trustee Bee reassured attendees that he would "investigate" the issue. JA504, 1984.

The Balboni Bill was raised again at the March 9 EPOA meeting, prompting Bee to promise residents that he would meet with Senator Balboni personally to "gain a better understanding" of the bill. JA1876. Garden City residents also raised the Balboni Bill with Bee separately, and Bee met with Senator Balboni on several occasions about the potential effect of the bill. JA503, 505.

In March 2004, an inflammatory flyer was circulated to Garden City residents who lived near the Site. SJA129; JA628, 629, 632, 636. The flyer warned that the Balboni Bill could require affordable housing at the Site, which would bring people into the Village who earned "NOT JUST GARDEN CITY INCOMES!," and questioned "WILL GARDEN CITY PROPERTY VALUES DECREASE?" SJA129; JA1632. The flyer urged residents to take a stand against the proposed zoning at the upcoming March 18 Board meeting. JA1632. The flyer

17

was widely circulated, and reached Village Administrator Schoelle, who sent it to Fish and at least one member of the Board. SJA129; JA420. Trustee Lundquist also saw the flyer. SJA129; JA446-47.

Residents raised the Balboni Bill at the March 18 Board meeting, as the flyer had urged. SJA129-30; JA361-62, 1660-62, 1885. Residents expressed concern that the Balboni Bill might apply "retroactive[ly]" to projects that had been approved before its enactment. SJA129-30; JA362-63, 1661. One resident urged decision-makers to "play it safe" and "vote for single family homes." SJA130; JA362, 1660. Village officials thereafter met with state representatives to discuss the Balboni Bill, and reported the results at a meeting of the Central POA in April. SJA130; JA2016.

### 6.     The Trustees Abruptly Change Course.

After a year and a half of recommending R-M zoning controls and insisting that they would have no environmental impact, SJA124-30; JA1996, the Trustees abruptly buckled under this pressure and abandoned Local Law 1-2004. At a Board meeting on April 22, Fish gave another presentation, this time recommending that only 215 multi-family housing units be allowed at the Site. SJA130; JA280, 1286. But that was still too much for Garden City residents, who opposed *any* multi-family housing. JA287. Immediately after the presentation, BFJ, Schoelle, Filippon, and Garden City's regular counsel, Gary Fishberg, held a

18

private meeting; no members of the P-Zone Committee attended, nor did Garden City's zoning counsel. SJA130; JA281, 1360. That same evening, the Trustees voted to send an entirely new law, proposed Local Law 2-2004, to public hearing. JA1901, 1904.

Proposed Local Law 2-2004 was an empty shell at the time; no zoning text had been drafted, no EAF had been prepared, and no declaration under SEQRA regarding its environmental impact had been made. SJA131; JA1904. The details of Local Law 2-2004 would not be filled in for two weeks, when BFJ proposed R-T zoning for the first time. SJA130-31; JA1360-64. The new R-T classification – which had not previously existed in the Village Code, JA283 – eliminated the option of multi-family housing on most of the Site, permitting only single family homes or attached single-family townhomes on the 21 acres east of County Seat Drive. The new zoning allowed multi-family housing on the "unattractive" and "peculiar" 3.3-acre "sliver" of land west of County Seat Drive, but only by special permit of the Board. SJA130; JA281, 283-84, 835-36, 1345, 1360, 1470. The EAF for R-T zoning was not issued until May 2004. SJA131; JA282, 1299-1342. And the EAF was issued in final form, without a draft, even though BFJ described R-T zoning as a "significant" change from CO-5b with R-M controls. SJA131; JA282-83, 1299-1342.

19

Local Law 2-2004 was hastily enacted. The public hearing was held on May 20, shortly after the EAF was issued. SJA131; JA1904, 1437, 1299. Long Island ACORN members quickly organized when they learned that R-M zoning had been rejected in response to opposition to affordable housing. SJA131-32. Had affordable housing been built at the Site, many ACORN members would have sought to live there. JA711, 726. ACORN members attended the May 20 hearing and protested that R-T zoning would hurt minority populations by preventing affordable housing at the Site. SJA131; JA656. However, Fishberg explained that the required referral to the Nassau County Planning Commission (the "Commission") had already been made, and that the Commission would be addressing the law the following week. SJA131; JA1461.

### 7. The County Approves the Zoning.

Pursuant to New York law, the Commission was required to review Garden City's zoning ordinance before it was enacted, and to "recommend approval, modification, or disapproval, of the proposed action." N.Y. Gen. Mun. Law § 239-m(4)(a). If the Commission disapproved the zoning, Garden City could still overcome that disapproval, but only by approving the zoning by a super-majority, comprised of at least a majority plus one of the members of the Board (*i.e.*, at least six of the eight members). *Id*. § 239-m(5); *see* JA1999-2000 (listing eight members of Board).

20

The Commission met on May 26, 2004 to consider Garden City's proposed zoning. SJA131; JA657, 1461, 1505, 1870. ACORN members attended the meeting, expressed opposition to the discriminatory zoning, and urged the County not to approve it. SJA131; JA657. MHANY – operating under its prior name, New York ACORN Housing Company ("NYAHC") – sent a letter to the Commission protesting that the zoning would "ensure that developers cannot create affordable multi-family housing." SJA131-32; JA1871.

However, the County did not disapprove the zoning. On the contrary, the County stated that it "is in support of the direction of many of the proposed amendments." JA1505. The only modifications the County requested were that Garden City not eliminate "P" zoning for the public facility portions of the Site, and that density be less severely limited. JA1505-06.

The County's approval of R-T zoning was consistent with its longstanding and explicit policy of placing affordable housing in predominantly minority communities. JA2749, 2761-64. The County's 1995, 2000, 2005 and 2010 Consolidated Strategy and Plans – which the County is required to prepare in order to receive federal housing assistance from the U.S. Department of Housing and Urban Development ("HUD") – expressly state that:

> Nassau County currently targets its comprehensive community development efforts in . . . lower income and minority areas such as Roosevelt, Inwood, Hempstead

21

> Village, New Cassel and Freeport. Housing rehabilitation activities, constructions of affordable housing and housing redevelopment activities have been, and will continue to be, targeted to these areas.

JA2575, 2616, 2651, 2854.

### 8. The Effect of R-T Zoning.

Once the County gave its approval, Garden City's Trustees enacted R-T zoning into law at the Board's June 3, 2004 meeting, despite further opposition from ACORN members. SJA132; JA1905-10, 657.

In addition to eliminating multi-family housing on the great majority of the Site, the new R-T zoning also imposed large minimum floor area requirements: 4,000 square feet of land per multi-family unit (as opposed to 3,000 square feet under R-M controls), 6,000 square feet per single-family townhome, and 8,000 square feet per single-family detached home. SJA132; JA1343-48. These floor area and minimum lot size requirements prevented any affordable housing on the Site. SJA132, 170, 173; JA563, 736-37. Ismene Speliotis, Executive Director of NYAHC/MHANY, analyzed R-T zoning at the time and concluded that it was not feasible to build affordable housing under these zoning restrictions, at any acquisition price. SJA132, 170, 173; JA736-37.

22

### 9. Plaintiffs' Continued Opposition.

Even after Local Law 2-2004 passed, Plaintiffs continued to protest the zoning and lack of affordable housing in Garden City. JA657. ACORN members attended the June 17 Board meeting to express their opposition, and asked to meet with Village leadership. JA657-58, 1915-19. ACORN and NYAHC also wrote to and met with County officials. SJA132; JA659, 1516-22. When these efforts failed, ACORN members marched in protest in August 2004. JA660.

Garden City officials finally agreed to meet. On August 18, ACORN representatives met with Miller and Schoelle to express their concerns. JA660-62, 2180-84. In response, Miller flippantly told ACORN members that the Village already *had* affordable housing – "for people who can afford it." JA2180.

### 10. The County's RFP and the Plaintiffs' Response.

In July 2004, Nassau County issued a Request for Proposals ("RFP") for residential development at the Site, and sought a $30 million minimum bid. SJA132; JA1807-67. Since Plaintiffs' efforts to change R-T zoning had been unsuccessful, they could not submit a qualifying bid that included affordable housing. Instead, Plaintiffs timely submitted a non-complying "protest" letter, which included a proposal to develop a 2,000 unit, economically-integrated community on the Site. SJA132-33; JA740, 1516-22. The letter emphasized

23

Plaintiffs' concern that R-T zoning had been enacted for the purpose of precluding affordable housing. JA740, 1516-22.

Fairhaven Properties won the bidding, for $56,500,000. SJA133; JA1508-09. Fairhaven's winning final bid proposed a luxury development of 87 single-family luxury detached homes; it did not include any townhouses. JA1508-09. These luxury homes would likely not have been occupied by any significant number of minorities. SJA170.

Speliotis determined that she could have developed affordable housing under R-M zoning, even at the County's high bid demand. SJA140; JA734-35, 741, 749, 1873. After the bidding closed, Speliotis created four pro formas[7] for alternative developments. SJA133, 140; JA741, 744-45, 1873, 2185-86. She concluded that it would have been feasible to build 45 to 78 affordable housing units on the Site as part of a 311-unit development under R-M controls – including up to 78 Section 8 subsidized rental housing units – at acquisition costs ranging from $30,000,000 (the County's minimum price) to $56,000,000 (approximately the winning bid). SJA171; JA742, 744-46, 1873, 2185-86. Moreover, Speliotis' pro formas demonstrated that affordable housing developers have access to a variety of funding sources not available to market-rate developers, and that market-rate units

---

[7] "Pro formas" are models for analyzing the financial feasibility of housing development. JA735.

24

can cross-subsidize affordable housing in a mixed-income development. JA743-44, 1873, 2186. MHANY would have bid on the Site, and proposed a mixed-income development with an affordable component, if the Site had been zoned R-M. SJA140; JA749, 1873, 2185-86.

### 11. The Ring Road Proposal.

In 2006, Garden City officials blocked another proposal to develop affordable housing, this time at the "Ring Road" site, an 11-acre parcel at the eastern edge of Garden City. Suozzi contacted Lundquist, who was then Mayor, to discuss this proposed development. JA1924-25, 419. But Lundquist responded that there would be "equal [if] not greater public reaction" to affordable housing at Ring Road. JA1635. Indeed, the County received many hostile – and some openly racial – communications regarding its proposal for Ring Road, some of which referred back to the Social Services Site.[8]

In December 2006, Village Trustees considered purchasing the Ring Road site from the County to prevent the affordable housing project from going forward.

---

[8] These comments included: (1) "people who cannot afford to live somewhere should not be able to. TRS [Suozzi] is catering to ACORN and black people"; (2) "I am disgusted when I . . . read about how you still want to destroy our beautiful village by forcing in affordable housing"; (3) "Please do not pursue this low income housing in GC . . . Please do not turn GC into Hempstead, Roosevelt, etc."; (4) "Adamantly opposed to low income housing or affordable housing in Garden City – at the old DSS property or in the vicinity of Roosevelt Field. You live where you can afford to live – plain and simple…it is not a hand-out!" JA2683-84, 2690, 2692, 2699, 2702.

25

JA2003. In March 2007, the County issued an RFP for Ring Road that specifically called for development of affordable housing under R-M zoning. JA1926, 1929-31, 558, 747. MHANY submitted a formal proposal in response. JA1668-1806. But Garden City never rezoned Ring Road to R-M, JA419, 666, 747, and the County did not further pursue the project. JA2794. The site remains vacant. SJA121; JA419.[9]

**B.    Proceedings in the District Court**

> **1.    The Complaint and Motion to Dismiss.**

This lawsuit was filed in May 2005. SJA134. The original plaintiffs were NYAHC, ACORN and several individuals who have since dismissed their claims. SJA134, 136. Plaintiffs sued Garden City and the County for violations of the anti-discrimination provision of the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(a); the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982 and 1983; and the Equal Protection Clause. SJA135; JA85-86. Plaintiffs also alleged that the County's actions and policies violated its obligations under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, not to discriminate in the administration of

---

[9]    Ring Road represented at least the third time that Garden City balked at the prospect of affordable housing. In 1989, a developer proposed constructing fifty-one units of affordable housing at the Doubleday site. SJA121; JA190-23. The project never went forward; a building moratorium imposed and repeatedly extended by Garden City appeared designed to prevent such construction. JA412. Recently, a luxury development was approved for the site. SJA121; JA416.

26

federal funding, and under Section 808 of the FHA, 42 U.S.C. § 3608(e), to affirmatively further fair housing.  JA86-87.

In July 2006, the District Court (Bianco, J.) denied Defendants' motions to dismiss, rejecting their challenge to Plaintiffs' standing and finding that Plaintiffs had adequately alleged discrimination.  SJA1-14; *see ACORN v. Cnty. of Nassau*, 2006 WL 2053732 (E.D.N.Y. July 21, 2006).  The District Court found that NYAHC had "successfully pled a particularized injury," SJA9-10, and emphasized that "[t]he harm [to a discriminatory zoning plaintiff] does not have to be economic, indeed, 'an interest in making suitable low-cost housing available in areas where such housing is scarce' can 'support plaintiff's standing.'"  SJA8 (citing *Arlington Heights*, 429 U.S. at 262-63).  The Court held that ACORN had standing because its members had an interest in living in affordable housing. SJA11.

ACORN disbanded in early 2010.  JA645.[10]  NYCC, an organization with the same goals and mission – and many of the same members, SJA142; JA645 – moved to intervene.  SJA135.  In June 2010, the District Court (Spatt, J.) granted NYCC permission to intervene as ACORN's practical successor.  SJA135; JA92-100.[11]

---

[10]     At the same time, NYHAC changed its name to MHANY.  JA731.

[11]     Judge Bianco recused himself in March 2010.  JA91.

## 2.      The Summary Judgment Rulings.

Garden City and the County moved for summary judgment in July 2011. SJA135.  On February 15, 2012, the District Court issued a 101-page decision, denying Garden City's motion but granting the County's.  SJA15-115, 136; *see MHANY Mgmt. Inc. v. Cnty. of Nassau*, 843 F. Supp. 2d 287 (E.D.N.Y. 2012).

The Court denied Garden City's motion because it found disputed issues of fact as to whether Garden City had engaged in intentional discrimination and whether it was liable on a disparate impact theory.  SJA57, 78.

The Court granted the County's motion, however, because it held that the County did not "bear[ ] the legally required causal relationship to the complained-of Village zoning action."  SJA78; *see also* SJA90.  The Court assumed that the sole alleged discriminatory act was Garden City's rejection of R-M zoning, and held that the County did not have legal control over Garden City's zoning.  SJA78. Although the Court acknowledged that the County was required to review the zoning under New York law, the Court brushed that aside, stating: "although the Plaintiffs may find the lack of outrage by the County to be objectionable, that does not constitute a violation of law."  SJA83.

The Court disregarded completely that Plaintiffs also challenged the County's policies regarding the siting of affordable housing, under both the Fair Housing Act and Title VI of the Civil Rights Act of 1964.  The Court assumed

28

without basis that Plaintiffs' claims under Title VI were premised on the alleged discrimination regarding the Social Services Site. SJA105-06.[12]

On the eve of summary judgment motions, the County announced that it no longer intended to sell the Site, and would instead build a family courthouse there. JA117-18. Defendants claimed that this announcement mooted the case, but the District Court rejected that claim. SJA44-54. The Court found that it could still grant Plaintiffs relief even if the Site were no longer for sale, and also noted that "it may not be impossible . . . to grant some relief as to the Site." SJA49-50.

### 3.   The Court's Post-Trial Findings and Conclusions.

In June 2013, the District Court held an eleven-day bench trial during which it heard testimony from fifteen witnesses – half adverse to Plaintiffs – and admitted 89 exhibits into evidence. On December 6, 2013, the District Court issued a 65-page opinion containing its findings of fact and conclusions of law. SJA116-80; *see MHANY Mgmt. Inc. v. Inc. Vill. of Garden City*, 985 F. Supp. 2d 390 (E.D.N.Y. 2013).[13]

First, the District Court again held that MHANY and NYCC had standing. The Court held that NYAHC/MHANY "proved injury in fact" at trial because it

---

[12]    The Court dismissed Plaintiffs' claim against the County under Section 808(e) of the FHA, regarding its duty to affirmatively further fair housing, on the ground that there is no private right of action to enforce that provision. SJA91-102. Plaintiffs are not appealing that ruling.

[13]    Garden City's assertion that the decision is "unreported" (Br.3) is incorrect.

29

would have submitted a "directly competitive" bid to build a mixed-income development if the Site had been zoned R-M. SJA140. And NYCC's members desired, and would have been eligible to reside in, affordable housing in Garden City. SJA142.

The District Court also rejected Garden City's renewed argument that the case was moot. The Court again emphasized that Plaintiffs had requested and would be entitled to broad injunctive relief if they prevailed, whether or not the Site had been sold, and that relief as to the Site was still possible. SJA144.

On the merits, the District Court held Garden City liable under Section 804(a) of the FHA, both because Garden City's zoning decision was the product of intentional discrimination and because it had a disproportionate effect on minorities and perpetuated segregation. SJA118, 179-80.[14] The District Court grounded its finding of intentional discrimination in a thorough consideration of the factors set out by the Supreme Court in *Arlington Heights*. SJA148-49. The Court placed the greatest emphasis on the sequence of events leading up to Garden City's enactment of R-T zoning, SJA152, and the substantial impact R-T zoning had in preventing minorities from moving into Garden City, SJA150, 161, 170-72. The Court also concluded that the public opposition to R-M zoning reflected race-

---

[14]    In light of this intentional discrimination, the Court also held Garden City liable under 42 U.S.C. §§ 1981 and 1983 and the Equal Protection Clause. *See* SJA118, SJA175.

30

based animus, SJA154-56, that "findings of discrimination cannot 'be avoided by careful use of code words,'" SJA155 (citing *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 668 F. Supp. 762, 786 (E.D.N.Y. 1987) ("*Huntington II*"), *aff'd* 844 F.2d 926 (2d Cir. 1988) ("*Huntington III*"), *aff'd* 488 U.S. 15 (1988) (affirming holding that zoning ordinance had disparate impact on minorities, without reaching applicability of disparate impact test)), and that Defendants were "'swayed by the anti-[minority] animus present in the community,'" SJA161 (citing *Sunrise Dev., Inc. v. Town of Huntington*, 62 F. Supp. 2d 762, 775 (E.D.N.Y. 1999)).

The District Court considered Garden City's proffered non-discriminatory reasons for R-T zoning. SJA157. While the Court concluded that the Garden City Defendants had "satisfied their minimal burden" of proffering non-discriminatory reasons for R-T zoning, the Court turned to the ultimate question of "discrimination *vel non*" and concluded that those justifications were simply not persuasive. SJA158-60, 166-67. Rather, the Court held, "Plaintiffs have established that discrimination played a *determinative* role" in Garden City's zoning decision. SJA167 (emphasis added).

The District Court also made detailed findings that R-T zoning "largely eliminated the potential for the type of housing that minorities were disproportionately likely to need," SJA170, "prevented the overwhelmingly

31

African-American and Hispanic households on the Nassau County Section 8 waiting list from being able to live in Garden City," SJA171, and "perpetuate[d] segregation" in Garden City and Nassau County. SJA171-72. The Court rejected Garden City's argument that the zoning law could not be the subject of a disparate impact claim because Plaintiffs' allegedly were challenging a "one-off" zoning decision rather than a general "policy" or "practice." SJA172-73. Finally, the Court held that R-T zoning could not be upheld on the ground that no less discriminatory alternative existed, since Plaintiffs established that R-M zoning was a less discriminatory alternative. SJA174-75.

### 4. The Decision on Remedies and Final Judgment.

As the District Court requested, SJA179, the parties addressed appropriate remedies in post-trial briefing. Despite its contention that the case is moot because the Court could no longer award relief at the Site, Garden City asserted that "at most the Plaintiffs are entitled to have the Social Services Site rezoned R-M." SJA184.

On March 17, 2014, the District Court issued its decision on remedies, SJA181-202; *see MHANY Mgmt. Inc. v. Inc. Vill. of Garden City*, 4 F. Supp. 3d 549 (E.D.N.Y. 2014), and entered final judgment on April 22, 2014. SJA203-12. The final judgment imposes both Site-specific and more general relief. The Court ordered that, if the County decides to sell the Site, Garden City must rezone it R-

M. SJA206. The Court also granted other affirmative relief (including ordering Garden City to appoint a fair housing compliance officer, implement a fair housing training program, and – if the County does not sell the Site – join the Nassau County Urban Consortium and adopt an inclusionary zoning ordinance encouraging affordable housing), as well as an injunction prohibiting further discrimination. SJA189-201, 205-12.

The District Court also entered a final judgment of dismissal as to the County. SJA205. Garden City appealed, and Plaintiffs cross-appealed the County's dismissal. JA56.

## SUMMARY OF ARGUMENT

**Garden City's Appeal:**

I.      The District Court properly concluded that this case is justiciable.

A.      The District Court found that Plaintiffs proved their standing by demonstrating that MHANY wanted to build, and members of NYCC wanted to live in, affordable housing at the Site. SJA140-42. Plaintiffs did not have to establish with certainty that MHANY would have submitted the winning bid. As the Court recognized, MHANY would have been able to submit a "directly competitive" proposal to develop the Site had it been zoned R-M. SJA140. That was sufficient, since a plaintiff need not resolve all the uncertainties involved in housing development to establish standing.

33

B.     A case is only moot when it is impossible to grant relief.  Here, the District Court properly found that relief was possible, and then granted it.  The Final Judgment provides for both Site-specific and non-Site-specific relief, consistent with courts' broad remedial power to address discriminatory housing practices.  Although the relief may not guarantee that affordable housing will be built at the Site, it was designed to redress Plaintiffs' injuries by promoting affordable housing in Garden City and ordering affirmative measures to combat future housing discrimination.

II.     The District Court properly found that Garden City's decision to enact R-T zoning was the result of intentional racial discrimination.

A.     The District Court held a lengthy trial and heard testimony from numerous witnesses, including the relevant Garden City officials, concerning the circumstances surrounding their adoption of R-T zoning.  In its opinion, the Court conducted a detailed inquiry into Garden City's zoning decision under the well-established *Arlington Heights* factors.  The Court's finding that Garden City acted with discriminatory intent is a factual finding that must be sustained unless clearly erroneous.  There is no basis for finding clear error here.

B.     The District Court applied the correct legal standards, and there is no error in its analysis.  In particular, the Court was well aware that a finding of intentional discrimination – if based on municipal decision-makers' response to

34

public opinion – required that they be "knowingly responsive" to racially-based animus.  SJA148.  And the Court found that the public opposition to affordable housing here did reflect racial bias, using coded language.  In arguing that the Court applied the wrong standard, allegedly holding Garden City liable simply because the public comments "could have been construed" as racially-charged, Garden City takes one phrase out of context and ignores the balance of the District Court's detailed findings and conclusions.

C.     Garden City emphasizes that neither city officials nor residents explicitly stated that their objections were based on race, but this does not make the Court's intent finding clearly erroneous.  Findings of intentional discrimination are often necessarily based on circumstantial evidence, and the absence of overtly discriminatory remarks is not dispositive.  It is well settled that the court can properly consider comments that reflect coded references to race in concluding that intentional racial discrimination is at work.

D.     There is no basis for Garden City's blatant attack on the District Court's fact-finding and its weighing of the evidence regarding the reasons for adoption of R-T zoning.   The Court's analysis of Garden City's alleged justifications for R-T zoning is well-supported by the record and is not clearly erroneous.

35

E.     Garden City failed to preserve its argument that, under *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), the District Court could not impose liability unless discrimination was the "but-for" cause for its zoning decision, and that the Court erred in assigning the burden of proof on that issue to the Village.  But even if the Court decides to reach the issue, the Court need not decide whether *Gross*, an age discrimination case, applies to FHA claims in order to affirm.  Garden City ignores that the District Court *found* what Garden City claims is required under *Gross*:  that Plaintiffs proved that discrimination was the "determinative" cause of Garden City's adoption of R-T zoning, whether or not it was Plaintiffs' burden.   In any event, *Gross*'s "but-for" standard does not apply to FHA claims.

III.     The District Court also correctly held that Garden City's decision to adopt R-T zoning had an unjustified disparate impact on minorities and perpetuated residential segregation.  There is no basis to hold this finding clearly erroneous, and Garden City does not contend otherwise.

A.     Garden City asserts that disparate impact liability does not apply to local zoning decisions that involve a single parcel.  But courts across the country have long applied disparate impact liability to exclusionary zoning challenges like this one, and Garden City's argument would require the Court to abandon its own precedent.   R-T zoning was adopted through a generally

36

applicable zoning law like the one at issue in *Huntington III*, where this Court held that zoning a particular parcel of land had an unjustified disparate impact. Unlike cases involving one-off denials of special use permits or zoning variances for group homes, Plaintiffs here proved the disparate and segregative effect of R-T zoning with comparative statistical evidence.

B.    There is no merit to Garden City's claim that the District Court erred in stating that to avoid disparate impact liability, Defendants bore the burden of establishing there was no less discriminatory alternative. The District Court followed the established assignment of burdens set out in *Huntington III*. There is no basis for revisiting that precedent. And even if the Court did so, there is no basis for reversal, because the District Court in fact found that Plaintiffs proved that R-M zoning was a less discriminatory alternative.

**Cross-Appeal Against Nassau County:**

I.    The District Court erred in granting summary judgment to Nassau County on the ground that the County had no causal responsibility for Garden City's zoning. The facts presented were sufficient to raise triable issues. Former County Executive Suozzi admitted that opposition to R-M zoning was racially motivated, and that the County knowingly acquiesced to the discriminatory objections of Garden City residents. But Suozzi (and the District Court) were wrong to assert that Garden City's discriminatory actions were not the County's

concern. The County was required by law to review Garden City's zoning change, and could have disapproved it. Instead, it knowingly bowed to the racial animus of its constituents.

II.     In dismissing Plaintiffs' claims under the FHA, the District Court also failed to consider Plaintiffs' allegations regarding the County's policy of steering government-backed affordable housing into predominantly-minority municipalities. The Court erred in viewing this policy exclusively through the prism of Plaintiffs' claim that the County had failed to affirmatively further fair housing under Section 808 of the FHA. The County's policy was also relevant to Plaintiffs' claim that the County intentionally discriminated in violation of Section 804 of the FHA, and that this policy had a disparate impact on minorities by perpetuating deep-seated segregation in Nassau County.

III.     The District Court further erred in dismissing Plaintiffs' claim under Title VI of the Civil Rights Act of 1964. It is undisputed that the County is subject to Title VI in connection with its administration of HUD housing assistance programs. The County's explicit policy of steering affordable housing into minority communities plainly raised substantial issues under Title VI. In dismissing this claim, the District Court erroneously focused only on Plaintiffs' claims with respect to Garden City's approval of R-T zoning, and disregarded Plaintiffs' claims regarding the County's steering policy.

38

## <u>STANDARDS OF REVIEW</u>

Garden City claims that "[t]his Court reviews questions about mootness and standing *de novo*," Br.20, but this is only partly correct.  Although the Court reviews the ultimate legal issues *de novo*, the Court must accept the district court's resolution of disputed facts regarding standing and mootness unless they are clearly erroneous.  *Rajamin v. Deutsche Bank Nat'l Trust Co*., 757 F.3d 79, 84-85 (2d Cir. 2014); *Rent Stabilization Ass'n of City of N.Y. v. Dinkins*, 5 F.3d 591, 594 (2d Cir. 1993).

This Court reviews findings of discriminatory intent and impact, after trial, for clear error.  Fed. R. Civ. P. 52(a); *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985); *M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*, 689 F.3d 263, 273 (2d Cir. 2012).

Summary judgment decisions are reviewed *de novo*, and the Court must construe the evidence in the light most favorable to the non-moving party. *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003); *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988).

## ARGUMENT: GARDEN CITY'S APPEAL

### I.     THIS CASE IS JUSTICIABLE.

#### A.     Plaintiffs Have Standing.

Standing under the Fair Housing Act is as broad as Article III permits.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982).  To establish Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw*, 528 U.S. 167, 180-81 (2000).

A zoning plaintiff has standing if he can show "specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention."  *Warth v. Seldin*, 422 U.S. 490, 508 (1975).  Showing that a zoning ordinance prohibits a specific project where individual plaintiffs would live, or that a developer plaintiff would build, is generally sufficient to establish standing.  *See Arlington Heights* 429 U.S. at 261; *Warth*, 422 U.S. at 507.  A plaintiff need not prove that relief will "guarantee" the development will be built.  *Arlington Heights*, 429 U.S. at 261.  Requiring such proof would ignore "the uncertainties which shroud human

affairs." *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 689 F.2d 391, 394 (2d Cir. 1982) ("*Huntington I*").

The District Court properly found that Plaintiffs made this showing.  As the Court found, NYAHC wanted to develop affordable housing at the Site as part of a mixed-income development, and would have bid on the property if it had been zoned R-M.  SJA140.  When the Village first proposed R-T zoning, NYAHC and ACORN expressed opposition because R-T zoning would preclude affordable housing.  SJA130-31.  Although the County did not modify its RFP as Plaintiffs urged, NYAHC submitted a "protest" proposal to emphasize its interest in developing affordable housing at the Site.  SJA132-33.  NYAHC also prepared four proposals for developing the Site under R-M zoning – at bid prices ranging from $30 million to $56.1 million – that would have been occupied by 18% to 32% minority residents.  SJA133-34, 171.  The $56.1 million proposal "would have been directly competitive with the winning bid."  SJA140.

The District Court also correctly found (and Garden City does not dispute) that NYCC, as the practical successor to ACORN, had associational standing.  A membership organization has standing to bring claims on behalf of its members if the members would otherwise have standing to sue and "the interests at stake are germane to [its] purpose, and neither the claim asserted nor the relief requested requires the participation of individual members."  *Laidlaw*, 528 U.S. at 121.

41

Here, "Plaintiffs proved that NYCC's members would have been eligible for and would have an interest in obtaining affordable housing in Garden City." SJA142.

Garden City argues that Plaintiffs failed to prove standing because they did not establish definitively that NYAHC/MHANY would have won the bid if the Site had been zoned R-M. Br.30. But Plaintiffs were not required to offer such definitive proof. Those types of "uncertainties" are ever-present in discriminatory housing litigation, where factors affecting real estate development are often beyond the parties' control, and courts need not "engage in undue speculation" to find standing. *Arlington Heights*, 429 U.S. at 262-63 (developer had standing despite "uncertainties" surrounding financing and qualifying for federal subsidies); *see Scott v. Greenville Cnty.*, 716 F.2d 1409, 1416 (4th Cir. 1983) (finding standing despite "uncertainty surrounding carrying any large-scale housing development to fruition").

Accordingly, in *Huntington I*, this Court found that a non-profit housing developer that intended to develop a project using Section 8 funding had standing even though Section 8 funding for the fiscal year had been eliminated. 689 F.2d at 392, 394. The Court rejected defendants' "demand for complete certainty," held that plaintiff need only prove "some reasonable prospect for future financing," and found that the developer's "diligent efforts to secure funding" and "a relatively favorable response" from HUD were sufficient. *Id.* at 394-95.

42

Similarly here, the District Court found that if the Site had been re-zoned R-M, NYAHC would have submitted a "directly competitive" bid. SJA140. Thus, there was a "reasonable prospect" that MHANY would have won the RFP and had the opportunity to develop affordable housing.

The Village contends, without any evidentiary support, that Spelitotis's pro formas establish that "an affordable housing developer would have been outbid by a market-rate housing developer," Br.30, and therefore NYAHC *could not* have won the bid. The record belies Garden City's bald claim. Garden City relies entirely on the fact that in Speliotis's pro formas, the amount available for a bid increases as the percentage set aside for affordable housing decreases. JA1531. But that says nothing about whether a hypothetical market-rate bidder would necessarily have outbid MHANY. For one, a for-profit bidder would include in its calculations an anticipated profit on its investment, and could therefore be outbid by a non-profit corporation like MHANY that did not need to consider profit. Second, an affordable housing developer has access to sources of funds that a market-rate developer does not, including tax credits or other government programs encouraging affordable housing, JA743-44; indeed, Speliotis' pro formas included such funding sources. *Id.*; JA1531. These potential sources of equity might allow an affordable housing developer to bid *more* than a for-profit

developer. The Village's claim that a for-profit developer would necessarily have bid more is pure, unsupported, speculation.[15]

Garden City also contends that the increased density permitted by R-M zoning would have necessarily garnered a higher purchase price than under R-T zoning, even beyond the $56.5 million that Fairhaven bid, and therefore one that MHANY could not have matched. Br.31. This argument calls for another level of inappropriate speculation, and is again belied by the record. The record shows that higher density does not necessarily translate into a higher bid. In fact, Fairhaven's winning bid contemplated only 87 units, JA1508, even though R-T zoning allowed up to 186 units, and Fairhaven's initial bid – which proposed *more* units – was lower than its final bid. SJA134, 170, 204-05.

The Village's argument that a winning bid must be proved with certainty calls for precisely the type of "undue speculation" that the Supreme Court has counseled against. *Arlington Heights*, 429 U.S. at 261. MHANY proved its ability to submit a "directly competitive" bid, SJA140 – and thus, a reasonable prospect that it would have won and developed the property – and that is sufficient to establish standing. *Huntington I*, 689 F.2d at 394-95.

---

[15]   Garden City also ignores the possibility that, if NYAHC had submitted a competitive proposal that included affordable housing, the County might have chosen that proposal – even if it were not the highest bid – because it served *both* the County's revenue-raising goals *and* its obligation to affirmatively further fair housing.

44

**B.    The Case Is Not Moot.**

Garden City argues that the case is moot because, on the eve of summary judgment – when it was still a defendant facing imminent liability – the County announced its intention to build a family courthouse on the Site, rather than sell it. Br.22-29.    The District Court rejected this argument, on summary judgment, SJA47-54, and again after trial, SJA143-47.

The District Court's rulings were correct.  Garden City has failed to carry its "heavy" burden of demonstrating mootness.  *See Cnty. of L.A. v. Davis*, 440 U.S. 625, 631 (1979).  A case "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party."  *Chafin v. Chafin*, 133 S. Ct. 1017, 1019 (2013) (quotation omitted); *see also Fund for Animals v. Babbitt*, 89 F.3d 128, 133 (2d Cir. 1996).  "Where several forms of relief are requested and one of these requests subsequently becomes moot, the Court has still considered the remaining requests."  *Powell v. McCormack*, 395 U.S. 486, 496 n.8 (1969); *see also Gautreaux v. Romney*, 448 F.2d 731, 735-36 (7th Cir. 1971) (case not moot even though court could no longer grant injunctive relief related to specific construction projects).

Here, relief is not only "possible," it was properly granted.  The District Court granted Site-specific relief, requiring Garden City to rezone the Site to R-M if the County decides to sell it.  SJA195, 206.  Plaintiffs also sought – and the

45

District Court properly granted – more general equitable relief to redress their injuries.

### 1.    The District Court Properly Granted Broad Equitable Relief.

The FHA gives the courts broad authority to grant injunctive relief "as the court deems appropriate" to redress discriminatory housing practices.  42 U.S.C. § 3613(c)(1).  Courts have "broad equitable power to fashion remedies," including affirmative relief, to "heal the wounds" caused by discrimination.  *Smith v. Town of Clarkton*, 682 F.2d 1055, 1069 (4th Cir. 1982); *see also Park View Heights Corp. v. City of Black Jack*, 605 F.2d 1033, 1036 (8th Cir. 1979).

Relief need not be limited to the particular project underlying the lawsuit, and can be designed to ensure compliance with the FHA more broadly.  *See United States v. City of Parma*, 661 F.2d 562, 577 (6th Cir. 1981) (upholding injunction requiring city to establish educational program for employees, advertise city as equal housing opportunity community, and take action to allow construction of public housing); *Smith*, 682 F.2d at 1067-69 (upholding injunction requiring town to maintain board of directors on local housing authority and take action to permit third parties to go forward with construction of public housing); *see also LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 434 (2d Cir. 1995) (court may broadly enjoin discriminatory application of zoning ordinance).

46

Here, Plaintiffs sought injunctive relief going beyond the rezoning of the Site, SJA184, 190-93, 195-200, and the District Court properly exercised its equitable power to fashion such relief. SJA205-06, 208-11. This relief is not dependent on the Site, and is not mooted by the County's purported decision not to sell it. The District Court ordered that if the County decides not to sell the Site, Garden City must apply to join the Nassau County Urban Consortium, and require that 10% of newly-constructed residential developments be reserved for affordable housing. SJA207-08. Garden City must also implement fair housing training for its officials, and appoint a fair housing compliance officer to oversee its compliance with the Judgment. SJA208-11. The Court also enjoined future violations of the FHA. SJA206. The County's purported decision not to sell the Site does not moot any of this relief.

The Village argues that this relief will not redress Plaintiffs' injuries because it will not guarantee affordable housing will be built at the Site, Br.26, but there is no support for this claim. Indeed, the cases have rejected the contention that the relief granted in an FHA case must narrowly relate to the project giving rise to the claim. "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1236 (2d Cir. 1987) ("*Yonkers I*") (quotation omitted). Tellingly,

47

Garden City has not appealed the remedies granted as improper or beyond the District Court's power. Moreover, Garden City ignores that it was also held liable for actions that perpetuated segregation.[16]

Garden City also contends that the case is moot because Plaintiffs were injured by the County's decision not to sell the Site, not by the Village's zoning decision. Br.25. The District Court properly rejected this argument. SJA144-45. Had the Village re-zoned the Site to R-M, as originally planned, the County would have proceeded with sale and development of the Site, and there is a reasonable probability that affordable housing would have been built. That the County decided not to sell the property seven years later, when it was faced with potential liability for its role in the re-zoning, "does not alter the prior discriminatory conduct" or eliminate the need for relief. *See McDonald v. Verble*, 622 F.2d 1227, 1233 (6th Cir. 1980).[17]

---

[16]   Garden City argues that the case is moot because there are "no future threats of discrimination" or "lingering effects to be undone." Br.27. This astonishing claim is belied by the District Court's findings that Garden City denied Plaintiffs the opportunity to build or live in affordable housing in the Village and perpetuated segregation, both of which leave ongoing effects to be remedied.

[17]   Garden City also argues that Plaintiffs would "[o]bviously" have lacked standing "if the County had decided to keep the property before Plaintiffs sued." Br.24. This is actually not clear at all, and presents a hypothetical far removed from the facts of this case. Garden City relies on the Supreme Court's statement that mootness is "standing set in a time frame." *Id.* (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997)). But the Court has recently

Finally, given the broad equitable relief authorized by the FHA, the Village's reliance on the mootness analysis of non-FHA cases is misplaced. The Village relies (Br.22) on *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67 (1983), but that case has no relevance here. Iron Arrow was an all-male group that sued federal officials to prevent the University of Miami from interpreting federal regulations to ban the group from campus because of its discriminatory activities. The Court held the case moot when the University decided to ban the group for other reasons. But in *Iron Arrow*, the only remedy for the plaintiffs' alleged injuries was to lift the ban, which the court lacked authority to do because the University had an independent basis for imposing it. In contrast, here, the FHA gave the Court authority to grant broad equitable remedies to redress Plaintiffs' injuries. Moreover, unlike this case, where Plaintiffs are enforcing a statutory prohibition against discrimination, in *Iron Arrow* the group sought to *further* a discriminatory goal they had no legal right to pursue.

## 2. Site-Specific Relief Can Still Be (and Has Been) Granted.

This case is also not moot because relief relating to the Site has been granted and additional relief is still possible. The Village bore the burden of proof on mootness, *see Laidlaw*, 528 U.S. at 170; *Adarand Constructors, Inc. v. Slater*, 528

---

retreated from that characterization, because it "is not comprehensive" and causes litigants – like Garden City here – to "confuse[ ] mootness with standing." *Laidlaw*, 528 U.S. at 189-90.

U.S. 216, 221 (2000), but failed to offer *any* evidence at trial regarding the status of the Site.

It has been more than three years since the County announced its intent to build a courthouse at the Site, but there is still no courthouse there. The County has been talking about building a new family courthouse since 2004, JA115-16, but has done little to implement it, and has considered several locations besides the Site. JA3043-45. The timing of the County's announcement, immediately prior to the County's summary judgment motion, is suspect, and the "construction fence" around the property that Garden City mentions (Br.14 n.5, without citation) went up shortly after the parties filed notices of appeal. Moreover, the Site remains zoned R-T, which does not permit public, government use. SJA186-87. Ironically, unless the County is prepared to override Garden City's zoning, the County *cannot* build a courthouse there under current law.

Recognizing this, the District Court fashioned relief requiring Garden City to rezone the Site to R-M in the event the County decides to sell the Site within one year of the judgment. *See* SJA206. This possibility provides another reason the case is not moot. *See Knox v. Servs. Emps. Int'l Union Local 1000*, 132 S. Ct. 2277, 2287 (2012) ("[A]s long as the parties have a concrete interest, however

50

small, in the outcome of the litigation, the case is not moot.") (internal quotation omitted).[18]

## II. THE DISTRICT COURT PROPERLY FOUND GARDEN CITY LIABLE FOR INTENTIONAL DISCRIMINATION.

The District Court found that Garden City's decision to switch from R-M to R-T zoning was made with the intent to prevent racial minorities from moving into Garden City. The Court made that determination after a lengthy trial, at which the Court had the opportunity to hear and evaluate the testimony of numerous witnesses – including all the key Garden City officials, whom Plaintiffs called as adverse witnesses – and to consider the extensive documentary record. In its post-trial decision, the Court made detailed findings of fact to support its conclusion. *See* SJA118-36, 149-67.

There is no basis for this Court to overturn the District Court's factual finding that Garden City officials acted with discriminatory intent. The Court is required to give substantial deference to the trial court's findings, and may not set them aside unless they are clearly erroneous. *See Hunter v. Underwood*, 471 U.S. 222, 229 (1985); *Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982). Rule 52(a)(6) requires the Court to "give due regard to the trial court's opportunity to

---

[18] If the County is reinstated as a defendant as a result of Plaintiffs' cross-appeal, the District Court may have additional opportunities to fashion Site-specific relief.

51

judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6); *see Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 (1982). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574. If the district court's "account of the evidence" is "plausible" in light of the record, "the court of appeals may not reverse it." *Id*.

There is no clear error here. The District Court's finding is far more than merely "plausible" – it is amply supported by the detailed factual record, and by far the most reasonable interpretation of the evidence. Garden City's attack on the District Court's finding attempts to manufacture legal issues that might warrant *de novo* review, but these claims are merely an attempted end-run around the clearly-erroneous standard. Ultimately, Garden City asks this Court to do what it cannot: re-weigh the evidence without having heard and observed the witnesses first-hand.

### A. There is No Clear Error in the District Court's Finding That Garden City Enacted R-T Zoning With Discriminatory Intent.

In *Arlington Heights*, the Supreme Court set out a series of factors that courts ever since have routinely considered in evaluating evidence of discriminatory intent in zoning cases. 429 U.S. at 266-68.[19] The District Court

---

[19]    These factors are: (1) the specific sequence of events leading to the decision; (2) whether the impact of the decision bears more heavily on one race than another; (3) the historical background; (4) departures from normal procedural

carefully evaluated these factors, at substantial length, and found that Garden City

"acted with discriminatory intent." SJA161. The Court relied particularly on two

factors: "(1) the sequence of events involved in the Board's decision to adopt R-T

zoning instead of R-M zoning after it received public opposition to the prospect of

affordable housing in Garden City and (2) the considerable impact that this zoning

decision had on minorities in that community." *Id.*; *see* SJA152-56 (conclusions

regarding sequence of events, including discussion of residents' coded expressions

of race-based animus); SJA149-50, 170-72 (conclusions regarding discriminatory

impact). The Court also noted some historical evidence of discrimination in

Garden City, although it did not place "significant weight" on it. SJA151-52.[20]

And the District Court pointed out that R-T zoning was inconsistent with Garden

---

sequences; and (5) substantive departures from usual criteria. *Arlington Heights*, 429 U.S. at 266-68.

[20]     The Court declined, however, to consider the racially-based opposition in 2006 to affordable housing at Ring Road, holding that it would have "little relevance" to whether Garden City acted with discriminatory intent in 2004. SJA152. This ruling was erroneous, and the evidence regarding Ring Road provides further support for the Court's intent finding. The evidence regarding Ring Road expressly referred back to the Social Services Site, and was part of a continuing course of conduct intended to block affordable housing in Garden City. *See Smith & Lee Assocs., Inc. v. City of Taylor*, 13 F.3d 920, 927-28 (6th Cir. 1993) (affirming district court's reliance on historical evidence of discrimination in town apart from decision at issue, and holding *Arlington Heights* requires examination of "historical background" in broader sense); *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish*, 641 F. Supp. 2d 563, 569-70 (E.D. La. 2009) (noting that same public officials were involved in other discriminatory decisions taken at different times).

City's stated planning criteria. SJA160 (though Garden City's expressed preference was to "maximize the use of existing zoning tools," it instead created a new zoning classification); *see also* SJA131 (Garden City failed to issue a draft EAF for R-T zoning notwithstanding that it was a "significant change").

### 1. The District Court Found That Garden City *Knowingly* Responded to Discriminatory Animus.

Garden City emphasizes that municipal officials cannot be liable for the race-based animus of their constituents unless officials were "knowingly" responding to their racially-based opposition. Br.32-36. But the District Court was well aware of this principle, and indeed quoted the very case Garden City relies upon. *See* SJA148 (quoting *LeBlanc-Sternberg*, 67 F.3d at 425); Br.32 (same). As the District Court explained, "[u]nder the theory of disparate treatment, 'a plaintiff can establish a prima facie case by showing that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were *knowingly* responsive.'" SJA148 (quoting *LeBlanc-Sternberg*, 67 F.3d at 425) (emphasis added).

The District Court's analysis demonstrated that Garden City acted with knowledge of their constituents' discriminatory animus. The Court explained that R-M zoning was the "consistent recommendation" of the P-Zone Committee and

54

BFJ for eighteen months, yet was abruptly dropped for R-T zoning as a result of citizen opposition in "a matter of weeks," and that Garden City was "seeking to rewrite history" in claiming otherwise. SJA153; *see also* SJA154 (Garden City's "description of citizen reactions to the R-M proposal mischaracterizes the record").

The Court also found that some of the purported justifications Garden City officials offered to support their decision were "not just disputed, but unsupported by the record," SJA160, which lent further support to the Court's determination that racial animus played a determinative role. Indeed, the Court explained that it was "reluctant to second-guess citizens and decision-makers' legitimate concerns," even if those concerns were "ill-founded," SJA160 – and yet felt constrained by the evidence to conclude that Garden City officials "acted with discriminatory intent." SJA161.

The Court also found that the inflammatory flyer warning that R-M zoning would allow people who earned "NOT JUST GARDEN CITY INCOMES!" to move into town was brought to attention of at least two Trustees, as well as Fish and Schoelle, SJA129; that concerns about the Balboni Bill requiring "affordable housing" were raised at Board meetings and POA meetings attended by Trustees,

SJA129-30;[21] and that the zoning was changed because "the public was beginning to have an influence on the decision-making process." SJA130; *see also* SJA152 ("when it became clear at the public meetings that residents pointedly opposed the development of multi-family housing, BFJ and the Board reversed course").

Finally, the Court specifically relied upon citizen references to "affordable" housing and concern about changing the Village's "character" and "flavor," SJA154, and found these were known code words or "euphemisms" for race-based bias in housing. SJA154-56. The Court cited substantial case law to support the proposition that citizens' use of such coded language can support a finding of racial intent on the part of decision-makers. SJA154-55.

Despite all this, Garden City argues that the District Court applied the wrong legal standard in determining that the Village acted with discriminatory intent. Br.36-37. Taking one phrase in the Court's opinion out of context, Garden City contends that the Court erroneously held it liable because residents' comments "could have been construed" as reflecting race-based animus, and did not find that Village officials actually "knew" that these comments were race-based. Br.35 (quoting SJA156). This contention should be rejected. The language that Garden City quotes does not reflect the legal standard the Court applied; on the contrary,

---

[21]     Garden City errs in asserting that the Court "did not rely on" evidence about the Balboni Bill. Br.42 n.11. Indeed, the Court specifically relied on the flyer – which expressed concerns about the Balboni Bill – in its conclusion. SJA180.

the Court set out in detail the correct legal standard, requiring that Village officials must have acted "knowingly," SJA148, and cited the same cases – *LeBlanc-Sternberg* and *Yonkers I* – that Garden City relies upon. *Compare* SJA148 *with* Br.32, 36.

Moreover, Garden City's claim that this isolated phrase reflects the "sole[ ]" basis for the Court's finding of intentional discrimination, Br.35, is absurd. The statement that Garden City wrenches out of context is only one of the Court's many findings regarding the "sequence of events" leading up to the zoning decision. SJA156. As detailed above, the District Court applied the correct legal standards, evaluated the evidence under the *Arlington Heights* factors, and made extensive factual findings to support its conclusion that Garden City intentionally discriminated. These findings are completely independent of this one isolated expression and fully support the Court's ruling.

### 2. The District Court Properly Found that Opposition to R-M Zoning Was Race-Based.

Garden City contends that its residents' opposition to R-M zoning cannot have been race-based because no "remotely racist statements" were made. Br.39. "No one said anything about race," Garden City repeatedly argues. Br.8, 10, 12, 39. This contention is wrong, factually and legally. Factually, residents *were* talking about race – they were just using coded expressions, as a way of masking

57

their prejudices in more genteel language. And legally, it is well-settled that the use of such coded language supports a finding that defendants were motivated by racial discrimination.

It is a given in this day and age that "while discriminatory conduct persists, violators have learned not to leave the proverbial 'smoking gun' behind." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3d Cir. 1996) (reversing grant of summary judgment to employer on hostile work environment claim); *see Holcomb v. Iona Coll.*, 521 F.3d 130, 141 (2d Cir. 2008) ("[d]irect evidence of discrimination, 'a smoking gun,' is typically unavailable"). Rather, discrimination "is often simply masked in more subtle forms." *Aman*, 85 F.3d at 1082; *see also Freeman v. Pitts*, 503 U.S. 467, 490 (1992). The District Court was well aware of this principle, and devoted an entire page of its opinion setting out case-law establishing that "findings of discrimination cannot 'be avoided by careful use of code words.'" SJA154-55 (citing *Huntington II*, 668 F. Supp. at 786).

The District Court properly found that Garden City residents' objections to affordable housing involved the use of code words reflecting race-based bias. SJA154-56. The Court specifically cited residents' comments regarding "affordable" – as opposed to "upscale" – housing, and about changing the Village's "character" and "flavor." SJA154. The Court also placed weight on the inflammatory "flyer against multi-family housing," SJA180, which expressed

58

concerns about the impact of the Balboni Bill, and about low income people moving in and depressing property values. SJA129. And the Court found that residents expressed concerns about "full families living in one bedroom townhouses," and having "ten people in an apartment," SJA128; JA1260, 1275, which reflect common stereotypes regarding minorities.

The District Court's conclusion that these were coded references to race and supported a finding of intentional discrimination was not clear error and should be affirmed. *See*, *e.g.*, *Yonkers I*, 837 F.2d at 1192, 1226 (residents' references to effect subsidized housing would have on "character" of neighborhood supported finding of discriminatory intent); *Smith*, 682 F.2d at 1066-67 (citizens' concerns about "dilut[ion]" of public schools and "undesirable[ ]" new residents properly interpreted as "'camouflaged' racial expressions"); *St. Bernard Parish*, 641 F. Supp. 2d at 571-72 (collecting cases).

The District Court correctly viewed the comments of those opposing affordable housing at the Site in their proper context, in light of the "likely number of minorities that would have lived" there. SJA156. Garden City argues that "[i]t is not enough . . . to show that residents opposed affordable housing," because race and income are not equivalent. Br.38-39.[22] But the District Court found that, in

---

[22] Garden City relies on *Boyd v. Lefrak Org.*, 509 F.2d 1110, 1112-13 (2d Cir. 1975), to support this proposition, but that reliance is misplaced. Apart from the

Nassau County, those most likely to need affordable housing *were* minorities, SJA119; JA199, 203-04, and Garden City residents were well aware of that. The Court did not view comments about income as indicating racial bias in a vacuum; it did so based on extensive factual findings demonstrating that the connection was well-founded in this case.

Garden City also argues that even if residents were "obliquely" expressing race-based opposition to affordable housing, "there is no evidence that any Village official understood them in this fashion." Br.40. Not true. First, Negri, one of the members of the Village Board, testified that housing occupied by low income minorities is not consistent with the existing "character" of Garden City. JA570; *see also* JA1236 (Suozzi statement at February 5 hearing that "upscale" housing was more in "character" of City); JA2297-99 (Suozzi testimony). More fundamentally, Garden City officials were well aware of the demographics and the correlation between race and economic status in Nassau County. JA405, 828. The people who would live in affordable housing were primarily minorities, and Garden City officials knew it. *Id.*; JA1641-45.

---

fact that this Court questioned *Boyd*'s continuing vitality in *Huntington III*, 844 F.2d at 934, in this case – unlike *Boyd* – there is ample evidence connecting discrimination based on poverty with discrimination based on race.

60

Ultimately, Garden City cites its officials' trial testimony that they did not believe these comments were racially motivated, and claims that the District Court "did not question their credibility." Br.40. But the Court heard their testimony, and implicitly rejected it in concluding that they had acted with discriminatory intent. The District Court obviously *did* question the credibility of Garden City's witnesses, and was entitled to do so without expressly saying it in writing.[23]

### 3. The District Court Properly Weighed the Evidence and Rejected Garden City's Reliance on Non-Discriminatory Justifications.

Garden City also challenges the District Court's weighing of the evidence and argues that its findings were clearly erroneous. Br.40-46. But the District Court's evaluation of the evidence followed the correct legal standards, there is no clear error, and no basis on which this Court could overturn the District Court's factual conclusions.

First, Garden City advances an incorrect proposition of law. Garden City points to the District Court's conclusion that Garden City stated legitimate, non-

---

[23] Garden City complains that the District Court effectively required Garden City officials to "*assume* that . . . residents opposed to affordable housing were closeted racists," and condemns the District Court's "willingness to assume that the Village's residents were racists because of their skin color." Br.39, 50. These accusations of "reverse racism" are utterly unwarranted, and have no basis in the record. The District Court did not rely on the "assumption" that Village residents were racist; it relied solely on the reasonable inferences that it drew from residents' statements and the context in which they were made.

discriminatory justifications for R-T zoning, because it would reduce traffic and "promote" townhomes, SJA157-58, and argues that "[t]hose findings should have ended this case." Br.43. Garden City is wrong. Once Plaintiffs presented a prima facie case of discrimination, the burden shifted to Garden City to proffer a legitimate, non-discriminatory reason for its action. SJA157. But this is simply a burden of "production, not persuasion," and involves "no credibility assessment." SJA158-59 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). And once Garden City satisfied that "minimal burden," SJA158, the District Court was left with the issue of discrimination *vel non*. On that decisive issue, Plaintiffs bore the burden of proof, and satisfied it. SJA149, 159 (citing *Reeves*, 530 U.S. at 142); *see also Middletown*, 294 F.3d at 49.

Applying this well-settled framework, the District Court here merely found that Garden City satisfied its minimal burden of producing a legitimate, non-discriminatory justification.[24] The Court's finding did not "end the case;" it simply required the Court to evaluate whether – notwithstanding those justifications – Plaintiffs had borne their burden of proving discrimination.

---

[24]    Plaintiffs do not concede that Garden City's proffered reasons for adopted R-T zoning were legitimate, notwithstanding the District Court's finding. Indeed, Plaintiffs submit that the District Court's analysis of these supposedly "legitimate, non-discriminatory" reasons demonstrates their falsity. *See* SJA159-61, 166-67.

When the Court *did* evaluate Garden City's alleged rationales, it did not find them persuasive. Indeed, the weakness of Garden City's justifications directly supported the Court's conclusion that discrimination played the "determinative" role in Garden City's decision. SJA166-67. The Court found Garden City's concerns regarding traffic and promoting townhomes to be "ill-founded," even if "not entirely invalid." SJA160, 166. This is just the sort of credibility determination and weighing of competing evidence that may not be overturned on appeal absent clear error, *see Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 51-52 (2d Cir. 2011), but Garden City identifies none.

First, as to traffic: Garden City argues that the Court erred in finding that "it is not clear that traffic under R-M zoning would be significantly worse than under [R-T] zoning, if worse at all." Br.44; SJA167. But that is exactly what the evidence showed. Fish testified, based on the traffic analyses he prepared, that at most, elimination of multi-family housing reduced peak-hour traffic by only 3%. SJA159; JA337-38 (comparing JA1159-60 with JA1336-37). The Court did not clearly err in finding that such a *de minimis* reduction in traffic was not a strong justification for the change to R-T zoning. This is particularly true since the September 2003 EAF concluded that – even *with* office use that was later eliminated – the originally proposed zoning would not have generated traffic significantly above preexisting levels. SJA125, 159; JA271. The Court also

63

pointed out that the traffic figures relied upon by Garden City were created only "after the increase in public opposition to affordable housing." SJA167. Garden City claims that "[t]he court's timing point makes no sense," Br.44, but the Court was reasonably questioning the credibility of figures that were created to justify a particular result, rather than an unbiased study like the earlier EAF.

Next, as to "promotion" of townhomes: the District Court found "there is no indication in the record that, prior to the increase in public opposition, Garden City desired to make townhouses available in their community." SJA167. Garden City claims that the Court's finding is "untrue," but cites only the trial testimony of Filippon vaguely claiming that there had been "discussions" over the years "recognizing the fact that the village did not have that form of housing available." Br.45. This testimony does not cast doubt on the Court's finding that promotion of townhomes – mentioned *nowhere else* in the trial record – was not a major concern, until Garden City officials, needing to come up with a rationale to support the change to R-T zoning after the fact, began asserting it. The Court also noted that Garden City could have explicitly defined "townhouses" within R-M zoning, SJA167, which already permitted them, SJA159 – but Garden City has no answer to that finding. Finally, as it turned out, R-T zoning did not "promote" townhomes: the winning bid for the Site was a development of exclusively single-family detached homes. SJA133; JA1508-09.

64

Regarding school crowding: Garden City faults the District Court for noting the parties' positions, but then not making a finding whether Garden City's concerns were legitimate. Br.46 (citing SJA158). But the District Court did not err. Garden City's school overcrowding justification was not borne out by the record, JA272-73, 1158, and the Court therefore did not address it further. As Fish testified, residents who claimed to prefer single-family homes because of school impacts were "simply wrong." JA277.

In a footnote, Br.46 n.13, Garden City attacks the District Court's finding that one of the Village's other purported rationales, that R-T zoning would provide a smoother transition between single family homes to the south and east of the Site and the commercial area to the west – was "unsupported by the record." SJA160. But as the Court noted, R-M zoning equally provided a transition. *Id*. And the winning bid was for 87 single family homes, on both portions of the Site, JA1508 – with the result that R-T zoning actually provided no transition at all.

More generally, Garden City argues that public opposition was driven by "mundane problems locals worry about when zoning decisions put more people in less space," not by fear of affordable housing and its likely minority occupants. Br.40-42. The District Court rejected this argument, finding that racial discrimination was the "determinative" cause. SJA167. Garden City provides no basis to overturn its finding. Garden City continues to ignore the sequence of

events leading to the Village's abrupt abandonment of R-M zoning in the face of community opposition, *see* pp. 14-20, *supra*, upon which the District Court properly placed substantial reliance. SJA161. As the District Court found, the Village is simply "seek[ing] to rewrite history," SJA153, glossing over the fact that residents had raised those same "mundane" concerns for eighteen months, yet the Board did not change the zoning recommendation until fear of affordable housing entered the discourse. SJA123-30.

Garden City claims that the hasty enactment of R-T zoning was simply because it had been discussing the issues for some time, and "there was no need to spend additional time" once it settled on a different approach. Br.43. But the District Court was entitled to draw a different inference: that the abrupt abandonment of R-M zoning and the "not nearly as deliberative" consideration of R-T zoning was suspect. SJA153-54. The Court was also entitled to find it strange – notwithstanding Garden City's argument to the contrary, Br.43 – that none of the members of the P-Zone Committee, nor the Village's special zoning counsel, participated in the key meeting at which the R-T zoning proposal was developed. SJA154.[25]

_____

[25] Garden City points out one minor error in the District Court's factual findings: that the Court misquoted Trustee Bee's words at the January 2004 EPOA meeting. Br.41. Bee did not say that Garden City "demographically has a need for affordable housing," as the District Court wrote, SJA127, 152. Instead, Bee stated

**B.      The District Court Did Not Err In Assigning the Burden of Proof, and Found that Plaintiffs Proved "But-For" Causation.**

Finally, Garden City argues that the District Court erred in placing the burden of proof on the Village to prove that it would have adopted R-T zoning even if there had not been racially-motivated opposition to affordable housing. Br.46-49.  Garden City recognizes that the District Court's stated allocation of the burden was consistent with settled disparate treatment law, in FHA cases as well as under Title VII.  Br.47.  Garden City argues, however – for the first time on appeal – that this approach is no longer good law in light of the Supreme Court's decision five years ago in an Age Discrimination in Employment Act (ADEA) case, *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009).  *Gross* held that ADEA plaintiffs, in contrast to Title VII plaintiffs, have the burden of proof on this issue, and must prove that age is the "but for" cause (not just a motivating factor) of an employer's adverse action.  *Id*. at 174-75.

This argument should be rejected.  *Gross* has no bearing on this case, for four reasons.

---

that Garden City "demographically has a need for multifamily housing."  JA1665.  But this is hardly the "crucial[ ]" misquoting of the record that Garden City claims.  Br.41.  This was a minor point in the Court's factual discussion, and played no significant role in the Court's analysis.  Garden City's claim that Bee's misquoted words were the District Court's "leading 'proof' that concerns about affordable housing drove the switch to R-T zoning" (*id*.) is plainly untrue.

First, Garden City did not preserve this argument for appellate review. *See Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994). Garden City argues that it did not raise this point below because of "Plaintiffs' focus on pretext," Br.47, but this is no excuse. Garden City should have been aware of any argument based on *Gross* long ago, since this Court applied *Gross* in ADEA cases as early as 2010 using the *McDonnell Douglas* "pretext" burden-shifting framework. *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010).

Second, even if *Gross* applied to FHA claims, Plaintiffs proved, and the District Court found, that discrimination *was* the "but for" cause of R-T zoning. Notwithstanding language in the Court's opinion stating that the burden of proof on this issue was on Garden City, SJA165-66, the Court – because it analyzed what it referred to as Garden City's "mixed motives" under *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), in *combination with* the burden-shifting framework of pretext cases – actually imposed the burden of proof on *Plaintiffs*. SJA159, 167. And the Court found that Plaintiffs satisfied this burden by proving that discrimination was the "but-for" cause of the R-T zoning decision, not simply a motivating factor. Specifically, the Court found: "Plaintiffs have established that discrimination played a *determinative role* [in the decision to adopt R-T zoning]. In other words, the Court declines to hold that . . . the Board would have shifted from R-M zoning to R-T zoning *even if* discrimination played no role." SJA167

68

(emphasis added). Thus, this Court need not decide whether *Gross* applies to FHA cases, because even if it did, the Court would have to affirm the District Court's finding of discrimination here.

Third, although the Court need not reach the question, *Gross* does not apply to FHA claims. In holding that the "because of" language of the ADEA required a plaintiff to prove "but-for" causation, *Gross* relied heavily on the fact that "Congress neglected to add [the motivating factor] provision to the ADEA when it amended Title VII [in 1991] . . . even though it contemporaneously amended the ADEA in several ways." 557 U.S. at 174 (internal citation omitted); *see Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2526-29 (2013) (using similar analysis for Title VII anti-retaliation provision). But Congress did not amend the FHA in 1991. Congress *did* comprehensively amend the FHA in 1988, *see* Pub. L. No. 100-430, 102 Stat. 1619, but when it did so, the circuit courts were unanimously applying "mixed motive" analyses – under which it is sufficient that discrimination is a "motivating factor," but not necessarily the "but-for" cause, of the challenged action – to hold defendants liable under the FHA. *See*, *e.g.*, *Robinson v. 12 Lofts Realty*, *Inc.*, 610 F.2d 1032, 1042-43 (2d Cir. 1979) (collecting cases); *see also* SJA163. Congress left the FHA's "because of" language intact in 1988, and therefore implicitly ratified these holdings. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of

69

an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.").

Fourth, it is beyond question that *Gross*' "but-for" requirement does *not* apply to Plaintiffs' constitutional claims, in light of the Supreme Court's holding in *Arlington Heights*. *See* 429 U.S. at 270 n.21 ("[p]roof that the decision … was motivated in part by a racially discriminatory purpose would … have shifted to the [defendant] the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered").

Finally, to the extent Garden City implies that *Gross* does not allow a finding of discrimination where more than one motive is present, Garden City is wrong. This Court's decisions interpreting *Gross* presume that various considerations, both permissible and impermissible, may inform an adverse action for which discrimination was nevertheless the "but-for" cause. *See*, *e.g.*, *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (*per curiam*) ("The condition that [the impermissible consideration] must be the 'but for' cause of the adverse employment action is not equivalent to a requirement that [it] was the employer's only consideration.") (internal quotation marks omitted); *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 n.5 (2d Cir. 2013) (same, interpreting *Nassar*). That is exactly what the District Court found here. SJA 159-62.

*        *        *

70

Garden City ends its discriminatory intent argument with a comparison to *Arlington Heights*, contending that the facts here provide "far less (if any) evidence of discriminatory intent." Br.49. But the Supreme Court in *Arlington Heights* was reviewing a district court's finding that there was *no* discrimination, and it was governed – as this Court is on this appeal – by the clear error standard. That the facts of *Arlington Heights* did not lead the Supreme Court to believe that the trial court had erred does not suggest that the District Court clearly erred in *this* case, on very different facts, when it found that Garden City intentionally discriminated.

## III. THERE WAS NO LEGAL ERROR IN THE DISTRICT COURT'S DISPARATE IMPACT HOLDING.

The record overwhelmingly supports the District Court's conclusion that Garden's City's rejection of R-M zoning in favor of R-T zoning had a significant disparate impact on minorities. *See* pp. 8-9, 22, *supra*. The District Court properly found that Garden City's zoning decision "largely eliminated the potential for the type of housing that minorities were disproportionately likely to need – namely, affordable rental units." SJA170. The Court further found that adoption of R-T zoning "perpetuate[d] segregation generally because it decrease[d] the availability of housing to minorities in a municipality where minorities constitute approximately only . . . 2.6% of the population." SJA171.

71

**A.    This Circuit and Courts Across the Country Have Long Applied Disparate Impact Liability to Exclusionary Zoning Laws.**

Garden City does not even attempt to dispute the District Court's factual findings.  Instead, it advances a broad-based attack on the policy rationale behind disparate impact claims under the FHA.  Br.51-55.  These arguments are more appropriately addressed to a higher court, and Garden City notes that it seeks to preserve for Supreme Court review whether the FHA permits disparate impact liability.[26]  But there is no need for this Court to address these arguments, since Garden City concedes that disparate impact liability under the FHA is well established in this Circuit.  Br.50.

In any event, Garden City's attack ignores that eradicating segregation and promoting residential integration are core purposes of the FHA.  *See Otero v. N.Y.C. Hous. Auth.*, 484 F.2d 1122, 1134 (2d Cir. 1973).  Eliminating exclusionary zoning practices is central to achieving these goals, and disparate impact liability is a key tool for doing so, because zoning practices that have an unjustified disparate impact can "make [housing] unavailable . . . because of race," 42 U.S.C. § 3604(a), regardless of intent.

---

[26]    The Supreme Court has granted certiorari on this issue in *Inclusive Communities Project, Inc. v. Texas Dep't of Hous. & Cmty. Affairs*, 747 F.3d 275 (5th Cir. 2014), *cert. granted in part*, No. 13-1371, 2014 WL 4916193 (U.S. Oct. 2, 2014).

72

Accordingly, federal courts have recognized for more than four decades that disparate impact liability is authorized under the FHA to accomplish Congress' goal of attaining fair and integrated housing throughout the United States. *See* 42 U.S.C. § 3601. It was in the context of a challenge to a facially neutral but exclusionary zoning decision that the Eighth Circuit first recognized disparate impact liability under the FHA. *United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974). Since *Black Jack*, at least six other Circuits, including this Court, have held that municipal zoning practices that have unjustified disparate impacts on protected groups violate the FHA.[27]

Despite these four decades of precedent, Garden City suggests that it is somehow improper to apply disparate impact liability to zoning decisions because "there is no *objective* basis for the judiciary to require . . . more residential density than a defendant municipality desires . . . ." Br.53. This claim is directly at odds with *Huntington III*, in which this Court held that the town's rejection of a proposed zoning change that would have permitted multi-family housing was invalid because it had an unlawful disparate impact. 844 F.2d at 941-42; *see also,*

---

[27]     *See Huntington III,* 844 F.2d 926; *Res. Advisory Bd. v. Rizzo*, 564 F.2d 126 (3d Cir. 1977); *Smith*, 682 F.2d 1055; *Parma*, 661 F.2d at 578; *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977) ("*Arlington Heights II*"); *Jackson v. Okaloosa Cnty.*, 21 F.3d 1531 (11th Cir. 2011).

73

*e.g.*, *Parma*, 661 F.2d at 578 (affirming order invalidating exclusionary zoning ordinance that had an unlawful disparate impact).

The Village attempts to frame its attack on disparate impact liability as a plea against court-imposed "minority maximization mandates." Br.54. But as Garden City acknowledges, Br.50-51, the disparate impact standard already protects defendants from unfounded "judicial policy-making" by allowing a defendant to prove that the challenged practice is necessary to achieve a legitimate governmental interest. *See Huntington III*, 844 F.2d at 936-37.

## B. The District Court Correctly Held that R-T Zoning Had an Adverse Impact on Minorities and Perpetuated Segregation.

Apart from its policy arguments, Garden City argues that the District Court decision should be reversed because of two alleged legal errors in the Court's disparate impact analysis.

First, Garden City argues that R-T zoning cannot be challenged on a disparate impact basis because it was a "single isolated zoning decision," Br.51, not a general policy or practice. Br.55-58. The District Court correctly rejected this argument, holding that "the zoning law at issue here is not one specific act similar to the denial of a variance of a particular parcel of property," but was instead "a generally applicable zoning law." SJA172-73. Moreover, in advancing this argument, Garden City ignores that there are *two* methods of proving the

74

discriminatory effect of a zoning statute: (1) adverse impact on a particular minority group, and (2) "harm to the community generally by the perpetuation of segregation." *Huntington III*, 844 F.2d at 937 (citations omitted). The District Court found that Plaintiffs proved both, SJA170-75, but Garden City's "isolated act" argument applies only to the first method, is wrong as to that method, and has no bearing on the Court's holding on the second method.

### 1. Garden City Misapplies *Middletown*.

Garden City relies primarily on this Court's decision in *Middletown*, 294 F.3d 35, which held that the plaintiffs could not use the adverse impact method of proving disparate impact to challenge the denial of a special-use permit for a group home for people with disabilities. Garden City's reliance on *Middletown* is misplaced. *Middletown* does *not* stand for the proposition that disparate impact analysis does not apply to a "single" or "one-off" zoning decision, as Garden City claims. Br.55. Instead, the Court in *Middletown* reasoned that, because the *only* people affected by the decision fell within the protected class, "[n]o comparison of the act's disparate impact on different groups of people is possible." 294 F.2d at

53.  *Middletown* thus stands for the proposition that where a zoning decision affects only one group, a disparate impact analysis may not be possible.[28]

Here, in contrast, the District Court found that it *is* possible to analyze R-T zoning's disproportionate effects on minorities versus whites – and that Plaintiffs proved R-T zoning precluded affordable housing that would have been occupied disproportionately by racial minorities.  Plaintiffs' evidence of adverse impact is the same type of proportional comparison that this Court applied in analyzing disparate impact in *Huntington III*.  *Compare* SJA170-72 (summarizing statistical evidence that minority households in Nassau County are disproportionately likely to occupy affordable housing) *with Huntington III*, 844 F.2d at 937-38 (holding that similar evidence established prima facie case of discriminatory effect).  Indeed, this case is on all fours with *Huntington III*, where this Court held that the town's refusal to zone a single parcel of land to allow multi-family housing had an unlawful disparate impact.  *See* 844 F.2d at 941.[29]

It is thus immaterial that this case involves "a single [zoning] decision about a single piece of property," as Garden City argues.  Br.56.  As this Court has made

---

[28]    The out-of-circuit district court cases Garden City cites, Br.55-56, likewise addressed the denial of housing intended exclusively for persons with disabilities, precluding any comparison of effects on different groups.

[29]    Similarly, the Seventh Circuit in *Arlington Heights II* applied a disparate impact analysis to defendant's zoning of a specific parcel.  558 F.2d at 1285, 1288-94.

clear, "[t]here is always some discrete event (refusal to rezone property, refusal to hire someone because he did not graduate from high school) which touches off litigation challenging a neutral rule or policy" with disparate impact liability. *Huntington III*, 844 F.2d at 934. While the Court in *Middletown* noted that the plaintiff was challenging "one specific act," 294 F.3d at 53, Garden City has taken that one phrase out of context; the rationale behind the Court's determination that disparate impact analysis did not apply was because "[n]o comparison of the act's disparate impact on different groups of people is possible." *Id*.

Finally, Garden City makes the audacious claim that R-T zoning actually had a positive impact on minorities because it "*increased* the likely number of minorities residing in Garden City because P zoning allowed no residential uses." Br.57. But the District Court properly compared the impact of R-T zoning to R-M zoning, because Garden City never considered retaining the P zoning.

## 2. Garden City Ignores that R-T Zoning Also Perpetuated Segregation.

Finally, in making this argument, the Village fails to address the District Court's finding that Plaintiffs proved disparate impact by showing that R-T zoning perpetuated segregation. The facts amply support the Court's finding that Garden City's switch from R-M to R-T zoning perpetuated segregation by virtually eliminating the possibility of developing housing available to minorities in the lily-

white Village. SJA170-72; JA737, 199-204. Garden City is ringed by adjoining communities with minority populations of over 50%. JA196-97, 646, 2187. The District Court compared these facts to *Huntington III*, in which this Court held that a proposed development "with [a] goal of 25% minorities" would have desegregated a neighborhood that was 98% white. 844 F.2d at 937. Nothing in *Middletown* calls this analysis into question: the plaintiffs in that case did not allege (or prove) liability on a perpetuation of segregation theory, and the *Middletown* court did not address it.

### C. Plaintiffs Proved That R-M Zoning Was the Less Discriminatory Alternative.

Garden City also argues (Br.58-61) that the District Court erred in placing the burden of proof on the Village to show there was no less discriminatory alternative to R-T zoning, and in holding that R-M zoning was a less discriminatory alternative. SJA174-75.

Garden City contends that the Court should have placed the burden on Plaintiffs to establish that there was a less discriminatory alternative, as provided in the discriminatory effects rule recently adopted by HUD. 24 C.F.R. § 100.500(c)(3). This contention should be rejected, for at least three reasons.

First, Garden City waived any argument that the burden should have been placed on Plaintiffs. HUD published its final rule in February 2013, months before

the trial and post-trial briefing, but Garden City never cited HUD's regulation and never argued that Plaintiffs have the burden to demonstrate a less discriminatory alternative. On the contrary, Garden City accepted that it had the burden on this issue, and argued in its post-trial brief, quoting *Huntington III*, that "the Village has clearly shown that . . . no alternative would serve [its] interest with less discriminatory effect." Dkt. 408 at 35 (internal citations omitted).

Second, in purporting to assign this burden to the defendants, the District Court was following well-settled Circuit law, established decades ago in *Huntington III*, *see* 844 F.2d at 936, and routinely followed since.

And third, despite citing to *Huntington III*, the District Court actually imposed this burden on *Plaintiffs* and found that Plaintiffs had met this burden by demonstrating that R-M zoning was a less discriminatory alternative that could have achieved any legitimate, non-discriminatory interests Garden City advanced in support of R-T zoning. SJA174-75; JA266, 274, 834. In particular, the District Court found that R-M zoning would have served the Village's purportedly legitimate interests in reducing traffic and providing for the construction of townhomes, while having a less discriminatory harmful effect on the availability of affordable housing. SJA175. Accordingly, the Court concluded: "Plaintiffs have "established, by a preponderance of the evidence, . . . [that] less discriminatory alternatives to the current zoning ordinance existed." SJA175.

Finally, Garden City asserts that the District Court erred in concluding that R-M zoning was a less discriminatory alternative, because, Garden City contends, R-M zoning would not have been as effective as R-T zoning in accomplishing the Village's objectives in reducing traffic or "promoting" townhomes (or reducing schoolchildren, or providing transition). Br.59-60. But as discussed above, the District Court found that R-T zoning did not actually do a better job of any of these things. *See* p. 31, *supra*; SJA174-75. Garden City is again asking the Court to re-weigh the evidence when there is no basis for contending that its findings are clearly erroneous. In addition, the HUD rule that Garden City urges this Court to apply explains that to qualify as a less discriminatory alternative, the alternative need not be "'equally effective,' . . . in serving the . . . defendant's interests." 78 Fed. Reg. 11460, 11473 (Feb. 15, 2013). Rather, the alternative need only "'offer a viable alternative that satisfies [any] legitimate policy objectives while reducing the challenged practice's discriminatory impact.'" *Id.* at 11473 n.125 (quoting *Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.*, 417 F.3d 898, 906 (8th Cir. 2005) (brackets omitted)).

## ARGUMENT:  CROSS-APPEAL AGAINST THE COUNTY

### I. THE DISTRICT COURT ERRED IN HOLDING THAT THE COUNTY BEARS NO RESPONSIBILITY FOR R-T ZONING.

The District Court granted the County's motion for summary judgment because it held, as a matter of law, that Plaintiff "failed to raise any factual issues as to whether the County bears the legally required causal relationship to the complained-of Village zoning action," and that "the County had no legal authority to alter or ignore the Garden City Defendants' zoning decision once enacted." SJA78, 83-84.  The Court erred in dismissing Plaintiffs' claims.  Plaintiffs raised substantial factual issues that could lead to liability for the County after trial.

#### A. The County Knew That Opposition to R-M Zoning Was Racially Animated.

The County repeatedly admitted that it knew exactly what R-T zoning was – a law motivated by opposition to affordable housing based on racial animus – but did not care.  Multiple County officials testified in depositions that racially motivated exclusionary zoning was a systemic problem in the County.  JA2478, 2483-84, 2491; *see also supra* at p. 9 n.4.  County officials also admitted that this systemic problem was present in Garden City.  Suozzi, the County's highest official, testified that "Garden City . . . historically, has been viewed as a community that didn't want to have affordable housing in it."  JA2279.  And he

81

understood that that racism motivated constituents' vocal opposition to affordable housing at the Social Services Site. JA2266.

The County also knew that Garden City officials knowingly responded to this racially-motivated opposition. SJA63-72; JA2292-93. Equally important, the County itself knowingly bowed to the racially-motivated views of Garden City residents when R-M zoning was still under consideration. At the February 2004 public hearing, Suozzi (1) appeased Garden City residents by assuring them that, despite the "great need for affordable housing" in the County, "Garden City is not the location," SJA18, 129; JA1236; (2) promised that Nassau County, as landowner, would covenant to exclude affordable housing at the Site and put in deed restrictions so that any development would be "upscale," SJA18; JA1237-40, 2257-58, 2276; and (3) gave Garden City residents repeated assurances that the County would abide by their wishes with regard to the Site, SJA34; JA2266, 2287. Indeed, Suozzi testified that so long as the County got what it wanted, Garden City residents' racially-motivated opposition to affordable housing "was not my concern as its County Executive." SJA34; JA2287-88.

### B. The County Had Legal Responsibility for R-T Zoning.

Thus, Plaintiffs presented, at a minimum, substantial factual issues regarding the County's knowledge that racial animus was involved in opposition to R-T zoning and whether the County acted with discriminatory intent. The District

82

Court disregarded these factual issues because it concluded that the County nevertheless had no legal responsibility for Garden City's adoption of R-T zoning. In so ruling, the Court erred.

### 1. R-T Zoning Was Only Enacted After Approval by the County's Planning Board.

Pursuant to New York law, the Nassau County Planning Commission was required to review the Village's proposed R-T zoning ordinance before it was enacted, and to "recommend approval, modification, or disapproval, of the proposed action, or report that the proposed action has no significant county-wide or inter-community impact." N.Y. Gen. Mun. Law § 239-m(4)(a) (McKinney 2014).[30] This law does not give the Commission absolute veto power over municipal zoning changes. Rather, it gives the Commission "an advisory veto which the town or village legislative body can override by a vote of a majority plus one of such body's total membership." *We're Assocs. Co. v. Bear*, 317 N.Y.S.2d 59, 60 (2d Dep't 1970).

When Garden City sent the proposed R-T zoning to the Commission for review under Section 239-m, the Commission issued a report approving the zoning, with a few requested modifications. JA1505-07, 2330-39. The Commission did *not* disapprove the zoning law, even though the County *knew* it to

---

[30] The Commission is an administrative agency of the County. *See* Nassau County Charter §§ 1601, 1604.

83

be discriminatory. Nor did the Commission recommend that the more inclusive R-M zoning – which the County itself had previously supported – be substituted for R-T zoning. Quite the contrary: the Commission stated that "the County is in *support* of the direction of many of the proposed amendments (*especially* the opportunity for a new residential use at the . . . property)." JA2330 (emphasis added).

The District Court erred in minimizing the effect of the County's approval, holding that "the lack of outrage by the County . . . does not constitute a violation of law." SJA83. But it is not the lack of outrage that matters – it is that the County's approval was required and granted pursuant to state law, and created a causal nexus between the County and Garden City's approval of R-T zoning.

While it is true that the Village could have enacted R-T zoning over the County's veto with a supermajority vote, there is no way of knowing whether the Village would have done so. Certainly, public disapproval from the County setting forth the basis it knew to be true – that the Village had impermissibly bowed to residents' racially-motivated opposition – would have been a major impediment to enactment of the law. It could easily have galvanized opposition to R-T zoning, increased media focus on what Garden City was doing, embarrassed Garden City officials, and forced them to reconsider their discriminatory actions. The County itself proclaims that "the Planning Commission plays an important role in the

84

review of certain zoning actions." JA2833. The District Court cited no authority (and there is none) for its conclusion that the formal approval of a zoning law by an agency with statutory oversight powers as a matter of law is not a causally significant factor in its passage.

### 2. New York Law Gave the County Authority to Override Discriminatory Zoning.

The District Court also erred in holding that "the County had no legal authority to alter or ignore" Garden City's zoning decision. SJA83-84. On the facts of this case, the County had the legal right, and obligation, to exercise its authority to override local zoning control. New York law grants counties the right to ignore local zoning when necessary to further important public policies, by "balancing" the interests of the county and municipality. *Matter of Monroe Cnty. (City of Rochester)*, 72 N.Y.2d 338, 343-44 (2012) (Monroe County's interest in expansion of airport outweighed city of Rochester's interests in land use regulation). For example, in *Westhab, Inc. v. Village of Elmsford*, 574 N.Y.S.2d 888, 891 (Sup. Ct. Westchester Cnty. 1991), the court, in reliance on *Monroe*, held that Westchester County and its tenant, a non-profit corporation, were exempt from compliance with local building codes where the tenant planned to build a homeless shelter. Moreover, this authority to override local zoning can apply even where a private developer purchases land from the county. *See Crown Commc'n N.Y., Inc.*

*v. Dep't of Transp. of State of N.Y.*, 4 N.Y.3d 159, 164 (2005) (installation of antennae by private communications company on state-owned towers in New Rochelle not subject to application for permit from town, where public benefit from proposed use outweighed town's interest in enforcing zoning laws).

Here, a reasonable trier of fact could easily find that the balancing of these interests tilts strongly in Plaintiffs' favor. The County has a substantial public interest in combating segregation and providing affordable housing. JA1236, 2584. These interests are clearly paramount to any of the interests advanced by Garden City in support of R-T zoning, which the District Court found after trial to be "ill-founded." SJA160. *See Otero*, 484 F.2d at 1134 (emphasizing importance of duty to promote fair housing under Constitution and FHA); *Young v. Pierce*, 544 F. Supp. 1010, 1018 (E.D. Tex. 1982) (same); *Hart v. Cmty. Sch. Bd. of Brooklyn*, 383 F. Supp. 699, 754 (E.D.N.Y. 1974) (duty to desegregate, arising under Constitution and FHA, takes precedence over other local government policies).[31]

Although the District Court was aware of this authority, SJA81-82, the Court held that the County was entitled to sit on its hands and do nothing in the face of what it knew to be discriminatory actions. But, as this Court has explained, "[g]overnment officials, whether city or state, are not permitted to engage in

---

[31]    Indeed, the County asserted, in connection with its 2011 announcement that it intended to build a family courthouse on the Site, that "we have the authority" to do so even though the Site is no longer zoned for public/government use. JA3046.

deliberate conduct or *deliberate omissions* that have the foreseeable effect of perpetuating known segregation, where their acts or omissions are undertaken in response to and in accordance with the segregative wishes of the others that are known to be racially motivated." *United States v. City of Yonkers*, 96 F.3d 600, 617-18 (2d Cir. 1996) ("*Yonkers II*") (emphasis added).

The District Court rejected the argument that the County could have overridden Garden City's zoning, relying on a slippery-slope concern: it was reluctant to hold that a county must "sue a municipality every time a county believes it might be violating the FHA." SJA82. But Plaintiffs have never sought – and this Court need not adopt – so broad a holding. The County need not have sued Garden City. Plaintiffs' point is that the County could have acted in disregard of zoning it knew to be discriminatory. It could also have taken steps to protect any developer who was going to build on the land, for example, by explicitly adopting resolutions overriding Garden City's zoning and providing the developer with contractual guarantees and indemnification. And if Garden City sued either the County or a developer, both would have had a valid defense.

Indeed, the County had a *duty* to take action in the circumstances presented here, where:

- The Village instituted its rezoning process at the *express request* and *for the benefit* of the County, *supra* at p. 10;

87

- The County was *intimately involved* in that process for two years, *supra* at pp.10, 15-16, 20-21;

- The County was the landowner, with absolute control over the potential uses of the property; and

- The County, as a recipient of federal housing funds, had an affirmative obligation to further fair housing pursuant to Section 808 of the FHA, 42 U.S.C. § 3608(e)(5). *See* SJA93-97.

Instead, not only did the County not take action to oppose Garden City's discrimination, it affirmatively took steps to support it, promising to use deed restrictions to prevent "anything but upscale housing" from being built on the Site, JA1237, and enthusiastically approving Garden City's discriminatory zoning, JA2330. The District Court agreed that Section 808 of the FHA imposed on the County an affirmative duty to further fair housing, even if that duty did not give rise to a private right of action. SJA93-97. But in the circumstances presented here, that affirmative obligation is analogous to the duty to desegregate schools imposed by state law at issue in *Yonkers II*, where the Court held that inaction by the State in the face of "citizen opposition … motivated by racial animus" created at least an inference of intentional discrimination. 96 F.3d at 618. Just so here: where the County was fully aware of Garden City residents' racial animus and chose to turn a blind eye, a rational finder of fact could easily find that Nassau

88

County shared liability with the Village under the FHA, on both disparate treatment and disparate impact theories.

## II. THE COUNTY'S ADMITTED POLICY OF DIRECTING AFFORDABLE HOUSING TOWARD MINORITY COMMUNITIES WAS AN ADDITIONAL BASIS FOR LIABILITY.

The District Court also erred in overlooking Plaintiffs' claims based on the County's admitted policy of siting affordable housing in low-income, majority-minority communities. The Court discussed the facts relating to this issue in detail in its summary judgment opinion, SJA39-42, but apparently considered these allegations relevant only to Plaintiffs' claim under Section 808(e) of the FHA, 42 U.S.C. § 3608(e), that the County had violated its obligation to "affirmatively further fair housing." *See* SJA101 (holding that, since there is no private right of action under Section 808(e), Court "need not address" whether County fulfilled its obligations in the administration of federal funds). The Court failed to recognize that these factual allegations were *also* relevant to Plaintiffs' claims under Section 804(a) of the FHA, 42 U.S.C. § 3604(a), and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d.

It is undisputed that the County has an explicit policy of steering affordable housing to low-income, majority-minority communities. The County described this policy in documents it submitted to HUD: four strategic plans prepared by the County between 1995 and 2010 unambiguously state that "Nassau County

89

currently targets its comprehensive community development efforts in . . . lower income and minority areas such as Roosevelt, Inwood, Hempstead Village, New Cassel and Freeport."  JA2575, 2616, 2651, 2854.  Indeed, the County boasted about this policy:  "[f]or three decades, Nassau County has provided HOME funds to local governments and non-profits to acquire sites *exclusively* in low and moderate-income census tracts."  JA2598 (emphasis added).

The County's record in housing development is consistent with this policy. As Plaintiff's expert showed, the County's records reveal a stark difference in the location of County-subsidized affordable housing aimed at families and first-time buyers (usually racial minorities) – which is steered to majority-minority communities – versus housing for seniors (usually whites) – which is placed in majority-white communities.  JA2761-62 (52% of family housing located in high-minority communities, while two-thirds of senior housing located in low-minority communities).  And the County's actions with respect to the Social Services Site display this policy in action.  At the February 2004 public hearing, Suozzi conceded that the County had "a great need for affordable housing," only to immediately state that Garden City, which is 97% white, "is not the location" for it. JA1236.

The impact of this policy on segregation in Nassau County is clear.  As of 2006, the County claimed to have been involved in the construction or

90

rehabilitation of 1,565 units of affordable housing. But *all* of the units designated as "new construction" were located in municipalities where the percentage of minority residents was more than twice the County average, and almost two-thirds of the rehabilitated units were located in such municipalities. JA2735, 2763. In light of this policy, it is no wonder that Nassau County is one of the most segregated counties in the country. SJA19; JA2749, 2751-52, 2754-60.

The District Court erred failing to consider these facts when it addressed the County's liability under Section 804(a). The Court erroneously assumed that Plaintiffs' claims against the County under Section 804(a) were limited to its responsibility for R-T zoning. *See* SJA78 ("the alleged discriminatory act at issue in this case is the rejection of the R-M designation in favor of the R-T designation"). But Plaintiffs' allegations against the County under Section 804(a) were far broader.

The District Court thus erred in granting summary judgment to the County on Plaintiffs' Section 804(a) claims for this additional reason. In light of the undisputed facts set out above, a reasonable finder of fact could have determined that the County's steering policy – planned and executed with full knowledge that it would perpetuate segregation – constituted an additional basis for liability under Section 804(a). *See Yonkers I*, 837 F.2d at 1218-19; *Okaloosa Cnty.*, 21 F.3d at 1542 n.17 (Section 804(a) applies broadly "to practices that affect the housing

91

market for minorities," including municipal decisions concerning siting of subsidized housing in majority-minority neighborhoods). And a reasonable finder of fact could also determine that the County's steering policy had a disparate impact on minorities and reinforced the extreme pattern of segregation within the County. *See United States ex rel. Anti-Discrimination Ctr. of Metro. N.Y., Inc. v. Westchester Cnty.*, 668 F. Supp. 2d 548, 564-65 (S.D.N.Y. 2009) ("providing more affordable housing for a low income racial minority will improve [a county's] housing stock but may do little to change any pattern of discrimination or segregation. Addressing that pattern would at a minimum necessitate an analysis of where the additional housing is placed").

The District Court also erred in dismissing Plaintiffs claims under Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, without considering these allegations.[32] In dismissing Plaintiffs' Title VI claims, the Court held that the County "cannot be held liable under Section 2000d because "no genuine issues of material fact exist as to whether the County acted with discriminatory intent in selling the Social Services Site to the highest bidder." SJA106.

---

[32]    42 U.S.C. §2000d provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

92

This was error, because Plaintiffs' Title VI claims also challenged the County's policy of intentionally siting affordable housing in minority communities.[33] As an initial matter, there is no question that the County's housing and development activities are subject to Title VI. Title VI prohibits discrimination by "any program or activity receiving Federal financial assistance," 42 U.S.C. § 2000d, and it is undisputed that the County routinely receives federal housing funds from HUD for community development and housing purposes, including the development of affordable housing. SJA39.

In light of the undisputed facts, a reasonable finder of fact could have determined that the County's intentional policy of steering affordable housing to minority communicates, with full knowledge that its actions would perpetuate racial segregation, was a violation of 42 U.S.C. §2000d. *See Hills v. Gautreaux*, 425 U.S. 284, 296 (1976) (noting HUD did not dispute that it violated Title VI by "knowingly funding [a] racially discriminatory family public housing program"); *see also Gautreaux*, 448 F.2d 731 (same); *Blackshear Residents Org. v. Hous. Auth. of City of Austin*, 347 F. Supp. 1138, 1145-46 (W.D. Tex. 1971) (same); *Hicks v. Weaver*, 302 F. Supp. 619, 632 (E.D. La. 1969) (defendant violated Title

---

[33] As the District Court noted, Section 2000d does not permit claims for disparate impact. SJA106. Plaintiffs' Section 2000d claims are thus based solely on intentional discrimination by the County.

VI by giving primary consideration to racial concentration of neighborhoods in deciding where to locate public housing).

## CONCLUSION

For these reasons, the Court should (1) affirm the District Court's Final Judgment against Garden City, and (2) reverse and vacate the Final Judgment and Summary Judgment Order dismissing the County, and remand for trial.

October 28, 2014
New York, New York

Respectfully submitted,

/s/ Ira M. Feinberg

Joseph D. Rich
LAWYERS' COMMITTEE FOR
CIVIL RIGHTS UNDER LAW
1401 New York Avenue, NW,
Suite 400
Washington, D.C. 20005
(202) 662-8600

Ira M. Feinberg
Stanley J. Brown
Benjamin A. Fleming
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
(212) 918-3000

Frederick K. Brewington
LAW OFFICES OF FREDERICK K.
BREWINGTON
556 Peninsula Blvd.
Hempstead, New York 11550
(516) 489-6959
*Counsel for Plaintiff-Appellee-*
*Cross-Appellant MHANY*
*Management Inc. and Intervenor-*
*Plaintiff-Appellee-Cross-Appellant*
*New York Communities*
*for Change, Inc.*

Chava Brandriss
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600

*Counsel for Plaintiff-Appellee-Cross-*
*Appellant MHANY Management Inc.*

94

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 32(a)(7)(C) and 28.1(e)(3), I certify that:

1.      Pursuant to the Court's order dated October 20, 2014, Plaintiffs were granted leave to file a response brief and principal brief on cross-appeal of no more than 21,500 words.  This brief complies with the Court's order, because it contains 21,210 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point Times New Roman typeface, a proportionally spaced typeface, using Microsoft Word 2010.

October 28, 2014
New York, New York

/s/ Ira M. Feinberg